Laura K. Granier, Esq. (NSB 7357)
laura.granier@dgslaw.com
DAVIS GRAHAM & STUBBS LLP
50 W. Liberty Street, Suite 950
Reno, Nevada 89501
(775) 229-4219 (Telephone)
(775) 403-2187 (Fax)

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| WESTERN EXPLORATION LLC, ELKO COUNTY, NEVADA, EUREKA COUNTY, NEVADA, QUANTUM MINERALS LLC,<br><br>                    Plaintiffs,<br><br>v.<br><br>U.S. DEPARTMENT OF THE INTERIOR, SALLY JEWELL, in her official capacity as Secretary, BUREAU OF LAND MANAGEMENT, a part of the U.S. Department of the Interior, NEIL KORNZE, in his official capacity as Director of the Bureau of Land Management, U.S. Department of the Interior, AMY LUEDERS, in her official capacity as Nevada State Director of the Bureau of Land Management, THE DEPARTMENT OF AGRICULTURE, TOM VILSACK, in his official capacity as Secretary, U.S. FOREST SERVICE, a part of the Department of Agriculture, THOMAS L. TIDWELL, in his official capacity as Chief, U.S. Forest Service, BILL DUNKLEBERGER, in his official capacity as Humboldt-Toiyabe National Forest Supervisor,<br><br>                    Defendants. | Case No.  3:15-cv-00491-HDM-VPC<br><br>**PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**<br><br>**EXPEDITED TREATMENT REQUESTED**<br><br>**ORAL ARGUMENT REQUESTED** |

DAVIS GRAHAM &
STUBBS LLP
ATTORNEYS AT LAW
50 W.  LIBERTY ST., STE. 950
RENO, NEVADA 89501
(775) 229-4219

Plaintiffs respectfully move this Court, pursuant to Fed. R. Civ. P. 65, for a preliminary injunction:

1.     Enjoining and restraining Defendants U.S. Department of Interior, Sally Jewell, in her official capacity as Secretary; Neil Kornze, in his official capacity as Director of the Bureau of Land Management, Amy Lueders, in her official capacity as Acting Nevada State Director of the Bureau of Land Management; the Department of Agriculture, Tom Vilsack, in his official capacity as Secretary; U.S. Forest Service, Thomas L. Tidwell, in his official capacity as Chief, U.S. Forest Service; Bill Dunkleberger, in his official capacity as Humboldt-Toiyabe National Forest Supervisor; U.S. Bureau of Land Management ("BLM"), and the U.S. Forest Service ("USFS") (together, "the agencies") and their agents, employees, affiliates and all those acting in concert with them, from implementing the NV Challenged Restrictions (as defined in the attached Memorandum);

2.     Enjoining Defendants from taking any action to prevent continued access to lands currently open for mineral entry in Nevada within the areas subject to the NVLLMP or otherwise prohibiting multiple-use of such lands; and,

3.     Directing Defendants Secretary Jewell and Secretary Vilsack to instruct all federal, state and local officials and employees responsible for any actions to implement the NVLMP that the NV Challenged Restrictions shall not be applied unless or until this Court orders otherwise.

Plaintiffs base their request on the Memorandum of Points and Authorities, and Declarations and exhibits filed herewith.

Plaintiffs respectfully request that this Court set an expedited briefing schedule and consider this motion at its earliest opportunity, so that this matter may be resolved prior to any

DAVIS GRAHAM &
STUBBS LLP
ATTORNEYS AT LAW
50 W. LIBERTY ST., STE. 950
RENO, NEVADA 89501
(775) 229-4219

irreparable harm occurring to the environment, Elko and Eureka Counties and to Plaintiffs Quantum Minerals LLC or Western Exploration LLC, both of which have their entire business at stake facing imminent irreparable harm.

Respectfully submitted this 28th day of September, 2015.

DAVIS GRAHAM & STUBBS LLP

By:  /s/ Laura K. Granier
Laura K. Granier (NSB 7357)
50 W. Liberty Street, Suite 950
Reno, Nevada 89501
*Attorneys for Plaintiffs*

## MEMORANDUM OF POINTS AND AUTHORITIES

### INTRODUCTION

Defendants are attempting a massive management change for over 20.4 million acres of land in our state, through the Nevada portion of land management plans finalized in September 2015 by the U.S. Bureau of Land Management ("BLM")[1] and the U.S. Forest Service ("USFS")[2] (collectively, the "agencies"), without the "hard look" the National Environmental Policy Act ("NEPA") requires and in violation of the Federal Land Policy and Management Act ("FLMPA"). These plans include conservation measures for the Greater Sage-grouse ("GSG") that impose land use restrictions and prohibitions on use of public and National Forest System lands that violate statutory multiple use and sustained yield mandates which require BLM and USFS to achieve balance among competing land uses. The agencies' failure to comply with these statutory mandates and disregard for other federal laws including the National Forest

---

[1] Record of Decision ("ROD") and Approved Resource Management Plan Amendments for the Great Basin Region, Including the Greater Sage-Grouse Sub-Regions of Idaho and SW Montana, Nevada and Northeastern California, Oregon, Utah, September 21, 2015.

[2] ROD for Idaho and SW Montana, Nevada, and Utah, Land Management Plan Amendments, September 16, 2015.

DAVIS GRAHAM &
STUBBS LLP
ATTORNEYS AT LAW
50 W. LIBERTY ST., STE. 950
RENO, NEVADA 89501
(775) 229-4219

Management Act ("NFMA") and the General Mining Law will result in imminent irreparable harm to Plaintiffs.

The inconsistencies in the Nevada portion of the BLM's and USFS' land management plans ("NVLMP") and State and local land use plans interfere with local police powers to protect the public health and safety that require maintaining road access in rural Nevada.  The NVLMP restrictions reduce grazing and interfere with important provisions in Elko and Eureka Counties' plans to use managed grazing to reduce rangeland fuel loads and decrease the risk of wildfire (the primary threat to GSG habitat).  The grazing restrictions will result in an annual loss to Elko County of $31 million of agricultural productivity and the wind energy restrictions will cost the county over $500 million.  Livestock grazing restrictions will cost Eureka County $7 to $15 million annually.  The Counties also will be harmed by the NVLMP's interference with travel restrictions that interfere with access to ranching operations and lands where many of Nevada's most important mineral deposits and gold trends are located (in violation of the Mining Law).

The NVLMP prohibits mineral exploration, mining, wind and solar energy development, and oil and gas development on 2.8 million acres[3] of land identified as Sagebrush Focal Areas ("SFA") where other land uses including livestock grazing will be severely restricted. The SFA violates FLPMA and NFMA multiple use principles, federal mandates to manage public and National Forest System lands to provide a source of domestic minerals, and the Mining Law. The SFA restrictions cause Plaintiffs severe harm by prohibiting exploration and development on lands designated for withdrawal.  This proposed withdrawal includes lands that are not GSG habitat because it is based on facially erroneous data, identifying areas of non-habitat as critical GSG habitat.  This will dramatically reduce future discoveries of valuable mineral deposits that can ultimately become mines, stifle job creation, impede the entire State's economic recovery

---

[3] The NVLMP identified 2.8 million acres of land for withdrawal, but the Segregation Notice published in the Federal Register on September 24, 2015 to initiate the withdrawal process for these lands identified 4.4 million acres for proposed withdrawal.  **Ex. 4**, Liebler Dec.

DAVIS GRAHAM &
STUBBS LLP
ATTORNEYS AT LAW
50 W. LIBERTY ST., STE. 950
RENO, NEVADA 89501
(775) 229-4219

1    and interfere with our Nation's need for mineral resources.  The NVLMP restrictions already are

2    chilling investment in Plaintiffs' and other mineral projects in Nevada.

3        The SFA withdrawal of 2.8 million acres from mineral entry will deprive Plaintiffs

4    Western Exploration LLC ("Western") and Quantum Minerals LLC, ("Quantum") of their rights

5    under the Mining Law and put these small companies out of business.  An injunction would

6    benefit the public far more than the NVLMP's implementation because it will ensure the

7    agencies do not violate their statutory mandates, or make decisions based on faulty data, and will

8    avoid destruction of small businesses and the environmental harm the NVLMP will cause.

