1   Adam Paul Laxalt
    *Nevada Attorney General*
2   Lawrence VanDyke (NSB 13643C)
    *Solicitor General*
3   C. Wayne Howle (NSB 3443)
    *Chief Deputy Attorney General*
4   OFFICE OF THE ATTORNEY GENERAL
5   100 North Carson Street
    Carson City, Nevada  89701
6   (775) 684-1100/1108 (Tel./Fax)
    LVanDyke@ag.nv.gov
7   WHowle@ag.nv.gov
8   *Attorneys for State of Nevada*

9   Christopher Hicks, Esq. (NSB 7747)
    District Attorney
10  Michael W. Large, Esq. (NSB 10119)
    Deputy District Attorney
11  WASHOE COUNTY DISTRICT ATTORNEYS'
      OFFICE
12  1 South Sierra Street, South Tower, 4th Floor
13  Reno, Nevada  89501
    775-328-3200 (Telephone)
14  *Attorneys for Washoe County, Nevada*

15  Laura K. Granier, Esq. (NSB 7357)
16  laura.granier@dgslaw.com
    DAVIS GRAHAM & STUBBS LLP
17  50 W. Liberty Street, Suite 950
    Reno, Nevada 89501
18  (775) 229-4219 (Telephone)
19  (775) 403-2187 (Fax)
    *Attorneys for Counties and Private Plaintiffs*

20

    **UNITED STATES DISTRICT COURT**
21
    **DISTRICT OF NEVADA**
22

23  **STATE OF NEVADA, EX REL. ADAM**          Case No.  3:15-cv-00491-MMD-VPC
    **PAUL LAXALT, ATTORNEY GENERAL,**
24  **WESTERN EXPLORATION LLC,**               **FIRST   AMENDED   COMPLAINT   FOR**
    **ELKO COUNTY, NEVADA,**                   **DECLARATORY    &    INJUNCTIVE**
25  **EUREKA COUNTY, NEVADA,**                 **RELIEF**
    **QUANTUM MINERALS LLC,**
26  **LANDER COUNTY, NEVADA,**
    **WHITE PINE COUNTY, NEVADA,**
27  **LINCOLN COUNTY, NEVADA,**

28

DAVIS GRAHAM &
STUBBS LLP
ATTORNEYS AT LAW
50 W. LIBERTY ST., STE. 950
RENO, NEVADA 89501
(775) 229-4219

3945780.1

**HUMBOLDT COUNTY, NEVADA, WASHOE COUNTY, NEVADA, CHURCHILL COUNTY, NEVADA, PERSHING COUNTY, NEVADA, PARAGON PRECIOUS METALS, LLC, NINETY-SIX RANCH, LLC**

**Plaintiffs,**

**v.**

**U.S. DEPARTMENT OF THE INTERIOR, SALLY JEWELL, in her official capacity as Secretary, BUREAU OF LAND MANAGEMENT, a part of the U.S. Department of the Interior, NEIL KORNZE, in his official capacity as Director of the Bureau of Land Management, U.S. Department of the Interior, AMY LUEDERS, in her official capacity as Nevada State Director of the Bureau of Land Management, U.S. DEPARTMENT OF AGRICULTURE, TOM VILSACK, in his official capacity as Secretary, U.S. FOREST SERVICE, a part of the U.S. Department of Agriculture, THOMAS L. TIDWELL, in his official capacity as Chief, U.S. Forest Service, BILL DUNKLEBERGER, in his official capacity as Humboldt-Toiyabe National Forest Supervisor,**

**Defendants.**

1.      The State of Nevada, ex Rel. Adam Paul Laxalt, Attorney General; Elko County, Nevada; Eureka County, Nevada; Western Exploration LLC;  Quantum Minerals LLC; Lander County, Nevada; White Pine County, Nevada; Lincoln County, Nevada; Humboldt County, Nevada; Washoe County, Nevada; Churchill County, Nevada; Pershing County, Nevada; Paragon Precious Metals, LLC, and Ninety-Six Ranch, LLC (collectively the "Plaintiffs") bring this action against the U.S. Department of the Interior ("DOI") and Sally Jewell, in her official

2

DAVIS GRAHAM &
STUBBS LLP
ATTORNEYS AT LAW
50 W. LIBERTY ST., STE. 950
RENO, NEVADA 89501
(775) 229-4219

capacity as Secretary; Neil Kornze, in his official capacity as Director of the Bureau of Land Management ("BLM"); Amy Lueders, in her official capacity as Nevada State Director of the BLM; the Department of Agriculture ("USDA") and Tom Vilsack, in his official capacity as Secretary; Thomas L. Tidwell, in his official capacity as Chief, U.S. Forest Service ("USFS"); Bill Dunkleberger, in his official capacity as Humboldt-Toiyabe National Forest Supervisor; BLM, and USFS (together, "the agencies"). Plaintiffs seek declaratory and injunctive relief for violations of federal laws including, but not limited to: the Federal Land Policy and Management Act of 1976 ("FLPMA"), 43 U.S.C. §§ 1701 *et seq.*; the National Forest Management Act of 1976 ("NFMA"), 16 U.S.C. §§ 1601 *et seq.*; the National Environmental Policy Act of 1969 ("NEPA"), 42 U.S.C. § 4231 *et seq.*; the Small Business Regulatory Enforcement Fairness Act ("SBREFA"), 5 U.S.C § 601 *et seq.*; the Administrative Procedure Act ("APA"); the 1872 Mining Law (the "General Mining Law"), 20 U.S.C. §§ 21a *et seq.*, as amended; and the United States Constitution.

2.     Plaintiffs request the Court enjoin DOI and BLM from implementing the Nevada portion of the September 21, 2015 Record of Decision and Approved Resource Management Plan Amendments for the Great Basin Region, Including the Greater Sage-Grouse Sub-Regions of Idaho and Southwestern Montana, Nevada and Northeastern California, Oregon, and Utah ("BLM ROD"), and USDA and USFS from implementing the Nevada portion of the September 16, 2015 Greater Sage-grouse Record of Decision for Idaho and Southwest Montana, Nevada, and Utah ("USFS ROD") (collectively with the BLM ROD, the "NVLMP"). Plaintiffs request the Court enjoin Defendants from taking any action to interfere with continued access to all Nevada lands that were open for mineral entry or other public use prior to any segregation resulting from withdrawals proposed in the NVLMP, including segregating lands from operation of the General Mining Law, or otherwise prohibiting multiple-use of such lands.

3

DAVIS GRAHAM &
STUBBS LLP
ATTORNEYS AT LAW
50 W. LIBERTY ST., STE. 950
RENO, NEVADA 89501
(775) 229-4219

## JURISDICTION & VENUE

3.     Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1331 (Federal question jurisdiction) and the APA, 5 U.S.C. § 702 (judicial review of final agency action).  This Court can grant declaratory and injunctive relief under 28 U.S.C. § 2201 (declaratory judgment), 28 U.S.C. § 2202 (injunctive relief), and 5 U.S.C. §§ 552, 701-706, for violations of, *inter alia*, the APA, NEPA, FLPMA, and the NFMA.

4.     Venue is proper in the U.S. District Court for the District of Nevada under 28 U.S.C. §§ 1391(c)(2) and (e) in that: (i) Defendants reside in the District of Nevada, with BLM maintaining an office at 1340 Financial Blvd., Reno, Nevada 89502, from which BLM implements its policies within the State, and with USFS maintaining an office at 1200 Franklin Way, Sparks, Nevada 89431, from which USFS implements its policies within the State; (ii) the events giving rise to the claims occurred in Nevada, and the NVLMP's regulatory impacts will be felt within this district where it will be implemented; and (iii) each of the Plaintiffs reside, and/or operate businesses, or are governmental entities in Nevada.

## THE PARTIES

5.     The State of Nevada, ex rel. its Attorney General Adam Paul Laxalt appears in this action under the authority of Nev. Rev. Stat. 228.190 (1)(a)((2)), which provides that,

> 1.   The Attorney General, in the name of the State, is authorized to intervene or to appear in:
> (a)  Any action or proceeding at law or in equity which may now or hereafter be pending, when it is necessary for or incident to the purpose of establishing and determining the rights of the State of Nevada, or the residents thereof, in and to:
> ***
> (2) The public lands, and to the waters therein and thereunder, located in the State of Nevada.

6.     The State of Nevada has significant interests at stake in the litigation.  Nevada law provides for the "protection, propagation, restoration, transplanting, introduction and

DAVIS GRAHAM &
STUBBS LLP
ATTORNEYS AT LAW
50 W. LIBERTY ST., STE. 950
RENO, NEVADA 89501
(775) 229-4219

management of wildlife in this State." Nev. Rev. Stat. 501.181 (1)(a); *See also* Nev Rev. Stat. 501.331.  The State of Nevada, through Governor Brian Sandoval notified Neil Kornze, Director of the United State Department of the Interior, that "The project-scale [Distrubance Cap Protocol (DCP)] actually encourages habitat fragmentation because it provides a perverse incentive to locate new disturbances in areas with little existing disturbance, which in turn increases direct and indirect effects to GRSG." Appeal from Governor Brian Sandoval, p. 3.

7.      The State of Nevada contributed significant resources to the development of the state sage grouse plan. The plan was developed by the Sagebrush Ecosystem Council. The council contains ex officio members from the Bureau of Land Management, United States Forest Service, and United States Fish and Wildlife Service.  The federal agencies were required under 43 USC 1712(c)(9) to develop plans that incorporate the state plan to the extent it is "consistent with federal law and the purposes of the action."

8.      Elko and Eureka Counties are political subdivisions of the State and were cooperating agencies for the Nevada and Northeastern California Environmental Impact Statement ("EIS"/LUPA") upon which the NVLMP is based.  Their County Commissioners and staff devoted countless hours and resources to reviewing the November 2013 Draft EIS, the May 2015 Administrative Draft of the Nevada and Northeastern California Final Environmental Impact Statement ("FEIS"), and the June 2015 FEIS/Proposed LUPA.   They submitted comments on each of these documents, including Elko County's June 26, 2015 Protest Letter and Eureka County's June 29, 2015 Protest Letter on the FEIS/Proposed LUPA.  The agencies' September 15, 2015 Protest Resolution Report Nevada and Northeastern California Sub-Regional Greater Sage-Grouse Land Use Plan Amendment/Final Environmental Impact Statement ("Protest Report") does not adequately address their comments or inconsistencies between local and State conservation and land use plans and laws and the LUPA.

DAVIS GRAHAM &
STUBBS LLP
ATTORNEYS AT LAW
50 W. LIBERTY ST., STE. 950
RENO, NEVADA 89501
(775) 229-4219

9.     Elko County's Protest Letter, submitted under 43 C.F.R. § 1601.5-2, identified inconsistencies between the LUPA and Elko County conservation plans.  BLM and USFS did not make any meaningful changes to the Approved Resource Management Plan ("ARMP") to address these inconsistencies, offering instead a vague statement that there may be differences between local, state, and federal laws and plans, but does not describe the differences or explain why the differences and inconsistencies could not be resolved.  (BLM ROD at 2-15).

10.     Elko County covers 10,995,840 acres and has a population of 52,760 people.  The county's economic drivers are ranching, mining, recreation, and tourism.  Over 72 percent of the county is federal land managed by BLM and USFS.  The FEIS habitat maps show 75 percent of Elko County as Priority Habitat Management Areas ("PHMA") and General Habitat Management Areas ("GHMA").  The NVLMP restrictions on these lands will interfere with Elko County's land use planning and police powers including its obligation to maintain its transportation system and provide emergency services; the NVLMP travel restrictions affect more than 1,500 miles of roads in Elko County.  The NVLMP will cause environmental harm because its grazing restrictions will result in a build-up of fuel load on the range and increase wildfire frequency and intensity, which will destroy Greater Sage-grouse ("GSG") habitat.  The travel restrictions will impede emergency vehicles including fire-fighting equipment.

11.     Elko County estimates the NVLMP will result in an annual loss of $31 million in agricultural productivity and substantial losses from severely restricted mineral exploration and development, oil and gas exploration and development, wind energy, and other natural resource development, as discussed in Elko County's June 26, 2015 Protest Letter.  The NVLMP will result in the total destruction of certain businesses and interference with the Counties' police powers to implement land use plans including the Elko County, Nevada Greater Sage Grouse Management and Conservation Strategy Plan ("Elko County Plan") adopted in September 2012.

6

DAVIS GRAHAM &
STUBBS LLP
ATTORNEYS AT LAW
50 W. LIBERTY ST., STE. 950
RENO, NEVADA 89501
(775) 229-4219

12. Western Exploration ("Western") is a small company incorporated in Nevada. Western owns two projects in Elko County, 112 unpatented mining claims at Doby George and 331 unpatented mining claims at Wood Gulch – Gravel Creek. The USFS approved a Plan of Operations governing Western's exploration drilling that includes provisions to protect GSG and its habitat. For example, the environmental protection measures preclude Western from drilling until mid-July each year to protect GSG and other species. Western has worked cooperatively with the USFS since 1997 to obtain its Plan of Operations, investing millions of dollars on its continued exploration. At no time prior to June 1, 2015, did the agency indicate any of the proposed project area might be considered for withdrawal from mineral entry. The November 2013 DEIS preferred alternative did not propose withdrawing millions of acres of land, recognizing the inconsistency of doing so with the agencies' statutory multiple-use mandates.

13. Gravel Creek has significant potential to become a sizeable economic gold and silver mine. The NVLMP restrictions obstruct Western's development of Gravel Creek by identifying a Sagebrush Focal Area ("SFA") that proposes the withdrawal of over 2 million acres of land in Elko County from mineral entry, including the 6,950 acres on which Western's mining claims are located. Western had no notice of the agencies' plans to designate the Gravel Creek project area as an SFA to be withdrawn from mineral entry until the May 29, 2015 publication of the EIS/Proposed LUPA. Western was deprived of proper notice of the SFA withdrawal and the opportunity to comment on the DEIS and the adverse impact the SFA will have on Western's business and the development of a significant mineral deposit. Western filed a protest letter on the EIS/Proposed LUPA, which the Protest Report does not adequately address.

14. The NVLMP jeopardizes Western's investment of over $32 million, which it made with reasonable expectations that its rights under the General Mining Law would be respected. Gold deposits like Gravel Creek are extremely rare, costly, and difficult to find; the

7

DAVIS GRAHAM &
STUBBS LLP
ATTORNEYS AT LAW
50 W. LIBERTY ST., STE. 950
RENO, NEVADA 89501
(775) 229-4219

1
2
3
4
5
6

odds of finding another similarly promising deposit elsewhere are extremely remote. The invalidation of this discovery through the claim contest and segregation processes the agencies have threatened in conjunction with the SFA will render Western's investment worthless. Other NVLMP restrictions inconsistent with the State and local plans also interfere with Western's rights.

7
8
9
10
11
12
13

15. Eureka County is made up of 81 percent federally administered land, primarily managed by BLM and USFS. The County's economy is driven by mining, farming, and ranching, all of which will be harmed by the NVLMP's land use restrictions. Approximately 2,000 people live in Eureka County and are mainly employed in the natural resources or ranching sectors. The community's welfare and viability depend on business and recreational activities conducted on or in connection with use of and access to federal lands.

14
15
16
17
18
19
20
21

16. Like Elko County, Eureka County was a cooperating agency for the EIS/LUPA and submitted comments on each of the BLM/USFS documents developed. The County's March 2012 scoping comments emphasized the need for the LUPA to be consistent with the Eureka Master Plan and Eureka County Code Title 9. Throughout the EIS process, Eureka County commented on the many ways the agencies' proposed land use restrictions are inconsistent with Eureka County's policies and code. Eureka County's protest letter on the FEIS/Proposed LUPA describes the agencies' utter lack of effort to coordinate with Eureka County.

22
23
24
25
26
27
28

17. Eureka County repeatedly asserted that its local plans, policies, and proposals for GSG conservation were superior to the Proposed LUPA and would result in protecting GSG and conserving and enhancing habitat while maintaining a strong and vibrant economic base. The ROD and NVLMP ignore these comments and the detailed economic data the County provided. The Protest Report does not adequately address Eureka County's comments, erroneously asserting that such a regional programmatic planning document does not require the agencies to

8

DAVIS GRAHAM &
STUBBS LLP
ATTORNEYS AT LAW
50 W. LIBERTY ST., STE. 950
RENO, NEVADA 89501
(775) 229-4219

examine impacts to local communities with this level of detail or specificity. The agencies failed to demonstrate the Eureka County Master Plan and Title 9 of the County Code would not benefit and conserve GSG. The NVLMP livestock grazing restrictions will interfere with Section 6.21 of the Eureka Master Plan's provision for managed grazing in a beneficial manner that prevents fuel buildup and excessive wildfire damage. The NVLMP's livestock grazing restrictions will create increased fuel loads that will burden Eureka's fire district and result in destruction of GSG habitat. The NVLMP will interfere with Eureka's land use planning and sovereign police powers.

18.     Quantum Minerals LLC ("Quantum") is a small private Nevada company formed to acquire property interests in and near the Jarbidge Mining District in Elko County. Quantum's business plan focuses on exploring this highly prospective gold district to potentially redevelop the property into a modern gold mine. Quantum's only property is at Jarbidge and comprised of approximately 110 unpatented mining claims and nine patented mining claims.

19.     On August 20, 2015, the Deputy District Ranger of the Humboldt-Toiyabe National Forest approved Quantum's Plan of Operations (the "Decision Memo"). During the 14-month period USFS evaluated Quantum's Plan of Operations, consultants performed environmental baseline studies including a vegetation study to identify wildlife habitat present in the project area. Neither these studies nor USFS personnel ever identified GSG habitat in the Jarbidge project which ranges in elevation between 6,000 and 9,000 ft. above sea level and has numerous trees, which make it unsuitable habitat for GSG which avoid wooded areas because trees serve as perching sites for ravens and other avian predators.

20.     Quantum relied on the expertise of local USFS personnel from the Jarbidge Ranger District to accurately evaluate environmental conditions at the property, including the presence of federally threatened or endangered species or critical habitat, based on their personal

9

DAVIS GRAHAM &
STUBBS LLP
ATTORNEYS AT LAW
50 W. LIBERTY ST., STE. 950
RENO, NEVADA 89501
(775) 229-4219

knowledge and on-the-ground experience with the Jarbidge area. Prior to acquiring the claims, Quantum reviewed the maps in the DEIS which did not show any GSG habitat in the immediate Jarbidge claim area, with the closest habitat located at least one-third of a mile to the northwest of Quantum's claim block.  The addition of the SFA to the NVLMP contradicts the facts on the ground, as determined by USFS personnel, who studied the area.  In less than two years, the known habitat characteristics of the Jarbidge project area mysteriously transformed – without any changes in actual on-the-ground habitat conditions – from non-habitat to the highest priority habitat and an SFA proposed for withdrawal. This sudden termination of Quantum's rights under the General Mining Law to explore its only project will destroy Quantum's business.

21.    The SFA withdrawal (and resulting segregation) deprives Quantum of its rights under the General Mining Law to use and occupy its unpatented mining claims and will severely devalue adjacent patented mining claims and potentially render these private lands worthless. Because the boundaries of mineral deposits rarely conform to land ownership borders, invalidation of the unpatented claims and the prohibition against using these lands for mineral development may create spatial, physical, and technical constraints that make economic development of the private lands infeasible and even impossible.

22.    The Decision Memo considered the baseline studies, which did not identify any suitable habitat for GSG because of the high elevation and numerous trees, consistent with the professional knowledge and experience of USFS personnel for the environmental and habitat conditions in the project area.  Without explanation, the FEIS included these lands within the SFA, catapulting them to the "best of the best" of GSG habitat without science or commercial information to support such an arbitrary change which will put Quantum out of business.

23.    Eighty percent of Humboldt County's 6.2 million acres of lands is under public ownership.  Less than one percent of the land is urban or developed.  Approximately 16,100

10

DAVIS GRAHAM &
STUBBS LLP
ATTORNEYS AT LAW
50 W. LIBERTY ST., STE. 950
RENO, NEVADA 89501
(775) 229-4219

people live in Humboldt County and are mainly employed in the natural resources, agriculture, or ranching sectors. Humboldt County has several mines that produce gold, silver, limestone, and opals. Gold mining accounts for over 40 percent of the tax base in the county. In addition, livestock production is the primary agricultural commodity in Humboldt County.

24.     The NVLMP establishes over 633,000 acres SFA in Humboldt County putting this land off limits to new mining claims and restricting activities on existing claims, which threatens the development of an important lithium project. Humboldt County will be harmed due to the loss of net proceeds of mines taxes and the loss of mining and mineral exploration jobs.

25.     The NVLMP will have a significant negative effect on two of Humboldt County's most important industries: mining and ranching, as well as many other businesses that directly or indirectly support mining and livestock production. The NVLMP reduction in the number of livestock allowed to graze is likely to force ranchers and their families to seek other employment. The seasonal road closures during the breeding and nesting seasons and restrictions on pasture rotation in the NVLMP will make it difficult for ranchers to manage livestock and maintain fences and other ranch infrastructure. Moreover, ranches are valued on the number of livestock they can run based on their carrying capacity. The NVLMP restrictions on livestock grazing will reduce grazing permits by 25 percent or more, thereby decreasing the value of the ranch, which will impact ranching families and the local economies that rely on those ranches.