9                            **SUMMARY OF RELEVANT FACTS**

10       Elko and Eureka Counties were cooperating agencies for the Nevada and Northeastern

11   California Greater Sage-Grouse Environmental Impact Statement/Land Use Plan Amendment

12   ("EIS"/"LUPA") and commented on the 2013 Draft EIS ("DEIS"), the 2015 Administrative Draft

13   of the Final Impact Statement ("FEIS"), and the 2015 FEIS/Proposed LUPA. The Counties

14   submitted 43 C.F.R. § 1610.3-2 Protest Letters that identified examples where BLM and USFS

15   ("the agencies") failed to address inconsistencies between local and state conservation and land

16   use plans and the Proposed LUPA.  **Ex. 1**, Dahl Dec. ¶4; **Ex. 2**, Goicoechea ("JJG") Decl. ¶11.

17       The County Plans provide for multiple-use and habitat conservation as compatible land

18   use objectives incorporating the local ranching communities' decades of land stewardship

19   expertise and first-hand experience with livestock grazing procedures that reduce rangeland fuel

20   loads and the risk of wildfires, which are the key threat to GSG habitat. The multiple-use

21   approach in the Counties' Plans is superior to the NVLMP, which imposes land use prohibitions

22   and restrictions that violate FLPMA and NFMA multiple-use and sustained yield mandates, does

23   not effectively address wildfire, and interferes with the Counties' Plans.  Ex. 1, Dahl Dec.; Ex. 2,

24   JJG Decl.

25       Western's and Quantum's mineral exploration projects are authorized by USFS and now,

26   within the SFA that the NVLMP stipulates should be withdrawn from operation of the Mining

27

28

DAVIS GRAHAM &
STUBBS LLP
ATTORNEYS AT LAW
50 W.  LIBERTY ST., STE. 950
RENO, NEVADA 89501
(775) 229-4219

5

Law. The September 24, 2015 Segregation Notice to start the withdrawal process has harmed both companies. The threat of withdrawal of these lands will eliminate each company's key asset and destroy their businesses.  **Ex. 6**, Cleary Dec. ¶11, 14; **Ex. 3**, Gustin Dec. ¶18.

The 2014 Nevada Greater Sage-grouse Conservation Plan ("Nevada Plan"), developed by the Sagebrush Ecosystem Program (SEP), balances multiple land uses and protection of GSG habitat. Like the Counties' Plans, the Nevada Plan emphasizes the scientifically sound use of properly managed livestock grazing as an effective rangeland fire reduction tool and conservation measure. The FEIS evaluated the Nevada Plan but did not select it – despite the Nevada Plan's superiority because it is consistent with FLPMA and covers all lands in the state compared to the NVLMP, which only applies to BLM- and USFS-administered lands. The State submitted a Protest Letter and Governor's Consistency Review Letter and Appeal that detailed the many ways the Proposed LUPA was inconsistent with the State and local plans and will cause imminent harm.  BLM summarily dismissed this input and denied the Governor's appeal.

## ARGUMENT

A court should issue a preliminary injunction where, as here, plaintiffs can demonstrate: [1] a likelihood of success on the merits, [2] that they will suffer irreparable harm absent preliminary relief, [3] that the balance of equities tips in their favor, and [4] that an injunction is in the public interest. *Winter v. Natural Res. Del Council,* 555 U.S. 7, 20 (2008).  A stronger showing of one element may offset a weaker showing of another: a stronger showing of irreparable harm might offset a lesser showing of likelihood of success on the merits. *Alliance for Wild Rockies v. Cottrell,* 632 F.3d 1127, 1131 (9th Cir. 2011).  Even in cases where a plaintiff has not shown a "likelihood" of success on the merits, injunctive relief should issue if "serious questions" are raised on the merits, and the balance of hardships tips in [his] favor. *Id.*

## I.    DEFENDANTS' CONDUCT IS UNLAWFUL

Plaintiffs must show a likelihood of success or a "substantial question" as to the merits concerning only one of their claims to obtain a preliminary injunction. *N.Y. Pathological & X-*

DAVIS GRAHAM &
STUBBS LLP
ATTORNEYS AT LAW
50 W.  LIBERTY ST., STE. 950
RENO, NEVADA 89501
(775) 229-4219

*Ray Labs., Inc. v. INS,* 523 F.2d 79, 82 (2d Cir. 1975); *United Healthcare Ins. Co. v. AdvancePCS,* 316 F.3d 737, 743 (8th Cir. 2002). Plaintiffs demonstrate a strong likelihood of success on the merits in numerous respects.

**A.   Defendants Have Violated FLPMA & NFMA**

    *1.   Defendants violated FLPMA Section 202(c)(9) consistency requirements*

Defendants violated Section 202(c)(9) of FLPMA, 43 U.S.C. § 1712(c)(9), and 43 C.F.R. § 1601.4, which require that in revising land use plans, the Secretary of the Interior ("Secretary") must coordinate with state and local governments and "assure that consideration is given" to state and local plans "that are germane to the development of land use plans for public lands" and "provide for meaningful public involvement of State and local government officials…."[4] FLPMA recognizes state and local governments have expertise in and sovereign powers over land use planning, and *requires* the Secretary develop land use plans that "are consistent with State and local plans to the maximum extent" such plans are "consistent with Federal law and the purposes of [the] Act." *See* 43 U.S.C. § 1712(c)(9). FLPMA honors fundamental federalism principles allowing states to develop unique solutions and engage in cooperative efforts with local governments to solve state-specific problems. Executive Order 13232, Aug. 4, 1999, 64 Fed. Reg. 43255. The BLM made no real attempt to reconcile inconsistencies between the NVLMP and the state and local plans in violation of FLPMA § 202(c)(9) and EO 13232.

Under 43 C.F.R. § 1601.4-2(c) and (d), the Counties and the State notified BLM of significant inconsistencies between their plans and the Proposed LUPA. Ex. 1, Dahl Dec. ¶4; Ex. 2, JJG Dec. ¶12. BLM was required to address and resolve these inconsistencies to the maximum extent possible. This statutory directive obligates BLM to explain why resolution of the inconsistencies is not possible. BLM ignored the inconsistences violating 43 U.S.C. § 1712(c)(9) and 43 C.F.R. § 1601.4. *American Motorcyclist v. Watt*, 534 F. Supp. 923 (1981).

---

[4] State officials may furnish the Secretary advice regarding the development and revision of land use plans, land use guidelines, rules, and regulations for the public lands. 43 U.S.C. § 1712(c)(9).

DAVIS GRAHAM &
STUBBS LLP
ATTORNEYS AT LAW
50 W. LIBERTY ST., STE. 950
RENO, NEVADA 89501
(775) 229-4219

BLM failed to cooperate or coordinate with the State and local governments and to analyze whether the State and local plans, policies, and proposals will benefit and conserve GRSG. Instead, BLM improperly substituted top down "one-size-fits-all" national policy for plans developed by experienced state and local agencies. The NVLMP land use restrictions are inconsistent with the County and the State plans which are based on multiple use and promote GSG conservation while not interfering with ranching, mining, recreation and other uses important to the Counties' economic health. Ex. 1, Dahl Dec. ¶11,14; Ex. 2, JJG Dec. ¶27. The resulting inconsistencies between the Counties' Plans and the NVLMP violate FLPMA and NFMA.

The FEIS treated the Elko Plan as an alternative eliminated from detailed consideration asserting that it was inconsistent with the agencies' GSG objectives and federal law. Yet, in violation of FLPMA, the agencies failed to identify any inconsistencies in the Elko Plan with federal law. The Elko Plan is more consistent with FLPMA's multiple-use mandate and the U.S. Fish and Wildlife Service's ("FWS") 2013 GSG Conservation Objectives: Final Report ("COT Report")[5], than the NVLMP and presents conservation strategies including managed livestock grazing, noxious weed control, fire management, predation control and pinyon-juniper removal based on the best available science superior to those presented in the NVLMP. Similarly, the BLM's response to the State's consistency review did not identify inconsistencies between the Nevada Plan and federal law, but instead cited to "policies, strategies and goals" none of which are a basis under FLPMA for refusing to resolve inconsistencies between the state and local plans and the LUPA. In response to the State, BLM cited its GSG Strategy, its Special Status Species Policy (Manual 6840), and "its goal to provide regulatory certainty for the conservation of GSG and its habitat." BLM Response Letter at 3. However, this unlawfully ignores that the

_____

[5] The COT Report recognizes fire and invasive grass species as a primary threat to GSG habitat and defers to local plans that already provide an effective strategy for fire -- specific strategies or actions necessary to achieve "conservation objectives *must be developed and implemented at the state or local level, with the involvement of all stakeholders.*"  COT Report at 52, 38, 41.