26.     The NVLMP unnecessarily interferes with good grazing practices and agricultural management underway in Humboldt County; interferes with the Humboldt County Regional Master Plan; conflicts with Humboldt County zoning ordinances; impedes the County's wildfire and wildlife management activities; and is inconsistent with Humboldt County's development goals to attract industrial development outside of the Winnemucca industrial area. The travel

DAVIS GRAHAM &
STUBBS LLP
ATTORNEYS AT LAW
50 W. LIBERTY ST., STE. 950
RENO, NEVADA 89501
(775) 229-4219

restrictions specifically interfere with key Humboldt County responsibilities, including road construction and maintenance, landfill plans, pipelines, and local and interstate travel.

27. Washoe County covers approximately 4.2 million acres, with the majority of land within the County being public land administered and managed by BLM. However, in Washoe County, many public land boundaries are contiguous with developed areas as shown in Maps 1 and 2 in **Exhibit 4**; as such, many suburban communities in Washoe County are surrounded by public land.

28. The NVLMP conflicts with the Conservation Element of the Washoe County Master Plan and will interfere with Washoe County's ability to acquire public land parcels needed for schools, cemeteries, and other community development purposes (Map 3, Exhibit 4) and to manage other habitat and economic development issues using a comprehensive approach based on the best available science. Such interference stems, in part, from inaccurate BLM mapping that shows all or portions of public lands bordering developed areas as either GHMA or PHMA, where more detailed County habitat maps based on site specific information show these areas as unsuitable GSG habitat. Consequently, the disposal category for these lands has changed from suitable for disposal (and thus available for Washoe County's use in development) to retention as federal land. Moreover, reliance on the NVLMP maps results in arbitrary exclusion of lands from use—even when those lands might not be actual habitat.

29. Lander County covers approximately 3.5 million acres. Over 85 percent of the land in Lander County is public land managed by the BLM and National Forest System lands managed by the US Forest Service. This land is primarily used for livestock grazing, mining, geothermal energy production, and outdoor recreation. The single greatest land use within the County is open space agriculture comprised of a series of grazing allotments. Also interspersed throughout the County are 24 mining districts. Mining, outdoor recreation, and agriculture serve

12

DAVIS GRAHAM &
STUBBS LLP
ATTORNEYS AT LAW
50 W. LIBERTY ST., STE. 950
RENO, NEVADA 89501
(775) 229-4219

as a basis for the County's economy.  The mining industry is by far the dominant industry sector in Lander County, as to job shares (45 percent), payrolls (63.7 percent), personal incomes (64.2 percent), and its positive impacts on other industry sectors in the county and regional economies.

30.    The NVLMP conflicts with the Lander County Master Plan, the County's Comprehensive Economic Development Strategy ("CEDS"), the Lander County 2012 Policy Plan for Federally Administered Lands, and the Lander County Sage Grouse Conservation Plan. The NVLMP restrictions will interfere with Lander County's ability to expand recreational opportunities, to manage future economic development issues using a comprehensive approach, and to pursue development of alternative energy projects including geothermal, solar, and wind energy, as identified in its CEDS and a 2012 Renewable Energy Development Feasibility Study.

31.    Churchill County participated as a Cooperating Agency in the EIS/LUPA process and submitted detailed comments on the May 2013 Administrative Agency Review Draft for the DEIS. Churchill County's comments focus on controlling the spread of invasive annual grasses to reduce wildfire risks and the need for much better post-fire restoration funding and efforts. Churchill County reiterated these comments in its review of the DEIS, stating that the agencies had not addressed the County's previous comments. Churchill County objected to the proposed reduction in livestock grazing as a GSG conservation measure and instead stressed the superiority of weed control, predator control, wild horse and burro population control, and habitat restoration

32.    The NVLMP perpetuates the problems Churchill County identified in its comments on the draft documents. The NVLMP restrictions interfere with the Conservation and Natural Resources and Policy Plan for Public Lands components of Churchill County's 2010 Master Plan. The agencies' failure to give adequate consideration to Churchill County's Master Plan violates FLPMA and conflicts with the Counties' Policy Plan for Public Lands which

13

DAVIS GRAHAM &
STUBBS LLP
ATTORNEYS AT LAW
50 W. LIBERTY ST., STE. 950
RENO, NEVADA 89501
(775) 229-4219

requires federal agencies to include the County in Consistency Reviews for federal decisions regarding public and federal lands in Churchill County.

33.     White Pine County covers approximately 8,876 square miles of land, of which about 94 percent is federal land.  Within the County's borders, there are 2,344 center line miles of certified roads, a significant portion of which will be subject to the travel restrictions in the NVLMP.  White Pine County's economic base consists of mining, ranching, farming, tourism and recreation, including hunting, fishing, hiking, and other motorized and non-motorized activities.

34.     By limiting access to public lands, creating landlocked private lands and by focusing on GSG conservation to the exclusion of multiple land uses, the NVLMP interferes with the White Pine County Master Plan, which includes the County's Land Use Plan, and the White Pine County Conservation, Recreation, and Development Act (which was approved by Congress) ("WPCCRDA").  Within the Plan, and as manifested in the WPCCRDA, are County goals for land use, including road maintenance needs and recreational and tourism related goals, as well as the development of private property.  The County prides itself on attaining such goals while also protecting important and sensitive environmental qualities and access to public lands.

35.     Pershing County is comprised of over 2,100,000 acres public land managed primarily by BLM, which represents roughly 81 percent of the County's land base. Pershing County's economic well-being is thus tied closely to the ability of its residents to use public lands for ranching, mineral exploration and development, recreation, travel, and other purposes. The majority of the natural resources within the County's geographic boundaries are located on public land. Decisions governing public lands in Pershing County have a history of negative impact on the interrelated heritage of cultural, environmental, and economic well-being and stability of County residents. The NVLMP restrictions will perpetuate this history and BLM's

14

DAVIS GRAHAM &
STUBBS LLP
ATTORNEYS AT LAW
50 W. LIBERTY ST., STE. 950
RENO, NEVADA 89501
(775) 229-4219

1   failure to fulfill its statutory obligations pursuant to FLPMA to coordinate planning efforts with

2   Pershing County's local land use plans.

3         36.    The NVLMP conflicts with Pershing County's Master Plan and Natural Resource

4   Management Plan, will harm the interests of Pershing County, and impede the County's ability

5   to implement these plans. The travel management restrictions will interfere with Pershing

6   County's police powers and its obligations to provide for public health and safety. The NVLMP

7   land use restrictions interfere with Pershing County's current and future development plans

8   which rely on mining, communication infrastructure, and energy production. The NVLMP's

9   restrictive approach to range management will produce unhealthy vegetation and increase fire

10   hazards in Pershing County.

11         37.    Paragon Precious Metals, LLC ("Paragon") is a small private Nevada corporation

12   that has controlled unpatented lode mining claims on Buckskin Mountain in the northern Santa

13   Rosa Range in Humboldt County, Nevada since 1995.  Paragon's 90 claims are situated on

14   National Forest System lands and these cover an area of approximately 1,737 acres.  This mining

15   property has significant potential for the discovery and development of a high-grade gold and

16   silver deposit, like the nearby National Mine, the Midas Mine, and the Sleeper Mine.

17         38.    Paragon has expended considerable time and money in exploring its claims and

18   will be financially harmed by the NVLMP restrictions. Because a significant portion of

19   Paragon's claims are located in an SFA, the NVLMP threatens the Company's mineral rights.

20   Paragon will lose the significant investments it has made in the property to date when these lands

21   are withdrawn from operation of the General Mining Law and will forfeit any potential reward

22   stemming from the significant risk incurred by maintaining the property in good standing and

23   conducting exploration on the property.  The termination of Paragon's rights under the General

24   Mining Law to explore its only project creates such substantial, imminent, and irreparable harm

15

DAVIS GRAHAM &
STUBBS LLP
ATTORNEYS AT LAW
50 W. LIBERTY ST., STE. 950
RENO, NEVADA 89501
(775) 229-4219

that it will likely destroy Paragon's business.  In addition, the threat of withdrawal imposes such a significant adverse cloud on the property that it is interfering with Paragon's ability to raise necessary funding to continue with its exploration on its claims.

39.     Ninety-Six Ranch, LLC (the "Ranch") is Nevada's first and only sesquicentennial ranch to still be owned and operated by one family.  The Ranch covers 16,000 acres of private land, as well as a set of grazing permits encompassing over 250,000 acres of BLM and USFS public lands in and around the Santa Rosa Mountains in Humboldt County, Nevada.  The NVLMP's restrictions threaten the survival of the ranching operation and devalue the ranch's land and resources because, a reduction in or cancellation of its grazing permits will threaten the viability of its business and significantly reduce the saleable value of the Ranch.  Any changes in the Ranch's grazing permits must be consistent with the Taylor Grazing Act which the impacts from the NVLMP are not.

40.     By limiting grazing during the spring and summer months, the NVLMP restrictions make the Ranch's grazing permits useless in violation of Federal law.  These same restrictions threaten the safety and viability of the ranch because the NVLMP allows fuels on affected rangeland to grow (or, in the case of cheatgrass, to invade) without the check normally provided by managed grazing; thus, the risk of wildfire and the potential destruction of important sage-grouse habitat on the Ranch – as well as neighboring private land inholdings – is very real and exacerbated by the livestock grazing restrictions in the NVLMP.

41.     In violation of the Taylor Grazing Act and other Federal laws, the NVLMP also interferes with access to over one-third of the Ranch's total private lands because the NVLMP limits the use of trailing permits on or near sage grouse leks.  The inability to trail cattle across public lands within four miles of leks impacts the Ranch's entire permit area and leaves the Ranch without access to some of the private additional pasture that the Ranch has already paid

16

DAVIS GRAHAM &
STUBBS LLP
ATTORNEYS AT LAW
50 W. LIBERTY ST., STE. 950
RENO, NEVADA 89501
(775) 229-4219

for and leased.  Critically, the restrictions also leave the Ranch without access to its historic and vested water sources on both BLM- and USFS-managed lands.

42.    Lincoln County is comprised almost entirely of federal lands, with approximately 97 percent of its land base managed by the BLM and US Forest Service.  Consequently, the land use restrictions in the NVLMP will have a profound impact on the County's residents, economy, culture, and way of life. In its comments on the Draft EIS, Lincoln County voiced concerns that the agencies had not properly considered input from Lincoln County's Local Area Working Group which represents the best source of reliable information on GSG habitat and populations in the County.

43.    Lincoln County identified wildfire, conifer invasion, predation, and GSG habitat degradation due to BLM's failure to properly manage grazing wild horses and burros as the primary threats to GSG in the County. Lincoln County provided the agencies with specific recommendations for reducing these threats, which the agencies did not incorporate into the NVLMP. The County strenuously objected to the way in which the FEIS/LUPA failed to distinguish between properly managed livestock grazing and the problems resulting from uncontrolled grazing of wild horses and burros.

44.    The land use restrictions in the NVLMP substantially conflict and interfere with Lincoln County's Public Lands Policy Plan which was developed in 2010 and amended in 2015. This Plan relies on the County's future ability to acquire federal land parcels to enable County development objectives. With 97 percent of the County's land in federal ownership, communities in Lincoln County are landlocked and face harsh impacts from the NVLMP's reclassification of lands formerly identified as suitable for acquisition by the County to retention by the federal government. This change in disposal status may conflict with long-standing agreements (including the Lincoln County Conservation, Recreation, and Development Act of 2004). The

17

DAVIS GRAHAM &
STUBBS LLP
ATTORNEYS AT LAW
50 W. LIBERTY ST., STE. 950
RENO, NEVADA 89501
(775) 229-4219

NVLMP's restrictions on the transfer of public lands and on livestock grazing, and its failure to address the specific key threats to GSG habitat in Lincoln County will create substantial economic hardships for Lincoln County residents.

45.     U.S. DEPARTMENT OF THE INTERIOR ("Interior" or "DOI") is charged with protecting and managing the Nation's natural resources and, under FLPMA, developing, maintaining and revising land use plans with public involvement and employing the principals of multiple-use and sustained yield.

46.     BUREAU OF LAND MANAGEMENT ("BLM") is responsible for managing and conserving resources for multiple-use and sustained yield on public lands.  In doing so, BLM must prepare NEPA analyses to evaluate the direct, indirect, and cumulative impacts from amending land use plans pursuant to FLPMA.

47.     U.S. FOREST SERVICE ("USFS") is part of the U.S. Department of Agriculture and is charged with implementing the NFMA and to prepare NEPA analyses to evaluate the direct, indirect, and cumulative impacts from amending land and resource management plans. NFMA requires the USFS manage the nation's Forest System Lands to provide for a broad range of resource issues consistent with principles established under the Multiple Use & Sustained Yield Act of 1960 ("MUSYA"), 16 U.S.C. § 528.

48.     SALLY JEWELL is the Secretary of Interior and is sued in her official capacity. Secretary Jewell, in her capacity as Secretary of Interior, has ultimate responsibility for BLM actions pursuant to FLPMA and the General Mining Law.

49.     NEIL KORNZE is the Director of BLM and is sued in his official capacity and oversees BLM, the agency that implements FLPMA and administers the General Mining Law.

50.     AMY LUEDERS is the Nevada BLM State Director and is sued in her official capacity and supervises BLM's implementation of FLPMA within the State of Nevada.

18

DAVIS GRAHAM &
STUBBS LLP
ATTORNEYS AT LAW
50 W. LIBERTY ST., STE. 950
RENO, NEVADA 89501
(775) 229-4219

51.     TOM VILSACK is the Secretary of the Department of Agriculture and is sued in his official capacity in which he has ultimate responsibility for USFS' actions under the NFMA.

52.     THOMAS L. TIDWELL is the Chief of the USFS and is sued in his official capacity.  Chief Tidwell has responsibility for the USFS' actions under the NFMA.

53.     BILL DUNKLEBERGER is the Forest Supervisor for the Humboldt-Toiyabe National Forest and is sued in his official capacity.  Forest Supervisor Dunkleberger supervises USFS' implementation of the NFMA within the State of Nevada.

## LEGAL BACKGROUND

### A.     Federal Land and Policy Management Act

54.     FLPMA requires that public lands be managed under principles of multiple-use in a manner that recognizes the nation's need for domestic sources of minerals, including implementation of the Mining and Minerals Policy Act of 1970.  43 U.S.C. § 1701(a)(12). FLPMA defines "multiple use" as the "management of the public lands and their various resource values so that they are utilized in the combination that will *best meet the present and future needs of the American people*" providing a "combination of ***balanced and diverse resource uses*** . . . without permanent impairment of the productivity of the land and the quality of the environment" and with consideration "to the relative values of the resources."  43 U.S.C. § 1702(c).  The NVLMP violates multiple-use, ignoring the "present and future needs of the American people" and making GSG habitat conservation the primary land management objective to the exclusion of other uses without adequate consideration of science and commercial information to evaluate viable alternatives that would allow balanced and diverse resource uses.

55.     FLPMA preserves rights of claim locators under the General Mining Law, including access rights.  43 U.S.C. § 1732(b).  The SFA withdrawals from mineral entry and

DAVIS GRAHAM &
STUBBS LLP
ATTORNEYS AT LAW
50 W. LIBERTY ST., STE. 950
RENO, NEVADA 89501
(775) 229-4219

travel restrictions violate § 1732(b) of FLPMA, the requirement to recognize the Nation's needs for domestic sources of minerals, 43 U.S.C. § 1701(a)(12), and the General Mining Law.

56.     FLPMA recognizes state and local governments have expertise in and sovereign local police powers over land use planning, and *requires* the Secretary to develop land use plans that "are consistent with State and local plans to the maximum extent" such plans are "consistent with Federal law and the purposes of [the] Act."  *See* 43 U.S.C. § 1712(c)(9).  This honors fundamental principles of federalism allowing states to develop unique solutions and engage in cooperative efforts with local governments to solve state-specific problems.  *See* Executive Order 13232, Aug. 4, 1999, 64 Fed. Reg. 43255.  The NVLMP is inconsistent with the 2014 Nevada Sage-Grouse Conservation Plan ("Nevada Plan"); the Humboldt County Regional Master Plan; the Conservation Element of the Washoe County Master Plan; the Lander County Master Plan, CEDS, 2012 Policy Plan for Federally Administered Lands, and the Lander County Sage Grouse Conservation Plan; the White Pine County Master Plan, Land Use Plan, and the White Pine County Conservation, Recreation, and Development Act; the Elko County Plan; and the Eureka Master Plan in violation of FLPMA § 202(c)(9).  The Protest Report summarily dismisses the consistency requirement with generalized conclusions that state and local plans and laws may be different than federal laws, in which case the NVLMP can be inconsistent with state and local plans, failing to identify the differences or explain why they cannot be reconciled. (Protest Report at 42). While an agency's final decision may, in certain cases, be inconsistent with state or local plans, the BLM cannot ignore critical comments from state and local governments and refuse to engage in a meaningful involvement with them.

57.     The NVLMP is irreconcilably different from the state and local plans which are consistent with the multiple use and sustained yield mandates in FLPMA and NFMA, whereas the NVLMP is not.  BLM obscures this difference stating its objective is to implement a "GSG

20

DAVIS GRAHAM &
STUBBS LLP
ATTORNEYS AT LAW
50 W. LIBERTY ST., STE. 950
RENO, NEVADA 89501
(775) 229-4219

conservation strategy rangeland [that] provide[s] for the conservation of the GRSG and its habitat and to provide FWS with regulatory certainty that in turn will potentially preclude a determination that the species is warranted for listing." (BLM Response to Sandoval Consistency Review at 3).  BLM admits that it has chosen to subordinate its multiple use and sustained yield mandate in order to influence FWS' listing determination, which is unlawful; FLPMA requires BLM to take a balanced approach that achieves multiple- use while also conserving GSG habitat.

58.     The Nevada and County plans focus on reducing key threats to GSG habitat (as identified in the U.S. Fish & Wildlife Service ("FWS") 2013 Greater Sage-grouse Conservation Objectives: Final Report ("COT Report")) – wildfires and invasive species infestations.  The NVLMP does not focus on reducing these primary threats but instead imposes onerous restrictions on public land use, despite the COT Report's conclusion that use of public lands is not the primary habitat threat.  The NVLMP's failure to focus on the primary threats to GSG habitat will result in environmental harm by interfering with the State's and Counties' Plans. The BLM ROD emphasizes the COT Report finding that fire and weeds/annual grasses are a ubiquitous threat throughout the ROD planning area, and shows threats ascribed to mining and "*improper* grazing" as being much less widespread.  (BLM ROD at 1-10, -11).

59.     The agencies have violated their Congressional grant of authority in developing the NVLMP by substituting their statutorily mandated objective to manage federal lands for multiple-use and sustained yield with GSG conservation measures that will "…provide the FWS with regulatory certainty that in turn will potentially preclude a determination that the species is warranted for listing."  BLM Response to State's Consistency Review at 3.  Neither FLPMA nor NFMA provide the agencies with the statutory authority to ignore or subordinate their multiple-use and sustained yield statutory mandates in preference for influencing FWS' decisions.  FWS does not have statutory authority over an unlisted species or land use planning.  The agencies

DAVIS GRAHAM &
STUBBS LLP
ATTORNEYS AT LAW
50 W. LIBERTY ST., STE. 950
RENO, NEVADA 89501
(775) 229-4219

unlawfully delegated their land use planning authority to FWS by adopting the "Stronghold Areas" (called SFA in the NVLMP and RODs) that FWS asserted were necessary in an October 2014 memorandum from Director Ashe to Director Kornze and Chief Tidwell. *See* **Exhibit 1**. This action was arbitrary, capricious and unlawful because FWS and the agencies failed to identify and disclose science or commercial information to support that such withdrawals are necessary to achieve the conservation objective.

60. The 2014 FWS memorandum includes habitat maps that show areas along the northern border of Nevada in Washoe, Humboldt and Elko Counties as PHMA where FWS asserts "the strongest levels of protection are recommended" based on areas "noted and referenced by the conservation community." The agencies have improperly added the third-party "conservation community" stronghold maps to the FEIS, labeling the stronghold areas as SFA withdrawal zones, and included them as a new concept (FEIS at 1-1) without giving the public an opportunity to review a Supplemental EIS that included the FWS October 2014 maps or disclosing science or commercial information underlying the identification of the SFA boundaries and conclusion these areas should be withdrawn. The Protest Report similarly characterizes the October 2014 memorandum and maps as providing new information: "This memorandum provides information *in addition* to that which was already considered in the Draft LUPA/FEIS . . . ." (Protest Report at 172).