DAVIS GRAHAM &
STUBBS LLP
ATTORNEYS AT LAW
50 W. LIBERTY ST., STE. 950
RENO, NEVADA 89501
(775) 229-4219

1   state and local plans *are* consistent with FLPMA and other Federal laws and do achieve
2   conservation using measures based on local expertise that the COT Report endorsed.

3       BLM did not respond to the Counties' comments that the LUPA doesn't follow their
4   local plans or Nevada guidance; that water rights and non-adjudicated road jurisdictional issues
5   are left in limbo; that managed grazing can improve GSG habitat and reduce fire risks, or that
6   BLM didn't use best available science (*e.g.*, assumptions based on "no data" or "lacking data"
7   are not best available science).  Ex. 1, Dahl Dec. ¶24, 23, 5; Ex. 2, JJG Dec. ¶27, 17, 15.
8   Similarly, the FEIS/Proposed LUPA did not evaluate how the Nevada Plan is inconsistent with
9   federal law; or demonstrate that the Proposed LUPA will result in superior GSG habitat
10  conservation compared to the Nevada Plan. Without meaningful consideration of the Nevada and
11  Counties' Plans, the agencies' selection of the LUPA violates FLPMA's consistency mandate.[6]

12          *2.    Defendants have ignored their multiple-use & sustained yield mandates*

13      FLPMA requires BLM manage public lands for multiple-use in a manner that recognizes
14  the nation's need for domestic sources of minerals.  43 U.S.C. § 1701(a)(12).  "Multiple use"
15  means "management of the public lands and their various resource values so that they are
16  utilized in the combination that will *best meet the present and future needs of the American*
17  *people*" providing a "combination of *balanced and diverse resource uses*." and with
18  consideration "to the relative values of the resources."  43 U.S.C. § 1702(c). The NVLMP
19  ignores the "present and future needs of the American people" and fails to provide for "balanced
20  and diverse resource uses."   BLM provided inadequate analysis of "the relative values of the
21  resources" and, instead, selected GSG habitat conservation measures based on faulty science and
22  without consideration of viable alternatives that would balance diverse resources.

23      NFMA requires the USFS to manage National Forest System lands consistent with the
24  Multiple Use and Sustained Yield Act, 16 U.S.C. § 528, to "achieve integrated consideration of

---

[6] The State's Protest and Consistency Review Letters detailed numerous inconsistencies between the LUPA and the state and local plans, and best available science that BLM ignored.

DAVIS GRAHAM &
STUBBS LLP.
ATTORNEYS AT LAW
50 W.  LIBERTY ST., STE. 950
RENO, NEVADA 89501
(775) 229-4219

physical, biological, economic, and other sciences," 16 U.S.C. § 1604(b), to consider **both environmental and economic goals,** 16 U.S.C. § 1604(g); 36 C.F.R. § 219.1(a), **while taking into account the Nation's needs for minerals,** 16 U.S.C. § 528. The SFA withdrawal zones and travel restrictions in the NVLMP violate this multiple-use mandate based on faulty science and without meaningful consideration of economic goals or the Nation's need for minerals.

The agencies' Preferred Alternative (Alternative D) in the DEIS did not include the SFA withdrawal zones instead emphasizing "***balancing resources and resource use among competing human interests, land uses, and the conservation of natural and cultural resource values*** . . .." The agencies selected Alternative D to comply with NEPA and the agencies' multiple use mandates: "Formulated by the planning team, the preferred alternative represents those goals, objectives, and actions determined to be most effective at resolving planning issues and balancing resource use." The DEIS selected the Preferred Alternative because it satisfied the purpose and need, the agencies' multiple-use mission, interdisciplinary team recommendations, and environmental consequences analysis of the alternative. (DEIS, 2-24). Inexplicably, the FEIS abandoned the Preferred Alternative's multiple-use approach.

The local and State plans provide science-based and locally proven conservation methods for GSG habitat while at the same time incorporating multiple-use mandates. Rather than considering the local and State plans' combined effectiveness, the agencies ignored the local plans and gave the State Plan inadequate consideration. Ex. 1, Dahl Dec. ¶13; Ex. 2, JJG Dec. ¶12. The NVLMP's proposed withdrawal of 2.8 million acres of land, onerous travel restrictions on 16 million acres, and restrictions on grazing do not balance multiple uses. The DEIS Preferred Alternative provided for "no unmitigated loss" and included a suite of actions to offset or restore disturbance to GSG habitat including off-site mitigation and restoration in advance of disturbance. DEIS at 2.4.4. Without explanation, the FEIS drastically changed this multiple-use approach and instead proposed to withdraw 2.8 million acres, restrict access to another 16 million acres, and replace "no unmitigated loss" with a requirement for "net conservation gain."

DAVIS GRAHAM &
STUBBS LLP
ATTORNEYS AT LAW
50 W. LIBERTY ST., STE. 950
RENO, NEVADA 89501
(775) 229-4219

The NVLMP violates multiple-use mandates without any explanation as to why established multiple uses must be prohibited or severely restricted in favor of GSG conservation on millions of acres when State and local plans provide for multiple-use and focus on reducing the key threats to GSG habitat - wildfire and the infestations of highly flammable non-native grasses. The NVLMP interferes with local planning, police powers, and the Counties' wildfire reduction programs, resulting in harm to the Plaintiffs Elko and Eureka Counties and to the environment.[7] Ex. 1, Dahl Decl. ¶ 2, 13, 23, 24; Ex. 2, JJG Decl. at ¶ 6, 13, 17, 22.

### 3.   Failure to Provide the Counties Meaningful Involvement Per FLPMA 202(c)(9)

BLM failed to provide the Counties with meaningful involvement as required by FLPMA 202(c)(9). "BLM State Directors and District Managers are required to keep apprised of state and local plans, to assure that consideration is given to them and to assist in resolving inconsistencies between BLM plans and such plans to the extent practical." *American Motorcycle Ass'n v. Watt, 534 F. Supp.* 923, 936 (C.D. Cal. 1981). Where an agency has not followed consistency review procedures, which include failure to present "adequate evidence of their response" to the County's "list of inconsistencies," violations of 202(c)(9) are ripe for consideration. The Counties identified inconsistencies with the Proposed LUPA and their local plans that interfere with county roads needed for emergency vehicles, access to ranching operations on public and private lands and to some of the best exploration terrain in the world; county noxious weed control programs; livestock grazing programs to conserve habitat; pinyon-

---

[7] In addition, BLM failed to respond to Eureka County's comments that the LUPA/FEIS fails to analyze long and short-term benefits to the County's residents as required by FLPMA. The discussions are too broad to be meaningful, and the agencies rely on the Impact Analysis for Planning Model to demonstrate that they considered such impacts. A model is only as good as its inputs. For example, Eureka County provided county-specific economic data that were not used. Ex. 2, JJG Dec. Similarly, readily available information about Nevada's mineral resources and mining employment numbers in the mining industries were not included or analyzed in the LUPA/FEIS, calling the accuracy of the model inputs into question. The model inputs were not based on known factors. Therefore, the agencies' explanation of long-term and short-term benefits in Eureka, Elko, and the State are inaccurate in violation of FLPMA 202(c)(7).

DAVIS GRAHAM & STUBBS LLP
ATTORNEYS AT LAW
50 W. LIBERTY ST., STE. 950
RENO, NEVADA 89501
(775) 229-4219

11

1    juniper removal programs; and collaborative public-private GSG conservation efforts.  Ex. 1,

2    Dahl Dec.; Ex. 2, JJG Dec.  Because BLM does not discuss or otherwise adequately comment on

3    those inconsistencies, BLM has failed to meaningfully coordinate with the Counties.

4       While FLPMA permits an agency's final decision to be inconsistent with state or local

5    plans to the extent such plans are inconsistent with Federal law, the local plans here are more

6    consistent with Federal law than the NVLMP.  FLPMA does not allow BLM to ignore comments

7    from local and state governments.  The resulting NVLMP creates severe economic hardships to

8    Plaintiffs Elko and Eureka Counties and environmental harm due to the livestock grazing

9    restrictions that will lead to increased risks of future wildfires that will destroy GSG habitat.