61. The agencies' use of the FWS October 2014 memorandum to delineate the SFA is questionable especially in light of FWS' September 22, 2015 announcement that GSG is not warranted for listing as a protected or endangered species under the Endangered Species Act. The Nevada Division of Wildlife – not FWS—has primary authority over unlisted species like GSG; FWS has no statutory authority or jurisdiction. Therefore, it is unlawful for BLM to

DAVIS GRAHAM &
STUBBS LLP
ATTORNEYS AT LAW
50 W. LIBERTY ST., STE. 950
RENO, NEVADA 89501
(775) 229-4219

delegate its land management authority to FWS and to provide FWS "veto" authority in project-level decisions including relative to disturbance cap determinations.

62.     An agency may not sub-delegate authority to another agency under the guise of taking advice.  FWS advocated for the SFA and engaged in the land use planning process in a manner outside of its authority.  The BLM acquiesced to the FWS' SFA under the guise of taking advice.  This violates the land use planning authority Congress delegated to BLM and exceeds FWS' authority which is limited to federally listed threatened and endangered species.

63.     FLPMA authorizes BLM to "make, modify, extend, or revoke withdrawals <u>but only in accordance with the provisions and limitations of this section</u>."  *See* 43 U.S.C. § 1714(a) (emphasis added).   The BLM may choose to propose a withdrawal, or it may consider withdrawal upon application from an entity or person outside the BLM.  *Id.* § 1714(b)(1).  USFS has acknowledged it must propose a withdrawal to BLM through the application process.  *See U.S. v. Smith Christian Min. Enterprises, Inc.*, 537 F. Supp. 57, 60-61 (D. Ore. 1981).  USFS's own manual on withdrawal applications indicates: "[USFS] must apply to the Secretary of Interior for withdrawal actions on USFS lands."  Manual 2760.01, *Special Uses Management: Withdrawals*.  In evaluating the appropriateness of a withdrawal, this manual directs USFS to "encourage mineral activity where mineral extraction is the best use of the site."  Moreover, USFS notes requests for withdrawal of minerals "should be made rarely."

64.     The DEIS did not select a preferred alternative involving widespread withdrawals. Then, after publication of the DEIS, FWS and, effectively USFS (given USFS has jurisdiction over the Forest System Lands at issue), proposed the SFA, which requires implementation of widespread withdrawal zones including approximately 395,000 acres of USFS-administered lands in Elko County and 175,000 acres of USFS- administered lands in Humboldt County – in conflict with the DEIS analysis.  USFS did not conduct a FLPMA or NEPA analysis of the SFA

23

DAVIS GRAHAM &
STUBBS LLP
ATTORNEYS AT LAW
50 W. LIBERTY ST., STE. 950
RENO, NEVADA 89501
(775) 229-4219

withdrawals as required by the evaluation criteria in its own manual for proposing withdrawal of lands.  This proposed land withdrawal was not made in accordance with the provisions and limitations of 43 U.S.C. § 1714.

65.    To initiate a new withdrawal, BLM, or another applicant must follow § 1714 and its implementing regulations. FLPMA's implementing regulations on withdrawal require pre-application consultation with BLM. 43 C.F.R. § 2310.1-1 ("A potential applicant should contact the appropriate State" BLM office "well in advance of the anticipated submission date of an application . . . Early consultation also will assist in determining the need for a withdrawal, taking possible alternatives into account.")  After consultation, "before the authorized officer can take action on a withdrawal proposal, a withdrawal application in support thereof ***shall be*** submitted." *Id*. § 2310.1-2 (emphasis added).  The application shall contain, *inter alia*,

> A legal description of the entire land area that falls within the exterior boundaries of the affected area and the total acreage of such lands . . . The extent to which the lands embraced in the application are requested to be withheld from entry under the public land laws, including the mining laws . . . The type of temporary land use that, at the discretion of the authorized officer, may be permitted or allowed during the segregation period . . . An analysis and explanation of why neither a right-of-way under section 507 of the Act . . . nor a cooperative agreement . . . would adequately provide for the proposed use . . . The place where records relating to the application can be examined by interested persons.

*Id*. §§ 2310.1-2(c)(5), (8), (9), (10), (12), (14).  Based on information and belief, neither USFS nor FWS engaged in pre-application consulting with BLM, or filed a withdrawal application with BLM as FLPMA requires.

66.    In addition, USFS failed to comply with its own procedures when it accepted, wholesale, the FWS' proposed "strongholds" which led to the SFA.  According to Forest Service Manual 2760, before requesting BLM to withdraw lands, USFS should "[n]otify permittees

DAVIS GRAHAM &
STUBBS LLP
ATTORNEYS AT LAW
50 W. LIBERTY ST., STE. 950
RENO, NEVADA 89501
(775) 229-4219

holding permits on lands open to mineral development of their risks and liabilities," and "document new withdrawal of lands from…entry under the mining law by: (a) An assessment of the mineral potential. (b) An evaluation of alternatives. (c) An analysis showing that the use or special features of the area cannot be adequately preserved or protected through other means." Manual 2761.03, *Special Uses Management: Withdrawals*.   Moreover, USFS directs forest officers to "[i]nclude in the withdrawal the minimum area needed for the intended use." *Id*.   The USFS did not perform any of the required functions in proposing the land withdrawal to BLM. There has been no analysis to determine whether the proposed withdrawal was the minimum area "needed for the intended use" and, as demonstrated herein, it is not.   The public has been deprived of any meaningful opportunity to evaluate the SFA.

67.     A "withdrawal petition" is a request to file an application for withdrawal that is originated within the DOI. *Id.* § 2300.5(p).   The withdrawal petition must be submitted to the BLM for transmittal to the Secretary. *Id.* § 2310.1-3.   A withdrawal petition must contain, *inter alia*: the office originating the petition; the type and purpose of the proposed withdrawal action; and a preliminary identification of the mineral resources in the area.   *Id*. §§ 2310.1-3(b)(1), (2), (5).   Upon information and belief, neither USFS nor FWS submitted a withdrawal petition to BLM in violation of these requirements.

68.     FWS is an agency within DOI without specific land use planning authority, and it is thereby required to submit a withdrawal petition to BLM if it seeks land withdrawals.   Based on information and belief, FWS did not engage in the requisite application process to request withdrawal of land (i.e., the "highest level of protection") within the Strongholds identified in the October 2014 memorandum that became the SFA in the NVLMP.   Moreover, FWS' role in identifying and requesting the SFA withdrawal must be examined now that FWS determined not to list GSG and the limited jurisdiction the agency has over an unlisted species.

25

DAVIS GRAHAM &
STUBBS LLP
ATTORNEYS AT LAW
50 W. LIBERTY ST., STE. 950
RENO, NEVADA 89501
(775) 229-4219

69.     BLM and USFS should be enjoined from implementing the SFA in the NVLMP because such adoption did not occur in conformance with the requirements to request land withdrawal, and thereby violated the requirements of FLPMA.

**B.**     **The National Forest Management Act**

70.     NFMA requires the Secretary of Agriculture and its agency the USFS to manage the Nation's National Forest System lands consistent with the principles established under the Multiple Use and Sustained Yield Act of 1960 ("MUSYA"), 16 U.S.C. § 528.  NFMA directs USFS to manage federal lands for multiple uses, and requires USFS to use "a systematic interdisciplinary approach to achieve integrated consideration of physical, biological, economic, and other sciences" (16 U.S.C. § 1604(b)), to consider both environmental and economic goals (16 U.S.C. § 1604(g); 36 C.F.R. § 219.1(a)), while taking into account the Nation's needs for minerals (*see* 16 U.S.C. § 528).  The SFA withdrawal zones and travel restrictions in the NVLMP that affect USFS-administered lands violate the NFMA multiple-use mandate.  The USFS ROD mischaracterizes the changes that the NVLMP makes to the Humboldt-Toiyabe Land Management Plans as "non-significant," despite the fact that it asserts GSG habitat covers 44 percent of the Humboldt National Forest and 15 percent of the Toiyabe National Forest. (USFS ROD at 67).  Impacting 44 percent of a national forest is significant – especially when 566,600 acres are SFA to be withdrawn from operation of the General Mining Law (USFS ROD at 21).  The SFA withdrawal in the Humboldt National Forest represents roughly 50 percent of the GSG habitat in the forest, 22 percent of the entire forest area and is significant.

**C.**     **The General Mining Law**

71.     Section 22 of the General Mining Law requires that public lands be open for mineral exploration and development.  This right of access, use, and occupancy applies to unpatented mining claims before and after discovery of a valuable mineral deposit pursuant to

26

DAVIS GRAHAM &
STUBBS LLP
ATTORNEYS AT LAW
50 W. LIBERTY ST., STE. 950
RENO, NEVADA 89501
(775) 229-4219

Section 22 and 30 U.S.C. § 612(b), the Surface Use Act (herein referred to as "the General Mining Laws") guaranteeing the right to use and occupy federal lands open to mineral entry, for prospecting, mining and processing and all uses reasonably incident thereto, including ancillary use rights, and rights of and associated with ingress and egress. These rights extend to public lands being used and occupied for mill site purposes and ancillary uses for facilities necessary to support mining operations. Numerous land use restrictions in the NVLMP including the SFA withdrawals and the access (travel) restrictions violate the General Mining Laws.

72.     The proposed travel restrictions in Nevada's "checkerboard lands" where the odd-numbered sections are private lands interspersed between public lands, will subject the federal government to property takings claims. Restrictions on road uses on public lands will render the contiguous road segment on adjacent private land sections inaccessible eliminating their economic value. Nevada courts have held that the government's substantial impairment of a property owner's right of access constitutes a compensable taking. BLM did not analyze the financial impact to the federal government of such takings claims, in violation of Executive Order 12360 or viable alternatives such as the conservation measures in the County and Nevada Plans to achieve the same objectives. In addition, the primary jurisdiction over use of roads resides with local governments; BLM cannot lawfully restrict such use or the right of local governments to maintain or improve such roads.

73.     The 2.8 million acres proposed for withdrawal is grossly out of proportion with the footprint of mineral activities in Nevada. For example, Western Exploration's claims at issue cover only 6,950 acres. BLM's LR 2000 database shows the statewide authorized surface disturbance of mineral exploration and development as of January 2014 was 191,374 acres – a mere 6.8 percent of the 2.8 million acre SFA areas. The proposed withdrawal of 2.8 million

DAVIS GRAHAM &
STUBBS LLP
ATTORNEYS AT LAW
50 W. LIBERTY ST., STE. 950
RENO, NEVADA 89501
(775) 229-4219

acres is fifteen times the size of the entire footprint of authorized mineral projects in Nevada and includes significant acreage in southern Nevada *outside of GSG habitat*.

74.     The FWS' October Not Warranted Determination clearly demonstrates that the SFA are completely unnecessary to protect GSG habitat: "…Overall, the extent of [mining] projects *directly affects less than 0.1 percent of the sage-grouse occupied range*. Although direct and indirect effects may disturb local populations, *ongoing mining operations do not affect the sage-grouse range wide*." (FR 59858, October 2, 2015, p. 59915, emphasis added). According to DOI's September 22, 2015 press release[1], the range-wide GSG habitat covers roughly 173 million acres of land in the western U.S. Because mining projects only affect about 173,000 acres of GSG habitat throughout the west, the 2.8 million acre SFA withdrawal in Nevada (and over 10 million acres nationwide) is grossly out of proportion to the size of mining's impact, underscoring the utter lack of a rational, scientifically sound basis for imposing this unprecedented oversized withdrawal.

75.     It is arbitrary, capricious, and unlawful for BLM and USFS to propose withdrawing the SFA and extinguishing claimants' rights under the Mining Laws given the FWS' admission that mining does not have a significant impact and the agencies' acknowledgment in the FEIS that some of the areas proposed for withdrawal do not have important habitat – or habitat at all.  This raises the question of what, if any, science exists to support identification of these areas.  As explained in the State of Nevada's Sagebrush Ecosystem Council's June 29, 2015 Protest Letter,  "[t]he methods provided for delineation of the SFAs are not explicit and therefore are not transparent nor scientifically defensible…Overall,

---

[1] (http://www.blm.gov/wo/st/en/info/newsroom/2015/september/nr_09_22_2015.html)

DAVIS GRAHAM &
STUBBS LLP
ATTORNEYS AT LAW
50 W. LIBERTY ST., STE. 950
RENO, NEVADA 89501
(775) 229-4219

the criteria described for producing the SFA does not match the State's assessment of breeding bird densities…or resistance and resilience mapping statewide …, and it is unclear what criteria were applied to determine which landscapes qualify as being 'essential to conservation and persistence of the species.'"  (SEC pages 5 – 6).  Instead, the agencies blindly adopted the stronghold area/SFA from the October 2014 Ashe memo with no supporting information or even disclosure to the public of what science or data supported identification of the SFA boundaries.

76.     Numerous Nevada counties identified errors in the NVLMP's identification of areas mischaracterized as GSG habitat, such as the PHMA in Eureka County that covers the Town of Eureka, US Highway 50, State Route 278, the Eureka County landfill, the Falcon-to-Gondor major distribution line, multiple ancillary power lines, multiple subdivisions with homes, paved and gravel roads, farms with alfalfa fields and irrigation systems, hay barns and other infrastructure.  The Washoe County lands needed for a school and a cemetery are another example of lands mischaracterized in BLM's habitat map. The Protest Report glosses over problems with the habitat maps stating that they need not be resolved because the NVLMP is a regional, programmatic plan and the agencies should wait to resolve such problems on a project-by-project basis if and when a project proponent raises inconsistencies between the NVLMP maps and the on-the-ground habitat conditions. (Protest Report at 172).  This response is inadequate for the SFA where the agencies admit the actual presence of GSG populations is speculative, (Protest Letter at 82) and where there will never be any project proponents to raise this issue due to the mineral withdrawal and other onerous prohibitions and restrictions that apply to the SFA. The answer is also unsatisfactory because the PHMA shown in the NVLMP habitat maps will create widespread areas where project development is strongly discouraged based on little or no reliable information about actual habitat condition, which will substantially interfere with the local and state land use plans and economic development objectives.  Finally,

DAVIS GRAHAM &
STUBBS LLP
ATTORNEYS AT LAW
50 W. LIBERTY ST., STE. 950
RENO, NEVADA 89501
(775) 229-4219

the identification of these areas, among other characteristics, renders the document a site-specific EIS in addition to a programmatic EIS.

77.     The agencies' broad assertion in the NVLMP that the restrictions will be applied "to the extent" permissible by law does not provide analysis or disclosure of impacts to rights under the General Mining Laws, the necessity or alternatives to impairment of such rights, or provide adequate public notice of how restrictions will be applied.  Although many stakeholders (including plaintiffs) raised concerns about valid existing rights, the RODs remain ambiguous about this important issue. Many voiced concerns that rights for unpatented mining claims located under the General Mining Law would be restricted to claims with a proven discovery of a valuable mineral deposit.  The glossary in the BLM ROD at 2-4 is unresponsive to this concern and offers a valid existing right definition that may interfere with claimants' rights under § 22 of the General Mining Law prior to discovery of a valuable mineral deposit.  The USFS ROD at 64 is similarly vague stating that valid existing rights would be preserved and uses a nearly identical definition of valid existing right as used in the BLM ROD.  (USFS ROD at 100).  Despite the numerous comments pertaining to valid existing rights and the discovery status of mining claims that are included in the Protest Report (Protest Report at 13 - 26), the report fails to address the concerns raised about the discovery status of a claim and simply asserts that the "FEIS/PLUPA does not violate valid existing rights."  (Protest Report at 26).  The NVLMP and ROD are replete with vague conclusory statements that the widespread land use prohibitions and restrictions in the SFA, PHMA, and GHMA do not interfere with valid existing rights.  The references to valid existing rights in the RODS obscures the real impact of the NVLMP on mineral exploration and mine development, which will be to impose such rigid land use restrictions including but not limited to lek buffer zones, travel restrictions, and seasonal constraints that the NVLMP extinguishes rights under § 22 of the General Mining Law for

30

DAVIS GRAHAM &
STUBBS LLP
ATTORNEYS AT LAW
50 W. LIBERTY ST., STE. 950
RENO, NEVADA 89501
(775) 229-4219

claims without a discovery of a valuable mineral deposit (which is the bulk of the mining claims in Nevada), resulting in the *de facto* withdrawal of millions of acres of PHMA and GHMA habitat areas shown on the faulty ARMP maps from operation of the General Mining Law *See* BLM ROD at 1-17 and USFS ROD  at 127.  The impacts of this were not adequately disclosed or analyzed in the NEPA or FLPMA process completed for the NVLMP.

D.   **The Taylor Grazing Act**

78.   The Taylor Grazing Act ("TGA") mandates that the Secretary "safeguard grazing privileges."  43 U.S.C. 315(b) (1994).  To ensure ranchers, such as the Ninety-Six Ranch, who have been using the public rangeland prior to the TGA would still be able to graze the public lands, Congress provided that grazing permits be allocated with preference to those landowners who were engaged in the livestock business, bona fide occupants or settlers, or owners of water or water rights, as may be necessary to permit the proper use of the lands, water or water rights owned, occupied or leased by them.  *Id.*  FLPMA did not repeal the major TGA provisions and the Secretary still is statutorily required to provide for stabilization of the livestock industry when formulating rangeland policy.  She failed to do this in the NVLMP.

79.   The TGA provided "those engaged in the livestock industry" with "certainty of tenure in their grazing use of the public lands."  H.R. Rep. No. 73-903 at 7 (1934).  Stabilizing the livestock industry was one of the primary purposes of the TGA.  *Faulkner v. Watt*, 661 F.2d 809 (9th Cir. 1981).  Congressman Taylor who sponsored the TGA and represented a constituency of ranchers who supported the TGA knew that the grazing privilege would need to be "definite and sufficient."  78 Cong. Rec. 5371 (1934).  Congress still understands and values stability of the livestock industry.  As recently as 1993, Congress considered the issue of grazing reform and Senator Reid, who sponsored the reform legislation, did not include changes to the grazing preference because to do so would "devaluate the permit."   139 Cong. Rec. 14,087

31

DAVIS GRAHAM &
STUBBS LLP
ATTORNEYS AT LAW
50 W. LIBERTY ST., STE. 950
RENO, NEVADA 89501
(775) 229-4219

1   (1993).  Yet, what Congress has safeguarded, the agencies have now jeopardized through the

2   restrictions imposed in the NVLMP.

3       **E.      The National Environmental Policy Act**

4       80.     NEPA requires that an EIS contain "high-quality information and accurate

5   scientific analysis."  40 C.F.R. § 1500.1(b).  If there is incomplete or unavailable relevant data,

6   the EIS must disclose this fact.  40 C.F.R. § 1502.22.  Internal email correspondence reveals that

7   the agencies knew the information they relied upon to create requirements in the NVLMP had

8   shortcomings and yet did not disclose these shortcomings.  This withholding of information

9   violated NEPA, which requires up-front disclosures of relevant shortcomings in the data or

10   models. *Id*.; *Lands Council v. Powell*, 395 F.3d 1019 (9th Cir. 2005). DOI officials recognized

11   the unlawful nature of the some of the land use restrictions and prohibitions in the NVLMP,

12   which originated in the December 2011 National Technical Team Report ("NTT Report").  E-

13   mail correspondence between DOI personnel who prepared the NTT Report reveals that some

14   NTT members voiced concerns about the illegality of the recommended conservation measures

15   in the NTT Report yet these same measures survived DOI's internal review and are now

16   incorporated into the NVLMP.  *See* **Exhibit 2**.  The resulting policy that is being advanced in the

17   NVLMP violates FLPMA and NFMA.  The BLM ROD confirms the purpose of the ARMP is to

18   implement the NTT Report, describing the ARMP as a radical change in BLM's management of

19   the public lands: "This change represents a new paradigm in managing the sagebrush landscape

20   for the BLM … to conserve the GRSG, consistent with direction articulated in the NTT report.

21   (BLM ROD at 1-40, citing the NTT Report at 6-7)

22       81.     NEPA requires a supplemental EIS when the agency makes substantial changes in

23   the proposed action that are relevant to environmental concerns or significant new circumstances

24   or information are included relevant to environmental concerns and bearing on the proposed

DAVIS GRAHAM &
STUBBS LLP
ATTORNEYS AT LAW
50 W. LIBERTY ST., STE. 950
RENO, NEVADA 89501
(775) 229-4219

action or its impacts.  40 C.F.R. § 1502.9(c).  Here, the Proposed LUPA in the FEIS differed so dramatically from the Preferred Alternative in the DEIS because it introduced for the first time the SFA, which the FEIS described as a "new concept" (FEIS at 1-1 and Protest Report at 172), it precluded "meaningful consideration" by the public and required circulation of a Supplemental EIS.  *State of Cal. v. Block*, 690 F.2d 753 (9th Cir. 1982).  The public comment procedures are "at the heart of the NEPA review process" and require responsible opposing viewpoints be included in the FEIS reflecting the "paramount Congressional desire to internalize opposing viewpoints into the decision-making process."  NEPA requires not merely public notice, but meaningful public participation in the evaluation process.  Failure to include significant elements of the NVLMP, such as the SFA, disturbance caps, net conservation gain objectives, and lek buffers in the DEIS defeats this aim and has resulted in NVLMP restrictions radically different from the preferred alternative in the DEIS.  By failing to disclose such substantial requirements until the FEIS when opportunity for comment pursuant to NEPA passed, the agencies insulated their decision-making process from public scrutiny rendering NEPA's procedures meaningless. *Id.*  In addition, supplementation is required where, as here, modifications to a proposed action "alter the overall cost-benefit analysis of the proposed action."  *Russell County Sportsmen v. USFS*, 668 F.3d 1037, 1048 (9th Cir. 2011).