10   **B.**   **Defendants Have Violated NEPA**

11       ***1.***   ***Failure to prepare a Supplemental EIS***

12      Defendants violated NEPA by failing to prepare a Supplemental EIS ("SEIS") given that

13   the final action incorporates at least three new federal actions not analyzed in the DEIS:

14   (1) designation of 2.8 million acres of SFA; (2) imposition of uniform lek buffers across all

15   habitat zones based on a post-DEIS USGS study; and (3) mandating a new and undefined "net

16   conservation gain" mitigation standard based on a post-DEIS FWS Mitigation Framework. When

17   an agency makes substantial changes in the proposed action that are "significant new

18   circumstances or information relevant to environmental concerns and bearing on the proposed

19   action or its impacts" NEPA requires the agencies supplement the EIS.  40 C.F.R. § 1502.9(c).

20   The Proposed LUPA in the FEIS differed dramatically from the Preferred Alternative in the

21   DEIS because it introduced for the first time the SFA, described in the FEIS as a "new concept"

22   (FEIS at 1-1), which precluded "meaningful consideration" by the public and required

23   circulation of an SEIS.  *State of Cal. v. Block*, 690 F.2d 753 (9th Cir. 1982).

24      Public comment procedures are "at the heart" of the NEPA process and require

25   responsible opposing viewpoints be disclosed reflecting the "paramount Congressional desire to

26   internalize opposing viewpoints into the decision-making process." 40 C.F.R. § 1502.14.  The

27

28

DAVIS GRAHAM &
STUBBS LLP
ATTORNEYS AT LAW
50 W. LIBERTY ST., STE. 950
RENO, NEVADA 89501
(775) 229-4219

12

public had no opportunity to comment on the SFA or the net conservation gain paradigm, or to evaluate any data supporting the SFA or why "net conservation gain" should replace "no unmitigated loss" and the suite of actions to offset or restore disturbance in the DEIS.  DEIS at 2.4.4.

NEPA requires meaningful public participation in the evaluation process.  Failure to include significant elements of the NVLMP, such as the SFA, disturbance caps and lek buffers in the DEIS defeats this aim and has resulted in NVLMP restrictions radically different from the DEIS Preferred Alternative.  By failing to disclose such substantial requirements until the FEIS, after opportunity for NEPA comment had passed, the agencies insulated their decision-making process from public scrutiny rendering NEPA's procedures meaningless.  *Id.*; *Florida Power & Light Co. v. United States*, 846 F.2d 765, 771 (D.C. Cir. 1988) (agencies must give adequate time and "must provide sufficient factual detail and rationale" to permit interested parties to comment meaningfully.)  Supplementation is required where modifications to a proposed action "alter the overall cost-benefit analysis of the proposed action."  *Russell County Sportsmen v. USFS*, 668 F.3d 1037, 1048 (9th Cir. 2011).  The NVLMP restrictions impose millions of dollars of costs on the Counties, and threaten destruction of Quantum and Western and other small mining and ranching businesses.  Ex. 1 ¶20, 31; Ex. 2 ¶8; Ex. 6 ¶10, 14; Ex. 3 ¶16; **Ex. 5 ¶¶13-17**.  These impacts were not disclosed in the DEIS or the FEIS or responded to in the RODs or the Protest Resolution Report ("Protest Report").[8]  The agencies ignored their requirement to compare the potential benefits of the proposed conservation against the economic impacts of prohibiting development and putting lands with some of the greatest mineral potential off limits.  *See, e.g., Block*, 690 F.2d at 767.

---

[8] Excerpts of the Protest Report are attached as **Ex. 10**, and the complete report is available at: http://www.blm.gov/style/medialib/blm/wo/Planning_and_Renewable_Resources/nevada. Par.2809.File.pdf/Nevada-Northeastern_California_GRSG_LUPA_Protest_Report_%28 September_15_2015%29.pdf.

DAVIS GRAHAM & STUBBS LLP
ATTORNEYS AT LAW
50 W.  LIBERTY ST., STE. 950
RENO, NEVADA 89501
(775) 229-4219

BLM did not adequately address Plaintiffs' protests raising the agencies' failure to provide an SEIS. The FEIS includes substantially new information including revised habitat delineations and SFAs, new disturbance caps, and new lek buffers. These significant changes are not "a minor variation of the Preferred Alternative." In their Protest Report the agencies mischaracterize these changes saying "impacts of the Proposed LUPA would not affect the human environment in a substantial manner or to a significant extent not already considered in the [D]EIS." Protest Report at 105. To the contrary, the significant impacts of withdrawing 2.8 million acres affect parties, such as Quantum, Western, and the Counties in radically different ways that were not analyzed in the DEIS. Statements in the FEIS and Protest Report that most mineral deposits and new exploration mainly occur around active mines is erroneous. Mineral exploration often re-examines previously mined areas such as Quantum's exploration at Jarbidge. Ex. 3 ¶3. Western's discovery of Gravel Creek is estimated to be a $3 billion project located within the SFA and is not near an active mine which clearly refutes this conclusion. Ex. 6 ¶7. Affected parties cannot respond and understand the basis of the agency's ultimate decisions when such information is not made available, and courts do not view such eleventh hour additions lightly. *American Motorcycle Ass'n*, 534 F. Supp. at 935 ("By failing to make the appendices available at the outset, defendants made it impossible for state and local governments, the public, and special interest groups" to review and comment upon the changes the Plan would effect and the data upon which these actions were based.).

The agencies acknowledge in the FEIS and in their Protest Report, that the SFA is a new policy recommendation based on an October 27, 2014 memorandum from the FWS Director entitled "Greater Sage-Grouse: Additional Recommendations to Refine Land Use Allocations in Highly Important Landscapes." *See* **Ex. 7**. This memorandum was marked "Pre-Decisional. For Internal Review Purposes Only. Do Not Distribute," suggesting the agencies intentionally delayed disclosure of this FWS Memo to avoid public comment. There was ample time between October 2014 and publication of the FEIS to give public notice and opportunity to comment on

DAVIS GRAHAM &
STUBBS LLP
ATTORNEYS AT LAW
50 W. LIBERTY ST., STE. 950
RENO, NEVADA 89501
(775) 229-4219

the new maps.  Yet, the agencies waited until May 29, 2015 to publish the maps in the FEIS. The agencies' failure to prepare an SEIS, to disclose the science or data relied upon to prepare the new SFA map and seek public comments on such information violates NEPA.

The agencies' eleventh-hour addition of the SFA contradicts their stated justification for the DEIS Preferred Alternative that balanced "resources and resource use" and provision for potential mitigation options to provide "no unmitigated loss" with no explanation for this reversal other than the FWS directive. The agencies acknowledge another significant change from their DEIS proposed "no unmitigated loss" to a new FEIS standard of "net conservation gain" with no opportunity for public comment or impact analysis of this unattainable standard that is inconsistent with FLPMA's unnecessary or undue degradation standard at 43 U.S.C 1732(b) which recognizes some impacts associated with multiple-use are necessary.  *See* FEIS at 2-5.

### 2.      *Failure to evaluate a full range of reasonable alternatives*

NEPA mandates the agencies produce an impact statement that rigorously explores and objectively evaluates all reasonable alternatives so the agencies can sharply define the issues and provide a clear basis for choice among options by the decision maker and the public.  40 C.F.R. 1502.14.   The agencies may not define their objective in "unreasonably narrow terms" to foreclose alternatives.  *City of Carmel-by-the-Sea v. United States Dep't of Transp.*, 123 F.3d 1142, 1155 (9th Cir. 1997).  The existence of a viable but unexamined alternative renders an EIS inadequate. *Resources Ltd. v. Robertson*, 35 F.3d 1300, 1307 (9th Cir. 1994).  Alternatives shall be distributed between the minimum and the maximum resource potential to reflect the "full range of major commodity and environmental resource uses and values that could be produced" from public and forest system lands.  *Id.*; s*ee also* 36 C.F.R. § 219.12(f)(1).  *Resources Limited, Inc. v. Robertson*, 35 F.3d 1300, 1307 (9th Cir. 1993).   The DEIS and FEIS fail to examine reasonable alternatives accommodating multiple use and balancing major commodity values with GSG conservation which the State and local plans achieve.  The agencies did not present a

DAVIS GRAHAM &
STUBBS LLP
ATTORNEYS AT LAW
50 W.  LIBERTY ST., STE. 950
RENO, NEVADA 89501
(775) 229-4219

15

complete discussion of the regulatory tools already in place to protect GSG habitat, including the State and local plans, BLM Manual 6840, and the surface management regulations for locatable minerals at 43 C.F.R. § 3809 and 36 C.F.R. § 228 Subpart A that require minimizing and mitigating impacts.   These existing conservation plans and regulations should have been considered in the context of the No Action Alternative as they all are in place, provide for GSG habitat conservation, and will continue to be implemented absent federal action through the NVLMP.