82.     The agencies' Preferred Alternative (Alternative D) in the November 2013 DEIS did not include the SFA withdrawal zones because such withdrawals would be inconsistent with the multiple-use and sustained yield mandates in FLPMA and NFMA and would not meet the agencies' planning regulations or NEPA requirements.  "Alternative D . . . emphasizes *balancing resources and resource use among competing human interests, land uses, and the conservation of natural and cultural resource values* . . . ."  The agencies explained in the DEIS

33

DAVIS GRAHAM &
STUBBS LLP
ATTORNEYS AT LAW
50 W. LIBERTY ST., STE. 950
RENO, NEVADA 89501
(775) 229-4219

1
2

that Alternative D "seeks to provide a balanced level of protection, restoration, enhancement, and use of resources and services to meet ongoing programs and land uses." (DEIS, 2-13).

3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

83.     The agencies selected Alternative D to comply with NEPA and the agencies' multiple use mandates: "Formulated by the planning team, the preferred alternative represents those goals, objectives, and actions determined to be most effective at resolving planning issues and balancing resource use . . . ." The agencies selected this as the Preferred Alternative based on it meeting the purpose and need, the agencies' multiple-use mission, interdisciplinary team recommendations, environmental consequences analysis of the alternative, and Cooperating Agency comments provided on the Administrative Draft EIS. (DEIS, 2-24). Adding the SFA is a substantial change between the DEIS and the FEIS that is arbitrary and capricious and cannot be explained or justified by any change in law or regulations. The Protest Report mischaracterizes the discussion in the DEIS explaining why Alternative D was the Agency Preferred Alternative stating that "Alternative D resulted from customizing Alternative B to balance among competing  interests" (Protest Report at 59). The DEIS discusses *balancing resources* in the context of complying with the agencies' multiple use and sustained yield mandates – not to address competing interests – such as those of the conservation groups that advocated alternatives that included more widespread land use prohibitions and more stringent land use restrictions. The Protest Report also rationalizes adding the SFA to the FEIS despite the DEIS Preferred Alternative by characterizing this change as *minor* and within the scope of the alternatives analyzed in the DEIS. (Protest Report at 83). NEPA demands more to determining a Proposed Action, which must be a "logical outgrowth" stemming from the DEIS. The addition of the SFA withdrawal zones to the NVLMP is not a logical outgrowth of the DEIS Preferred Alternative which was selected on the basis of satisfying the agencies' multiple use and sustained yield mandates, which the NVLMP does not.

28

DAVIS GRAHAM &
STUBBS LLP
ATTORNEYS AT LAW
50 W. LIBERTY ST., STE. 950
RENO, NEVADA 89501
(775) 229-4219

84.     In the FEIS, the agencies acknowledge the SFAs are a new policy recommendation that is based on the October 2014 FWS Ashe memorandum.  *See* **Exhibit 1**. The USFS ROD at 20 and the Protest Report at 172 reiterate that the SFA concept originated with FWS and was new information added to the FEIS. There was ample time between October 2014 and publication of the FEIS to give public notice and opportunity to comment on the new maps.   Yet, BLM withheld this information from the public until May 29, 2015 when it published the FEIS -- depriving the public meaningful opportunity to comment on the new SFA. BLM's failure to publish a Supplemental EIS, disclose any science or data relied upon to prepare the new maps and seek public comments on those maps violates NEPA.  Moreover the agencies' eleventh-hour addition of the SFA contradicts their stated justification for the DEIS Preferred Alternative that balanced "resources and resource use" by avoiding withdrawal zones – with no explanation for this reversal.

85.     The Protest Report states that the SFA boundaries were determined using maps prepared by the USGS, but that the presence of GSG populations in the SFA has not been verified:  "…the ***potential*** presence of birds in these areas of the SFAs is acknowledged." (Protest Report at 82).  The agencies admit they propose draconian withdrawal of these lands, which puts some of the most valued potential mineral resource lands in the world off limits without even confirming that the SFA contain important GSG populations.  The agencies further admit that the proposal to withdraw these lands from mineral entry and processing of grazing permits is a new "additional recommendation" presented for the first time in the FEIS.  (Protest Response at 82). The agencies failed to provide the public an opportunity to review and comment on the data first identified in the FWS Memo and used to draw the SFAs.[2]  Worse still, the BLM discloses for the

---

[2]  The maps are marked: "Pre-Decisional. For Internal Review Purposes Only. Do Not Distribute."

DAVIS GRAHAM & STUBBS LLP
ATTORNEYS AT LAW
50 W. LIBERTY ST., STE. 950
RENO, NEVADA 89501
(775) 229-4219

first time in the Protest Report that USGS mapping was considered to draw the SFA boundaries. NEPA requires the disclosure of this in the DEIS and opportunity for public comment. The SFA boundaries are not drawn using best available science, were not provided in time for public comment as NEPA requires and are therefore unlawful.

86.     NEPA requires an EIS "[r]igorously explore and objectively evaluate all reasonable alternatives." 40 C.F.R. § 1502.14(a). The DEIS and FEIS do not present a complete or accurate discussion of the regulatory tools already in place to protect GSG habitat, including BLM Manual 6840, *Special Status Species Management* and the surface management regulations pertaining to locatable minerals at 43 C.F.R. § 3809 and 36 C.F.R. § 228 Subpart A, and the local and State plans. All of these existing regulations and conservation plans should have been considered in the context of the No Action Alternative as they all are in place and will continue to be implemented even absent federal action through revision of the LUPA.

87.     Although Manual 6840 is not included in Chapter 7, References, of the FEIS, nor were any alleged inconsistencies with it ever raised by Director Lueders who actively participated in the development of the Nevada Plan, the BLM relies on it extensively in its August 6, 2015 response to Governor Sandoval's FLPMA § 202(c)(9) consistency review letter. The absence of any meaningful discussion of Manual 6840 anywhere in the DEIS or FEIS is a flaw that requires a Supplemental EIS be prepared for public comment – especially in light of BLM's reliance on Manual 6840 in replying to Governor Sandoval's consistency review letter. The DEIS and FEIS did not disclose that the Nevada Plan was inconsistent with Manual 6840 – an issue BLM first raised in its response to the Governor's Consistency Review notwithstanding the State Director's active participation in development of the Nevada Plan.

88.     The No Action Alternative should have considered the effectiveness of the continued implementation of the State and Local Plans. Although the FEIS considered the

36

DAVIS GRAHAM &
STUBBS LLP
ATTORNEYS AT LAW
50 W. LIBERTY ST., STE. 950
RENO, NEVADA 89501
(775) 229-4219

Nevada Plan as Alternative E, it did not give this alternative meaningful consideration, dismissed the Elko Conservation Plan as an alternative that did not require detailed consideration, and did not give much consideration at all to the Eureka Plan or other county plans.  The Protest Report at 175, 180, and 197 correctly states that the objective of Manual 6840 is to reduce threats to BLM sensitive species with the objective of minimizing the likelihood for listing. However, in establishing its objectives for the NVLMP, BLM is using Manual 6840 in a vacuum as if the species protection objectives of the mandate eclipse or even nullify BLM's statutory multiple use and sustained yield mandates.  BLM must implement the species protection measures in Manual 6840 in a manner consistent with FLPMA multiple use and sustained yield directives.

89.     The agencies must consider reasonable alternatives to ensure they have before them and take into account all reasonable approaches to, and potential environmental impacts associated with a proposed action.  BLM and USFS should **not** have considered the Proposed Plan given that they are "infeasible, ineffective, or inconsistent with the basic policy objectives for the management of the area."  An alternative that maximized multiple-use of lands, such as the Elko County Plan, should have been fully analyzed.  Although the Nevada Plan also provides for such multiple-use, the BLM did not select it or propose it as the Preferred Alternative apparently because the agency now says the plan is inconsistent with Manual 6840 though Director Lueders never raised this during the numerous meetings she participated in over several years to develop the Nevada Plan.

90.     The agencies inappropriately eliminated two reasonable alternatives, the Elko County Plan and an Increased Grazing Alternative, from detailed analysis (FEIS, Section 2.11). The agencies' rejection of both alternatives reflects an unwillingness to take a "hard look" at the synergies between properly managed grazing and GSG habitat conservation that is embraced in Nevada Plan and the County plans.  The agencies' erroneous statement: "[t]here are currently no

37

DAVIS GRAHAM &
STUBBS LLP
ATTORNEYS AT LAW
50 W. LIBERTY ST., STE. 950
RENO, NEVADA 89501
(775) 229-4219

science-based studies that demonstrate that increased livestock grazing on public lands would enhance or restore GRSG habitat or maintain or increase GRSG abundance and distribution" (FEIS at 2-460) ignores the detailed list of scientific, published references included in the Elko County and State Plans. The agencies provide no justification for why they failed to consider the published scientific literature on managed grazing and habitat conservation. The Nevada Plan cites numerous technical studies that discuss livestock grazing and GSG habitat conservation and the important role that managed livestock grazing plays in maintaining riparian areas and wet meadows – two important seasonal GSG habitats. Elko County provided the agencies with information about how livestock grazing can reduce wildfire risks, including the following citation from federal expert, Dr. Lynn James, Director of USDA, ARS plant research laboratory at Logan Utah:

> Fires depend on adequate fuels-grasses and certain shrubs. The larger the fuel load, the hotter the fire will burn and the more damaging it will be…An economical and efficient way to remove excess grass is with an on-off grazing system. Fuel loads are reduced while producers benefit from forage consumed by their livestock. Other grazing strategies can aid in preventing or managing wildfires and controlled burns. Fires that do occur burn with reduced intensity and a general upward trend in rangeland condition is sustained. (Elko County Protest Letter at 9).

91. Because the sweeping land use restrictions in the NVLMP are inconsistent with FLPMA and NFMA multiple-use and sustained yield mandates and the General Mining Law, they do not meet NEPA criteria for a reasonable alternative, which must be practical or feasible from legal, technical, and economic standpoints. This, combined with the existence of viable and preferable but unexamined alternatives renders the FEIS legally inadequate.

### F. The Small Business Regulatory Enforcement and Fairness Act

92. The Regulatory Flexibility Act ("RFA") was enacted with the purpose of requiring agencies "to fit regulatory and informational requirements to the scale of businesses,

DAVIS GRAHAM &
STUBBS LLP
ATTORNEYS AT LAW
50 W. LIBERTY ST., STE. 950
RENO, NEVADA 89501
(775) 229-4219

organizations, and governmental jurisdictions subject to regulation." Pub. L. No. 96-354, § 2(b), 94 Stat. 1164 (1980). In order to achieve this purpose, "agencies are required to solicit and consider flexible regulatory proposals and to explain the rationale for their actions to assure that such proposals are given serious consideration." *Id.*

93.     The Small Business Regulatory Enforcement and Fairness Act ("SBREFA") amended the RFA noting the need for fundamental changes in the regulatory and enforcement culture of Federal agencies to be more responsive to small business without compromising the statutory missions of the agencies. Pub. L. No. 104-121, § 202(3), 110 Stat. 864. Congress additionally noted "the requirements of [the RFA] have too often been ignored by government agencies, resulting in greater regulatory burdens on small entities than necessitated by statute." *Id.* § 202(5). As a result, Congress determined "[s]mall entities should be given the opportunity to seek judicial review of agency actions required by [the RFA]." *Id.* § 202(6).

94.     The RFA defines "small entities as including small organizations, small businesses, and small governmental jurisdictions that have populations under 50,000 people." 5 U.S.C. § 601(5). Small businesses are determined by industry classification according to the current Small Business Administration's ("SBA") Table of Small Business Size Standards. *Id.* § 601(3). A small business for the mining industry is 500 people or less. Plaintiffs Western, Quantum, Paragon, and the Ranch qualify as small businesses. According to the U.S. Census Bureau: Eureka County has a population of 2,018; Humboldt County has a population of 17,279; Lander County has a population of 6,009; White Pine County has a population of 10,034; Churchill County has a population of 23,989; Pershing County has a population of 6,698; and Lincoln County has a population of 5,184. These rural counties therefore qualify as small entities under the RFA.

DAVIS GRAHAM &
STUBBS LLP
ATTORNEYS AT LAW
50 W. LIBERTY ST., STE. 950
RENO, NEVADA 89501
(775) 229-4219

95.     The RFA requires "an agency [that] is required by [5 U.S.C. § 553], or any other law, to publish general notice of proposed rulemaking for any proposed rule . . . [to] prepare and make available for public comment an initial regulatory flexibility analysis." *Id.* § 603(a).  An initial regulatory flexibility analysis must "contain a description of any significant alternatives to the proposed rule which accomplish the stated objectives of applicable statutes and which minimize any significant economic impact of the proposed rule on small entities." *Id.* § 603(c).

96.     The RFA requires the agency prepare a final regulatory flexibility analysis. *Id.* § 604.  This analysis must include, among other things, a description of the steps the agency took to minimize the significant economic impact on small entities, including a statement of the factual, policy, and legal reasons for selecting the alternative adopted in the final rule and why each of the other significant alternatives considered was rejected. *Id.* § 604(a).

97.     The agencies failed to make available for public comment an initial or final regulatory flexibility analysis in violation of SBREFA.  Given the significant economic impacts on small businesses such as Western, Quantum, and Paragon, and small entities such as Eureka, Humboldt, Lander and White Pine Counties, the NVLMP should be stayed and any enforcement against small entities deferred.

## **PROCEDURAL & FACTUAL BACKGROUND**

### A.     **Elko County Plan**

98.     Elko County's strong commitment to land stewardship and conservation is reflected in the Elko County Plan.  The Elko County Board of Commissioners approved the Elko County Plan and endorsed its purpose of ensuring that GSG populations and their habitat "are maintained, enhanced, or restored on public lands," and also promoted on private lands.  (Elko County Plan at 13).  In preparing the plan, the Elko County Division of Natural Resources Management developed a carefully researched and referenced study based on best available

40

DAVIS GRAHAM &
STUBBS LLP
ATTORNEYS AT LAW
50 W. LIBERTY ST., STE. 950
RENO, NEVADA 89501
(775) 229-4219

science that focuses on the site-specific environmental and socioeconomic conditions in the county. The Elko County Plan is the principal resource for GSG habitat management in the county, protects GSG populations and achieves significant sage-grouse habitat conservation.

99.     The Elko County Plan reflects the multiple-use land management principles in the December 2010 Elko County Public Land Use and Management Plan (together with the Elko County Plan the "Elko Conservation Plans") which was developed under the direction of the Elko County Board of Commissioners and the Elko County Natural Resources Advisory Commission to promote traditional multiple-uses in unison with conservation measures for federal lands. The foundation of the Elko Conservation Plans is FLPMA's mandate that the public lands be managed to achieve multiple-use and sustained yield. (43 U.S.C. § 1701). Elko's Conservation Plans promote GSG habitat conservation while maintaining a sustainable local economy and will provide superior GSG conservation than the NVLMP.

100.    Elko County is a cooperating agency for the EIS/LUPA process and submitted comments on the DEIS and FEIS/Proposed LUPA that document the numerous inconsistencies between the Elko Conservation Plans and the LUPA and explain that the LUPA provides inferior GSG conservation compared to the Elko Conservation Plans, and consequently harms the environment and threatens Elko County's economy. The agencies ignored these comments and failed to demonstrate the Elko Conservation Plans would not benefit and conserve GSG habitat.

101.    The Elko County Plan focuses on reducing threats to GSG and its habitat (mainly wildfire, invasive grass species, and predation) while maintaining multiple-uses of the land whereas the NVLMP focuses on prohibiting and restricting regulated multiple-uses (e.g., livestock grazing, mining, recreation, access, etc.) in the SFA, PHMA, and GHMA. These conflicting land management objectives between the NVLMP and the Elko County Plan will substantially interfere with Elko County's GSG habitat conservation policies.

41

DAVIS GRAHAM &
STUBBS LLP
ATTORNEYS AT LAW
50 W. LIBERTY ST., STE. 950
RENO, NEVADA 89501
(775) 229-4219

102.    The threat reduction objectives in the Elko County Plan are consistent with the COT Report recommendations – that regulated public land uses are not the main threats to GSG habitat and that wildfire and the invasion of non-native grass species like cheat grass are the main threats to GSG and its habitat in Nevada.  The Elko County Plan focuses on reducing these threats while adhering to FLPMA multiple-use principles.  It is thus consistent with federal law and will achieve far superior GSG habitat conservation compared to the NVLMP.

103.    The Elko County Plan emphasizes that properly managed livestock grazing can play a significant role in creating and enhancing GSG habitat and reduce habitat destruction due to wildfire by strategically using livestock grazing to reduce the fuel load associated with cheat grass and other non-native grasses.  Because livestock grazing activities occur on most of the land in Elko County, capitalizing upon the synergies between livestock grazing and GSG habitat conservation can be of tremendous benefit to GSG and its habitat.  The NVLMP ignores these synergies and imposes rigid, one-size-fits-all livestock grazing restrictions (such as unreasonable stubble height requirements, restrictions on grazing seasons and allowable numbers of cattle, and prescriptive limits on maximum structure heights) that create conflicts with the Elko Conservation Plans.  Many of the NVLMP grazing restrictions will increase the buildup of highly flammable, non-native grass species and lead to more frequent and intense wildfires and destruction of GSG habitat.  The Elko County Plan, like the COT Report, explicitly rejects uniform, range-wide prescriptions for managing the land: "Due to the variability in ecological conditions, species' and threat status, and differing cultural perspectives across the Sage Grouse range, developing detailed, prescriptive species or habitat actions is biologically untenable and inappropriate at the range-wide scale."  (Elko County Plan at 112).

104.    The NVLMP's SFA withdrawals are inconsistent with the Elko County Plan which emphasizes multiple-use.  The SFA prohibits mineral exploration and development, and

42

DAVIS GRAHAM &
STUBBS LLP
ATTORNEYS AT LAW
50 W. LIBERTY ST., STE. 950
RENO, NEVADA 89501
(775) 229-4219

solar and wind energy, and place unworkable restrictions on other land uses including oil and gas development, geothermal energy, and livestock grazing. The SFA in Elko County covers over two million acres (*nearly 20 percent of the county*) and is comprised of roughly 1.65 million acres of BLM-administered land and 395,000 acres of USFS-administered lands.

105. The Elko County Plan consists of various strategies developed to address several general conservation categories:

- Population and habitat management measures that focus on maintaining existing healthy populations and habitat conditions;

- Habitat enhancement and rehabilitation actions where on-the-ground projects have been identified and developed to mitigate verified risks;

- Education and outreach to promote long-term conservation through widespread stewardship and proper land use ethics;

- Regulations and policies to facilitate implementation of management actions.

- Guidelines that will permit for the development of GSG Conservation Programs that will not cause detriment to local, state and regional economies; and

- Incentive-based directives for private property owners to develop management methods to protect GSG populations and to preserve and restore GSG habitat.

106. From 2010-2012 Elko County devoted at least 1,400 hours of staff time and spent more than $189,000 to develop the Elko County Plan which is jeopardized by the NVLMP.

107. The NVLMP is inconsistent with the Elko County Plan and violates the FLPMA consistency mandate at 43 U.S.C. § 1712(c)(9), the FLPMA and NFMA multiple-use and sustained yield provisions, and interferes with Elko's planning efforts and local police powers, including measures to reduce wildfire dangers through the planned use of livestock grazing.

108. The Elko County Plan contains numerous recommended actions to reduce rangeland fuel loads comprised of highly flammable non-native annual grasses with strategies to restore a more fire resistant, resilient and diverse vegetation community that provides GSG

DAVIS GRAHAM &
STUBBS LLP
ATTORNEYS AT LAW
50 W. LIBERTY ST., STE. 950
RENO, NEVADA 89501
(775) 229-4219

habitat.  The NVLMP restrictions on grazing will interfere with this critical component of the Elko County Plan.  The agencies adopted the "strongholds" proposed by the conservation community through FWS to draw the SFA boundaries, yet they ignored the FWS COT Report that provides for deference to local management plans that provide an effective strategy for fire, and recognizes the importance of local ecological conditions for grazing management strategies and of using local data on threats and ecological conditions, and that "specific strategies or actions necessary to achieve . . . conservation objectives *must be developed and implemented at the state or local level, with the involvement of all stakeholders.*"  COT Report at 52, 38, 41. This is precisely what Elko has done yet the agencies' SFA and other proposals for disturbance caps, travel restrictions, and lek buffers disregard and interfere with these local efforts.