Although Manual 6840 is not referenced in the DEIS or FEIS, nor was it ever raised by the BLM Nevada State Director who actively participated in developing the Nevada Plan as an *ex-officio* member of the Council (Ex. 2 ¶14), it is referenced extensively for the first time in BLM's response to Governor Sandoval's FLPMA consistency review letter.   **Ex. 11**.   The absence of any discussion of Manual 6840 in the FEIS or analysis of the State Plan's inconsistency with it is a flaw that requires BLM and USFS to prepare an SEIS for public comment.   In addition, the No Action Alternative should have considered the effectiveness of implementing the State and Local Plans, or in the alternative, evaluated Local Plans as action alternatives. Although the FEIS considered the Nevada Plan as Alternative E, it did not give this alternative meaningful consideration, dismissed the Elko Conservation Plan as an alternative that did not require detailed consideration, and did not give much consideration at all to the Eureka Plan.   FEIS at 2-458.

In addition to failing to consider the Elko County Plan as a viable alternative, the agencies also inappropriately eliminated an Increased Grazing Alternative, a key component of the Counties' Plans, from detailed analysis (FEIS 2-459). The agencies' rejection of grazing to control invasive grasses and reduce wildfire risks reflects an unwillingness to take a "hard look" at the synergies between properly managed grazing and GSG habitat conservation that is embraced in the State's and Counties' Plans. The agencies' statement "[t]here are currently no science-based studies that demonstrate that increased livestock grazing on public lands would

16

DAVIS GRAHAM &
STUBBS LLP
ATTORNEYS AT LAW
50 W.  LIBERTY ST., STE. 950
RENO, NEVADA 89501
(775) 229-4219

enhance or restore GRSG habitat or maintain or increase GRSG abundance and distribution" (FEIS at 2-460) contradicts the detailed list of scientific, published references included in the Elko County and State Plans.  The agencies provide no justification for ignoring published scientific literature on managed grazing and habitat conservation. Elko County provided information from recognized experts about how livestock grazing can reduce wildfire risks, including federal expert, Dr. Lynn James, Director of USDA, ARS plant research laboratory at Logan Utah:

> "Fires depend on adequate fuels-grasses and certain shrubs. The larger the fuel load, the hotter the fire will burn and the more damaging it will be…An *economical and efficient way to remove excess grass is with an on-off grazing system. Fuel loads are reduced while producers benefit from forage consumed by their livestock*. Other grazing strategies can aid in preventing or managing wildfires and controlled burns. Fires that do occur burn with reduced intensity and a general upward trend in rangeland condition is sustained." (Elko County Protest Letter at 9) (emphasis added).

Because the sweeping NVLMP land use prohibitions and restrictions violate FLPMA and NFMA and the Mining Law, they do not meet NEPA criteria for a reasonable alternative, which must be feasible from legal, technical, and economic standpoints. This, combined with the existence of viable and, preferable, but unexamined alternatives renders the FEIS legally inadequate.

### 3.    Failure to adequately disclose all science

NEPA requires that an EIS contain "high-quality information and accurate scientific analysis."  40 C.F.R. § 1500.1(b).  If there is incomplete or unavailable relevant data, the EIS must disclose this fact.  40 C.F.R. § 1502.22.  Internal agency email correspondence reveals that the agencies knew the information they relied upon to create requirements in the LMP had shortcomings and yet did not disclose them.  This withholding of information violated NEPA, which requires up-front disclosures of relevant shortcomings in the data or models. *Id*.; *Lands Council v. Powell*, 395 F.3d 1019 (9th Cir. 2005).  An agency cannot "ignore reputable scientific criticism" in its EIS.  *City of Carmel-By-The-Sea v. U.S. Dept. of Transp.*, 123 F.3d 1142, 1151

17

DAVIS GRAHAM &
STUBBS LLP
ATTORNEYS AT LAW
50 W. LIBERTY ST., STE. 950
RENO, NEVADA 89501
(775) 229-4219

1   (9th Cir. 1997).  BLM has failed to address in a "meaningful way the various uncertainties

2   surrounding the scientific evidence."  *Seattle Audubon,* 998 F.2d at 704.

3         The NVLMP is based largely on the recommended restrictions derived from the

4   December 2011 National Technical Team ("NTT") Report.  Yet the agencies failed to disclose

5   peer reviewers' scientific criticism[9] of the NTT recommendations that reveal questionable

6   science behind the NTT's recommended conservation measures.  The peer reviewers were highly

7   critical of the science used to develop the NTT report, finding it grossly oversimplified because it

8   ignores the seasonal aspects of how GSG use the landscape.  The peer reviewers <u>objected to the</u>

9   <u>one-size-fits-all approach to habitat conservation and the absence of state-level data in the report,</u>

10   <u>and suggested that the recommended conservation measures are inconsistent with FLPMA and,</u>

11   <u>therefore, unlawful</u>:

12        *"…There is no discussion of the seasonal requirements of sage-grouse to provide*
     *managers with a context for their actions. There are limited references to the state-level*

13        *sage-grouse plans. A good deal of effort went into these plans and they contain*
     *valuable information that should be incorporated into the planning process."*

14

15        *"…I expected a science document that reviewed the literature, laid out what is known*
     *about program area impacts to sage-grouse, and where the uncertainties lie. This*

16        *seems a strange blend of policy loosely backed by citations, <u>with no analysis of the</u>*

17        *<u>science</u>."*

18        *"<u>The document suffers from a 1-size fits all approach that lacks context.</u> Lumping all*
     *sage grouse seasonal habitats in all locations across the range regardless of population*

19        *size or relative importance of the population to either "priority sage grouse habitats" or*
     *"general sage grouse habitats" strikes me as tremendously over simplistic."*

20

21   *See* Ex. 8.  BLM ignored these comments, did not disclose the scientific criticism over NTT

22   recommendations it adopted, and failed to address in a "meaningful way the various uncertainties

23   surrounding the scientific evidence."  *Id.*  An SEIS must be prepared that fully discloses the

24

25   _____

26   [9] The peer reviewers' comments are attached to the December 18, 2012 letter from Secretary of
the Interior to the Honorable Doc Hastings, US House of Representatives.  (*See* **Ex. 8**.)

27

28

DAVIS GRAHAM &
STUBBS LLP
ATTORNEYS AT LAW
50 W. LIBERTY ST., STE. 950
RENO, NEVADA 89501
(775) 229-4219

1  scientific criticism of the NVLMP conservation measures and analyzes alternative local plans

2  and their conservation efforts so the public can have a meaningful opportunity to comment.

3      The agencies failed to respond to the Counties' substantial concerns with the agencies'

4  reliance on the NTT and COT Reports because those reports are not reflective of the best

5  available science. Ex. 1 Dahl Dec. ¶15, 19.  The Counties provided examples of scientific

6  deficiencies, yet the agencies' only response is that those reports reflect best available science.

7  BLM is surely aware that these reports are currently subject to Data Quality Act challenges,[10] yet

8  most of the management directives in the NVLMP are based on conclusions from those reports.

9  There is no acknowledgement or analysis of deficiencies the County identified; they have been

10  ignored wholesale.  Thus, there has been no reasoned analysis with respect to whether the reports

11  do, in fact, represent best available science as required by NEPA and BLM's own internal

12  guidelines.

13      The methods provided for delineating the SFAs are not explicit and therefore are not

14  transparent or scientifically defensible.  The criteria described for producing the SFA does not

15  match the State's assessment of breeding bird densities or resistance and resilience mapping

16  statewide, and it is unclear what criteria were applied to determine which landscapes qualify as

17  being 'essential to conservation and persistence of the species.'  (SEC pages 5 – 6)(**Ex. 9**).  The

18  agencies blindly adopted the stronghold area/SFA from the October 2014 FWS memo with no

19  adequate disclosure of what science or data supported the SFA boundaries.