109.    The NVLMP includes widespread travel restrictions that affect roughly 40 percent of all of the roads in the county and segments of nearly all of the 1,500 miles of roads that Elko County maintains.  The Elko Conservation Plans rely on maintaining access throughout Elko to achieve the County's conservation goals for access to ranches throughout the County, as routes to adjacent counties, and to provide emergency services for ambulances and fire-fighting equipment.  The NVLMP prohibits cross-country travel in the SFA, PHMA, and GHMA; imposes restrictions on road use and maintenance of existing roads including prohibiting the use of certain roads during specific seasons and times of day and limiting noise; and recommends road closures.  All of these travel restrictions are inconsistent with the access requirements of FLPMA and interfere with Elko's Conservation Plans and its obligations to maintain its transportation systems, one of its core police power functions for public health and safety.

**B.    The Eureka Master Plan and County Code**

110.    Eureka County has a long history of developing land stewardship policies pertaining to wildlife habitat conservation.  In 2006, the County updated the Land Use Element

DAVIS GRAHAM &
STUBBS LLP
ATTORNEYS AT LAW
50 W. LIBERTY ST., STE. 950
RENO, NEVADA 89501
(775) 229-4219

of the Eureka County Master Plan with provisions for wildlife and wildlife habitat, including sage grouse.  The County updated this plan again in 2010 ("Eureka Master Plan").  The Eureka Master Plan was adopted pursuant to NRS Chapter 278.  The NVLMP is inconsistent with the Eureka County Master Plan and will interfere with Eureka County's road access and maintenance obligations, zoning laws, and economic development.

111.   Title 9 of the Eureka County Code also governs natural resources, wildlife management and conservation, and public lands.  The NVLMP is inconsistent with key elements of Title 9, including: Chapter 30, for land-use planning on federal lands; Chapter 40, procedures to ensure full disclosure and cooperation regarding decisions affecting federal lands located within the County; and Chapter 50, declaring that the County holds title in trust for the public to all public roads and public travel corridors in the County except for State and federal highways.

112.   Only 13 percent of Eureka County's total land area consists of private land, creating a dependency on federal land that is often detrimental to the socioeconomic conditions in the County.  The NVLMP's land use restrictions will exacerbate this problem by substantially reducing use of the federally administered lands that cover most of Eureka County.  The NVLMP will adversely affect the ranching, farming and mining businesses that form the County's economic base, resulting in a loss of employment and economic outputs that will be devastating to Eureka County, which is already facing serious economic challenges.

113.   Eureka County's policies place a similar emphasis as Elko County on the important and cost-effective role that properly managed livestock grazing plays in reducing wildfire risk and enhancing GSG habitat.  The livestock grazing restrictions in the NVLMP conflict with Section 6.21 of the Eureka Master Plan which states that:  1) wildfires are causing unreasonable economic hardship to Eureka County livestock producers; 2) properly managed grazing provides a substantial advantage for native plant recovery following fire; and

45

DAVIS GRAHAM &
STUBBS LLP
ATTORNEYS AT LAW
50 W. LIBERTY ST., STE. 950
RENO, NEVADA 89501
(775) 229-4219

3) managed grazing is beneficial in preventing excessive damage to plants by wildfire and prohibiting grazing prior to a fire results in unnecessary damage to the plants.

114.    The economically burdensome and technically ill-advised livestock grazing restrictions in the NVLMP will result in increased fuels and burden the county's fire district, harm ranchers and the economy, and result in destruction of GSG habitat.   The NVLMP livestock grazing restrictions will also cause economic harm to Eureka County's ranching industry, with an estimated cost of $7 to $15 million per year.   The inevitable decline in the ranching industry that will result from the NVLMP will cause further harm to GSG.   The constant presence of ranchers on the rangeland benefits GSG by developing water sources and being first responders to fire.   Fewer ranchers forced to operate on less land means fewer benefits to GSG.

115.    The habitat maps covering Eureka County in the FEIS/Proposed LUPA and the RODs and NVLMP are not based on quality data or sound science and dramatically conflict with on-the-ground conditions.   For example, there is a large area in southern Eureka County designated as PHMA that incorrectly includes the Town of Eureka, US Highway 50, State Route 278, the Eureka County landfill, the Falcon-to-Gondor major distribution power line, multiple ancillary power lines, multiple subdivisions with homes, paved roads and gravel roads, farms with alfalfa fields and irrigation systems, and hay barns, among other infrastructure.   The NVLMP includes many land use restrictions for PHMA such as disturbance caps that are nonsensical for the Town of Eureka and the surrounding developed area.   Obviously, the infrastructure associated with an established community is not habitat.   The serious flaws in the habitat maps create many inconsistencies with the Eureka Master Plan and Title 9.   These map errors have significant implications for Eureka County's land use planning because BLM has revised its maps designating which lands are suitable for disposal on the basis of the faulty

DAVIS GRAHAM &
STUBBS LLP
ATTORNEYS AT LAW
50 W. LIBERTY ST., STE. 950
RENO, NEVADA 89501
(775) 229-4219

habitat maps. Lands that Eureka County needs for community expansion, economic development, and infrastructure that were formerly designated as suitable for disposal are no longer considered suitable for disposal because of the erroneous classification of these lands as GSG habitat.

116.    The Eureka County Department of Natural Resources ("ECDNR"), the Eureka County Wildlife Advisory Board to Manage Wildlife and the Eureka Conservation District initiated efforts to address pinyon-juniper ("P-J") encroachment into high-value GSG habitat areas and movement corridors, which is a key threat to GSG.  In 2011, these local agencies proposed to BLM a plan to hand-thin P-J around selected springs on public lands. Unfortunately, Eureka County is still waiting for BLM to approve this habitat improvement project.  In the meantime, Eureka County is proactively addressing thousands of acres of P-J that exist on private lands with habitat characteristics that would benefit from P-J removal.  Eureka County has successfully worked with private landowners and identified funding, including grants, to hire hand-crews to reduce the density of P-J.  Since 2013, this effort has improved over 4,000 acres of GSG habitat on private land on Roberts Mountain and in the Diamond, Monitor, and the Sulphur Springs ranges in southern Eureka County at a cost of $262,658.  The County has additional funds committed to continue the P-J removal projects.  The NVLMP restrictions, including but not limited to the lek buffer zones, disturbance caps, seasonal travel restrictions, road closures, and noise limits, will interfere with these types of conservation projects, because private landowners will be less able and willing to work cooperatively on conservation efforts, which will ultimately frustrate the goal of conserving and enhancing sage-grouse habitat.

117.    Because invasive weeds increase wildfire risks, Eureka County treats an average of over 1,000 acres of noxious and invasive weeds per year at a cost of $60,000 to $100,000 per year.  The NVLMP threatens the viability of this habitat conservation program, which is funded

DAVIS GRAHAM &
STUBBS LLP
ATTORNEYS AT LAW
50 W. LIBERTY ST., STE. 950
RENO, NEVADA 89501
(775) 229-4219

with taxpayer monies collected mainly from ranchers and farmers.  Tax revenues from ranching and farming are expected to decline as a result of the NVLMP land use restrictions.

118.    Additionally, since 2010, ECDNR has received three separate Clean Water Act 319(h) sub-grants through the Nevada Division of Environmental Protection that have directly benefitted GSG.  These sub-grants provide 50 percent of the project costs and have reduced livestock use of riparian areas that are important GSG habitat.  To date, the total grant monies awarded for these efforts exceeds $252,000.  These coordinated efforts rely upon the continued use of public lands in combination with private lands.  The NVLMP will interfere with the effective conservation strategies implemented by Eureka County through the course of its land use planning and general exercise of police powers to protect the public health and safety.

119.    Eureka County recently obtained GSG population data from the Nevada Department of Wildlife ("NDOW") for areas where the County conducted its habitat conservation projects to determine their impact.  The June 2015 NDOW population data shows high counts of males using leks in the Diamond Population Management Unit ("PMU") and the 3 Bars PMU, which cover over half of Eureka County and have the bulk of the priority and general habitat in the County.  The Diamond PMU had a record high count of 159 males.  The 3 Bar PMU had a high count of 348 males, the third highest count since a record count in 2006 of 460.  The 3 Bar #1 lek has been monitored since 1971 and had a high count of 41 males, the highest since 1987.  This lek had no birds from 1995 to 1997.  The NDOW data clearly document the importance and success of the County's conservation efforts and show that Eureka County's efforts have resulted in stabilizing and increasing GSG numbers *without the land use restrictions in the NVLMP*.

120.    The NVLMP will interfere with Eureka County's ability to create incentives for landowners, ranchers with BLM or USFS grazing permits, and other agencies to participate in

DAVIS GRAHAM &
STUBBS LLP
ATTORNEYS AT LAW
50 W. LIBERTY ST., STE. 950
RENO, NEVADA 89501
(775) 229-4219

the County's conservation efforts.  These incentives will vanish as a result of the NVLMP, which will discourage these same partners from collaborating on important on-the-ground projects because of the NVLMP's restrictive provisions.  Rather than facilitating conservation work and partnerships at the local level with a proven track record of success, the NVLMP will discourage this work and ultimately harm GSG and its habitat.  A recent BLM grazing decision in the Little Smoky Valley Use Area of the Duckwater Allotment proposed to severely reduce and restrict cattle grazing because, although there are no active GSG leks currently identified in the Little Smoky Valley Use Area "or within three miles of the boundary, both preliminary priority ("PPH") and preliminary general (PGH) Sage-grouse habitat occur in the use area."  This type of arbitrary grazing restrictions in the NVLMP will force many Eureka County ranchers out of business because the forage utilization thresholds in the NVLMP are unrealistic.

121.    The NVLMP includes widespread travel restrictions inconsistent with the Eureka Master Plan and that interfere with the County's obligation to maintain its transportation system to achieve the county's conservation goals, for access to ranches throughout the county, as routes to adjacent counties, and to provide emergency services for ambulances and fire-fighting equipment. BLM has already imposed travel restrictions that severely restricted travel based on proximity of roads to GSG leks.  Approximately 1,958 miles of roads in Eureka County, are located within areas where the NVLMP travel restrictions apply.  The NVLMP prohibits cross-country travel in PHMA, and GHMA, which is another source of inconsistency between the NVLMP and the Eureka Master Plan, and imposes restrictions on road use and maintenance of existing roads including prohibiting the use of certain roads during specific seasons and times of day and limiting noise.  The NVLMP also recommends road closures that are inconsistent with the access requirements of FLPMA and interfere with Eureka County's fire-fighting capabilities and obligation to maintain its transportation systems.

49

DAVIS GRAHAM &
STUBBS LLP
ATTORNEYS AT LAW
50 W. LIBERTY ST., STE. 950
RENO, NEVADA 89501
(775) 229-4219

122.     The NVLMP's interference with private property rights is inconsistent with the Eureka Master Plan.  Despite the vague statements that the NVLMP will recognize and maintain valid existing rights, the NVLMP land use restrictions could impair use of water rights, rights-of-way, and mineral rights in Eureka County.  The NVLMP requires removal of certain range improvements and water conveyances like dams, water tanks, ditches, and pipelines that may qualify as RS 2339 rights and that constitute private property rights.  The NVLMP provides no meaningful discussion of how the agencies intend to address valid existing rights, including those rights that have not been adjudicated in federal court but are nonetheless valid existing rights (e.g., roads that have not yet been adjudicated as RS 2477 roads) or rights under § 22 of the General Mining Law on mining claims.  This leaves in limbo the status of water rights, grazing permits, water conveyances (RS 2339), mining claims, and unadjudicated RS 2477 roads and places a significant financial burden on the Counties to pay for the protracted and costly legal process of seeking adjudication.  For the duration of that process, which can take years and cost millions, the roads in question remain subject to the NVLMP travel restrictions which interfere with the County's policy powers and obligations to provide emergency services.  Interference with the ongoing use of rights pursuant to grazing permits, water conveyances and mining claims will substantially harm both the owners and Eureka County's economy and potentially subject the federal government to takings claims.  The NVLMP does not evaluate the potential takings claims that could arise from this interference with private property rights.

123.     The NVLMP substantially interferes with implementation of Eureka County's Master Plan and Code, local conservation efforts that have documented success, and Eureka County's land use planning and police powers and will harm GSG habitat in Eureka County.

/ / /

/ / /

50

DAVIS GRAHAM & STUBBS LLP
ATTORNEYS AT LAW
50 W. LIBERTY ST., STE. 950
RENO, NEVADA 89501
(775) 229-4219

C.      **The Humboldt County Regional Master Plan**

124.    The Humboldt County Regional Master Plan addresses Land Use Planning, Open Space, and Transportation planning to "promote the general health, safety, welfare, convenience and prosperity of the region and its residents . . . The plan strives to protect existing quality-of-life attributes as well as the natural environment."  The Plan recognizes there are adequate transit options available for both local and interstate travel, and the region provides an ideal location for a new transportation hub.  This will not be the case if the NVLMP is implemented because NVLMP restrictions pertaining to surface disturbance and public lands disposal will adversely affect the new Interstate-11 route proposed to run adjacent to the US-95 corridor.  The inability to develop this important expanded transportation hub will have a significant negative fiscal impact and lost opportunity costs on Humboldt County.

125.    The Humboldt County SFA threatens an important lithium project and Paragon's project, both of which are located within the SFA.  The SFA and the travel restrictions outside of the SFA will impede mineral exploration and development, ranching and grazing, and will have a significant adverse economic impact on Humboldt County.

126.    The NVLMP conflicts with Humboldt County zoning ordinances defined within the land use inventory found within the combined urbanized area of Winnemucca, Grass Valley, Rose creek, Jungo Road, and to a large extent the unincorporated "outer County" land.

127.    The travel restrictions in the NVLMP interfere with key Humboldt County responsibilities, including road maintenance, landfill plans, pipelines, and local and interstate travel. Specifically, the NVLMP maps designate several thousand acres within Humboldt County as Travel and Transportation Closed or Limited Areas, which will close or restrict County roads including the County's access to critical public safety communications infrastructure.

DAVIS GRAHAM &
STUBBS LLP
ATTORNEYS AT LAW
50 W. LIBERTY ST., STE. 950
RENO, NEVADA 89501
(775) 229-4219

128.    The NVLMP has halted mining growth and chilled potential investments that would otherwise benefit Humboldt County.  The mining economy represents the single greatest concentration of capital investment, human resources and skills, technology, equipment, and land in Humboldt County.  Mining contributes major revenues to the area and constitutes at least 20 percent of the labor force in Humboldt County. Humboldt County has several mines that produce gold, silver, limestone and opals. Gold mining alone accounts for over 40 percent of the tax base in the county.  A review of the current data reveals that a decline in all other employment sectors as well as population follows the decline in mining activity.

129.    The agencies ignored significant information, including data and relevant science Humboldt County provided about, among other things, managed grazing and the benefits to GSG habitat.  Humboldt County identified significant concerns and harms from the impractical and unsupported restrictions on grazing the agencies proposed.

130.    BLM and USFS did not consult Humboldt County on GSG issues related to wildfire management or make any efforts to consider whether the agencies' proposed restrictions are consistent with the County Plan and/or County land use planning and conservation efforts.  In fact, in response to the Draft EIS, Humboldt County commented extensively regarding the need for fuel breaks, fuel management, and to reduce the risk of catastrophic fire which is identified as the highest risk to GSG habitat; however, the NVLMP restrictions will make it much more difficult to accomplish the proactive management activities that Humboldt County identified as needed to address this primary risk.  Many of these management activities are underway through local land use planning and conservation efforts within Humboldt County's jurisdiction.  The travel restrictions in the NVLMP threaten the County's ability to continue these activities in the future.  Moreover, the SFA withdrawal is not suitable for optimal wildfire management. Although managed cattle grazing is a proven tool to reduce rangeland fuel loads, the NVLMP

52

DAVIS GRAHAM &
STUBBS LLP
ATTORNEYS AT LAW
50 W. LIBERTY ST., STE. 950
RENO, NEVADA 89501
(775) 229-4219

unnecessarily interferes with grazing practices and restricts the good grazing practices and agricultural management underway in Humboldt County.

**D.    The Conservation Element of the Washoe County Master Plan**

131.    The Washoe County Master Plan's goal is to prevent damage to species and their habitats, so that their presence in Washoe County can be maintained in a practical, comprehensive way.   The NVLMP conflicts with the Conservation Element of the Washoe County Master Plan and will interfere with the County's ability to acquire federal land parcels needed for schools, cemeteries, and other civic purposes and to manage other habitat and economic development issues using a comprehensive approach based on best available science.

132.    Washoe County spent considerable time and money to address GSG in the Conservation Element of its Plan, including utilizing NDOW habitat mapping to produce GIS mapping of GSG habitat.   The Conservation Element Maps delineate plots of land and their characteristics, including areas suitable for development and areas of critical environmental concern and are different and more detailed than the NVLMP habitat maps.

133.    Washoe County has a demonstrated history of coordination and collaboration with the Carson City BLM District to identify lands that the County wanted to acquire during preparation of the Resource Management Plan ("RMP") for the district.   The County-requested lands were shown on RMP maps as suitable for disposal *until the NVLMP eliminated some of the areas previously classified as such* due to the alleged presence of GSG habitat.   However, in many cases, the County's site specific maps do not show habitat in areas that the NVLMP maps do. For example, the 40-acre parcel identified in Sparks as a desirable site for a veterans' cemetery is highly disturbed ground because four-wheelers currently use it as a recreational site. It most certainly is not suitable GSG habitat.

DAVIS GRAHAM &
STUBBS LLP
ATTORNEYS AT LAW
50 W. LIBERTY ST., STE. 950
RENO, NEVADA 89501
(775) 229-4219

134.     The generalities in the NVLMP maps and the BLM's inability or refusal to consider site-specific data and information to ground-truth their maps is resulting in arbitrary exclusion of Washoe County lands from use—even when those lands might not be actual habitat. For example, the cities of Reno and Sparks have exerted planning jurisdiction over certain public lands, and these areas directly conflict with BLM-mapped PHMA or PGMA because lands with these map designations are no longer suitable for acquisition by the County for community development purposes.  **Exhibit 4**.  Reliance on the sage-grouse habitat maps in the NVLMP (and, thus, the management directives associated with those mapped areas) precludes any ability for future designation of acquisition targets to meet the needs of growing communities in Washoe County.  Beyond the existing identified conflicts involving parcels that Washoe County identified for a new school and cemetery, there is significant potential for future conflicts given the amount of public land that surrounds suburban developments in the County.

   **E.     The Lander County Plans**

135.     The Lander County Master Plan, the County's CEDS, and the Lander County 2012 Policy Plan for Federally Administered Lands set forth land use policies for the County, including expanding recreational opportunities via development of new trails (including trails for off-highway vehicle use) and new recreational facilities and expanding energy projects including mining, geothermal, solar and wind projects.

136.     NVLMP restrictions further conflict with and undermine Lander County's Sage Grouse Conservation Plan, including implementation of locally-developed GSG conservation measures and activities.

137.     The Federal restrictions in the NVLMP undermine or ignore key County land use and development policies.  For example, the "general" habitat in the NVLMP maps overlay many of the areas identified by the County as suitable for further development of new and

54

DAVIS GRAHAM &
STUBBS LLP
ATTORNEYS AT LAW
50 W. LIBERTY ST., STE. 950
RENO, NEVADA 89501
(775) 229-4219

1  expanded recreational facilities as discussed in the Recreation Element of the Lander County

2  Master Plan and the 2012 Lander County Policy Plan for Federally Administered Lands.  The

3  NVLMP's travel restrictions and projected road closures will negatively impact Lander County

4  residents due to the threat of increased wildfires that cannot be effectively fought because of the

5  travel restrictions. The travel restrictions also interfere with most, if not all, of the County's

6  sporting, hunting, and recreation areas.

7

8  **F.      The Churchill County Plan**

9  138.    The 2010 Churchill County Master Plan includes specific chapters dealing with

10 Conservation and Natural Resources and a Policy Plan for Public Lands.  Among the provisions

11 in the Policy Plan for Public Lands is the requirement that Churchill  County should be included

12 in   Consistency Review for federal decisions regarding public and federal lands in Churchill

13 County.  Many elements of the NVLMP are inconsistent with the Churchill County Master Plan

14 in violation of FLPMA and the County's consistency requirement and will interfere with

15 Churchill County's implementation of its Master Plan.

16

17 139.    The grazing and travel restrictions in the NVLMP will interfere with the County's

18 ranching and agricultural businesses, which are the lifeblood of Churchill County's economy.

19 Grazing and travel restrictions on public lands may adversely affect ranching and agricultural

20 operations on adjacent private land sections by reducing the value of the private land operations

21 or even rendering them impractical or uneconomic. Any downturn in ranching or agricultural

22 productivity will severely harm Churchill County's economy.

23

24 140.    The NVLMP interferes with Churchill County's use of grazing as a means to

25 control wildfires by reducing rangeland fuel loads pursuant to its Policy Plan for Public Lands.

26 The County's Policy Plan for Public Lands endorses the use of managed livestock grazing to

27 control wildfires as well as prescribed fires.

28

DAVIS GRAHAM &
STUBBS LLP
ATTORNEYS AT LAW
50 W. LIBERTY ST., STE. 950
RENO, NEVADA 89501
(775) 229-4219

**G.     The White Pine County Master Plan/Land Use Plan and the County Conservation, Recreation, and Development Act**

141.    The White Pine County Master Plan, of which the Land Use Plan is a part, represents the long-term interests of the residents of White Pine County by promoting the health, safety and general welfare of the community.  Within the Plan are the goals for diverse and varied land uses in the County.  The Plan supports responsible development of private property in a way that protects important and sensitive environmental qualities and access to public lands.