20       Nevada counties informed the agencies that the NVLMP's habitat maps mischaracterize

21  non-habitat as GSG habitat, such as the Priority Habitat Management Area ("PHMA") in Eureka

22  County that covers the Town of Eureka, US Highway 50, State Route 278, the County landfill,

23  the Falcon-to-Gondor distribution line, multiple ancillary power lines, multiple subdivisions with

24

25  [10] The NTT Challenge and the COT Report Challenge (*Garfield County, Colorado, et al. vs.*
*Bureau of Land Management*)  were filed on or about March 18, 2015 with the U.S. Dept. of the
26  Interior Bureau of Land Management Data Quality Official.

27

28

DAVIS GRAHAM &
STUBBS LLP
ATTORNEYS AT LAW
50 W. LIBERTY ST., STE. 950
RENO, NEVADA 89501
(775) 229-4219

homes, paved and gravel roads, farms with alfalfa fields and irrigation systems, hay barns and other infrastructure. Ex. 2, ¶15. The law requires this type of information be available for the public and agencies to consider before final action was taken.

The Protest Report glosses over problems with the habitat maps stating that they need not be resolved because the NVLMP is a regional, programmatic plan and the agencies should wait to resolve such problems on a project-by-project basis if and when a project proponent raises inconsistencies between the maps and the on-the-ground habitat conditions. (Protest Report at 171-172). This response is inadequate (i) because the immediate implementation of the restrictions interferes with the Counties' land use planning and conservation; and, (ii) for the SFA where the agencies admit the actual presence of GSG populations is speculative, (Protest Letter at 82) and where there will never be any project proponents to raise this issue due to the segregation and mineral withdrawal and other onerous prohibitions and restrictions that apply to the SFA. The answer is also unsatisfactory because the PHMA shown in the NVLMP habitat maps will create widespread areas where development is strongly discouraged based on unreliable information about actual habitat condition, which will substantially interfere with the local and state land use plans, police powers, and economic development objectives. Finally, the identification of these areas renders the document a site-specific EIS and requires an adequate level of analysis.

### 4.    Failure to adequately address comments and inconsistencies

NEPA regulations require the agencies to invite the participation of affected state and local governments. 40 C.F.R. § 1501.7(a)(1).[11] To ensure that the agencies took a "hard look" at the consequences of the Proposed LUPA, they were required to "involve the public in preparing and implementing their NEPA procedures." 40 C.F.R. § 1506.6(a); *see also* 5 U.S.C. § 553(c) (the Forest Service was under an obligation to afford "interested persons an opportunity to

---

[11] An agency may not merely go through the motions; its "grudging, pro forma" compliance with these regulations violates NEPA's procedural safeguards." *See Block*, 690 F.2d 753, 769.

DAVIS GRAHAM &
STUBBS LLP
ATTORNEYS AT LAW
50 W.  LIBERTY ST., STE. 950
RENO, NEVADA 89501
(775) 229-4219

participate in the rule making.").  The agencies failed to explain inconsistencies with state, local, and county plans as required by NEPA and its implementing regulations at 40 C.F.R. § 1506.2. BLM's response that such identification would occur in the Record of Decision does not comply with the express mandate that an EIS must discuss any inconsistency of a proposed action with approved State or local plans and laws. Where an inconsistency exists, the EIS must describe the extent to which the agency would reconcile its proposed action with the plan or law.  BLM provided nothing more than a cursory acknowledgment of inconsistencies, and, thus, the FEIS, the ROD and Protest Report fail to describe how BLM intends to reconcile the NVLMP with those plans.  The agencies' assertion that this discussion will occur in a later document does not cure the fatal deficiency of the FEIS' failure to discuss the inconsistencies as required by NEPA.

## C.      BLM Unlawfully Delegated its Statutory Authority to FWS & Violated Procedures

BLM has sole authority to control the resource management process and develop resource management plans under FLPMA, with very few exceptions. 43 U.S.C. § 1601.0-1. USFS and FWS must apply to BLM to withdraw lands.  An administrative agency cannot delegate its authority to act pursuant to a statute without express authorization from Congress. *See Bowen v. Georgetown Univ. Hosp.,* 488 U.S. 204, 208 (1988)*; Ruley v. Nevada Bd. Prison Com'rs,* 628 F.Supp. 108 (D. Nev. 1986).  An agency delegates its Congressionally-authorized authority when it shifts to another party "almost the entire determination of whether a specific statutory requirement ... has been satisfied."  *U.S. Telecom Ass'n v. F.C.C.*, 359 F.3d 554, 567 (D.C. Cir. 2004).  Responsibility is also delegated where an agency abdicates its "final reviewing authority." *Nat'l Park & Conservation Ass'n v. Stanton,* 54 F.Supp.2d 7, 19 (D.D.C.1999).[12]

Even sister agencies cannot subdelegate ultimate authority over decision-making absent congressional approval. For example, in 1981, FWS unlawfully delegated administrative responsibilities over approval of § 3142(e) plans for the Arctic Wildlife Refuge to USGS.  *See*

---

[12] It is not permissible for an agency to delegate authority to a non-subordinate agency, absent congressional authorization.  *See Frankl v. HTH Corp*., 650 F.3d 1334, 1352 (9th Cir. 2011).

DAVIS GRAHAM &
STUBBS LLP.
ATTORNEYS AT LAW
50 W. LIBERTY ST., STE. 950
RENO, NEVADA 89501
(775) 229-4219

*Trustees for Alaska v. Watt*, 524 F. Supp 1303, 1305-06 (D. Alaska 1981).  The court held that §

3142 required FWS to approve the plans expressly; such was Congress' intent.  *Id.*  A delegation

that violates congressional intent is unlawful.  *U.S. Telecom Ass'n v. FCC*, 359 F.3d 554, 567-78

(D.C. Cir. 2004) (Agency may not subdelegate authority to outside entities when it is solely

responsible for administration). That is precisely what BLM did here – proposing a multiple-use

approach as the DEIS Preferred Alternative and then abandoning that approach to acquiesce to

the FWS' October 2014 recommendations for "strongholds" resulting in SFAs.  BLM unlawfully

subdelegated its authority to FWS and improperly conflated its land management authority with

the FWS' species protection for listed species under the Endangered Species Act ("ESA").

 FLPMA authorizes BLM to "make, modify, extend, or revoke withdrawals but only in

accordance with the provisions and limitations of this section."  43 U.S.C. § 1714(a).  The BLM

may choose to propose withdrawal, or it may consider withdrawal upon application from an

entity or person outside the BLM.  *Id.* § 1714(b)(1).  USFS has acknowledged it must propose

withdrawal to BLM through the application process.  *See U.S. v. Smith Christian Min.*

*Enterprises, Inc*., 537 F. Supp. 57, 60-61 (D. Ore. 1981).  USFS's manual provides that requests

for withdrawal from mineral use "should be made rarely." Manual 2760.01, *Special Uses*

*Management: Withdrawals*. Similarly, FWS is required to apply to BLM for withdrawals.

 The SFA land withdrawal proposal, which originated with FWS and includes National

Forest System lands, was not made "in accordance with the provisions and limitations of

[43.U.S.C. § 1714]" because neither FWS nor USFS[13] have submitted an application to withdraw

the SFA. FLPMA's implementing regulations on withdrawal direct potential applicants to pre-

application consultation with BLM.  *See* 43 C.F.R. § 2310.1-1 (requiring contact with the State

BLM "well in advance of the anticipated submission date of an application" to allow for early

consultation to "assist in determining the need for a withdrawal, taking possible alternatives into

---

[13] In Elko County alone, the SFA withdrawal includes 395,000 acres. Withdrawal of these land
must comply with the withdrawal procedures at § 1714 and its implementing regulations

DAVIS GRAHAM &
STUBBS LLP
ATTORNEYS AT LAW
50 W.  LIBERTY ST., STE. 950
RENO, NEVADA 89501
(775) 229-4219

account.")  After consultation, "before the authorized officer can take action on a withdrawal proposal, a withdrawal application in support thereof shall be submitted."  *Id.* § 2310.1-2.  Upon information and belief, USFS did not engage in pre-application consulting with BLM, nor did it file a withdrawal application with BLM as required by statute.  The BLM and USFS cannot avoid compliance with FLPMA's procedural requirements to apply for withdrawal through informal exercises or agreements. *See e.g., Clayton W. Williams*, Jr*., Exxon Corp.,* 103 IBLA 192, 205A (1988) (informal agreement resulting in a lease moratorium "'fit squarely' within the definition of withdrawal as found in FLPMA," which could only be implemented under the procedures in 43 U.S.C. § 1714.)  BLM cannot circumvent limitations on withdrawal authority established by FLPMA.  *See e.g., Casey E. Folks, Jr. et al.,*183 IBLA 24 (2012).