142.    The NVLMP restrictions interfere with the goals and intent of White Pine County's Land Use and Master Plan.  For example, the NVLMP prohibits the local electrical power company, Mt. Wheeler Power, from erecting much-needed distribution lines in the same foot print as the existing line because of sage grouse habitat.  This prohibition means that studies will need be conducted prior to rerouting lines around PHMA and GHMA areas, with the additional cost that will become the burden of County consumers.

143.    The NVLMP restrictions do not reflect on-the-ground conditions in White Pine County and, as such, are not scientifically sound and their application is unreasonable.  In fact, GSG habitat is not extensive in White Pine County, and, despite suggestion to the contrary, GSG leks have remained active along County roadways for decades with no noticeable change in population or disruption in lekking activities.

144.    Further, the NVLMP restrictions may interfere with and undermine the Congressionally-approved Public Law 109-432, also known as the WPCCRDA.  The WPCCRDA designated 538,000 acres of land for wilderness and created an account to dispose of 18,543 acres of public lands from BLM management to private ownership.  The lands identified for disposal are critical to the County's economic growth and stability, so much so that White Pine County has expended approximately $417,000.00 on underground water and sewer

DAVIS GRAHAM &
STUBBS LLP
ATTORNEYS AT LAW
50 W. LIBERTY ST., STE. 950
RENO, NEVADA 89501
(775) 229-4219

extensions, road pavement, and curb and street lighting in anticipation of the conveyance of lands towards the County's Industrial Park Expansion Project ("Expansion Project"). However, if the NVLMP habitat maps are used as the basis for management decisions, the future growth, development, and economic stability promised by the Expansion Project (and relied upon by the County) will be hampered, if not destroyed, because over 78 percent of the lands identified for disposal will be considered PHMA or GHMA.

145. Lastly, the NVLMP includes travel and access limitations and closures which interfere with the County's road maintenance plans and emergency needs. Travel restrictions in the NVLMP could prohibit access by fire and EMS personnel who require access to these roads to assist in a time of need to provide for health, safety and the protection of persons and property; these same restrictions prohibit access by hikers, shed antler hunters, and other persons engaged in timeless recreational pursuits to enjoy the natural resources the County has to offer. Roads must be maintained in order to provide County residents and visitors with access to the County's recreational and tourism-related resources; to provide County emergency services the ability to respond safely and effectively to incidents in the County; and to allow mining operations and other revenue generators to conduct their operations. The road and travel restrictions in the NVLMP do not account for these very real needs and so serve to undercut and interfere with the County's police powers in this regard.

**H.    The Pershing County Plan**

146. The NVLMP impedes economic development and contravenes Pershing County's Land Use Management Plan. As discussed within the Pershing County Master Plan, Pershing County is committed to the current and future development of mining, communication infrastructure, and energy production, especially geothermal energy. This approach is consistent with the Mineral Leasing Act of 1920 as amended; the Geothermal Steam Act of 1970, as

57

DAVIS GRAHAM &
STUBBS LLP
ATTORNEYS AT LAW
50 W. LIBERTY ST., STE. 950
RENO, NEVADA 89501
(775) 229-4219

amended; and the Mining and Mineral Policy Act of 1970, which reflect the Federal Government's policy to foster and encourage private enterprise in the development of domestic energy and mineral resources.

147.    Because the locations of many future developments cannot be identified at this time, all currently available land must remain accessible and not put functionally off limits by the NVLMP land use restrictions which will block renewable energy efforts, energy delivery efforts, mineral exploration efforts and the efforts of Pershing County residents to provide for their families.

148.    The NVLMP will also interfere with livestock production in Pershing County. The increased stubble height requirements in the NVLMP from 4 inches to 7 inches, and in riparian areas from 3 inches to 6 inches, are unattainable. These substantial changes to stubble height, without corresponding increases to Animal Unit Months ("AUMs") will result in significant decreases in livestock production, which will harm Pershing County's economy.  The socioeconomic effects of reduced livestock production will come at a time when Pershing County is already experiencing a significant downturn in the economic contribution from the livestock industry.  For example, data reported annually in the Nevada Agricultural Statistics indicate that cattle numbers in Pershing County have declined to 22,000 head (from T. Lesperance, 1996, *Cowboys, Bureaucrats and the Long Rope of Justice*, 12 p.).  The 2001 Nevada Grazing Statistics Report and Economic Analysis for Federal Lands in Nevada confirm this gross decline in livestock numbers.  More recently, Nevada Agricultural Statistics report some 22,000 cattle (including calves) in Pershing County in 2008.  UNR Cooperative Extension Fact Sheet 03-62, "Economic Development; 2002 Pershing County Agricultural Statistics" reports the combined cattle and calf numbers in Pershing County was 22,000 in 2002 as well as 13,000 sheep and lambs.  The loss of some 68% of the cattle production within the County

DAVIS GRAHAM &
STUBBS LLP
ATTORNEYS AT LAW
50 W. LIBERTY ST., STE. 950
RENO, NEVADA 89501
(775) 229-4219

represented a loss of tax base within the County of $84,000,000 by the year 2000, based on appraised values of $3,000 per animal unit.   Lesperance reported that the average expenditure per cow was $350 per year for the operation of a ranch, including purchase of supplies, equipment, labor, etc.  The direct impacts to the Pershing County is a reduction (loss) of cash circulating within the local economy of some $6,000,000 to $9,800,000 every year, more when multiplier effects are applied.  Implementation of the NVLMP will exacerbate an already precipitous decline to Pershing County's economy.

149.   Additionally, the NVLMP reductions to grazing conflicts with the County's natural resource strategy (as detailed in the Pershing County Natural Resource Plan), which includes management based on the renewable nature of Pershing County's vegetation resources. This strategy demonstrates the County's efforts to maintain a sustainable rangeland for livestock, wildlife, recreation, and reduce fire hazard.  Pershing County's conservation approach relies to a large extent on managed livestock grazing because essentially all rangeland use and value depend upon the maintenance and enhancement of the primary landscape resources of soils, vegetation, and watersheds. All renewable rangeland values stem directly or indirectly from vegetation.  Sustained high-level production of these values therefore depends on proper management of the vegetation.  The Pershing County Natural Resource Plan deems livestock grazing as the principal tool for managing vegetation because it is the only force under firm control of range managers that can be applied on practically the entire range area. Desirable vegetation and the overall productive capacity of rangelands can be increased more rapidly with livestock grazing than without. Livestock can be used to trample seed into the soil thereby promoting more forage and a better soil cover; to remove stifling old growth on plants, thus increasing plant vigor and production of useable herbage; to stimulate adventitious growth and higher quality forage; and to reduce fire hazard. The NVLMP's restrictive approach to range

DAVIS GRAHAM &
STUBBS LLP
ATTORNEYS AT LAW
50 W. LIBERTY ST., STE. 950
RENO, NEVADA 89501
(775) 229-4219

1  management will produce unhealthy vegetation and increase fire hazards in Pershing County in

2  direct conflict with Pershing County's Natural Resource Management Plan.

3      150.    The NVLMP interferes with Pershing County's road network which is needed to

4  provide access to resources on federal lands and checkerboard private lands in the County. The

5  right to pass uninhibited across federal lands is an important historical component of the

6  Pershing County's custom and culture and is required for the present and future well-being of the

7  County. Pershing County, as political subdivision of the State of Nevada, holds title, as trustee

8  for the public, to all public roads, trails, pathways, traces, highways, byways, and similar public

9  travel corridors situated in the County, of every kind whatsoever, except for State and federal

10  highways, however such roads may have come into being.  Title to those roads commonly

11  known as R.S. 2477 roads, irrevocably granted to the public by Congress is held in trust by the

12  County as the unit of government closest to the people. Miners, ranchers, hunters and fishermen

13  still use these early rights-of-way and rely on R.S. 2477 routes for their economic welfare and

14  recreational opportunities.

15      151.    The NVLMP travel restrictions interfere with travel on roads that Pershing

16  County considers as R.S. 2477 routes despite the fact that the County has not had the resources

17  to pursue the costly and protracted adjudication process for these roads. The NVLMP travel

18  restrictions as applied to these un-adjudicated routes will thwart economic development and

19  interfere with implementation of Pershing County's Master Plan. Moreover, restricted access

20  designations and interference with access to roads will impair law enforcement in Pershing

21  County, impede search and rescue efforts, and interfere with fire suppression efforts.

**I.**    **The Lincoln County Plan**

    152.    Lincoln County has identified uncontrolled grazing of wild horses and burros and

conifer encroachment as primary threats to GSG habitat in Lincoln County. The uncontrolled

DAVIS GRAHAM &
STUBBS LLP
ATTORNEYS AT LAW
50 W. LIBERTY ST., STE. 950
RENO, NEVADA 89501
(775) 229-4219

spread of conifers, primarily pinyon and juniper ("PJ"), fragments GSG habitat and increases the buildup of fuel loads and wildfire risks. BLM's failure to manage wild horse and burro grazing has resulted in significant GSG habitat degradation in Lincoln County. These impacts are specific to Lincoln County and differ somewhat from the key GSG threats in other Nevada counties that are more arid and have a greater proportion of low elevation terrain. The one-size fits all approach of the NVLMP fails to address the different site conditions throughout GSG habitat in Nevada and thus includes many measures that are not optimal or even appropriate for conserving GSG habitat.

153.    The NVLMP's treatment of livestock grazing as a threat to GSG habitat is inconsistent with Lincoln County's Public Lands Policy Plan and will create significant economic hardships for Lincoln County residents, many of whom are in the livestock production business. In its comments on the Draft EIS, Lincoln County strongly urged BLM to recognize managed livestock grazing rights and to eliminate grazing restrictions which will render many Lincoln County ranching operations uneconomic and create the unintended consequence that ranchers will be forced to sell their lands for development purposes which will harm GSG because it will eliminate critically important GSG habitat (e.g., meadows and pastures that provide important brood-rearing habitat).

154.    The NVLMP will reduce managed grazing and precipitate the loss of important ranching operations throughout Lincoln County. As such, the NVLMP conflicts with Lincoln County's Plans which advocates for a no net loss of grazing activities as measured by Animal Unit Months, and which relies on the economic benefits from ranching and the invasive species control and fuel reduction benefits associated with the County's ranching industry.

155.    The travel restrictions, lek buffer zones, and seasonal use constraints in the NVLMP also conflict with Lincoln County's plans. Site-specific conditions throughout Lincoln

DAVIS GRAHAM &
STUBBS LLP
ATTORNEYS AT LAW
50 W. LIBERTY ST., STE. 950
RENO, NEVADA 89501
(775) 229-4219

County (like topography and vegetation stands) make the rigid, one-size-fits-all, four-mile buffer zone unnecessary and inappropriate. The buffer zones and seasonal use restrictions will create problematic travel constraints on the County's road network that will interfere with ranching operations, mineral exploration and development, and recreation. Additionally, these travel restrictions conflict with the County's police powers and the County's obligations to provide for public health and safety.

### J. The Nevada State Plan

156.    Nevada has led GSG conservation since 2000, when it established a task force to develop a plan that would conserve and protect Nevada's GSG populations and habitat.  The October 2001 Nevada GSG Conservation Strategy laid the groundwork for the formation of local area working groups ("LAWG") and Population Management Units ("PMUs").  From 2001 to 2004 the Governor's GSG Conservation Team, under leadership of NDOW, completed an intensive planning effort for the State in which LAWGs developed plans for their respective areas and PMUs.  In June 2004, the 1st Edition of the Greater Sage-grouse Conservation Plan for Nevada and Eastern California (2004 State Plan) was completed. Between 2004 and 2014, resource management agencies implemented conservation projects and instituted policies to support the conservation goals in the 2004 State Plan.

157.    In March 2012, Governor Sandoval established the Governor's Greater Sage-grouse Advisory Committee ("Advisory Committee") to provide a State Plan Alternative to be evaluated in the EIS that BLM and USFS were preparing in conjunction with developing the Nevada and Northeastern Nevada GSG conservation LUPA.   The Advisory Committee published the 2012 Strategic Plan for Conservation of Greater Sage-Grouse in Nevada ("2012 State Plan") which presented a list of primary threats and strategies to conserve GSG and its habitat in Nevada and recommended that the Governor establish the Sagebrush Ecosystem

62

DAVIS GRAHAM &
STUBBS LLP
ATTORNEYS AT LAW
50 W. LIBERTY ST., STE. 950
RENO, NEVADA 89501
(775) 229-4219

Program ("SEP"), comprised of the Sagebrush Ecosystem Council ("SEC") and the Sagebrush Ecosystem Technical Team ("SETT").  The SEC was established on November 19, 2012.

158.    In April 2013, the SEC directed the SETT to further develop a comprehensive and detailed conservation plan.  The SEC worked through a series of meetings starting in July 2013 including multiple opportunities for public comment and in October 2014 adopted the 2014 Nevada Greater Sage-grouse Conservation Plan ("Nevada Plan").  The FEIS evaluated the Nevada Plan as Alternative E but did not select it as the Proposed Plan despite its superiority in that it covers all lands in the state compared to the LUPA, and complies with FLPMA and NFMA multiple-use and sustained yield mandates.  The Nevada Plan is based on the best available science and stakeholder input. The GSG conservation plan addresses the habitat threats and other factors specific to Nevada, and is consistent with the COT Report.  The Nevada Plan provides effective and comprehensive conservation measures that include substantial financial mitigation requirements for both direct and indirect impacts to GSG habitat on both public and private lands that cannot be avoided or minimized.  In contrast, the NVLMP only focuses on direct impacts; it does not require mitigation of indirect impacts.

159.    The Nevada Plan's foundation is the habitat conservation hierarchy of "avoid, minimize, and mitigate," which implements a multiple-use land management objective consistent with FLPMA and the FWS COT Report that strives to balance multiple land uses including protecting GSG habitat.  This hierarchy requires avoidance of impacts to habitat to the maximum extent possible, minimized habitat impacts that cannot be avoided, and mitigated impacts that are unavoidable and cannot be minimized.  Nevada has developed a state-of-the art Conservation Credit System requiring financial mitigation based on site-specific metrics to determine a valuation for the impacted habitat and the mitigation required to offset the impacts by investing in mitigation that will achieve a net habitat gain.

DAVIS GRAHAM &
STUBBS LLP
ATTORNEYS AT LAW
50 W. LIBERTY ST., STE. 950
RENO, NEVADA 89501
(775) 229-4219

160.    The FEIS describes the Nevada Plan as a comprehensive and scientifically sound plan that carefully considers site-specific habitat conditions and land uses.  The Nevada Plan is the <u>only</u> alternative in the FEIS that is described as being based on data and as using methods that have been scrutinized and accepted in peer-reviewed scientific sources.

> The State of Nevada SGMA map is based on a data-driven approach that uses existing GRSG telemetry locations and mapping products as multiple environmental factors to model the probability of GRSG occurrence throughout Nevada. This process resulted in resource selection functions that were used to create a habitat suitability index and predict the relative importance of all areas, even those where data are lacking. These methods have been accepted in peer-reviewed scientific literature and have been shown to be valuable for identifying areas meaningful to GRSG populations. (FEIS, Page 2-100)

161.    The data and science-based foundations for the Nevada Plan/Alternative E comply with the information and data quality standards BLM must use in developing a NEPA document and amending a land use plan.  The agencies must describe how the Proposed Plan is based on data and use methods that have been accepted by peer-reviewed scientific literature and disclose that information for public comment.  The FEIS/Proposed LUPA did not adequately explain why the agencies did not select Alternative E, the Nevada Plan, as the Proposed Plan; discuss why the Proposed Plan must differ from the Nevada Plan; evaluate how the Nevada Plan is inconsistent with federal law; or demonstrate that the Proposed Plan will result in superior GSG habitat conservation compared to the Nevada Plan.  Without this discussion, the agencies' selection of the Proposed Plan violates FLPMA's consistency mandate.  Moreover, the Proposed Plan is based on questionable science and the agencies failed to fully disclose that.

162.    Early in the LUPA process, BLM asked scientists to peer-review the NTT Report.[3]  The peer-reviewers' comments reveal questionable science behind the conservation measures recommended in the NTT Report, which are the foundation for the Proposed Plan.  The

---

[3] The peer reviewers' comments are attached to the December 18, 2012 letter from Secretary of the Interior to the Honorable Doc Hastings, US House of Representatives. (*See* **Exhibit 3**).

DAVIS GRAHAM &
STUBBS LLP
ATTORNEYS AT LAW
50 W. LIBERTY ST., STE. 950
RENO, NEVADA 89501
(775) 229-4219

peer reviewers were highly critical of the science used to develop the report, finding it grossly oversimplified because it ignores the seasonal aspects of how GSG use the landscape. The peer reviewers objected to the one-size-fits-all approach to habitat conservation and the absence of state-level data in the report, and suggested that the recommended conservation measures are inconsistent with FLPMA and, therefore, unlawful:

- "…There is no discussion of the seasonal requirements of sage-grouse to provide managers with a context for their actions. There are limited references to the state-level sage-grouse plans. A good deal of effort went into these plans and they contain valuable information that should be incorporated into the planning process."

- "…I expected a science document that reviewed the literature, laid out what is known about program area impacts to sage-grouse, and where the uncertainties lie. This seems a strange blend of policy loosely backed by citations, ***with no analysis of the science***."

- "…Lack of consideration of space, and particularly (in this document) time is a critical mistake that, to me, renders this document problematic, if not dangerous. As written, there is essentially no consideration of the temporal dynamics of plant communities that provide sage-grouse habitat."

- "The document suffers from a 1-size fits all approach that lacks context. Lumping all sage grouse seasonal habitats in all locations across the range regardless of population size or relative importance of the population to either "priority sage grouse habitats" or "general sage grouse habitats" strikes me as tremendously over simplistic."

- "It … assumes that grouse are the highest and best use of the land…this HAS to be addressed before these guidelines become policy or serious problems will arise. What about FLPMA… where does it fit into the picture?"

*See* **Exhibit 3**. Accurate scientific evidence remains essential to an EIS. *Seattle Audubon Soc. v. ESPY*, 998 F.2d 699 (9th Cir. 1993). An agency cannot "ignore reputable scientific criticism" in its EIS. *See City of Carmel-By-The-Sea v. U.S. Dept. of Transp.*, 123 F.3d 1142, 1151 (9th Cir. 1997). BLM has failed to address in a "meaningful way the various uncertainties surrounding the scientific evidence." *Seattle Audubon,* 998 F.2d at 704. BLM has not disclosed the scientific criticism over some of the NTT recommendations that it has adopted.

DAVIS GRAHAM &
STUBBS LLP
ATTORNEYS AT LAW
50 W. LIBERTY ST., STE. 950
RENO, NEVADA 89501
(775) 229-4219

163.    Conversely, the Nevada Plan emphasizes the scientifically sound importance of properly managed livestock grazing as an effective GSG habitat conservation measure and that farming and ranching on private lands in unison with authorized livestock grazing on adjacent public lands has been a long standing practice in Nevada.

Historically, many homesteaders began to farm and ranch much of Nevada's riparian and mesic landscapes due to the availability of surface water or springs. Once developed, many of these mesic areas were expanded by the artificial spreading of water or irrigation. These larger, irrigation induced, privately and publicly owned meadows served to support many species of wildlife in addition to livestock. This expansion of late brood rearing habitat and an increase in sagebrush acreage due to an absence of fire after consumption of fine fuels, (Burkhardt and Tisdale 1976) may be the cause of sage-grouse population expansion in the late 1800s and early 1900s (Gruel and Swanson 2012). ***Today, by allowing for the authorized use of proper and targeted livestock grazing on public lands, private landowners and wildlife habitat managers can serve to protect or even benefit each other if managed properly (by reductions in fuels, targeted grazing of specific habitats and cheatgrass, etc.).*** The State of Nevada recognizes and supports this long standing beneficial relationship and the property interests associated with grazing permits (Figure 10, Nevada Plan at 84)(emphasis added).

Section 7.5, Management Action 1.1.5 of the Nevada Plan: "At a minimum, use grazing management strategies for riparian areas and wet meadows to maintain or achieve riparian Proper Functioning Condition (PFC) and promote brood rearing/summer habitat objectives, as described in Table 4.1, within sage-grouse habitat. Within sage-grouse habitat, manage wet meadows to maintain a component of available perennial forbs with diverse species richness to facilitate brood rearing and stabilizing riparian species (Burton et al. 2011) near where water flows to achieve or maintain PFC. Use Ecological Site Descriptions (ESDs) or locally relevant information about soils, hydrology, soil moisture, and site potential to set realistic objectives and evaluate assessments and monitoring data (Swanson et al. 2006). Also conserve or enhance wet meadow complexes to maintain or increase amount of edge and cover near that edge to minimize elevated mortality during the late brood rearing period (Hagen et al. 2007; Kolada et al. 2009a; Atamian et al. 2010) as observed throughout the stream/watershed and not limited to only easily accessible sites. Some defined areas of concentrated livestock use may be necessary to protect and enhance the overall riparian area. (Nevada Plan at 88).