In addition, USFS failed to comply with its own procedures when it accepted, wholesale, the FWS' proposed SFA withdrawal.  Before requesting BLM withdraw lands, USFS should notify "permittees holding permits on lands open to mineral development of their risks and liabilities," and document new withdrawal of lands by: (a) an assessment of the mineral potential; (b) an evaluation of alternatives, and (c) an analysis showing the use or special features of the area cannot be adequately preserved or protected through other means.  USFS Manual 2761.03, *Special Uses Management: Withdrawals.* Moreover, USFS directs forest officers to "[i]nclude in the withdrawal the minimum area needed for the intended use." *Id.*  The USFS did not perform any of the required functions in proposing the land withdrawal to BLM.[14]  Ex. 6 ¶9.

---

[14] Separately, a "withdrawal petition" is a request to file an application for withdrawal that is originated within the DOI.  *Id.* § 2300.5(p).  The withdrawal petition must be submitted to the BLM.  *Id.* § 2310.1-3.  A withdrawal petition must contain, *inter alia*: "The office originating the petition . . . The type and purpose of the proposed withdrawal action . . . whether the petition pertains to the making, extension or modification of a withdrawal; . . . [and] [a] preliminary identification of the mineral resources in the area."  *Id.* §§ 2310.1-3(b)(1),(2),(5).  If a petition is submitted with a withdrawal application, *the information requirements pertaining to <u>withdrawal applications</u> are required. Id.* § 2310.1-3(c). FWS is an agency within DOI, and it must submit a withdrawal petition to BLM.   Upon information and belief FWS did not engage in this application process to request withdrawal of the SFA, has not submitted a proper withdrawal petition to BLM, and thereby violated the procedural requirements of FLPMA.

DAVIS GRAHAM &
STUBBS LLP
ATTORNEYS AT LAW
50 W. LIBERTY ST., STE. 950
RENO, NEVADA 89501
(775) 229-4219

## II.   PLAINTIFFS MEET THE OTHER REQUIREMENTS FOR AN INJUNCTION

This Court should enjoin implementation of the SFA, Travel Restrictions, Grazing Restrictions and requirement for "net conservation gain" ("NV Challenged Restrictions") in the NVLMP because they will inflict irreparable injury on Plaintiffs and the environment and, the State and Local Plans achieve conservation while allowing multiple-use.

### A.   Plaintiffs Will Suffer Irreparable Harm as will the Environment

Elko and Eureka Counties will suffer irreparable harm if the NV Challenged Restrictions are not enjoined, in that their general planning duties will be significantly obstructed by the NVLMP restrictions that conflict with their Local Master Plan and Conservation Plans which apply to both public and private lands. *American Motorcyclist Ass'n*, 534 F. Supp. at 936. The restrictions on the federal lands will interfere with the Counties' land use planning and police powers including their obligation to maintain transportation systems and provide emergency services. The NVLMP travel restrictions affect thousands of miles of roads in Elko and Eureka Counties. Ex. 1 ¶24; Ex. 2 ¶25. In addition, the NVLMP will cause environmental harm because its grazing restrictions will result in a build-up of fuel load on the range and increase wildfire frequency and intensity, which will destroy GSG habitat. The travel restrictions will impede emergency vehicles including fire-fighting equipment. *Id.*

The NVLMP restrictions obstruct Western's development of Gravel Creek and the nearby Doby George Project by identifying an SFA that proposes the withdrawal of lands where Western's mining claims are located. Western had no notice of the designation of these areas for withdrawal until the May 29, 2015 publication of the FEIS. Western was deprived of proper notice of the SFA withdrawal and the opportunity to comment as required before USFS files its application with BLM for withdrawal and on the DEIS and the adverse impact the SFA will have on Western's business and the development of a significant mineral deposit. Western filed a protest letter on the Proposed LUPA, which the Protest Report does not adequately address.

DAVIS GRAHAM &
STUBBS LLP
ATTORNEYS AT LAW
50 W.  LIBERTY ST., STE. 950
RENO, NEVADA 89501
(775) 229-4219

The NVLMP jeopardizes Western's investment of over $32 million (which it made with reasonable expectations that its rights under the Mining Law would be respected) and the 758,800 ounces of gold at Doby George. Gold deposits like Gravel Creek (worth a gross $3 billion and growing) and Doby George are extremely rare, costly and difficult to find; the odds of finding another similarly promising deposit elsewhere are extremely remote. The invalidation of this discovery through the claim contest and segregation processes the agencies have commenced to implement the SFA withdrawal will render Western's investment worthless. Although the ultimate withdrawal decision will not occur for another two years, the segregation of these lands effective September 24, 2015 has created a significant cloud of uncertainty on the project and continued development and has a chilling effect on Western's ability to continue raising necessary funds for its development. Ex. 6, ¶¶ 7,10,12,14.

The SFA segregation and withdrawal similarly deprives Quantum of its rights under the Mining Law to use and occupy its unpatented mining claims and will severely devalue adjacent patented mining claims and potentially render these private lands worthless. Because the boundaries of mineral deposits rarely conform to land ownership borders, invalidation of the unpatented claims and the prohibition against using these lands for mineral development may create spatial, physical, and technical constraints that make economic development of the private lands infeasible and even impossible. Moreover, the USFS permits and environmental reviews that authorize Quantum's exploration activities clearly document that the Jarbidge area does not contain any GSG habitat. Ex. 3 ¶8,9,13. Like Western, Quantum was immediately harmed by the segregation of its lands and there is no countervailing interest given the lands do not contain GSG habitat, as USFS has confirmed. The NVLMP Restrictions already are chilling investment in Plaintiffs' and other mineral projects in Nevada. Quantum and Western's existence is threatened by the NV Challenged Restriction. They therefore satisfy the irreparable injury requirement. *Doran v. Salam Inn, Inc.,* 422 U.S. 927, 932 (1975). Additionally, where "interests

DAVIS GRAHAM &
STUBBS LLP
ATTORNEYS AT LAW
50 W. LIBERTY ST., STE. 950
RENO, NEVADA 89501
(775) 229-4219

involving real property are at stake, preliminary injunctive relief" is appropriate. *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1210 (10th Cir. 2009).

**B.     The Balance of Hardships Tips Sharply in Favor of Granting an Injunction**

The balance of hardships tips sharply in favor of granting an injunction. Indeed, the balance tips so sharply in favor of Plaintiffs that they need only demonstrate a "serious question" as to the merits in order to obtain an injunction. *Alliance for the Wild Rockiesl,* 632 F.3d at 1135. Plaintiffs and the public clearly will suffer hardship in the absence of an injunction. The Counties' Plans contain numerous recommended actions to reduce fuel loads (e.g., highly flammable non-native annual grasses) with strategies to restore a more fire resistant, resilient and diverse vegetation community that provides GSG habitat. The NVLMP restrictions on grazing will interfere with this critical component of the Counties' Plans, and result in destruction of GSG habitat. Exs. 1 & 2.

The agencies adopted the "strongholds" proposed by the conservation community through FWS[15] to draw the SFA boundaries, yet they ignored the FWS COT Report that provides for deference to local management plans. The agencies further ignored the FWS COT Report conclusion that "specific strategies or actions necessary to achieve . . . conservation objectives *must be developed and implemented at the state or local level, with the involvement of all stakeholders.*" COT Report at 52, 38, 41. This is precisely what Elko and Eureka Counties have done yet the agencies' SFA and other proposals for disturbance caps, travel restrictions, and grazing restrictions disregard and interfere with these local efforts.

Conversely, Defendants will not suffer any hardship if the implementations of the NV Challenged Restrictions are enjoined because the State and Local Plans in Nevada are

---

[15] "The areas we have identified within PHMA represent recognized "strongholds" for the species that have been noted . . . by the conservation community as having the highest densities of the species and other criteria important for the persistence of the species." FWS Memo, Ex. 7. The public had no opportunity to comment on what data supposedly supported these conclusions that led to the agencies' proposal to withdraw 2.8 million acres of land in Nevada.