164.    Because grazing allotments on public lands cover almost the entire State of Nevada (Nevada Plan at 213), the NVLMP's livestock grazing restrictions and shortcomings in addressing wildfire have an enormous detrimental impact on GSG habitat and interfere

DAVIS GRAHAM &
STUBBS LLP
ATTORNEYS AT LAW
50 W. LIBERTY ST., STE. 950
RENO, NEVADA 89501
(775) 229-4219

substantially with the conservation efforts of the State, Elko, Eureka, Humboldt, Lander, and White Pine County Plans.

165.    The State of Nevada provided the agencies with detailed comments on the many ways the LUPA's new provisions are inconsistent with the Nevada Plan and will harm the State. First, the SEP's June 29, 2015 Protest Letter states:

> We remain troubled…[that] significant new federal agency actions were added that replaced important components of the State Plan. FLPMA and its implementing regulations require that BLM's land use plans be consistent with officially approved state and local plans. The State Plan *is* consistent with the purposes, policies, and programs of federal laws and regulations applicable to the public lands, is based on best available data and science, addresses each of the threats identified by the Conservation Objectives Team (COT) report, was developed entirely in a public and transparent process, and is supported by a wide array of stakeholders across the State of Nevada. Therefore, the State Plan should be fully implemented as the preferred alternative in the FEIS. The full implementation of the FEIS, as currently written, will adversely impact the State due to, among other things, unnecessary land use allocations, an unnecessary disturbance cap, and unrealistic expectations to achieve certain habitat objectives solely through management actions." (SEP Protest Letter at 1.)

The Protest Letter details the inconsistent provisions in the LUPA including adaptive management triggers; allowance of other unspecified mitigation measures; SFA; three percent disturbance cap; no mitigation requirement in Other Habitat Management Areas ("OHMAs") or for indirect impacts to PHMA and GHMA as a result of indirect impacts in OHMA; and travel and transportation management.

166.    Second, Governor Sandoval's July 29, 2015 consistency review letter to BLM reiterates the inconsistencies outlined in the SEP's Protest Letter and adds that the LUPA is inconsistent with local plans.  The state expended "millions of dollars and thousands of hours to present a scientific, innovative and effective conservation plan."  The State's comments on the DEIS "identified hundreds of inconsistencies with state and local plans, and best available science that were largely ignored in the FEIS/Proposed LUPA."  Governor Sandoval expressed concerns about the SFA, which are a new concept "with significant environmental and societal

DAVIS GRAHAM &
STUBBS LLP
ATTORNEYS AT LAW
50 W. LIBERTY ST., STE. 950
RENO, NEVADA 89501
(775) 229-4219

implications" introduced "without adequate public notice or opportunity for comment in the LUPA/FEIS." His letter criticizes the significant methodologies changed with little scientific justification or explanation provided to the public. (Consistency Review Letter at 2).

167. Governor Sandoval objected to a "heavy-handed, federal approach that uses status-quo approaches and relies primarily on information from federal officials in Washington D.C., rather than expertise from state conservation and wildlife agencies, and local input." The LUPA/FEIS replaces Nevada's state and local planning efforts with national level policy resulting in a "document that is insufficient and flawed; not based on the best available science, or state and local plans, and not well rooted in federal law." (*Id.* at 2, 5). The BLM summarily dismissed the inconsistencies asserting that the State's recommendations would not be consistent with "the goal of the BLM's GRSG conservation strategy" to provide for GSG conservation and regulatory certainty that in turn will preclude an FWS determination that the species is warranted for listing. (BLM Response Letter at 3). FLPMA does not authorize BLM to manage the public lands to influence the FWS' listing determination – especially at the expense of multiple-use. The FLPMA multiple use and consistency mandates *required* BLM to accept all elements of the Nevada Plan (as well as local plans) that are consistent with federal law. Throughout the LUPA process, BLM has not provided any specific examples of how the Nevada Plan is inconsistent with the multiple use principles in FLPMA.

168. On September 4, 2015, Governor Sandoval filed an appeal with BLM Director Kornze pursuant to § 1610.3-2(e) that decries "BLM['s] decision to summarily reject Nevada's recommendations" regarding significant inconsistencies between the LUPA/FEIS, and Nevada's state and local plans. Governor Sandoval asserts that the LUPA/FEIS is incompatible with the Nevada Plan and provides less protection to GRSG and, therefore, should not be implemented without adopting the Nevada Plan which provides for increased conservation for GRSG,

68

DAVIS GRAHAM &
STUBBS LLP
ATTORNEYS AT LAW
50 W. LIBERTY ST., STE. 950
RENO, NEVADA 89501
(775) 229-4219

complies with federal law and policies, and is supported by a vast majority of Nevadans. The appeal letter outlines how the LUPA will interfere with GSG conservation and harm the State and emphatically rejects the SFA as "scientifically, functionally and administratively flawed" noting that the two-year segregation period to evaluate the mineral withdrawals in the SFA is "ill-advised" and would immediately and irreparably harm Nevada, as the segregation would create a *de facto* withdrawal and have a chilling effect in the region to the detriment of local, state, and national interests. (Appeal Letter at 4, 5).

## CLAIMS FOR RELIEF

169. On December 27, 2011, the BLM issued Instruction Memoranda No. 2012-043 and 2012-044 directing preparation of LUPAs and EIS documents that included the NTT Report conservation measures as one of the alternatives to be evaluated. The NVLMP is based largely on the NTT Report's recommended restrictions and prohibitions.

170. Plaintiffs participated in the EIS/LUPA process and through various forms of participation objected to the land use restrictions and prohibitions in the EIS alternatives and the Proposed LUPA.

### Count I
### Violation of the APA and FLPMA by Ignoring Consistency Requirements

171. Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 170 of this Complaint, as though fully set forth below.

172. FLPMA requires the Secretary's land use plans "shall be consistent with State and local plans to the maximum extent he finds consistent with Federal law and the purposes of this Act." 43 USC § 1712(c)(9). The FEIS identifies the Elko Plan as an alternative eliminated from detailed consideration because it purportedly was inconsistent with the agencies' GSG objectives and federal law. Yet, the agencies fail to identify any inconsistencies of the Elko Plan with

DAVIS GRAHAM &
STUBBS LLP
ATTORNEYS AT LAW
50 W. LIBERTY ST., STE. 950
RENO, NEVADA 89501
(775) 229-4219

federal law.  The Elko Plan is more consistent with FLPMA's multiple-use mandate and the recommendations of the COT Report than the NVLMP and presents conservation strategies based on the best available science superior to those presented in the NVLMP.

173.   Similarly, the BLM's response to the State's consistency review did not identify inconsistencies between the Nevada Plan and federal law, but instead cited to "policies, strategies and goals" none of which are a basis under FLPMA for refusing to resolve inconsistencies between the state and local plans and the LUPA.  The BLM denied several local and state recommendations simply as "not consistent with the purposes, policies and programs of federal laws and regulations applicable to public lands, in particular BLM's Sage-Grouse Strategy, its Special Status Species Policy, and its goal to provide regulatory certainty for the conservation of Greater Sage-Grouse and its habitat," that unlawfully ignores the fact that the state and local plans *are* consistent with FLPMA, which should have been the focus of BLM's response.  BLM Response Letter at 3.  Neither the DEIS nor FEIS disclosed that the Nevada Plan/Alternative E was inconsistent with BLM's Special Status Species Policy.

174.   The NVLMP grazing restrictions will interfere with the implementation of the county Plans' use of livestock grazing to improve GSG habitat and adversely affect ranchers and the counties' economies.   The livestock grazing restrictions in the NMLMP are counterproductive because they create substantial environmental harm to GSG and its habitat in the Plaintiff Counties and throughout Nevada.  The Counties' Plans and the Nevada Plan accomplish the same goals BLM identifies, using practice and cost effective grazing measures that have a track record of successfully conserving and restoring GSG habitat.  Broadly asserting generalizations that the state and local plans do not accomplish these goals based on the FWS memoranda is contrary to the facts, arbitrary, capricious, and unlawful.

DAVIS GRAHAM &
STUBBS LLP
ATTORNEYS AT LAW
50 W. LIBERTY ST., STE. 950
RENO, NEVADA 89501
(775) 229-4219

175.    The Plaintiff Counties' Plans and the Nevada Plan are based on science and local site-specific data which in many instances reveals facial data errors in the NVLMP's habitat mapping and will produce more effective GSG habitat conservation efforts than the NVLMP. The state and local plans apply to all GSG habitat categories, including the 7.6 million acres of OHMA that is not the primary focus of the NVLMP; the State Plan requires mitigation of direct and indirect impacts to all habitat management categories, which the NVLMP does not. Similarly, the Plaintiff Counties' Plans apply to all lands (public and private) in the respective counties.  Because the NVLMP only applies to federal lands GSG conservation measures may differ where the land ownership pattern consists of adjacent sections of public and private lands and is likely to result in less effective and inconsistent conservation efforts.

176.    Numerous entities, including each of the Plaintiffs, advised BLM of these inconsistencies through comments and protest letters to BLM which ignored these inconsistencies in violation of FLPMA and instead displaced comprehensive, collaborative science-based state and local conservation plans with the NVLMP.

177.    Irreparable environmental harm to GSG habitat and Plaintiffs' interests in achieving effective habitat conservation will result from BLM's interference with implementation of the Nevada Plan and the Counties' Plans and disruption of local planning activities resulting from the NVLMP's inconsistencies.

178.    The agencies' failure to comply with FLPMA's consistency requirements will result in imminent substantial harm to Plaintiffs who will suffer loss of use of public lands and property rights due to the NVLMP's restrictions.  In addition, the NVLMP's inconsistencies with State and local land use and conservation plans will interfere with the local police powers, implementation of those plans and other functions to protect the public health and safety such as

DAVIS GRAHAM &
STUBBS LLP
ATTORNEYS AT LAW
50 W. LIBERTY ST., STE. 950
RENO, NEVADA 89501
(775) 229-4219

1   obligations to maintain transportation systems and management of fire protection services.  The

2   agencies' actions are contrary to law and must be set aside under 5 U.S.C. § 706(2).

3                                   **Count II**
4   **Violation of the APA, FLPMA & NFMA: Failure
    to Manage Federal Lands for Multiple-Use and Sustained Yield &
5   In A Manner that Recognizes the Nation's Need for Minerals**

6       179.    Plaintiffs incorporate by reference the allegations contained in paragraphs 1

7   through 178 of this Complaint, as though fully set forth below.

8       180.    The NVLMP ignores FLPMA's and NFMA's multiple-use mandate and

9   substitutes a prioritization of GSG habitat conservation to the exclusion of other uses on over 20

10  million acres of Nevada's public and National Forest System lands without adequate

11  consideration of science, viable alternatives to the severe restrictions proposed, or due process in

12  
13  accordance with USFS procedures to propose withdrawals to BLM.  Defendants have failed to

14  undertake the appropriate review, consideration, and analysis of relevant local data, conservation

15  efforts, and other authorized uses of the public and National Forest System lands at issue.

16
17      181.    Defendants' proposal to withdraw 2.8 million acres of lands in Nevada will put

18  some of the best mineral exploration in the world off-limits to exploration and development and

19  ignores the Nation's need for minerals.  The agencies have not demonstrated such measures are

20  necessary or that these lands all include critical GSG habitat or, in some instances, habitat at all.

21  The agencies' action is arbitrary, capricious and in violation of law particularly given the

22  erroneous habitat maps the agencies used to identify conservation areas and the very minor

23  impacts that mining projects have on range-wide GSG habitat. (Mining affects less than 0.1

24  percent or the range-wide habitat according to FWS officials).

25
26      182.    Defendants' actions will put Western, Quantum, and Paragon out of business and

27  put lands with some of the greatest mineral potential off limits to exploration and development

28

DAVIS GRAHAM &
STUBBS LLP
ATTORNEYS AT LAW
50 W. LIBERTY ST., STE. 950
RENO, NEVADA 89501
(775) 229-4219

without adequate impact analysis of the loss of such resource potential, the need or effectiveness for the conservation or the reasonable consideration of viable alternatives such as the local and state plans.  The agencies' actions are contrary to law and must be set aside under 5 U.S.C. § 706(2).

**Count III**
**Violation of the APA and the General Mining Law**

183.    Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 182 of this Complaint, as though fully set forth below.

184.    In violation of Section 22 of the Mining Law, the NVLMP restrictions impose severe harm on Plaintiffs by constraining exploration and development on a significant portion of the lands where many of Nevada's most important mineral deposits and gold trends are located. Each of the County Plaintiffs will be harmed by the NVLMP's interference with mineral exploration and development and creation of such severe burdens that some of the best mineral exploration terrain **in the world** will be off-limits to exploration and development.  This will dramatically reduce future discoveries of valuable mineral deposits that can ultimately become mines, stifle job creation, and impede these Counties' (and the State's) economic recoveries. The NVLMP restrictions will chill investment in Plaintiffs' and other mineral projects in Nevada.

185.    The proposed withdrawal of 2.8 million acres from mineral entry in Nevada, most of which is located in Elko and Humboldt Counties, and other onerous travel and land use restrictions in the NVLMP will interfere with and, in some instances, entirely deprive Plaintiffs Western, Quantum, and Paragon of their rights under the Mining Law and put these small companies out of business.  Further, it is not in accordance with law.

DAVIS GRAHAM &
STUBBS LLP
ATTORNEYS AT LAW
50 W. LIBERTY ST., STE. 950
RENO, NEVADA 89501
(775) 229-4219

186.   The SFA withdrawal will cause substantial irreparable harm to Plaintiffs Western, Quantum, and Paragon whose mining claims on USFS-administered lands are threatened with imminent claims contests.  The NVLMP restrictions that affect USFS- and BLM-administered lands outside of the SFA interfere with rights under the General Mining Law, including rights of ingress and egress, and will substantially harm Plaintiffs and should be set aside as unlawful.

## Count IV
### Violation of the APA, NEPA & FLPMA: Substantial Changes between the DEIS and the FEIS With No Opportunity for Public Notice or Comment

187.   Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 186 of this Complaint, as though fully set forth below.

188.   The agencies rely on the FWS memorandum in adopting the SFA but did not provide the public the information in the DEIS about how the FWS determined the SFA boundaries were appropriate to identify the "best of the best" GSG habitat and justify setting aside these lands solely for GSG habitat.  No science, data or commercial information was disclosed in the DEIS to explain the basis for the proposed boundaries which conflict with local data and as the agencies acknowledge were new information in the FEIS.  As discussed in the SEP's Protest Letter, State experts disagree with the SFA boundaries and strenuously object to the omission of Nevada-specific data and the fact that FWS and the agencies did not consult with any Nevada experts in delineating the SFA boundaries.  Consequently, the FWS conclusions that such boundaries are appropriate for land withdrawals to conserve GSG habitat conflict with local expertise, and the result of a process that is inexplicable, arbitrary, and devoid of reason.

189.   As described in the FEIS, the inclusion of the SFA in the Proposed Plan is introduced as a new concept that is based on the October 2014 memorandum.  Consequently, the addition of the SFA in the NVLMP is not a logical outgrowth of the Preferred Alternative in the DEIS – but instead contradicts the FLMPA and NFMA multiple-use approach which the

74

DAVIS GRAHAM &
STUBBS LLP
ATTORNEYS AT LAW
50 W. LIBERTY ST., STE. 950
RENO, NEVADA 89501
(775) 229-4219

agencies identified as a primary premise for avoiding widespread withdrawals.  As such, it is arbitrary and capricious and violates the APA and NEPA.  Title 5 of USC 553(b) requires that agencies publish proposed rules to provide interested persons an opportunity to participate through submission of written data, views, or arguments. Although the publication of notice of a proposed rule need not contain every precise proposal which may ultimately be adopted as a rule, the final rule must be a "logical outgrowth" of the proposed rule. In determining whether a final rule is a "logical outgrowth," the court should determine whether the interested parties "should have anticipated that such a requirement might be imposed." Plaintiffs could not have anticipated the addition of the SFA withdrawal zones because the DEIS states that the agencies were bound by their statutory multiple-use mission and selected Alternative D as their preferred alternative rather than alternatives that included large-scale land withdrawals.

190.   The public must be provided 90 days for review of a DEIS.   43 C.F.R. § 1601.3(i).  Given the new elements in the FEIS including the SFA map which is an integral part of the Plan and was not available to the public until the May 29th publication of the FEIS, (but had been provided to the agencies in October 2014), the agencies deprived Plaintiffs and all interested stakeholders a meaningful opportunity to review and comment upon the significant changes and the data upon which they were based.  The agencies' failure to follow the planning criteria established for the EIS documents by creating a new alternative so materially different from the Preferred Alternative in the DEIS prejudiced the Plaintiffs' and the public's ability to comment upon and participate in the formulation of the LUPA as required by FLPMA, 43 U.S.C. § 1712(f), as well as violating NEPA public review requirements.  The agencies' actions are unlawful and should be set aside under the APA.

191.   An injunction would benefit the public far more than the NVLMP's implementation because it will ensure the agencies do not extend their power beyond Congress'

DAVIS GRAHAM &
STUBBS LLP
ATTORNEYS AT LAW
50 W. LIBERTY ST., STE. 950
RENO, NEVADA 89501
(775) 229-4219

delegation or make decisions based on unverifiable conclusions and avoid the environmental harm implementation of the NVLMP will cause.  An injunction would avoid the environmental harm associated with the NVLMP's interference with the Nevada and Counties' Plans.

**Count V**
**Violation of the APA and NEPA: Failure to take a Hard Look at the**
**Impacts of the Proposed Plan & Analyze Viable Alternatives**

192.   Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 191 of this Complaint, as though fully set forth below.

193.   The NVLMP includes land use restrictions and prohibitions that ignore multiple-use and sustained yield and threaten key economic drivers in northern Nevada including but not limited to ranching, mining, hunting, and recreation because so much of this area is comprised of BLM-administered public land.  The FEIS fails to provide a thorough cumulative socioeconomic impacts analysis of the simultaneous, layered, and overlapping restrictions and prohibitions in the NVLMP that would be placed on uses of public lands and instead relies on a piecemeal analysis of separate alternatives without looking at the cumulative effects of the numerous land use prohibitions and restrictions in the NVLMP.

194.   The NEPA requirements for public input also are material to rights protected under the Taylor Grazing Act.  When Secretary Babbitt promulgated regulations changing grazing privileges to permitted uses, he described the change as "inconsequential" asserted that permitted use would be established through the land use planning process, which "requires data collection and detailed analysis" and "multiple opportunities for public input."  Administration of Livestock Grazing on Public Rangelands, 60 Fed. Reg. 9894, 9928 (1995).  Secretary Babbitt said that establishing permitted use through the land use planning process would "increase, not decrease, the stability of grazing operations." *Id.*  Here, the onerous restrictions and SFAs were not based on data collection and detailed analysis but instead are based on erroneous landscape

76

DAVIS GRAHAM &
STUBBS LLP
ATTORNEYS AT LAW
50 W. LIBERTY ST., STE. 950
RENO, NEVADA 89501
(775) 229-4219

level mapping that puts millions of acres of federally managed lands off limits to other use. The public was not given adequate opportunity to provide input on these significant changes inserted for the first time in the FEIS after the time for public comment under NEPA had passed.

195. The NVLMP should be remanded with direction to the agencies to analyze how the NVLMP restrictions will severely reduce economic activity throughout northern Nevada, and evaluate alternatives that will reduce the widespread loss of tax revenues and jobs and the substantial economic and socioeconomic harm to Plaintiffs and minimize or avoid interfering with local police powers and land use planning (such as the 1,500 miles of roads in Elko County and the 1,958 miles of roads in Eureka County impacted by the NVLMP's travel restrictions).

196. The addition of the SFA withdrawal zones to the agencies' NVLMP grievously harms Plaintiffs Elko and Humboldt Counties where the agencies have designated a broad expanse of land along the Counties' northern border with Idaho as SFA. Elko County estimates that the NVLMP removes roughly 2,000 square miles (1.6 million acres of BLM-administered lands and 395,000 acres of USFS-administered lands) from multiple uses that include ranching, agricultural production, mineral exploration and development, oil and natural gas exploration and development, wind energy, and other natural resource development. The Humboldt County SFA covers over 633,000 acres of land (roughly 461,000 acres of BLM-administered lands and 172,000 acres of USFS-administered lands. The SFA also will significantly impair or destroy rights under and related to or depending on certain grazing permits including those belonging to the Ranch.

197. In addition, the NVLMP interferes with Elko's economy, local land use planning and other police powers. Using the USDA's agricultural census, Elko County calculates that the NVLMP will cause an annual loss of approximately $31 million of agricultural productivity. Elko County has identified over 236,000 acres of agricultural land affected within or adjacent to

77

DAVIS GRAHAM &
STUBBS LLP
ATTORNEYS AT LAW
50 W. LIBERTY ST., STE. 950
RENO, NEVADA 89501
(775) 229-4219

the SFA.   Additional losses are anticipated as a result of withdrawing the SFA lands from mineral exploration and development, oil and gas exploration and development, and wind energy.  The EIS failed to disclose or analyze these impacts in violation of NEPA.