DAVIS GRAHAM &
STUBBS LLP
ATTORNEYS AT LAW
50 W. LIBERTY ST., STE. 950
RENO, NEVADA 89501
(775) 229-4219

successfully implementing conservation plans. *Regents of Univ. of Cal. v. ABC,* 747 F.2d 511, 520 (9th Cir. 1984) (holding that the balance of hardships tilted sharply toward the plaintiffs where "[t]he record fails to reveal any significant injury to the defendants stemming from the issuance of a preliminary injunction"). Eureka County recently obtained GSG population data from the Nevada Department of Wildlife (NDOW). The June 2015 NDOW population data shows high counts of males using leks in the Diamond Population Management Unit (PMU) and the 3 Bars (PMU), which cover over half of Eureka County and have the bulk of the priority and general habitat in the County. The Diamond PMU had a record high count of 159 males.  The 3 Bar PMU had a high count of 348 males, the third highest count since a record count in 2006 of 460.  The 3 Bar #1 lek has been monitored since 1971 and had a high count of 41 males, the highest since 1987. This lek had no birds from 1995 to 1997.  The NDOW data document the success of the County's conservation efforts and show that Eureka County's efforts have stabilized and increased GSG numbers *without the land use restrictions in the LUPA.*[16]  Ex. 2, ¶21.  The balance of hardships thus tips in favor of Plaintiffs as the Local and State Plans further conservation. *ABC v. Heller,* No. 2:06-CV-01268-PMP-RJJ, 2006 U.S. Dist. LEXIS 80030, at *39 (D. Nev. Nov. 1, 2006) (holding that the balance of harms from enjoining a statute "clearly tips" in favor of the plaintiffs when there are a variety of other means to further their purpose).

## C.  An Injunction is in the Public Interest

Because livestock grazing activities occur on most of the land in Elko and Eureka County, capitalizing on the synergies between livestock grazing and GSG habitat conservation can be of tremendous statewide benefit to GSG and its habitat.  The NVLMP ignores these synergies and imposes rigid, one-size-fits-all livestock grazing restrictions (such as unreasonable stubble height requirements, restrictions on grazing seasons and allowable numbers of cattle, and

---

[16]  Similarly, the Nevada Plan emphasizes the scientifically sound importance of properly managed livestock grazing as an effective GSG habitat conservation measure and that farming and ranching on private lands in unison with authorized livestock grazing on adjacent public lands has been a long standing practice for many private landowners in Nevada.

DAVIS GRAHAM &
STUBBS LLP
ATTORNEYS AT LAW
50 W. LIBERTY ST., STE. 950
RENO, NEVADA 89501
(775) 229-4219

prescriptive limits on maximum structure heights) that create conflicts with the Elko and Eureka Plans including grazing to reduce wildfire risks, seasonal road use restrictions, lek buffers, and road closures that will interfere with ranching operations on public and adjacent private lands. Ex. 1, ¶15.  Because grazing allotments on public lands cover almost the entire State of Nevada, (Nevada Plan at 213), the NVLMP's livestock grazing restrictions and shortcomings in addressing wildfire have an enormous detrimental impact on GSG habitat and interfere substantially with state and local conservation efforts that reduce wildfire risks and provide superior GSG habitat conservation.

The widespread travel restrictions in the NVLMP affect roughly 40 percent of all roads in Elko County including segments of nearly all of the 1,500 miles of roads that Elko County maintains.  Ex. 1, ¶24.  Approximately 1,958 miles of roads in Eureka County are located within areas where the NVLMP travel restrictions apply. Ex. 2, ¶25. The Counties' Plans rely on maintaining access to achieve conservation, for access to ranches, as routes to adjacent lands, and to provide emergency services.  The NVLMP travel restrictions interfere with the Counties' Plans and their obligations to maintain transportation systems, a core police power functions.

Because 72 percent of Elko County and 81 percent of Eureka County are comprised of federally-managed lands, the Counties' economies depend on their residents' abilities to use federal land for ranching, mining, and other purposes. The NVLMP's land use restrictions will substantially reduce the use of the federally administered lands for economic purposes and adversely affect the ranching, farming and mining businesses that form the Counties' economic bases, resulting in a loss of employment and economic outputs that will be devastating. The economically burdensome and technically ill-advised grazing restrictions in the NVLMP will result in increased fuels and burden the counties' fire districts, harm ranchers and the economy, and result in destruction of GSG habitat.  Elko County estimates these restrictions will cost $31 million per year in lost agricultural productivity; Eureka County estimates these restrictions will $7 to $15 million per year.  The inevitable decline in the ranching industry in both counties that

DAVIS GRAHAM &
STUBBS LLP
ATTORNEYS AT LAW
50 W.  LIBERTY ST., STE. 950
RENO, NEVADA 89501
(775) 229-4219

will result from the NVLMP will cause further harm to GSG.  The constant presence of ranchers on the rangeland benefits GSG by developing water sources and being first responders to fire. Fewer ranchers forced to operate on less land means fewer benefits to GSG.  Ex. 2, ¶17.

Rather than facilitating conservation work and county governments' efforts with a proven track record of success, the NVLMP will discourage this work and harm GSG and its habitat. The NVLMP's arbitrary grazing restrictions will force many Elko and Eureka County ranchers out of business because the NVLMP forage utilization thresholds are unrealistic.

Despite the NVLMP's vague statements that it will recognize and maintain valid existing rights, the NV Challenged Restrictions could impair use of water rights, rights-of-way, and mineral rights in Elko and Eureka Counties.  The NVLMP requires removal of certain range improvements and water conveyances like dams, water tanks, ditches, and pipelines that may qualify as RS 2339 rights and that constitute private property rights.  The NVLMP provides no meaningful discussion of how the agencies intend to address valid existing rights, including those rights that have not been adjudicated in federal court but are nonetheless valid existing rights (e.g., roads that have not yet been adjudicated as RS 2477 roads) or rights under § 22 of the General Mining Law on mining claims.  This leaves in limbo the status of water rights, grazing permits, water conveyances (RS 2339), mining claims, and unadjudicated RS 2477 roads and places a significant financial burden on the Counties to pay for the protracted and costly legal process of seeking adjudication.  For the duration of that process, which can take years and cost millions, the roads in question remain subject to the NVLMP travel restrictions which interfere with the County's police powers.  Interference with the ongoing use of rights pursuant to grazing permits, water conveyances and mining claims will substantially harm both the owners and Elko and Eureka Counties' economy and potentially subject the federal government to takings claims. Ex. 1 ¶24; Ex. 2 ¶27.  The agencies have failed to evaluate the potential takings claims that could arise from this interference with private property rights as required under EO 12360.

DAVIS GRAHAM &
STUBBS LLP
ATTORNEYS AT LAW
50 W.  LIBERTY ST., STE. 950
RENO, NEVADA 89501
(775) 229-4219

1    The NVLMP is inconsistent with and provides less protection to GSG than the state and

2    local plans and will interfere with GSG conservation. The state and local plans are based on

3    science and site-specific data which reveals facial data errors in the NVLMP's habitat mapping

4    and will produce more effective GSG habitat conservation efforts than the NVLMP. The state

5    and local plans apply to both public and private lands, the NVLMP does not. Additionally, the

6    Nevada Plan applies to all GSG habitat categories, including the 7.6 million acres of Other

7    Habitat Management Areas that are not the primary focus of the NVLMP, and require mitigation

8    of direct and indirect impacts, which the NVLMP does not. An injunction will vindicate the

9    public's interests in aiding local economies, protecting property rights of mineral right owners

10   and ensuring public participation in agency rulemaking. *Minard Run Oil Co. v. USFS*, 670 F.3d

11   236 (3d Cir. 2011).

12                                   <u>**CONCLUSION**</u>

13   For these reasons, Plaintiffs respectfully request that this Court enjoin Defendants from

14   implementing the NV Challenged Restrictions or preventing continued access to lands currently

15   open for mineral entry within the areas subject to the NVLMP.

16   Respectfully submitted this 28th day of September, 2015.

17                                              DAVIS GRAHAM & STUBBS LLP

18                                              By:  /s/ Laura K. Granier
19                                                   Laura K. Granier (NSB 7357)
                                                     50 W. Liberty Street, Suite 950
20                                                   Reno, Nevada 89501
                                                     *Attorneys for Plaintiffs*

21

22

23

24

25

26

27

28

DAVIS GRAHAM &
STUBBS LLP
ATTORNEYS AT LAW
50 W. LIBERTY ST., STE. 950
RENO, NEVADA 89501
(775) 229-4219

30