198.    Elko County has suffered significant harm from BLM's deferral of the China Mountain Wind Energy Project because of GSG habitat.  As discussed in Elko County's June 2015 Protest Letter, this project would have provided Elko County $500 million to the local economy in phase one construction, 750 construction jobs and up to 50 permanent jobs. The full project would provide $18.8 million in property taxes with $7.6 million going to the state and the remainder to Elko County.  The China Mountain Wind Energy Project in Elko County is located in an area the NVLMP designates as SFA and places off-limits to wind energy development. This prohibition is inconsistent with the Elko County Conservation Plans that embrace multiple-use.  As the Elko County Plan notes, this type of prioritization of lands to be set aside for GSG habitat to the exclusion of all other uses raises significant concerns about the United States being self-sustainable.  The significant loss of lands for use to develop wind energy projects in Elko County in addition to agricultural and mining development will exacerbate not only our Country's reliance on foreign oil and energy but could lead us to become import dependent for food.

199.    The addition of the SFA to the NVLMP causes substantial and irreparable harm to Plaintiffs Western, Quantum, Paragon and the Ranch.  Withdrawing these lands from mineral entry will interfere with exploration and development of the companies' projects and destroy the future of Western, Quantum and Paragon.  The restrictions on use and "review" of grazing permits threaten to put the Ranch, a State and National historic treasure, and multiple generation family operation out of business.

DAVIS GRAHAM &
STUBBS LLP
ATTORNEYS AT LAW
50 W. LIBERTY ST., STE. 950
RENO, NEVADA 89501
(775) 229-4219

200.    In addition, the FEIS' range of alternatives analyzed is inconsistent with NEPA. 42 U.S.C. § 4331.  The Proposed Plan and listed alternatives do not attain "**the widest range of beneficial uses** of the environment without degradation, risk to health or safety, or other undesirable and unintended consequences" in violation of a core principle of NEPA.

201.    The FEIS also fails to satisfy NEPA's requirement that agencies take a "hard look" at how the choices before them affect the environment, and then place their data and conclusions before the public.  The FEIS is riddled with general statements about possible effects, which do not satisfy the hard look requirement absent a justification regarding why more definitive information could not be provided.  *Northwest Environmental Advocates v. National Marine Fisheries Service*, 460 F.3d 1125, 1141 (9th Cir. 2006).   The FEIS is full of material errors, omissions, and internal inconsistencies as detailed in Plaintiffs' protest letters and herein.

202.    The FEIS maps are internally inconsistent, rendering them legally insufficient. Chapter 3, Affected Environment, in the FEIS is incomplete because it does not include a section on geology and minerals.  The absence of such an analysis in the FEIS Affected Environment section violates NEPA because without this discussion, there is no baseline against which to measure the impacts that the NVLMP will have on locatable minerals or to conduct a proper balancing analysis to comply with the multiple-use mandate.   The land use restrictions – especially the over 16 million acres targeted for travel limitations – and the 2.8 million acres of mineral withdrawals proposed in the SFA will substantially irreparably harm Plaintiffs. Plaintiffs have been deprived of adequate notice and opportunity to comment on the adverse impact the NVLMP will have on their mineral exploration and development; impacts to minerals and geology were neither disclosed nor analyzed.  The omission of this discussion is inexcusable because there are numerous published sources of information on the geology and mineral potential of the NVLMP planning area available from the USGS and the Nevada Bureau of

79

DAVIS GRAHAM &
STUBBS LLP
ATTORNEYS AT LAW
50 W. LIBERTY ST., STE. 950
RENO, NEVADA 89501
(775) 229-4219

Mines. The Protest Report ignores the grievous omission of a section on geology and mineral resources saying it is unnecessary for a regional, planning-level analysis, which is incorrect.

203.    The FEIS contains perfunctory, vague, and un-quantified assessments that do not constitute a "hard look."    Statements like: "Any alternative that limits locatable mineral development (i.e., reduces the area available for development) subject to valid existing rights and applicable law will have some adverse impact on locatable minerals by reducing availability of these resources" (FEIS 4-306) do not satisfy standards for an adequate NEPA impact analysis.

204.    BLM's hard look requirement is explained in BLM's 2008 NEPA Handbook (H 1790-1), as "a reasoned analysis containing quantitative or detailed qualitative information." Section 6.8.1.2 "Analyzing Effects" in the NEPA Handbook requires that the effects analysis provide a level of detail sufficient to support reasoned conclusions by comparing the amount and degree of impact the proposed action alternative will cause.   General qualitative statements about possible effects and risk like "some adverse impact on locatable minerals" do not constitute a "hard look" absent a justification regarding why more definitive information could not be provided for public comment.   This is especially true where, as here, this information was readily available to the agencies in BLM's Land and Mineral Rehost 2000 System ("LR 2000") online database, which provides reports on BLM land and mineral use authorizations for mining claims, oil, gas, geothermal leasing and other land uses.   Without such an overlay to demonstrate impacts, BLM deprived the public of meaningful opportunity to comment, in violation of NEPA and FLPMA.   Proposing withdrawal of millions of acres of lands putting significant resources off limits, the agencies "may not rely upon forecasting difficulties or the task's magnitude to excuse the absence of a reasonably thorough site-specific analysis" of the decision's consequences. *State of Cal. v. Block*, 690 F.2d 753 (9th Cir. 1982).

DAVIS GRAHAM &
STUBBS LLP
ATTORNEYS AT LAW
50 W. LIBERTY ST., STE. 950
RENO, NEVADA 89501
(775) 229-4219

205.   When preparing an EIS, agencies must look hard at the factors relevant to the definition of purpose and consider the views of Congress in the agency's statutory authorization to act.  *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190 (D.C. 1991) When Congress expresses its intent by statute, as it has through FLPMA, NFMA, MUSYA, and the General Mining Laws, the agencies must take it seriously.  *Id.* at 198.  This evaluation must go into selecting reasonable alternatives for detailed analysis.  BLM and USFS analyzed alternatives that improperly make GSG habitat conservation the primary use of the relevant federal lands without adequately analyzing or disclosing the science or necessity for the scope of restricting 10 million acres including 2.8 million acres withdrawn from operation of the Mining Law.  Nor have the agencies demonstrated that less restrictive alternatives would not achieve GSG conservation, in violation of FLPMA, NFMA, TGA, MUSYA and the General Mining Laws.

206.   The agencies have not provided analysis to support that they cannot achieve GSG conservation in a manner compliant with FLPMA, NFMA, TGA, MUYSA, and the General Mining Laws.  The August 2015 Western Association of Fish and Wildlife Agencies ("WAFWA") report entitled "Greater Sage-Grouse Populations Trend: An Analysis of Lek Count Databases 1965 – 2015," documents that GSG population numbers show large variability with recent lek counts revealing that the number of male birds counted in 2015 on leks range-wide has increased 63 percent compared to the 2013 lek count data.  The encouraging improvement in recent population trends has occurred with the State and local plans in place and without the NVLMP's severe restrictions.  WAFWA's findings, along with the 2015 lek county data reported in Eureka County, are compelling evidence that current federal, state, local, and private conservation efforts are achieving significant conservation in compliance with the multiple-use mandates in FLPMA and NFMA, calling into question the need for the NVLMP's land use restrictions.

81

DAVIS GRAHAM &
STUBBS LLP
ATTORNEYS AT LAW
50 W. LIBERTY ST., STE. 950
RENO, NEVADA 89501
(775) 229-4219

207.   The absence of a thorough analysis of the direct, indirect, and cumulative socioeconomic impacts of implementing the NVLMP also violates NEPA.  For example, Section 5.14.2 of the FEIS makes virtually no attempt to evaluate the socioeconomic impacts to local governments and states: "Because specific impacts on local government tax revenues could not be quantified, the nature of the potential cumulative effect is not possible to characterize beyond the analysis in Section 4.20, Socioeconomics and Environmental Justice." (FEIS 5-241).  The Council on Environmental Quality regulations require the agencies deal with uncertainties by including a "summary of existing credible scientific evidence which is relevant to evaluating the reasonable foreseeable significant adverse impacts" and the agency's evaluation of such impacts based upon theoretical approaches or research methods generally accepted in the scientific community.  40 C.F.R. §§ 1502.22(b)(3)-(4); *San Luis Obispo Mothers for Peace v. Nuclear Regulatory Comm'n,* 449 F.3d 1016, 1033 (9th Cir. 2006).  This requires the use of information reasonably available to the BLM and an analysis of whether there is reasonably reliable scientific information available to support that such onerous restrictions which will cause significant economic impact are necessary and will effectively achieve conservation.  The FEIS is fatally deficient on both points.

208.   That it is "not possible to determine *specific* economic impacts" does not excuse the agencies from providing any analysis of economic impacts, which clearly is possible based on available information.  As the agency charged with managing the federal mineral estate BLM maintains the LR 2000 online database and is thus in possession of the necessary data to at least provide an estimate of claims currently located that would be affected by the NVLMP.  BLM has also failed to consider relative scarcity of values, integrated principles of economic sciences, and long-term benefits as required under Section 202(c) of FLPMA.  The FEIS fails to meet the agencies' obligation to "guarantee that relevant information is available to the public," *Save the*

DAVIS GRAHAM &
STUBBS LLP
ATTORNEYS AT LAW
50 W. LIBERTY ST., STE. 950
RENO, NEVADA 89501
(775) 229-4219

*Peaks Coalition v. U.S. Forest Service*, 669 F.3d 1025, 1035 (9th Cir. 2012), or to provide content to foster "informed decision-making and informed public participation." *Id.* The agencies' actions are contrary to law and must be set aside under 5 U.S.C. §706(2); the ARMP should be stayed and the documents remanded to the agencies for further analysis.

**Count VI**
**Violation of the APA and SBREFA:**
**Failure to Evaluate the Impact of the Proposed Plan on Small Entities**

209.   Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 208 of this Complaint, as though fully set forth below.

210.   Eureka, Humboldt, Lander, Churchill, Pershing, Lincoln and White Pine Counties have populations of under 50,000 people, and therefore qualify as small entities under the RFA. Quantum, Western, Paragon, and the Ranch are small businesses with fewer than 500 employees, and therefore qualify as small entities under the RFA.

211.   All of the Plaintiff Counties that are small entities and, Quantum, Western, Paragon, and the Ranch are all small businesses that will be directly regulated by the NVLMP, and the NVLMP causes a distinct risk to all Plaintiffs listed.

212.   The final publication of the LUPA/NVLMP/FEIS is a "final agency action for which there is no other adequate remedy in court."

213.   The LUPA/FEIS ignores the economic impacts on Plaintiffs Western, Quantum, Paragon, and the Ranch which will effectively terminate their existing operations, resulting in significant financial harm as well as the significant economic impacts on the Plaintiff Counties that are small entities which could put some of these Counties on the brink of or within the throws of economic devastation.

/ / /

DAVIS GRAHAM &
STUBBS LLP
ATTORNEYS AT LAW
50 W. LIBERTY ST., STE. 950
RENO, NEVADA 89501
(775) 229-4219

214.    Defendants failed to consider or certify whether the NVLMP would have a significant economic impact on a substantial number of small businesses and entities, in violation of the RFA.

215.    The RFA provides courts with jurisdiction to review any claims of noncompliance with section 601, 604, 605(b), 608(b), and 610 in accordance with the judicial review provisions of the APA, 5 U.S.C. §§ 701–706.  *Id*. § 611(a)(1).  Under the RFA, if the court grants relief, "the court shall order the agency to take corrective action including but not limited to: (A) remanding the rule to the agency, and (B) deferring the enforcement of the rule against small entities unless the court finds that continued enforcement of the rule is in the public interest." *Id*. § 611(a)(4); *see Northwest Mining Ass'n v. Babbitt*, 5 F.Supp.2d 9, 16 (1998) (remanding and deferring the effective date of a final rule for violation of the RFA/SBREFA).  The court may also stay the effective date of any rule.  *See* 5 U.S.C. § 611(a)(5).

216.    Enforcement of the NVLMP is not in the public interest, and the effective date of the rule should be deferred.  Small mining, ranching and farming businesses are an integral source of economic stability and employment in Nevada, and the NVLMP will detrimentally impact them by terminating operations.  The State and local plans are proving effective at GSG conservation and the NVLMP's interference with those efforts will cause environmental harm. The agencies' actions are unlawful and should be set aside under the APA.

## Count VII
## Violation of the Due Process Clause of the United States Constitution

217.    Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 216 of this Complaint, as though fully set forth below.

218.    The Due Process Clause of the Fifth Amendment forbids government practices and policies that violate precepts of fundamental fairness.  Here, FWS' and USFS' failure to

DAVIS GRAHAM &
STUBBS LLP
ATTORNEYS AT LAW
50 W. LIBERTY ST., STE. 950
RENO, NEVADA 89501
(775) 229-4219

comply with the withdrawal process requirements under FLPMA and the USFS Manual and notice and other substantive requirements under NEPA denied Plaintiffs due process and is fundamentally unfair to them, abrogates their rights and due process.

219.     Defendants have violated their statutory obligations for land use planning, multiple-use and sustained yield as described above and in violation of their constitutional obligation to execute laws enacted by Congress, violating precepts of fundamental fairness.

220.     The NVLMP should be declared null and void and any regulatory action proposed or completed as a result of the NVLMP including the RODs and any proposed land withdrawals, should be vacated and remanded to the agencies for further consideration.

**Count VIII**
**<u>Unlawful Delegation from BLM to FWS to Identify SFA Withdrawal Areas</u>**

221.     Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 220 of this Complaint, as though fully set forth below.

222.     An agency cannot delegate its authority without express authorization of Congress.  FWS directed the agencies to delineate stronghold areas that became the SFA in the Proposed LUPA and NVLMP.  BLM unlawfully sub-delegated its authority to identify the SFA when it acquiesced to FWS' directive in the October 2014 memorandum and delineated the NVLMP SFA on the basis of the stronghold areas shown on the maps in the FWS memorandum.

223.     Plaintiffs are seeking to enjoin the agencies from adopting the SFA in the NVLMP because of BLM's unlawful delegation of decision-making authority to FWS.

224.     The addition of the SFA to the NVLMP is causing real, imminent and irreparable harm based on the enforcement of a withdrawal zone identified by an agency without the authority to make such an identification.  In light of the FWS' September 22, 2015 determination that GSG is not warranted for listing as threatened or endangered, FWS has no jurisdiction over

DAVIS GRAHAM &
STUBBS LLP
ATTORNEYS AT LAW
50 W. LIBERTY ST., STE. 950
RENO, NEVADA 89501
(775) 229-4219

GSG populations further highlighting the unlawfulness of the FWS' role in identifying the SFA. Moreover, the FWS' recent acknowledgement that "…Overall, the extent of [mining] projects *directly affects less than 0.1 percent of the sage-grouse occupied range*. Although direct and indirect effects may disturb local populations, *ongoing mining operations do not affect the sage-grouse range wide*." (FR 59858, October 2, 2015, p. 59915) clearly demonstrates that withdrawing 2.8 million acres of Nevada lands from the operation of the General Mining Law is an unjustified and unlawful overreach unnecessary to protect GSG habitat from the impacts of mining. There is no scientific or rationale basis for this large withdrawal which is arbitrary and capricious.

225.    Western's, Quantum's, Paragon's and the Ranch's due process rights were violated when they were deprived of opportunity to comment on the SFA.  Adopting the SFA and withdrawing the land from mineral entry and restricting grazing will put the future of these small businesses at substantial risk of destruction.

226.    The NVLMP should be declared null and void and any regulatory action proposed or completed as a result of the NVLMP, Nevada portions of the RODs and any proposed land withdrawals, should be revoked and remanded to the agencies for further consideration.

### Count IX
### Violation of FLPMA & Due Process: Violation of Withdrawal Procedures

227.    Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 226 of this Complaint, as though fully set forth below.

228.    New land withdrawals must be proposed in accordance with FLPMA § 1714. BLM may propose land for withdrawal and publish the proposal in the Federal Register, or an applicant may apply to BLM to initiate a withdrawal pursuant to FLPMA.  USFS did not do pre-

DAVIS GRAHAM & STUBBS LLP
ATTORNEYS AT LAW
50 W. LIBERTY ST., STE. 950
RENO, NEVADA 89501
(775) 229-4219

application consulting or file an application for withdrawal with BLM for the lands in the SFA. FWS did not submit a valid withdrawal petition with BLM for SFA lands under FLPMA.

229.   The BLM's failure to require FWS and USFS to follow required application procedures causes substantial irreparable harm to Western, Quantum and Paragon.   The applications would have included studies and analyses required by FLPMA.  Withdrawing these lands from mineral entry will make exploration and development of these projects impossible, and put the future of the Western, Quantum, and Paragon at substantial risk of destruction.

### PRAYER FOR RELIEF

Plaintiffs respectfully request that this Court enter judgment in their favor, and:

1.   Declare the Defendants have violated FLPMA, its implementing regulations, and the APA by failing to ensure the NVLMP is consistent with State and local land use and conservation plans to the extent they are consistent with federal law;

2.   Declare the Defendants have violated FLPMA and NFMA multiple-use and sustained yield mandates for land use planning and failed to manage public lands in a manner that provides for the Nation's needs for mineral resources;

3.   Declare and adjudge that Defendants have violated the General Mining Laws and the Taylor Grazing Act;

4.   Declare and adjudge that Defendants violated the APA and NEPA by failing to take a hard look at impacts resulting from the NVLMP, to evaluate viable alternatives, and making substantial significant changes in the FEIS without meaningful opportunity for public review and comment on such changes, and stay the effectiveness of the Nevada portions of the RODs, remand the Nevada portion of the RODs to Defendants for further analysis consistent with NEPA and FLPMA, defer enforcement of any rules under the NVLMP, and enjoin any

DAVIS GRAHAM &
STUBBS LLP
ATTORNEYS AT LAW
50 W. LIBERTY ST., STE. 950
RENO, NEVADA 89501
(775) 229-4219

action taken to interfere with use of lands segregated or proposed for withdrawal from mineral entry;

5.      Declare and adjudge that Defendants violated the RFA in promulgating the NVLMP, remand the NVLMP to Defendants for additional rulemaking, and defer enforcement of the rule until the RFA requirements are satisfied;

6.      Declare and adjudge that Defendants unlawfully delegated their authority to FWS and violated Plaintiffs' constitutional right to due process of law; and

7.      Grant Plaintiffs such other relief as may be necessary and appropriate or as the Court deems just and proper.

Respectfully submitted this 22nd day of October, 2015.

OFFICE OF THE ATTORNEY GENERAL

Adam Paul Laxalt
*Attorney General of Nevada*

By:   /s/  Lawrence VanDyke
Lawrence VanDyke (NSB 13643C)
*Solicitor General*
C. Wayne Howle (NSB 3443)
*Chief Deputy Attorney General*

*Attorneys for State of Nevada*

WASHOE COUNTY DISTRICT ATTORNEY

Christopher Hicks
*District Attorney*

By:   /s/  Michael W. Large
Michael W. Large (NSB 10119)
*Deputy District Attorney*

*Attorneys for State of Nevada*

DAVIS GRAHAM &
STUBBS LLP
ATTORNEYS AT LAW
50 W. LIBERTY ST., STE. 950
RENO, NEVADA 89501
(775) 229-4219

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DAVIS GRAHAM & STUBBS LLP

By:  /s/  Laura K. Granier
         Laura K. Granier (NSB 7357)

*Attorneys for Counties and Private Plaintiffs*

DAVIS GRAHAM &
STUBBS LLP
ATTORNEYS AT LAW
50 W. LIBERTY ST., STE. 950
RENO, NEVADA 89501
(775) 229-4219

**CERTIFICATE OF SERVICE**

Pursuant to F.R.C.P. 5(b), I certify that I am an employee of Davis Graham & Stubbs LLP and not a party to, nor interested in, the within action; that on the 22nd day of October, 2015, a true and correct copy of the foregoing document was transmitted electronically to the following via the Court's e-filing electronic notice system:

| | |
|---|---|
| Holly Vance, Esq.<br>Assistant United States Attorney<br>100 West Liberty Street, Suite 600<br>Reno, NV 89501 | Holly.A.Vance@usdoj.gov |
| Luther L. Hajek, Esq.<br>Trial Attorney, Natural Resources Section<br>United States Department of Justice<br>Environment and Natural Resources Division<br>999 18th St., South Terrace, Suite 370<br>Denver, CO 80202 | luke.hajek@usdoj.gov |
| Tanya Nesbitt, Esq.<br>Trial Attorney<br>U.S. Department of Justice<br>Environment and Natural Resources Division<br>Natural Resources Section<br>P.O. Box 7611<br>Washington, D.C. 20044 | Tanya.Nesbitt2@usdoj.gov |

Dated this 22nd day of October, 2015.


_____/s/  Jeanette Sparks_____
Jeanette Sparks

DAVIS GRAHAM &
STUBBS LLP
ATTORNEYS AT LAW
50 W. LIBERTY ST., STE. 950
RENO, NEVADA 89501
(775) 229-4219