1

2

DANIEL G. BOGDEN
United States Attorney

3

HOLLY VANCE

4

Assistant United States Attorney
100 W. Liberty Street, Suite 600
Reno, NV 89501

5

Ph: (775) 784-5438, Fax: (775) 784-5181

6

Holly.A.Vance@usdoj.gov

7

JOHN C. CRUDEN
Assistant Attorney General

8

9

LUTHER L. HAJEK
BARCLAY SAMFORD

10

TANYA NESBITT
Trial Attorneys, Natural Resources Section

11

United States Department of Justice
Environment and Natural Resources Division

12

999 18th St., South Terrace, Suite 370
Denver, CO 80202

13

Tel: (303) 844-1376 / Fax: (303) 844-1350

14

luke.hajek@usdoj.gov

15

16

Attorneys for Defendants

17

**IN THE UNITED STATES DISTRICT COURT**

18

**DISTRICT OF NEVADA**
**(RENO)**

19

| | |
|---|---|
| WESTERN EXPLORATION, LLC ET AL., | Civil No. 3:15-cv-491-MMD-VPC |
| Plaintiffs, | **DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION** |
| v. | |
| U.S. DEPARTMENT OF THE INTERIOR, ET AL., | |
| Defendants. | |

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................................................1

BACKGROUND ...................................................................................................................2

I.     Factual Background ...................................................................................................2

      A.     The National Greater Sage Grouse Conservation Strategy.......................2

      B.     The Agencies' Land Management Plan Amendments for the Nevada and
             Northeastern California Sub Region .........................................................4

      C.     The Fish and Wildlife Service's 2015 Finding that a Listing of the Greater
             Sage-Grouse is Not Warranted ................................................................6

II.    Legal Background ....................................................................................................6

      A.     Management of Federal Lands by the U.S. Bureau of Land Management
             and the U.S. Forest Service....................................................................6

      B.     The Mining Law of 1872 and the Secretary of the Interior's Authority to
             Withdraw Lands from Location and Entry under the Law .....................7

      C.     National Environmental Policy Act ........................................................8

STANDARD OF REVIEW ...................................................................................................8

I.     Judicial Review Under the Administrative Procedure Act .......................................8

II.    Standard for Obtaining Preliminary Injunctive Relief .............................................9

ARGUMENT .........................................................................................................................9

I.     Plaintiffs Are Not Likely to Succeed On the Merits .................................................9

      A.     Plaintiffs Are Not Likely to Succeed on their FLMPA and NFMA Claims..........10

           1.     The FLPMA and NFMA Claims Are Not Ripe........................................10

           2.     BLM Complied with the Requirement to Coordinate with State and
                  Local Governments.................................................................................10

           3.     The Plan Amendments Are Consistent with the Principle of Multiple
                  Use and Sustained Yield .........................................................................13

            4.     BLM Did Not Delegate Its Authority to the Fish and Wildlife
                  Service.......................................................................................................15

      B.     Plaintiffs Are Not Likely to Succeed on Their Claim that the Agencies
             Violated the Procedures for Proposing a Withdrawal from the Mining Law........16

i

    C.      BLM and the Forest Service Complied with NEPA ..............................................18

        1.      The Agencies Were Not Required to Prepare a Supplemental Environmental Impact Statement................................................18

        2.      The EIS Analyzes a Reasonable Range of Alternatives ...........................22

        3.      The EIS Discloses the Scientific Basis of the Analysis...........................24

        4.      The Agencies Appropriately Responded to Comments...........................26

II.    Plaintiffs Have Failed to Demonstrate Irreparable Harm ..................................27

    A.      The Counties Fail to Demonstrate Imminent Environmental Harm from Grazing Reductions................................................28

    B.      The Counties Fail to Demonstrate Imminent Injury to Their Transportation Systems or to Their Ability to Provide Emergency Services ...............................28

    C.      The Counties Cannot Assert Injury as *Parens Patriae*...........................30

    D.      The Counties Fail to Demonstrate Imminent Economic Injury...........................30

    E.      The Mining Companies Fail to Demonstrate Imminent Injury ...........................31

III.   The Balance of Harms and the Public Interest Weigh Against an Injunction ..................33

CONCLUSION................................................35

# TABLE OF AUTHORITIES

**Cases**

*Alaska Survival v. Surface Transp. Bd.*,
  705 F.3d 1073 (9th Cir. 2013) ............................................................... 22, 23

*Alfred L. Snapp & Son v. Puerto Rico ex rel. Barez*,
  458 U.S. 592 (1982) ......................................................................... 30

*All. For The Wild Rockies v. Cottrell*,
  632 F.3d 1127 (9th Cir. 2011) ............................................................... 9

*Am. Motorcyclist Asso. v. Watt*,
  534 F. Supp. 923 (C.D. Cal. 1981) ......................................................... 12, 31

*Angoon v. Hodel*,
  803 F.2d 1016 (9th Cir. 1986) ............................................................... 24

*Ashley Creek Phosphate Co. v. Norton*,
  420 F.3d 934 (9th Cir. 2005) ............................................................... 34

*Ass'n of Pub. Agency Customers v. Bonneville Power Admin.*,
  126 F.3d 1158 (9th Cir. 1997) ............................................................... 8

*Baker v. USDA*,
  928 F. Supp. 1513 (D. Idaho 1996) ......................................................... 33

*Bennett v. Spear*,
  520 U.S. 154 (1997) ......................................................................... 17

*Big Hole Ranchers Asso. v. U.S. Forest Serv.*,
  686 F. Supp. 256 (D. Mont. 1988) ......................................................... 14

*California ex rel. Christensen v. FTC*,
  549 F.2d 1321 (9th Cir. 1977) ............................................................... 34

*California v. Block*,
  690 F.2d 753 (9th Cir. 1982) ......................................................... 8, 18, 19, 20

*Cameron v. United States*,
  252 U.S. 450 (1920) ......................................................................... 32

*Caribbean Marine Servs. Co. v. Baldrige*,
  844 F.2d 668 (9th Cir. 1988) ............................................................... 29, 31

*Chrisman v. Miller*,
  197 U.S. 313 (1905) ......................................................................... 7

*Drakes Bay Oyster Co. v. Jewell*,
　747 F.3d 1073 (9th Cir. 2014) ........................................................ 34

*Freese v. United States*,
　639 F.2d 754 (Ct. Cl. 1981) ........................................................... 32

*Friends of Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*,
　528 U.S. 167 (2000) ...................................................................... 36

*Idaho Farm Bureau Fed'n v. Babbitt*,
　58 F.3d 1392 (9th Cir. 1995) .......................................................... 36

*In re Multidistrict Vehicle Air Pollution*,
　481 F.2d 122 (9th Cir. 1973) .......................................................... 30

*Indep. Mining Co. v. Babbitt*,
　105 F.3d 502 (9th Cir. 1997) .......................................................... 32

*Indus. Customers of Nw. Utils. v. Bonneville Power Admin.*,
　408 F.3d 638 (9th Cir. 2005) .......................................................... 17

*Kane County v. Kempthorne*,
　495 F. Supp. 2d 1143 (D. Utah 2007) .............................................. 30

*Kane County, Utah v. Salazar*,
　562 F.3d 1077 (10th Cir. 2009) ...................................................... 30

*Kleppe v. Sierra Club*,
　427 U.S. 390 (1976) ........................................................................ 8

*Kootenai Tribe of Idaho v. Veneman*,
　313 F.3d 1094 (9th Cir. 2002) ........................................................ 22

*La. Forestry Ass'n v. Sec'y U.S. Dep't of Labor*,
　745 F.3d 653 (3d Cir. 2014) ........................................................... 16

*Lands Council v. McNair*,
　537 F.3d 981 (9th Cir. 2008) ................................................. 8, 26, 27

*Lexmark Intern., Inc. v. Static Control Components, Inc.*,
　134 S. Ct. 1376 (2014) ................................................................... 34

*Marbled Murrelet v. Babbitt*,
　83 F.3d 1068 (9th Cir. 1996) .......................................................... 35

*Marsh v. Or. Nat. Res. Council*,
　490 U.S. 360 (1989) ............................................................. 18, 21, 26

iv

*Mass. v. EPA*,
   549 U.S. 497 (2007) ................................................................................. 30

*Mazurek v. Armstrong*,
   520 U.S. 968 (1997) ................................................................................... 9

*McFarlane v. Kempthorne*,
   545 F.3d 1106 (9th Cir. 2008) ................................................................... 9

*McKown v. United States*,
   908 F. Supp. 2d 1122 (E.D. Cal. 2012) ................................................... 33

*Munaf v. Green*,
   553 U.S. 674 (2008) ................................................................................... 9

*N. Idaho Cmty. Action Network v. U.S. DOT*,
   545 F.3d 1147 (9th Cir. 2008) ................................................................. 19

*N.M. ex rel. Richardson v. BLM*,
   565 F.3d 683 (10th Cir. 2009) ................................................................. 14

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*,
   422 F.3d 782 (9th Cir. 2005) ................................................................... 35

*Nevada v. Burford*,
   918 F.2d 854 (9th Cir. 1990) ................................................................... 30

*Norton v. S. Utah Wilderness All.*,
   542 U.S. 55 (2004) ............................................................................ 13, 14

*Nw. Ecosystem All. v. U.S. Fish & Wildlife Serv.*,
   475 F.3d 1136 (9th Cir. 2007) ................................................................... 9

*Ohio Forestry Ass'n v. Sierra Club*,
   523 U.S. 726 (1998) ................................................................................. 10

*Orantes-Hernandez v. Thornburgh*,
   919 F.2d 549 (9th Cir. 1990) ................................................................... 36

*Pennsylvania v. Kleppe*,
   533 F.2d 668 (D.C. Cir. 1976) ................................................................ 31

*Perkins v. Bergland*,
   608 F.2d 803 (9th Cir. 1979) ................................................................... 14

*River Runners for Wilderness v. Martin*,
   593 F.3d 1064 (9th Cir. 2010) ................................................................... 9

*Robertson v. Methow Valley Citizens Council,*
   490 U.S. 332 (1989) ........................................................................ 8

*Russell Country Sportsmen v. U.S. Forest Serv.,*
   668 F.3d 1037 (9th Cir. 2011) ................................................ 19, 21

*Safari Club Int'l v. Jewell,*
   76 F. Supp. 3d 198 (D.D.C. 2014) ............................................. 17

*Seattle Audubon Soc'y v. Lyons,*
   871 F. Supp. 1291 (W.D. Wash. 1994) .................................... 15

*Seattle Audubon Soc'y v. Moseley,*
   80 F.3d 1401 (9th Cir. 1996) .................................................... 23

*Simon v. E. Ky. Welfare Rights Org.,*
   426 U.S. 26 (1976) ...................................................................... 34

*Trs. for Alaska v. Watt,*
   524 F. Supp. 1303 (D. Alaska 1981) ....................................... 16

*U.S. Telecom Ass'n v. FCC,*
   359 F.3d 554 (D.C. Cir. 2004) .................................................. 16

*United States v. Weiss,*
   642 F.2d 296 (9th Cir. 1981) ...................................................... 7

*Vane Minerals, L.L.C. v. United States,*
   116 Fed. Cl. 48 (2014) ............................................................... 32

*W. Radio Servs. Co. v. Espy,*
   79 F.3d 896 (9th Cir. 1996) ....................................................... 18

*Weinberger v. Romero-Barcelo,*
   456 U.S. 305 (1982) .................................................................... 34

*Westlands Water Dist. v. U.S. DOI,*
   376 F.3d 853 (9th Cir. 2004) .................................... 18, 19, 21, 22

*Wind River Multiple-Use Advocates v. Espy,*
   835 F. Supp. 1362 (D. Wyo. 1993) ......................................... 15

*Winter v. Nat. Res. Def. Council,*
   555 U.S. 7 (2008) ............................................................ 9, 28, 35

*Wyoming v. USDA,*
   661 F.3d 1209 (10th Cir. 2011) .......................... 14, 15, 21, 22

1

**Statutes**

5 U.S.C. § 706.................................................................................................. 17

5 U.S.C. § 706(2)(A).......................................................................................... 8

16 U.S.C. § 531(a)............................................................................................. 7

16 U.S.C. § 531(b)............................................................................................. 7

16 U.S.C. § 1604(i)............................................................................................ 5

30 U.S.C. § 22.................................................................................................... 7

30 U.S.C. § 23.................................................................................................... 7

30 U.S.C. § 26................................................................................................. 7, 32

42 U.S.C. § 4332(2)(C)...................................................................................... 8

42 U.S.C. § 4332(2)(C)(iii)............................................................................... 22

43 U.S.C. § 1502.9(c)(1)................................................................................... 19

43 U.S.C. §§ 1701(a)(1)-(8)............................................................................. 7

43 U.S.C. § 1702(c)........................................................................................... 7

43 U.S.C. § 1712(c)(9)............................................................................ 10, 11, 13

43 U.S.C. § 1714............................................................................................... 16

43 U.S.C. § 1714(a)................................................................................... 5, 7, 17

43 U.S.C. § 1714(b)........................................................................................... 17

43 U.S.C. § 1714(b)(1)...................................................................................... 8

43 U.S.C. § 1714(a)....................................................................................... 7, 17

43 U.S.C. § 1714(i)....................................................................................... 7, 17

**Regulations**

36 C.F.R. pt. 202.............................................................................................. 11

36 C.F.R. pt. 228........................................................................................... 7, 33

36 C.F.R. § 228.4(e).......................................................................................... 33

36 C.F.R. § 228.14............................................................................................. 33

36 C.F.R. § 261.13............................................................................................. 30

40 C.F.R. § 1500.1(b)................................................................................... 24, 25

40 C.F.R. § 1501.3............................................................................................. 8

40 C.F.R. § 1501.6............................................................................................. 11

40 C.F.R. § 1502.9(c)(1)(i)............................................................................... 19

40 C.F.R. § 1502.13........................................................................................... 22

40 C.F.R. § 1502.14 ................................................................................................ 22

40 C.F.R. § 1502.22 .......................................................................................... 24, 25

40 C.F.R. § 1503.4(a) .............................................................................................. 27

43 C.F.R. § 1610.3-1 ............................................................................................... 11

43 C.F.R. § 1610.3-2(a) ..................................................................................... 11, 13

43 C.F.R. § 1610.3-2(e) ........................................................................................... 11

43 C.F.R. § 1610.5-3(a) ............................................................................................. 5

43 C.F.R. § 2310.1-2 ................................................................................................ 17

43 C.F.R. § 2310.1-2(3) ........................................................................................... 17

43 C.F.R. § 2310.1-3(e) ........................................................................................... 17

43 C.F.R. § 2310.2 ..................................................................................................... 8

43 C.F.R. pt. 3809 ..................................................................................................... 7

43 C.F.R. § 8340.0-5(a)(2) ...................................................................................... 30

46 Fed. Reg. 18,026 (Mar. 23, 1981) ................................................................ 19, 21

64 Fed. Reg. 43,255 (Aug. 4, 1999) ...................................................................... 11

75 Fed. Reg. 13,910 (Mar. 23, 2010) .................................................... 2, 3, 23, 24

76 Fed. Reg. 77,008 (Dec. 9, 2011) ......................................................................... 3

80 Fed. Reg. 57,635 (Sept. 24, 2015) ..................................................................6, 16

80 Fed. Reg. 59,858 (Oct. 2, 2015) ................................. 2, 6, 17, 24, 32, 35

80 Fed. Reg. 63,583 (Oct. 20, 2015) ................................................................ 6, 32

**INTRODUCTION**

This case involves a planning effort of unprecedented scope – covering ten western states – conducted by the U.S. Bureau of Land Management ("BLM") and the U.S. Forest Service ("Forest Service") (collectively, "Agencies") designed to protect the Greater Sage-Grouse ("Sage-Grouse") and its habitat.  During this process, the Agencies worked closely with the U.S. Fish and Wildlife Service ("FWS"), state and county governments, state wildlife agencies, and industry and environmental interests.  The Agencies used a landscape-level approach to analyze threats to Sage-Grouse across its range and develop management strategies to ameliorate the threats to the species and to avoid the need to list the bird as a threatened or endangered species under the Endangered Species Act ("ESA").  The resulting planning-level protections that benefit Sage-Grouse, as well as other species that rely on the sagebrush ecosystem, were a key factor in FWS's recent decision not to list the species under the ESA.

The Court should deny Plaintiffs' motion to enjoin ("Pl. Mot.") (ECF No. 4) BLM's Resource Management Plan Amendment and the Forest Service's Land and Resource Management Plan Amendment for the Nevada and Northeastern California Greater Sage-Grouse Sub-Region (collectively, "Plan Amendments").  Plaintiffs are unlikely to succeed on the merits of their claims because the Agencies have complied with the procedural and substantive requirements of all applicable laws, including the Federal Land Policy and Management Act ("FLPMA"), National Forest Management Act ("NFMA"), and National Environmental Policy Act ("NEPA").

Plaintiffs also have failed to demonstrate that they face any immediate irreparable injury.  The Plan Amendments operate by guiding future site-specific decisions.  Any changes to grazing management will only occur when the Agencies issue new, or modify existing, grazing permits.  Nor do the Plan Amendments close existing routes or limit emergency vehicle access; any closures of existing routes will occur based on future travel management decisions.  Finally, Western Exploration LLC and Quantum Minerals LLC (collectively, "Mining Companies") claim that their rights will be harmed by the proposed withdrawal, and resulting segregation, of

1

lands from the Mining Law of 1872 ("Mining Law").  The proposed withdrawal, however, is subject to valid existing rights and has no immediate effect on mining operations.  Thus, the Plaintiffs have failed to demonstrate that they will suffer any imminent irreparable harm.

Finally, the government's interest and the public interest weigh strongly against an injunction.  Numerous stakeholders, including state and local governments, participated in a four-year process to create a landscape-level framework for protecting Sage-Grouse and avoiding the need to list the species under the ESA.  That process was based on the best available science and on extensive good faith negotiations with interested parties.  An injunction would diminish the protections for Sage-Grouse, undermine the collaborative effort that went into the Plan Amendments, and could have implications for FWS' recent decision not to list the species.  Accordingly, the motion for a preliminary injunction should be denied.

## BACKGROUND

**I.    Factual Background**

### A.    The National Greater Sage-Grouse Conservation Strategy

Sage-Grouse once occupied nearly half a million square miles, and its population is estimated to have been in the millions.  AR 5876; 75 Fed. Reg. 13,910, 13,920 (Mar. 23, 2010).[1] Sage-Grouse now occupy a little over half of their historic range, and the current population is roughly several hundred thousand birds distributed across the West.  75 Fed. Reg. at 13,918-23; *see also* 80 Fed. Reg. 59,858, 59,684 (Oct. 2, 2015).  The population decline is due to many factors, chief among those, the fragmentation and loss of habitat caused by energy development, fire, agricultural conversion, and encroachment of pinyon and juniper trees.  AR 5879-80; 75 Fed. Reg. at 13,924-62, 13,986.  In 2010, the FWS issued a finding that listing of the Sage-Grouse under the ESA was "warranted, but precluded by higher priority listing actions."  75 Fed. Reg. at 13,910.  FWS specifically found that existing regulatory mechanisms, including BLM

---

[1] "AR" refers to the consecutively Bates numbered documents in Defendants' Core Administrative Record, ECF No. 21, filed to facilitate briefing of this motion.  A full administrative record will be filed prior to resolution of the case on the merits.

1    and Forest Service land management plans which govern nearly 60% of remaining Sage-Grouse

2    habitat, were inadequate to protect the species.  *Id.* at 13,919, 13,973-82; AR 5472.

3          In light of FWS's 2010 finding, BLM initiated a national strategy to protect Sage-Grouse.

4    AR 5439.  BLM's strategy built on the 2006 Greater Sage-Grouse Comprehensive Conservation

5    Strategy developed by the Western Association of Fish and Wildlife Agencies ("WAFWA").

6    BLM established a National Technical Team ("NTT"), comprising resource specialists from

7    BLM, FWS, state fish and wildlife agencies, the USDA's Natural Resource Conservation

8    Service ("NRCS"), and the U.S. Geological Survey ("USGS").  *Id.*  The team met and produced

9    the NTT Report, which proposed science-based conservation measures to protect Sage-Grouse

10   within management zones identified by WAFWA and discussed in the FWS's 2010 "warranted,

11   but precluded" finding.  *Id.*  Subsequently, FWS – with support from the Western Governors

12   Association Sage-Grouse Task Force – convened a Conservation Objectives Team ("COT"),

13   which also was composed of representatives from federal and state entities.  AR 5441.  The COT

14   Report, issued in March 2013, analyzed the primary threats to Sage-Grouse survival and

15   identified Priority Areas for Conservation – areas that are the "essential foundation for sage-

16   grouse conservation."  *Id.*

17         Meanwhile, beginning in December 2011, the Agencies launched a national planning

18   process to incorporate Sage-Grouse conservation measures into the Agencies' land management

19   plans in ten western states.  *See* 76 Fed. Reg. 77,008 (Dec. 9, 2011); *see also* AR 5441; AR 5603.

20   For purposes of the planning process, Sage-Grouse habitat was divided into two regions with

21   differing ecological characteristics and threats to the species:  (1) the Great Basin Region,

22   covering all or parts of California, Nevada, Oregon, Idaho, Utah, and Montana, and (2) the

23   Rocky Mountain Region, covering all or parts of Montana, North and South Dakota, Wyoming,

24   Colorado, and Utah.  AR 5443, 5445 (Fig. 1-13); AR 5606.  Within those regions, BLM

25   conducted separate planning efforts in 15 sub-regions, and the Forest Service participated in the

26   planning process in five of the sub-regions.  AR 5443-45; AR 5605.  The Plan Amendments at

27

28

3

1  issue in this case cover the Nevada and Northeastern California Sub-Region, which is within the

2  Great Basin Region.  AR 5444-45; AR 5606-07.

3         The Agencies engaged in a four-year planning and NEPA process, which included

4  extensive input from the affected states and local governments, federal and state agencies, and

5  interested parties.  AR 5499-504; AR 4825-27; AR 3306-08.  Following numerous public

6  scoping meetings, the Agencies issued a Draft Plan Amendment and Draft Environmental Impact

7  Statement ("EIS") for the Nevada and Northeastern California Sub-Region in November 2013.

8  AR 3307-08.  There was a 90-day public comment period on the draft, and the Agencies held

9  seven public meetings in December 2013.  AR 3308-09.  The Agencies issued a Final EIS and

10  Proposed Plan Amendments on May 29, 2015.  AR 5486; AR 5652.  A 30-day protest period and

11  60-day governor's consistency review followed, during which the Agencies accepted additional

12  public comment.  AR 5486-90.  The Agencies completed the planning process in late September

13  2015 by each issuing records of decision ("ROD") approving management plan amendments and

14  revisions for the Great Basin Region and the Rocky Mountain Region.  *See* AR 5423; AR 5592.

15  Overall, the management plan amendments affect 67 million acres of federal land.  AR 5446.

16         **B.     The Agencies' Land Management Plan Amendments for the Nevada and**
               **Northeastern California Sub-Region**
17

18         This case involves the Plan Amendments applicable to Nevada and Northeastern

19  California, which govern 23 million acres of Sage-Grouse habitat.  AR 1801.  The Plan

20  Amendments categorize Sage-Grouse habitat based on the value of the habitat and identify goals,

21  objectives, and management decisions applicable to each type of habitat.  AR 5444-46.  With the

22  assistance of the state wildlife agencies, BLM mapped Sage-Grouse habitat and categorized it as:

23  (1) Priority Habitat Management Areas ("Priority Habitat") (highest value habitat), (2) General

24  Habitat Management Areas ("General Habitat") (land that is occupied seasonally or year round

25  by Sage-Grouse), or (3) Other Habitat Management Areas ("Other Habitat") (unmapped habitat

26  that contains seasonal or connectivity habitat).  AR 5446-48; AR 5610.  The Plan Amendments

27  also identify Sagebrush Focal Areas ("Focal Areas") within Priority Habitat that were identified

28  by the FWS as the "most vital to the species' persistence."  AR 5447-48; AR 5611.

4

1   The Plan Amendments incorporate specific conservation measures to address threats to

2   Sage-Grouse, including energy development, mining, improper grazing, and fire.  *See* AR 5449-

3   51; AR 5618-31.  The measures fall into four categories:  (1) avoiding or minimizing new

4   surface disturbance in Sage-Grouse habitat, (2) improving habitat, (3) reducing the risk of fire,

5   and (4) monitoring and adaptive management.  AR 5452.  The conservation measures vary

6   depending on the type of habitat.  Conservation measures are strongest in Focal Areas, followed

7   by Priority Habitat and General Habitat.  *See* AR 5449-51.  For the most part, the Plan

8   Amendments do not require any immediate action by the Agencies or other entities; instead,

9   conservation measures will be applied when the Agencies make site-specific decisions.  *See* AR

10   5475-76; AR 5661-62.[2]  For example, with respect to grazing, the Plan Amendments do not alter

11   existing permits; they instead direct the Agencies, when processing permits, to consider

12   modifications to the permits to protect Sage-Grouse habitat.  *See* AR 5450; AR 4809-10; AR

13   5622, 5662-62, 5709-10.

14   The Plan Amendments recommend, but do not initiate, the withdrawal of Focal Areas

15   from location and entry under the Mining Law, subject to valid existing rights.  *See* AR 5452;

16   AR 5625.  Following the approval of the Plan Amendments and given the importance of

17   minimizing further disturbance in vital Sage-Grouse habitat, the U.S. Department of the Interior

18   published a notice announcing a proposed withdrawal of Focal Areas from the Mining Law,

19   pursuant to 43 U.S.C. § 1714(a), and its intent to prepare an EIS regarding the proposal.  80 Fed.

20   Reg. 57,635 (Sept. 24, 2015), as amended by 80 Fed. Reg. 63,583 (Oct. 20, 2015).  The

21   publication of the notice had the effect of segregating the lands from entry under the Mining

22   Law, subject to valid existing rights, for a period of up to two years while the proposed

23   withdrawal is being considered.  *See* 80 Fed. Reg. at 57,635.

24   _____

25   [2] Both the Forest Service and the BLM manage lands in a staged process.  The first stage is the
development of an overall management plan, setting forth goals and guidelines for a particular

26   area.  *See* 16 U.S.C. § 1604(a) (Forest Service); 43 U.S.C. § 1712 (BLM).  At the second stage,
the Agencies propose, analyze, and approve project-level decisions; for example, approving a

27   grazing permit or a mining plan of operations.  *See* 16 U.S.C. § 1604(i) (Forest Service); 43
C.F.R. § 1610.5-3(a) (BLM).

28

### C. The Fish and Wildlife Service's 2015 Finding that a Listing of the Greater Sage-Grouse is Not Warranted

Following the issuance of the Plan Amendments, FWS found that the listing of the Sage-Grouse under the ESA is not warranted. *See* 80 Fed. Reg. 59,858 (Oct. 2, 2015). FWS noted that the Agencies' planning process was "unprecedented in scope and scale, and represents a significant shift from management focused within administrative boundaries to managing at a landscape scale." *Id.* at 59,874. FWS found that one of the key circumstances that had changed since its 2010 "warranted, but precluded" finding was that the Plan Amendments "provide adequate mechanisms to reduce and minimize new disturbance in the most important areas for the species." *Id.* at 59,882. In its conclusion, FWS emphasized that its determination that a listing was not warranted was dependent upon the "continued implementation of the regulatory mechanisms and conservation efforts," including the Plan Amendments. *Id.* at 59,941.

## II. Legal Background

### A. Management of Federal Lands by the U.S. Bureau of Land Management and the U.S. Forest Service

The Forest Service manages the lands of the National Forest System under a broad multiple-use mandate informed by several federal statutes, including the Organic Administration Act of 1897, *see* 16 U.S.C. § 551; the Multiple-Use Sustained-Yield Act ("MUSYA") of 1960, 16 U.S.C. §§ 528 *et seq.*; and NFMA, 16 U.S.C. §§ 1600 *et seq.* The national forests "are established and shall be administered" for the sustainable provision of multiple uses; *viz.*, "outdoor recreation, range, timber, watershed, and wildlife and fish purposes." 16 U.S.C. § 528. "Multiple use" allows for management of the various uses in the combination that will best meet the needs of the American people. 16 U.S.C. § 531(a). "Sustained yield" means that "the several products and services" of the national forests must be provided "in perpetuity" and "without impairment of the productivity of the land." 16 U.S.C. § 531(b). Congress noted that "some land will be used for less than all of the resources," and emphasized that management for multiple uses does not require "the combination of uses that will give the greatest dollar return or the greatest unit output." *Id.* at § 531(a).

6

1    The BLM manages the federal lands under its jurisdiction under a similarly broad

2    multiple use mandate.  FLPMA charges BLM with protecting environmental, ecological, and

3    recreational values while also providing for "multiple use and sustained yield" management.  43

4    U.S.C. § 1701(a)(1)-(8).  FLPMA's definition of "multiple use" calls for the "combination of

5    balanced and diverse resource uses that takes into account the long-term needs of future

6    generations for renewable and nonrenewable resources, including, but not limited to, recreation,

7    range, timber, minerals, watershed, wildlife and fish, and natural scenic, scientific, and historical

8    values . . . ."  *Id.* § 1702(c).  FLPMA affords BLM the discretion to determine the combination

9    of uses "that will best meet the present and future needs of the American people," to "use some

10   land for less than all of the resources," and to give consideration "to the relative values of the

11   resources and not necessarily to the combination of uses that will give the greatest economic

12   return or the greatest unit output."  *Id.*

13   **B.      The Mining Law of 1872 and the Secretary of the Interior's Authority to**
             **Withdraw Lands from Location and Entry under the Law**

14

15          The Mining Law authorizes citizens to locate claims on lands belonging to the United

16   States that are "open to exploration," 30 U.S.C. § 22, by making the "discovery" of a "valuable

17   mineral deposit" and complying with other applicable statutes and regulations.  30 U.S.C. § 23;

18   *see Chrisman v. Miller*, 197 U.S. 313, 320-22 (1905).  A valid mining claim confers the right to

19   use the surface of federal lands for mining, subject to reasonable regulation by BLM or the

20   Forest Service.  *United States v. Weiss*, 642 F.2d 296, 299 (9th Cir. 1981); 30 U.S.C. § 26; *see*

21   *also* 36 C.F.R. Part 228A (Forest Service mining regulations); 43 C.F.R. Subpart 3809 (BLM

22   mining regulations).  Section 204 of FLPMA authorizes the Secretary of the Interior to withdraw

23   federal lands, including lands under the jurisdiction of other federal agencies, from the public

24   land laws, including the mining laws.  43 U.S.C. § 1714(a), (i).  Publication in the Federal

25   Register of a proposal to withdraw lands from the Mining Law has the effect of segregating the

26   lands from location of new mining claims for up to two years, or until the Secretary makes a

27   decision regarding the withdrawal, whichever comes first. *Id.* § 1714(b)(1); 43 C.F.R. § 2310.2.

28

7

**C.     National Environmental Policy Act**

NEPA serves the dual purpose of informing agency decision-makers of the significant environmental effects of proposed major federal actions and ensuring that relevant information is made available to the public so that they "may also play a role in both the decisionmaking process and the implementation of that decision." *See Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989). To meet these dual purposes, NEPA requires that an agency prepare a comprehensive EIS for "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1501.3. The requirements of NEPA are procedural. *See Robertson*, 490 U.S. at 351. In reviewing the sufficiency of an EIS, a court should evaluate whether the agency has presented a "'reasonably thorough discussion of the significant aspects of the probable environmental consequences.'" *California v. Block*, 690 F.2d 753, 761 (9th Cir. 1982) (citation omitted). A court should not "substitute its judgment for that of the agency," *id.*, and should not "'fly speck' an EIS and hold it insufficient on the basis of inconsequential, technical deficiencies." *Ass'n of Pub. Agency Customers, Inc. v. Bonneville Power Admin.*, 126 F.3d 1158, 1184 (9th Cir. 1997) (citation omitted). Rather, "[o]nce satisfied that a proposing agency has taken a 'hard look' at a decision's environmental consequences, the review is at an end." *Block*, 690 F.2d at 761 (citation omitted).

**STANDARDS OF REVIEW**

**I.     Judicial Review under the Administrative Procedure Act**

Agency decisions are reviewed under the judicial review provisions of the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-06. *See Lands Council v. McNair*, 537 F.3d 981, 987 (9th Cir. 2008). Under the APA, agency decisions may be set aside if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). In accordance with that standard, an agency's decision will be overturned

> [O]nly if the agency relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, or offered an explanation for its decision that runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

8

*McFarland v. Kempthorne,* 545 F.3d 1106, 1110 (9th Cir. 2008) (citations and quotation marks omitted).  The standard of review is "highly deferential, presuming the agency action to be valid and affirming the agency action if a reasonable basis exists for its decision." *Nw. Ecosystem Alliance v. U.S. Fish & Wildlife Serv.*, 475 F.3d 1136, 1140 (9th Cir. 2007) (citation omitted).  The APA "does not allow the court to overturn an agency decision because it disagrees with the decision or with the agency's conclusions about environmental impacts." *River Runners for Wilderness v. Martin*, 593 F.3d 1064, 1070 (9th Cir. 2010) (citation omitted).

## II.       Standard for Obtaining Preliminary Injunctive Relief

A preliminary injunction is "an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion."  *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997).  To obtain a preliminary injunction, a plaintiff must, at a minimum, demonstrate four elements: (1) a likelihood of success on the merits, (2) a likelihood of irreparable harm in the absence of an injunction, (3) that the balance of equities tips in its favor, and (4) that the injunction is in the public interest.  *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  A party *must* demonstrate a "'likelihood of success on the merits'" in order to obtain a preliminary injunction.  *Munaf v. Geren*, 553 U.S. 674, 690 (2008) (citations omitted).  Furthermore, a party seeking preliminary injunctive relief must "demonstrate that irreparable injury is *likely* in the absence of an injunction."  *Winter*, 555 U.S. at 22 (rejecting a "possibility" of irreparable harm standard).  The Ninth Circuit has held that, notwithstanding the *Winter* decision, a preliminary injunction may issue if the plaintiffs can show "that serious questions going to the merits were raised and the balance of hardships tips sharply in the plaintiff's favor."  *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134-35 (9th Cir. 2010) (citation omitted).

## ARGUMENT

## I.       PLAINTIFFS ARE NOT LIKELY TO SUCCEED ON THE MERITS

The Agencies complied with their legal obligations under FLPMA, NFMA, and NEPA, and therefore, as shown below, Plaintiffs are not likely to succeed on the merits of their claims.

9

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**A.**     **Plaintiffs Are Not Likely to Succeed on Their FLMPA and NFMA Claims**

       **1.**     **The FLPMA and NFMA Claims Are Not Ripe**

Plaintiffs' claims that the Plan Amendments violate the Agencies' substantive mandates under FLPMA and NFMA must fail at the outset because they are not ripe. The Supreme Court has made clear that substantive challenges to a land management plan are not ripe until they are implemented through a site-specific decision. *See Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 733-37 (1998). In *Ohio Forestry*, the Court explained that immediate judicial review of land management plans is inappropriate because, in the context of the multi-tiered management structure used by federal land management agencies, the plans are only "tools for agency planning and management," 523 U.S. at 737, they "do not grant, withhold, or modify any formal legal license, power, or authority [and] create no legal rights or obligations," *id.* at 733. Here, the Plan Amendments modify the standards and guidelines of the BLM and Forest Service land management plans in Nevada. But until they are implemented through site-specific decisions, *e.g.*, modification of grazing permits, their substantive terms are not ripe for judicial review.[3]

       **2.**     **BLM Complied with the Requirement to Coordinate with State and Local Governments**

BLM complied with its obligations under FLPMA to coordinate its planning efforts with state and local governments. *See* 43 U.S.C. § 1712(c)(9). Plaintiffs claim that BLM violated this requirement by failing to allow the Elko and Eureka Counties (the "Counties") meaningful participation in the planning process and by not adopting the provisions of state and local plans. Pl. Mot. at 7-9, 11-12. These claims are without merit. Through a four-year planning effort involving stakeholders in ten states, including the Counties and the State of Nevada, BLM more than met its obligation to coordinate with state and local entities.[4]

---

[3] Defendants do not concede that any procedural claims, including NEPA, are ripe for review and reserve the right to conduct further briefing on the issue at a later stage of the litigation.

[4] Plaintiffs also claim that BLM violated Executive Order 13132, 64 Fed. Reg. 43,255 (Aug. 4, 1999), but that order contains no obligations that are "enforceable at law by any party against the United States, its agencies, its officers, or any person." *Id.* at 43,259.

10

1        Section 202(c)(9) of FLPMA directs BLM to coordinate its land use planning process

2   with state and local governments.  43 U.S.C. § 1712(c)(9).  This requirement has both procedural

3   and substantive components.  Procedurally, BLM should "assure that consideration is given" to

4   relevant state and local plans and "provide for meaningful public involvement of State and local

5   government officials" in the land management planning process.  *Id.*; *see also* 43 C.F.R. §

6   1610.3-1.  Substantively, FLPMA instructs that BLM's plans "shall be consistent with State and

7   local plans to the maximum extent [BLM] finds consistent with Federal law and the purposes of

8   this Act."  43 U.S.C. § 1712(c)(9).  BLM's regulations provided that it should ensure that its

9   plans are "consistent with officially approved or adopted resource-related" state and local plans,

10  but only so far as the state and local plans are "consistent with the purposes, policies and

11  programs of federal laws and regulations applicable to public lands."  43 C.F.R. § 1610.3-2(a).

12  BLM must submit a proposed resource management plan to the governors of affected states for

13  consistency review, and, at that time, "identify any known inconsistencies with state or local

14  plans, policies, or programs."  43 C.F.R. 1610.3-2(e).

15       Contrary to Plaintiffs' assertions, *see* Pl. Mot. at 9, 11-12, the record demonstrates that

16  BLM acknowledged and adequately responded to the Counties' comments and list of

17  inconsistencies.  BLM conducted an extraordinary planning process, during which it designated

18  dozens of state and local entities in ten states, including Elko and Eureka Counties, as

19  cooperating agencies.  AR 3300; *see also* 40 C.F.R. § 1501.6.  These cooperating agencies were

20  involved in the early stages of the plan amendment process and reviewed and commented on a

21  proposed range of alternatives based on their own plans.  AR 3302.  BLM coordinated closely

22  with state and local governments during the preparation of the Plan Amendments, identified

23  inconsistencies with state and local plans, made efforts to reconcile them, and provided an

24  opportunity for state and local governments to file protests.  *See* AR 3303-05; AR 5486-89.

25       In Nevada, BLM responded to a consistency letter from the Governor and to the

26  Governor's appeal.  *See* August 6 and September 15, 2015 Letters.  BLM also responded to the

27  protest letters submitted by the Counties.  *See* Elko and Eureka Protest Letters and Protest

28

1   Report.  BLM explained that the Plan Amendments were inconsistent with the Counties' plans

2   because they would provide restrictions on resource development and introduce the potential for

3   road closures and grazing standards, which the Counties oppose.  AR 3304.  BLM also provided

4   additional explanation in its response to the Counties' concerns in response to the Counties'

5   protest letters.  *See*, *e.g.*, AR 5283-94 (socioeconomic impacts), AR 5294-300 (grazing), and AR

6   5377 (travel).  Accordingly, Plaintiffs cannot credibly claim that they were not "meaningfully

7   involved" in the planning process or the BLM failed to engage in the process for ensuring

8   consistency with state and local plans.  *See* Pl. Mot. at 7-9, 11.[5]

9          Where possible, BLM took steps to reconcile differences with state and local plans.  In

10   Nevada, for example, BLM incorporated elements of the State of Nevada's Sage-Grouse

11   Conservation Plan.  For example, BLM will consider Nevada's conservation credit system in

12   developing mitigation for particular projects.  AR 5463; AR 3934-45.  In addition, the Plan

13   Amendments provided exceptions to the three percent ground disturbance cap for proposed

14   activities in key Sage-Grouse habitat, did not impose a no surface occupancy ("NSO") restriction

15   for geothermal development, and did not apply a disturbance density cap, all of which are

16   requirement that apply elsewhere.  AR 5463-64.  Other efforts to reconcile BLM's proposed Plan

17   Amendments with Nevada's plans are described in BLM's correspondence with the Governor's

18   Office.  *See* AR 5400-07; AR 5418-21.  Thus, Plaintiffs are wrong that BLM made no effort to

19   resolve differences with state and local plans.

20          Insofar as it was not possible to reconcile the differences, BLM adequately explained

21   why they could not be reconciled.  The Counties complain that BLM did not explain why

22   differences between BLM's proposed Plan Amendments and the Elko County's Sage-Grouse

23   Management and Conservation Strategy Plan ("Elko Plan")[6] could not be reconciled.  *See* Pl.

24

25   [5] *American Motorcyclist Association v. Watt* is inapposite because, in that case, BLM did not

26   explain its consistency process.  *See* 534 F. Supp. 923, 936 (C.D. Cal. 1981).

27   [6] The Elko Plan is available at:

    http://www.elkocountynv.net/Grouse/Elko_County_Sage_Grouse_Management_and_Conservati

28   on_Strategy_Plan___Final_Signatures_Sept_19_2012.pdf.

1    Mot at 8.  To the contrary, BLM clearly explained that the Elko Plan was inadequate to meet

2    BLM's goal of conserving and enhancing Sage-Grouse habitat and inconsistent with BLM's

3    policy on special status species because it "would not provide sufficient certainty to conserve,

4    enhance, and restore [Sage-Grouse] habitat by reducing, eliminating, or minimizing threats to

5    habitat."  AR 108-09; *see also* AR 5210; AR 5441; AR 11093 (BLM Manual 6840).  Some

6    aspects of the Elko Plan, such as offering incentives to private landowners, also were beyond the

7    scope of the Plan Amendments.  AR 109.

8        Plaintiffs argue that by considering its goal to protect Sage-Grouse and its sensitive

9    species policy, BLM violated its substantive consistency obligations.  *See* Pl. Mot. at 8.

10   Plaintiffs are wrong, however, in asserting that provisions of state and local plans must be

11   adopted as long as they are consistent with FLPMA.  FLPMA requires that BLM resolve

12   inconsistencies with state and local plans "to the maximum extent," that the Secretary finds that

13   those plans are consistent with "Federal law and the purposes of [FLPMA]," 43 U.S.C. §

14   1712(c)(9), and BLM's regulations interpreting this provision require consistency only so far as

15   state and local plans are also consistent with the "*purposes, policies and programs* of Federal

16   laws."  43 C.F.R. § 1610.3-2(a)-(b) (emphasis added).  If it were otherwise, BLM would be

17   required to subordinate its authority to state and local entities; but that is not what FLPMA

18   requires.  BLM must "strik[e] a balance among the many competing uses to which land can be

19   put."  *Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55, 58 (2004) ("*SUWA*").  Thus,

20   BLM was permitted to consider its own policy goals in the consistency review and to reject

21   portions of state and local plans that were inconsistent with those goals.

22        **3.    The Plan Amendments Are Consistent with the Principle of**
             **Multiple Use and Sustained Yield**
23

24        Plaintiffs claim that the Plan Amendments violated the Agencies' obligations under

25   FLPMA and MUSYA to manage according to the principle of multiple use and sustained yield

26   by placing undue emphasis on the protection of Sage-Grouse, including the designation of Focal

27   Areas, compensatory mitigation, and alleged travel restrictions.  *See* Pl. Mot. at 9-10.  Plaintiffs

28

                                                13

1    are mistaken.  The Agencies' targeted Plan Amendments, which are designed to conserve and

2    enhance Sage-Grouse habitat, are well within the Agencies' discretion.[7]

3            Managing the public lands to provide for the multiple use and sustained yield of

4    sometimes conflicting resources, is – as the Supreme Court has observed – an "enormously

5    complicated" task.  *SUWA*, 542 U.S. at 58.  Acknowledging that the multiple-use mandate

6    "breathe[s] discretion at every pore," courts have broadly deferred to Agency determinations of

7    the proper mix of uses  on public lands.  *Perkins v. Bergland*, 608 F.2d 803, 806 (9th Cir. 1979);

8    *see also Wyoming v. U.S. Dep't of Agric.*, 661 F.3d 1209, 1269 (10th Cir. 2011) ("[T]the ultimate

9    mix of uses chosen by the [agency] after consideration of the competing resource values is

10   largely left to agency discretion.");  *Bighole Ranchers Ass'n v. U.S. Forest Serv.*, 686 F. Supp.

11   256, 264 (D. Mont. 1988) (multiple-use management affords "wide discretion to weigh and

12   decide the proper uses with any area").  "Multiple use" does not mean that any particular piece of

13   land must be used for all uses or that extractive uses are favored.  *New Mexico ex rel. Richardson*

14   *v. Bureau of Land Mgmt.*, 565 F.3d 683, 710 (10th Cir. 2009) ("The Act does not mandate that

15   every use be accommodated on every piece of land; rather, a delicate balancing is required.").

16           Here, BLM and the Forest Service appropriately balanced conservation measures to

17   protect Sage-Grouse and with other uses.  The Agencies explicitly sought "to provide sustainable

18   habitat conditions, while continuing to provide for recreation and access opportunities, livestock

19   grazing, access to locatable mineral resources, development of renewable energy resources, and

20   active habitat restoration efforts."  AR 5617; *see also* AR 5465 (the Plan Amendment "provides

21   a coherent framework across BLM land use plans . . . to effectively address threats to [Sage-

22   Grouse] in the context of the agency's multiple-use sustained yield mandates.").  The Agencies

23   gave detailed consideration to wide range of uses and carefully compared the impacts of different

24   management alternatives on each use.  *See, e.g.,* AR 1946-49 (comparing allocations of land to

25   various uses under the proposed plan and its alternatives); AR 2978-3015 (comparing

26   ────────────────────

27   [7] The Plan Amendments contain direction for Sage-Grouse habitat within the planning area;
     lands that are not within Sage-Grouse habitat will continue to be managed according to pre-

28   existing land management plans.  *See* GB ROD at 1-2.

1    alternatives with regard to impacts to grazing, recreation, oil and gas leasing, locatable minerals,

2    saleable minerals, geothermal exploration and development, wind energy, tax revenues,

3    employment, earnings and social issues).

4         Plaintiffs argue that the Plan Amendments violate the principle of multiple use because

5    they are weighted too heavily in favor of protecting of Sage-Grouse and are too restrictive of

6    other uses of the land, such as grazing.  *See* Pl. Mot. at 10-11.  The case law, however, reflects

7    unanimous judicial recognition that multiple use management affords the BLM and the Forest

8    Service statutory authority to restrict certain uses on specific lands to benefit wildlife.  *See*

9    *Wyoming*, 661 F.3d at 1267-68 (upholding the Forest Service's "Roadless Rule" and rejecting a

10   challenge that the rule violated the principle of multiple use); *Seattle Audubon v. Lyons*, 871 F.

11   Supp. 1291, 1300-11 (W.D. Wash. 1994) (finding that a plan to reduce timber production in

12   order to protect the Northern Spotted Owl was "entirely consistent" with the multiple use

13   mandate); *Wind River Multiple-Use Advocates v. Espy*, 835 F. Supp. 1362, 1372-73 (D. Wyo.

14   1993) (rejecting a challenge to the establishment of "Grizzly Bear zones" within a National

15   Forest to promote recovery of the Grizzly Bear and finding that the Forest Service had acted

16   consistently with its multiple-use mandate).

17         **4.      BLM Did Not Delegate Its Authority to the Fish and Wildlife Service**

18         Plaintiffs argue that BLM improperly delegated its planning authority under FLPMA to

19   FWS by adopting Sage-Grouse "strongholds" identified by FWS in an October 27, 2014

20   memorandum as Focal Areas in the Plan Amendments.  *See* Pl. Mot. at 21-22.  In response to a

21   request from BLM and based on the latest studies, FWS found that these "strongholds" were the

22   areas most vital to the conservation of the species.  AR 7736-37.  Plaintiffs are incorrect,

23   however, that the Agencies simply adopted FWS's "strongholds."  The Focal Areas are based on

24   FWS's memorandum and on updated mapping conducted by the USGS in conjunction with

25   Nevada and California.  AR 1842-43.  Moreover, an improper delegation only occurs, however,

26   when an agency "shifts to another party almost the entire determination of whether a specific

27   statutory requirement . . . has been satisfied or where the agency abdicates its final reviewing

28

15

1    authority." *La. Forestry Ass'n v. Dep't of Labor*, 745 F.3d 653, 672 (3d Cir. 2014) (citation

2    omitted).  A delegation does not occur merely where an agency "turn[s] to an outside entity for

3    advice and policy recommendations."  *U.S. Telecom Ass'n v. FCC*, 359 F.3d 554, 568 (D.C. Cir.

4    2004).  Here, BLM retained the authority to approve the Plan Amendments, including the

5    designation of the Focal Areas and the management measures that would be applied therein, and

6    therefore did not improperly delegate its authority to FWS.  *See, e.g.*, AR 5447-48; AR 4776-77;

7    *see also* AR 1842-43.[8]

8        **B.    Plaintiffs Are Not Likely to Succeed on Their Claim that the Agencies Violated
            the Procedures for Proposing a Withdrawal from the Mining Law**

9

10            Plaintiffs claim that the Agencies have not followed the proper procedures for a

11    withdrawal pursuant to 43 U.S.C. § 1714.  This claim is not properly before the Court and fails

12    on the merits.  Plaintiffs have not challenged the notice of proposed withdrawal, which is the

13    agency action through which the Secretary segregated the affected lands and initiated the process

14    of considering the withdrawal proposal.  *See* 80 Fed. Reg. at 57,635-37.  Rather, the only agency

15    actions that Plaintiffs have challenged are the Agencies' decisions to adopt the Plan

16    Amendments, which only indicated that the Agencies would *recommend* to the Secretary that she

17    withdraw the Focal Areas.  *See* Pl. Compl. (ECF No. 1) at ¶ 2; Pl. Mot. at 3; AR 5612; AR 5452.

18    Even if Plaintiffs had challenged the notice of proposed withdrawal, that challenge would be

19    premature.  Under the APA, this Court has jurisdiction only over "final agency actions."  5

20    U.S.C. § 706.  To be "final" an agency action must satisfy two conditions: it must "mark the

21    consummation of the agency's decisionmaking process" and "must be one by which rights or

22    obligations have been determined, or from which legal consequences will flow."  *Bennett v.*

23    *Spear*, 520 U.S. 154, 178 (1997).  The notice of proposed withdrawal fails the first step of this

24    inquiry because it is only an initial step in an up to two-year public decision-making process that

25    will determine whether to withdraw the Focal Areas.  80 Fed. Reg. at 57,637.  While the notice

26

27    [8] *Trustees for Alaska v. Watt* is inapposite because in that case, the Secretary transferred the
     administration of a wildlife refuge from FWS to the USGS, in violation of an express statutory

28    requirement.  524 F. Supp. 1303, 1309-10 (D. Alaska 1981).  No such violation occurred here.

1  may have legal consequences, inasmuch as it immediately segregates the lands for up to two

2  years, to be judicially reviewable, an action must satisfy both prongs of the Bennett test.  *See*,

3  *e.g.*, *Indus. Customers of Nw. Utilities v. Bonneville Power Admin.*, 408 F.3d 638, 646 (9th Cir.

4  2005); *Safari Club Int'l v. Jewell*, 76 F. Supp. 3d 198, 208 (D.D.C. 2014).  Therefore, the Court

5  should not consider this claim.

6          Even if this claim were properly before the Court and were not premature, it is without

7  merit.  Only the Secretary or her immediate subordinates may make a withdrawal.  *See* 43 U.S.C.

8  § 1714(a).  When the Secretary proposes a withdrawal "on [her] own motion" or she receives an

9  application for withdrawal, the Department publishes notice in the Federal Register, which has

10  the effect of segregating the lands from the laws specified in the notice.  43 U.S.C. § 1714(b); *see*

11  *also* 43 C.F.R. § 2310.1-2.  Here, the proposed withdrawal was initiated by a petition submitted

12  by BLM that, once approved by the Assistant Secretary, became the Secretary's "proposal" to

13  withdraw the lands.  *See* AR 6403; AR 6394-402; 43 C.F.R. 2310.1-3(e).  Contrary to Plaintiffs'

14  suggestion, Pl. Mot. at 22, BLM's regulations do not require that an application be submitted by

15  the FWS or the Forest Service.  Rather, they provide that if the Secretary proposes a withdrawal

16  that would affect lands outside of the jurisdiction of the U.S. Department of the Interior, then she

17  must obtain the consent of the agency head responsible for managing those lands.  43 C.F.R. §

18  2310.1-2(c)(3).  The Department did obtain the Forest Service's consent.  *See* AR 6372.

19  Accordingly, BLM and the Department followed the proper procedure for a proposed withdrawal

20  under FLPMA.[9]

---

[9] Plaintiffs also claim that the Forest Service violated internal guidance regarding withdrawals, Pl. Mot. at 23, but this guidance does not create legal obligations that can be enforced against the agency.  *See W. Radio Serv. Co. v. Espy*, 79 F.3d 896, 901 (9th Cir. 1996).  Further, Plaintiffs misconstrue the guidance.  It states that the Forest Service should notify permittees of "their risks and liabilities where *withdrawal of the area is not appropriate*," not that the Forest Service is obligated to provide advance notice to permittees in areas proposed for withdrawal.  USFS Manual 2761.03 (emphasis added).

17

### C.     BLM and the Forest Service Complied with NEPA

BLM and the Forest Service fully met their procedural obligations under NEPA, and therefore Plaintiffs are not likely to succeed on the merits of these claims.[10]

### 1.     The Agencies Were Not Required to Prepare a Supplemental Environmental Impact Statement

Plaintiffs argue that changes to the proposed action made between the Draft EIS ("DEIS") and the Final EIS ("FEIS") required the preparation of a Supplemental Environmental Impact Statement ("SEIS"). Pl. Mot. at 12.  Specifically, Plaintiffs argue that an SEIS was required to address the designation of 2.8 million acres of Focal Areas in Nevada, the imposition of lek buffers based on a USGS report, and the application of a "net conservation gain" mitigation strategy.  *Id.*  Plaintiffs' arguments are without merit because each of these components were qualitatively within the spectrum of alternatives analyzed in the DEIS.

An agency need not prepare an SEIS for every change occurring between the DEIS and FEIS.  *Westlands Water Dist. v. U.S. Dep't of the Interior*, 376 F.3d 853, 873 (9th Cir. 2004) (citing *Marsh v. Or. Natural Res. Council,* 490 U.S. 360, 373 (1989)).  Such a requirement would frustrate the purposes of NEPA by deterring agencies from changing their proposals in response to information received during the comment period.  *Block*, 690 F.2d at 771.  An SEIS should be prepared when "[t]he agency makes substantial changes in the proposed action that are relevant to environmental concerns," or when "[t]here are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts."  40 C.F.R. § 1502.9(c)(1)(i)-(ii).  The touchstone is whether the change "will have a significant impact on the environment in a manner not previously evaluated or considered."  *Westlands Water Dist.*, 376 F.3d at 873; *see also N. Idaho Cmty. Action Network v. U.S. Dep't of Transp.*, 545 F.3d 1147, 1157 (9th Cir. 2008).

---

[10] The Mining Companies' claims of purely economic injury do not fall within NEPA's zone of interests.  *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377 (2014); *Ashley Creek Phosphate Co. v. Norton*, 420 F.3d 934, 940 (9th Cir. 2005).

1      NEPA thus affords agencies the "flexibility to modify alternatives canvassed in the draft

2      EIS to reflect public input," *Block*, 690 F.2d at 771, and does not require supplementation as

3      long as the action proposed in a final EIS is "qualitatively within the spectrum of alternatives

4      that were discussed in the draft."  Forty Most Asked Questions Concerning CEQ's NEPA

5      Regulations, 46 Fed. Reg. 18,026, 18,035 (Mar. 23, 1981) ("Forty Questions").[11]  In

6      determining whether an SEIS is required, the Ninth Circuit has urged courts to consider:  (1)

7      whether the new action is "within the range of alternatives the public could have reasonably

8      anticipated the [agency] to be considering," and (2) "whether the public's comments on the draft

9      EIS alternatives also apply to the chosen alternative and inform the [agency] of the public's

10      attitudes towards the chosen alternative."  *Block*, 690 F.2d at 772.

11      Applying these principles, the three changes between the DEIS and FEIS identified by

12      Plaintiffs did not warrant the preparation of an SEIS.  The Agencies explained in the FEIS that,

13      although the "Focal Areas" label did not appear in the DEIS, the management decisions

14      applicable to Focal Areas were analyzed in the DEIS.  *See* AR 1842-43.  Focal Areas are

15      generally subsets of Priority Habitat,[12] AR 5447-48; AR 4776-77, and designation of Priority

16      Habitat was part of the proposed action analyzed in the DEIS.  *See* AR 52.[13]  For Priority

17      Habitat, the DEIS discussed a range of potential management actions, including the

18      management actions that were ultimately applied to Focal Areas, *i.e.*, recommending that all

19      _____

20      [11] The Ninth Circuit has adopted the Council on Environmental Quality's ("CEQ's") Forty
21      Questions guidance as a "framework for applying § 1502.9(c)(1)" of CEQ's regulations.  *See
       Russell Country Sportsmen v. U.S. Forest Serv.*, 668 F.3d 1037, 1045 (9th Cir. 2011).

22      [12] In Nevada, the Focal Areas include some areas which FWS identified as "strongholds" for the
       species, but which were outside of mapped Priority or General Habitat in the DEIS.  Because
23      Sage-Grouse depend on large swaths of intact habitat, and because the goal of the Plan
       Amendments was to provide landscape-level conservation for the species, these pockets of
24      habitat that are necessary for the range-wide conservation of the species were identified in the
       FEIS and adopted in the Plan Amendments as Focal Areas.  *See* AR 1842-43.
25

26      [13] There were some changes to mapped Priority Habitat, and therefore to Focal Areas, in Nevada
       based on updated data compiled by the USGS in coordination with the State of Nevada.  *See* AR
27      1842-43; AR 3681-85.  The DEIS indicated that mapped habitat would be revised to reflect the
       best science available.  AR 1843; AR 147, 149, 179.
28

1    Priority Habitat (not just the smaller Focal Areas) for withdrawal from the Mining Law, AR

2    920, 984, requiring NSO stipulations for oil and gas leasing, AR 916-17, 982, and prioritizing

3    grazing permits for processing, AR 869, 926.  *See also* AR 1843; AR 5250-51.

4          Plaintiffs' assertion that the DEIS did not disclose that the Agencies were considering a

5    recommendation to withdraw lands from the Mining Law is simply incorrect.  *See* Pl. Mot. at

6    14.  The DEIS explained that "the study area produces several salable and locatable minerals"

7    and that Sage-Grouse management alternatives under consideration would impose "restrictions

8    on development of mineral production" and that under certain alternatives, "some lands would

9    be petitioned for withdrawal from locatable mineral entry."  AR 975.  Specifically, alternatives

10   B, C, and F in the DEIS analyzed a recommended withdrawal.  AR 984.  Thus, a recommended

11   withdrawal was "within the range of alternatives" the agency was considering.  *Block*, 690 F.2d

12   at 772.  Further, as demonstrated by comments submitted by the Counties on the DEIS,

13   Plaintiffs were aware that a recommended withdrawal from the Mining Law was being

14   considered.  *See* AR 10038 ("Elko County does not support any proposed action that would

15   withdraw from mineral entry."); *see also* AR 10593 (Eureka County comments).

16         Similarly, the lek buffers and the net conservation gain strategy are qualitatively and

17   quantitatively within the spectrum of alternatives analyzed in the DEIS.  The USGS's buffer

18   report study was not available at the time of the DEIS, but the application of buffers was

19   analyzed in the DEIS.  *See* AR 1843-44; AR 5251.  The buffer distances discussed in the DEIS,

20   such as a four-mile seasonal buffer around active leks, AR 1182, are consistent with (or greater

21   than) the buffer distances discussed in the USGS report.  *See* AR 2227 (4 mile buffer from leks

22   for construction of new routes); AR 2262 (4 mile NSO buffer for fluid mineral development).

23   Further, at least one of the alternatives analyzed closing areas to certain types of activities.  *See*,

24   *e.g.*, AR 2235 (exclusion area for rights of way); AR 2270 (closure to fluid mineral leasing).

25   Likewise, a "net conservation gain" mitigation strategy was adequately discussed in the DEIS.

26   *See* AR 1845.  The goal of the Plan Amendments was not simply conserve existing Sage-

27   Grouse populations, but to "conserve, enhance, and restore [Sage-Grouse] habitat," a goal that

28

1    was made express in the DEIS.  AR 5441; AR 1845; AR 128.  Although the preferred

2    alternative in the DEIS did not expressly include a "net conservation gain" mitigation strategy,

3    the principle was analyzed in the DEIS.  *See*, *e.g.*, AR 102 (directing BLM to "[c]onserve,

4    enhance and restore the sagebrush ecosystem"); AR 760 ("Management actions would . . .

5    conserve, enhance, or restore [Sage-Grouse] habitat"); *see also* AR 5252.  Thus, lek buffers and

6    net conservation gain were "qualitatively within the spectrum of alternatives" considered in the

7    DEIS.  Forty Questions, 46 Fed. Reg. at 18,035.

8         No SEIS is required because the approved action includes management measures that

9    were qualitatively analyzed in the DEIS and further study would not reveal any impacts on the

10   human environment that were overlooked.  *See Wyoming*, 661 F.3d at1257-62 (the Forest

11   Service was not required to prepare an SEIS when it made changes to a proposed rule, including

12   the addition of 4.2 million acres of protected forest land as a result of mapping changes); *Russell*

13   *Country Sportsmen*, 668 F.3d at 1045-49 (Forest Service was not required to prepare an SEIS

14   when a travel plan closed routes not designated for closure in the DEIS and made other changes

15   to the plan); *Westlands Water Dist.*, 376 F.3d at 873-74 (U.S. Bureau of Reclamation was not

16   required to prepare an SEIS based on reasonable and prudent measures required by the National

17   Marine Fisheries Service after the issuance of the draft EIS).  The Agencies' reasoned decision

18   that no SEIS was required is entitled to deference.  *Marsh*, 490 U.S. at 383.

19        Further, Plaintiffs' claim that the Agencies did not disclose the planned use of Focal

20   Areas until the issuance of the FEIS in May 2015 is incorrect.  *See* Pl. Mot. at 14.  After the

21   FWS issued its October 27, 2014 memorandum, BLM notified the affected states of the

22   memorandum and of the proposed designation of Focal Areas.  *See* AR 5401.  The proposal to

23   use Focal Areas was also presented at a January 20, 2015 meeting of the Western Governors

24   Association Sage Grouse Task Force Meeting.  *Id.*; AR 10705-15.  The presentation also

25   included information on the use of lek buffers, AR 10716-19, and the application of a "net

26   conservation gain" mitigation strategy.  AR 10721.  Through these meetings, BLM made

27   involved parties aware of the changes prior to the issuance of the final Plan Amendments.

28

21

Finally, Plaintiffs had the opportunity to comment on the FEIS/Proposed Plan Amendments during the protest period, and each of the Plaintiffs did so.  *See* AR 10236; AR 10253; AR 10269; AR 10275.  In those letters, the Plaintiffs commented on the changes in the Proposed Plan Amendments, including the plan to include Focal Areas and the management measures that would apply to such areas.  *See*, *e.g.*, AR 10271-74 (Quantum Minerals); AR 10255-59 (Western Exploration).  BLM fully considered and responded to those comments following the conclusion of the Protest Period.  *See*, *e.g.*, AR 5237-52 (responding to comments regarding the Focal Areas, buffers and net conservation gain).  This opportunity to comment "before the adoption of the final rule . . . further alleviated the need to prepare a separate supplemental EIS."  *Wyoming*, 661 F.3d at 1262 n.39; *see also Kootenai Tribe of Idaho v. Veneman*, 313 F.3d 1094, 1118 (9th Cir. 2002) (noting that the public was permitted an opportunity to comment on a final EIS before a rule was finalized), *abrogated on other grounds by Wilderness Soc'y v. U.S. Forest Serv.*, 630 F.3d 1173 (9th Cir. 2011).

## 2.  The EIS Analyzes a Reasonable Range of Alternatives

NEPA requires an EIS to include an analysis of "alternatives to the proposed action."  42 U.S.C. § 4332(2)(C)(iii); 40 C.F.R. § 1502.14.  The alternatives analysis should "describe and analyze 'every reasonable alternative within the range dictated by the nature and scope of the proposal.'"  *Alaska Survival v. Surface Transp. Bd.*, 705 F.3d 1073, 1087 (9th Cir. 2013) (citation omitted).  The range of alternatives must "relate to the purposes of the project."  40 C.F.R. §§ 1502.13, 1508.9(b); *see Westlands Water Dist.*, 376 F.3d at 865.  An agency need not consider alternatives that are "unlikely to be implemented or [are] inconsistent with its basic policy objectives."  *Seattle Audubon Soc'y v. Moseley*, 80 F.3d 1401, 1404 (9th Cir. 1996).  Plaintiffs' claims that the Agencies violated these requirements are without merit.

First, Plaintiffs claim that the Agencies did not consider all existing regulatory tools – including state and local plans, BLM Manual 6840, and federal regulations governing the development of locatable minerals – as part of the "no action" alternative.  Pl. Mot. at 15-16.  To the contrary, the "no action" alternative ("Alternative A") in both the DEIS and FEIS presumed

the continuation of "management decisions and agency policies under the current approved [land management plans]" and stated that "[d]irection contained in existing statutes, regulations, and policies would also continue to be implemented."  AR 1950; *see also* AR 1951-59; AR 98. Those existing regulations and policies expressly included BLM Manual 6840 regarding special status species, AR 1950; AR 3715, and federal regulations governing the development of locatable minerals, AR 1957.  The Agencies determined that these existing regulatory tools were not sufficient to meet their purpose and need of conserving and enhancing Sage-Grouse habitat in response to FWS's 2010 "warranted, but precluded" finding, which specifically concluded that existing regulatory mechanisms were insufficient to protect Sage-Grouse.  AR 108-09; AR 1803; AR 2298-99; AR 5439; *see also* 75 Fed. Reg. at 13,982.  Accordingly, the Agencies appropriately rejected the no action alternative.  *See*, *e.g.*, *Alaska Survival*, 705 F.3d at 1087.

Second, Plaintiffs wrongly claim that the Agencies gave inadequate consideration to state and local plans, and, in particular, the Elko Plan, in the FEIS.  Pl. Mot. at 16.  As discussed in section I.A.2., *supra*, the Agencies considered and incorporated many elements of state and local plans, but did not consider the Elko Plan to be a valid stand-alone alternative for conserving and enhancing Sage-Grouse habitat.  *See* AR 108-09; AR 2298-99; AR 3304-05.  In particular, the Agencies noted that the Elko Plan "questions the rationale and science used by [FWS]" in its 2010 finding.  AR 108; *see also* Elko Plan at 1, 7.  Indeed, the goal of the Elko Plan is not to provide additional protections for Sage-Grouse, but rather to provide an "alternative view" and to "challenge[] the presumption or conjecture that [Sage-Grouse] should be listed" under the ESA. Elko Plan at 1; *see also id.* at 13.  Since the premise is of the Elko Plan is that FWS's Sage-Grouse finding should be rejected, it is not a "reasonable alternative" to address the plight of the Sage-Grouse or FWS's 2010 finding, and therefore was properly rejected from detailed consideration.  *See City of Angoon v. Hodel*, 803 F.2d 1016, 1021–22 (9th Cir. 1986).

Third, Plaintiffs claim that the Agencies inappropriately eliminated an "Increased Grazing" alternative from detailed consideration.  Pl. Mot. at 16-17.  As explained in the FEIS, however, the Agencies dismissed an "increased grazing" alternative from detailed consideration

because there is no scientific evidence to support a correlation between increased grazing and improved Sage-Grouse habitat. AR 2298-99. In its 2010 finding, FWS concluded that while "some research suggests that *under very specific conditions* grazing can benefit sage-grouse," this is countered by the determination that "livestock management and domestic grazing can [also] seriously degrade sage-grouse habitat." 75 Fed. Reg. at 13,910-01; *see also* 80 Fed. Reg. 59,909. Although Plaintiffs claim that the scientific literature supports the view that an increase in grazing will benefit Sage-Grouse, they identify no studies supporting that claim. They rely instead on an unattributed quotation referring to an "on-off grazing system" as one method of removing excess grass for "preventing or managing wildfires and controlled burns." Pl. Mot. at 17. Regardless of its origin, the quoted material does not suggest that increased grazing would be beneficial to Sage-Grouse. Further, as noted in the FEIS, there does not appear to be demand for increased grazing, as grazing usage levels are currently at 60% of allowable rates. AR 2299-30. Accordingly, this alternative was properly rejected from detailed consideration.

### 3.    The EIS Discloses the Scientific Basis of the Analysis

Plaintiffs claim that the FEIS does not contain "high-quality information and accurate scientific analysis" and that he scientific data analyzed in the FEIS was incomplete. Pl. Mot. at 17 (citing 40 C.F.R. §§ 1500.1(b), 1502.22). This claim boils down to two assertions: (1) that the Agencies failed to consider peer review comments on the NTT Report and alleged scientific deficiencies in the COT Report, and (2) the Agencies have failed to disclose the scientific bases for the delineation of the Focal Areas. Both of these assertions are false.

First, the criticisms of the NTT Report and its incorporation into the Sage-Grouse planning process are without merit. *See* Pl. Mot at 17-18. The NTT Report was the result of a collaboration by BLM, USGS, NRCS, and state wildlife specialists. AR 5439. It preceded the planning process and provided a framework for analyzing and addressing threats to Sage-Grouse. *See id.* The draft NTT Report was scrutinized in a transparent peer review process commissioned by the Nevada Department of Wildlife. *See* Pl. Ex. 8 (Peer Review Report); AR 10211-12; AR 10233. A subset of the NTT members then met in Phoenix, from December 6-8,

1   2011, to address issues raised during the peer review process and further articulate and document

2   the scientific basis for the recommended conservation measures.  Pl. Mot. Ex. 8 at 2-3.

3   Revisions reflecting these additional deliberations were ultimately incorporated into the final

4   NTT Report.  *Id.* at 3.

5          Moreover, the NTT Report was issued before the start of BLM's planning process, and

6   BLM continued to address any shortcomings in the Report as it developed its Plan Amendments.

7   *See* AR 4799-83; AR 5444-48.  Thus, the criticisms that Plaintiffs raise with respect to the

8   recommendations in the NTT Report are not true of the Plan Amendments.[14]  For example, while

9   Plaintiffs complain that the NTT Report did not assess state-level data, Pl. Mot at 18, the

10  Agencies clearly did consider such data in the 2014 USGS study, *see* AR 3681-82, and

11  considered and incorporated aspects of state plans.  *See* AR 5463-64; *see also* AR 3303-04; AR

12  3934-45.  The Plan Amendments also do not adopt a "one size fits all" approach; instead, the

13  conservation measures are tailored based on the type of habitat, potential threats to Sage-Grouse

14  habitat, and state-specific policies.  *See* AR 5441-51; AR 5463-64; *see also* AR 4779-83.

15  Finally, the Plan Amendments are supported by numerous scientific studies and reports.  *See*,

16  *e.g.*, AR 3325-91) (listing references); AR 5437-41.  Accordingly, the alleged deficiencies in the

17  NTT Report were not ignored during the planning and NEPA process, and in no way undermine

18  that process.

19         Plaintiffs also claim that both the NTT Report and the COT Report are "not reflective of

20  the best available science."  Pl. Mot. at 19.  Like the NTT Report, the COT Report was peer

21  reviewed.  COT Report Cover Ltr at 1.  Aside from the peer review comments on the NTT

22  Report – which reflect the give-and-take of a valid scientific process – Plaintiffs point to no

23  actual deficiencies in the science.  While Plaintiffs may disagree, Defendants are entitled to rely

24  on the expert analysis of biologists at FWS, BLM, the Forest Service, and state wildlife agencies.

25  *See Marsh*, 490 U.S. at 378 ("When specialists express conflicting views, an agency must have

26  _____

27  [14] The NTT Report recommendations were analyzed as an alternative in the NEPA process, but

28  the full set of recommendations was not selected in the Plan Amendments.  AR 1934-35.

1    discretion to rely on the reasonable opinions of its own qualified experts . . ."); *see also Lands*

2    *Council*, 537 F.3d at 993 ("We are to be most deferential when the agency is making predictions,

3    within its area of special expertise, at the frontiers of science.") (citations and quotation marks

4    omitted).  Plaintiffs have offered no reason for overturning the Agencies' and FWS's carefully

5    considered scientific opinions regarding the Sage-Grouse.

6            Second, Plaintiffs also are wrong that the Agencies have not adequately disclosed the

7    scientific bases for the delineation of the Focal Areas.  Pl. Mot. at 19-20.  As explained in the

8    FEIS, the delineation of the Focal Areas in Nevada is based on the "strongholds" identified by

9    FWS in its October 27, 2014 memorandum, as updated based on a 2014 USGS mapping study

10   conducted in conjunction with Nevada and California.  AR 1842-43; AR 3681-82.  FWS

11   identified the "strongholds" because they contain "[e]xisting high-quality sagebrush habitat for

12   sage-grouse," and FWS identified several scientific studies supporting its conclusions.  AR 7736-

13   44.  The USGS mapping study utilized telemetry data collected from 1998 through 2013,

14   landscape habitat mapping, and Sage-Grouse lek data.  AR 3681-82.  The resulting map was

15   peer-reviewed and is considered by the states, the USGS, and BLM to be "the best available

16   science on location and suitability of sage grouse habitat in Nevada and northeastern California."

17   *Id.*[15]  Accordingly, the sound scientific basis for the Focal Areas was disclosed in the FEIS.

                    **4.    The Agencies Appropriately Responded to Comments**

19           Plaintiffs' final NEPA claim is that the Agencies "fail[ed] to adequately address

20   comments and inconsistencies."  Pl. Mot. at 20-21.  This argument is redundant of Plaintiffs'

21

22   _____

     [15] Plaintiffs complain that the Agencies' habitat maps include the Town of Eureka, as well as
23   roads, subdivisions, and facilities on state or private land.  Pl. Mot. 19-20.  It is unclear what map
     Plaintiffs are referring to.  A map included with the FEIS identifies habitat on federal land and
24   shows state land, which is not identified as habitat.  *See* AR 3576.  While the map does not show
     subdivisions or particular facilities, Defendants disagree that the mapped habitat includes non-
25   federal land.  In any case, the Plan Amendments apply only to federal land – not state or private
     land.  *See* AR 5434.  Accordingly, Defendants disagree that mistakes were made in the mapping
26   process.  However, to the extent that new information about Sage-Grouse habitat becomes
     available, any corrections to delineations of habitat could be addressed through a plan
27   maintenance or plan amendment process.  *See* AR 1924; AR 3702; AR 4798; AR 4830.

28

FLPMA claims, *see* section I.A.2., *supra*, and fares no better as a NEPA claim.  NEPA requires any agency preparing an EIS to "assess and consider comments both individually and collectively" and to "stat[e] its response in the final statement."  40 C.F.R. 1503.4(a).  The record demonstrates that the Agencies fully complied with NEPA's requirements for considering and responding to comments.  *See*, *e.g.*, AR 10180-205; AR 3687-89; AR 5169-84.  Plaintiffs insist that the Agencies did not consider their comments regarding consistency with state and local plans, but the record shows that they did.  *See* AR 33-4-05; AR 5417-21; AR 5397-408; AR 5201-10; AR 5232-36; AR 3696-97; AR 3711-13.  The Agencies also responded to comments regarding inconsistencies among the plans, water rights, travel management, managed grazing, and best available science.  *See* AR 3746-47 (inconsistencies); AR 3776-77 (water rights); AR 3764-65 (travel management); AR 3745-47, 3772 (managing grazing to reduce fire risk); AR 3713-14, 3717-18, 5252-68 (best available science).  Thus, Plaintiffs' claim that the Agencies did not adequately consider comments is baseless.

## II.   PLAINTIFFS HAVE FAILED TO DEMONSTRATE IRREPABLE HARM

To obtain emergency injunctive relief, Plaintiffs bear the burden of proving it is "likely"—and not just possible—that they will suffer substantial and immediate irreparable injury to their interests *before a decision on the merits can be rendered*.  *Winter*, 555 U.S. at 22.  The Plaintiffs seek to trace a host of injuries to the Plan Amendments, but as set forth below, none satisfies Plaintiffs' burden of showing imminent irreparable injury.[16]

---

[16] In addition to declarations from the four original named plaintiffs, the Plaintiffs have submitted "supplemental" harm declarations and, on the eve of this filing, amended their complaint.  *See* ECF Nos. 13, 18, 20.  Plaintiffs' motion for injunctive relief should be adjudicated on the basis of the allegations and declarations made in that motion, not on these late-filed materials.  Even had they been properly submitted with Plaintiffs' motion, Plaintiffs' supplemental declarations fail to identify imminent irreparable harm, because – like the original declarations – they allege speculative injuries that will come to pass, if at all, only after future site-specific decisions are made.  Should Plaintiffs seek to rely on these late-filed materials in their reply brief, Defendants respectfully seek leave to file a sur-reply.

**A.     The Counties Fail to Demonstrate Imminent Environmental Harm from Grazing Reductions**

The Counties assert that they face imminent environmental injury because the Plan Amendments will allegedly reduce grazing levels, resulting in accumulation of annual grasses and an increase in wildfire.  Pl. Mot. at 24.  This claim fails.

First, the record belies the claim that implementation of the Plan Amendments will increase fire risk.  The Plan Amendments are, in fact, projected to reduce the risk of fire, which is a significant threat to Sage-Grouse habitat.  *See* AR 5458-60; AR 2772 (management actions to improve vegetation are expected to lead to a more natural fire regime and a *decrease* in "fire sizes, intensity and management costs") (emphasis added).

Second, even assuming that grazing management under the Plan Amendments will lead to an increase in fire risk, Plaintiffs still have not shown any imminent risk of harm because, the Plan Amendments do not immediately change grazing practices.  Grazing will continue under existing permits, and those permits will be modified through future judicially reviewable decisions over the next several years to ensure that grazing is conducted consistent with the objectives outlined in the Plan Amendments.  *See* AR 5662 ("There will be no immediate change in grazing management or modification of term grazing permits."); AR 8495 (outlining management direction to be considered in reviewing BLM grazing permits).

**B.     The Counties Fail to Demonstrate Imminent Injury to Their Transportation Systems or to Their Ability to Provide Emergency Services**

The Counties allege that they face imminent harm because the Plan Amendments restrict their use of "thousands of miles of roads," impeding their ability to maintain their transportation systems and provide for emergency services.  Pl. Mot. at 24, 28.  This claim misrepresents the Plan Amendments:   the  Amendments not close any existing routes, but even if they did, the Agencies' regulations exempt emergency vehicles from OHV restrictions.

First, the Plan Amendments do not close any existing routes.  All existing routes will remain open until the Agencies complete a separate transportation management planning

28

1   process.[17]  *See* AR 4821-22 ("limit OHV travel to existing routes … until subsequent

2   implementation–level travel planning is completed and a designated route system is

3   developed.").  During that process, the Agencies will determine whether existing routes must be

4   closed and will impose any conditions on the use of routes needed to ensure consistency with the

5   Plan Amendments.  *See* AR 5453 ("Travel management plans, included route inventories, NEPA

6   analysis, and route designation will be completed in subsequent public planning process.").  In

7   sum, the record provides no support for the Counties' assertion that routes of importance to them

8   will be closed.  And any claim that such routes would be closed in the future after travel

9   management planning is speculative and cannot establish an imminent irreparable injury.[18]  *See*

10  *Caribbean Marine Servs. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1998).

11          Further, the Agencies' regulations make clear that emergency public-safety uses are not

12  subject to the obligation to remain on existing routes.  *See* 36 C.F.R. § 261.13(e) (exempting

13  "use of any fire, military, emergency, or law enforcement vehicle for emergency purposes" from

14  the prohibition on using motorized vehicles on Forest Service lands off of designated roads and

15  trails); 43 C.F.R. § 8340.0-5(a)(2), (4) (providing that limits to use of OHVs on BLM land do not

16  apply to  "[a]ny military, fire, emergency, or law enforcement vehicle while being used for

17  emergency purposes" or "[v]ehicles in official use").

---

[17] The Plan Amendments define "existing routes" broadly as "those routes on the ground that clearly show prior use to the extent that a clear path is visible with no vegetation on it, or in some cases there is little vegetation in the center of the travel path." AR 4840.

[18] Although not explicitly addressed in Plaintiffs' motion, the Counties' declarants assert the Plan Amendments interfere with the Counties' unadjudicated rights of way under Revised Statute ("R.S.") 2477.  *See* Dahl Decl. at ¶ 24; Goicoechea Decl. at ¶ 27.  This claim does not demonstrate an injury traceable to the Plan Amendments.  BLM is not obligated to determine ownership of R.S. 2477 rights of way during development of land management plans, and any claim of interference with rights of way must be resolved in a Quiet Title action.  *Kane County v. Kempthorne*, 495 F. Supp. 2d 1143, 1159 (D. Utah 2007), *aff'd sub nom. Kane County, Utah v. Salazar*, 562 F.3d 1077 (10th Cir. 2009).

1

### C.     The Counties Cannot Assert Injury as *Parens Patriae*

2       The Counties also allege a host of injuries to the citizens of the Counties rather than the

3 Counties themselves.[19]   However, States, and political subdivisions such as counties, may not

4 sue the federal government as *parens patriae* to protect the physical or economic wellbeing of

5 their citizens.  *Alfred L. Snapp & Son, Inc., v. Puerto Rico ex rel. Barez,* 458 U.S. 592, 610 n.16

6 (1982); *Nevada v. Burford*, 918 F.2d 854, 858 (9th Cir. 1990); *In re Multidistrict Vehicle Air*

7 *Pollution M.D.L. No. 31*, 481 F.2d 122, 131 (9th Cir. 1973) ("[P]olitical subdivisions such as

8 cities and counties, whose power is derivative and not sovereign cannot sue as *parens patriae*.").

9 To establish standing to sue the federal government, the Counties must show harm to their *own*

10 proprietary interests rather than those of their citizens.  *See, e.g., Massachusetts v. EPA,* 549 U.S.

11 497, 519 (2007).  Because the Counties cannot use alleged injuries to the interests of their

12 citizens to support standing, those injuries cannot support their claim of irreparable harm.[20]

13

### D.     The Counties Fail to Demonstrate Imminent Economic Injury

14       The Counties' claims that they face imminent economic injury also fall short.  Dahl Decl.

15 at ¶ 20; Goicoechea Decl. at ¶ 7.  First, these generalized allegations of economic harm concern

16 the Counties in their capacity as *parens patriae* and—as noted above—cannot constitute an

17 injury in litigation against the federal government.  *See Pennsylvania v. Kleppe*, 533 F.2d 668

18 (D.C. Cir.  1976) ("The alleged injuries to the state's economy . . . implicate the *parens patriae*

19 rather than the proprietary interest of the state.").  Second, even if the Counties could assert

20 general economic injuries, the economic harms they allege here are not imminent. The Counties'

21

_____

22 [19] *See, e.g.,* Dahl Decl. at ¶ 15-16 (alleging interference with use of private lands for agriculture
and grazing); *id.* at ¶ 25 (alleging private landowners are deprived of reasonable access to their
23 private property); *id.* at ¶ 24 (alleging "ranchers, hunters, recreationists, and  exploration
geologists" are injured by travel restrictions); Goicoechea Decl. at ¶ 7(alleging lost jobs in
24 Eureka County); *id.* at ¶ 24 (alleging grazers in Eureka County will be forced out of business).

25 [20] The Counties also claim the Plan Amendments conflict with their land management plans, *see*
26 Pl. Mot. at 24, but such interference is not an immediate irreparable harm.  *See Am. Motorcyclist
Ass'n*, 534 F. Supp. at937 (holding that although the allegation that BLM Land Management
27 Plan interfered with county land use plan was adequate to demonstrate standing, it did not justify
preliminary injunction).

28

1    alleged economic harms stem from the allegations that the Plan Amendments will reduce the

2    grazing economy.  *See* Goicoechea Decl. at ¶ 7; Dahl Del. at ¶ 20.  But as explained above, the

3    Plan Amendments do not make any immediate changes to existing grazing permits, and thus any

4    alleged economic impacts are not imminent.[21]

5          **E.      The Mining Companies Fail to Demonstrate Imminent Injury**

6          The Mining Companies wrongly assert that they will suffer imminent irreparable injury

7    from the proposed withdrawal of Focal Areas from the Mining Law because the resulting

8    segregation will allegedly deprive them of their "right" to mining claims and prevent them from

9    developing the claims.  *See* Pl. Mot. at 24-25.  First, as discussed in section I.B., *supra*,

10   Plaintiffs' claims of injury based on the notice of proposed withdrawal cannot support their

11   request for injunctive relief because the notice of proposed withdrawal  has not been challenged

12   and any such challenge would be premature.  Second, assuming the notice of proposed

13   withdrawal is properly before the Court, it does not cause any imminent injury to Plaintiffs'

14   rights under the Mining Law or immediately affect current operations on their mining claims.

15         Plaintiffs assert that they hold hundreds of unpatented mining claims within the

16   segregated area, but they do not specify whether they have made a discovery of a valuable

17   mineral deposit on any these claims.[22]  If they have made such a discovery, the proposed

18   withdrawal has no impact on them because they have a valid property interest in the claim that is

19

20   [21] The Plaintiffs allege that the Plan Amendments' restrictions on wind energy will cost Elko
     County over $500 million because they prevent construction of the China Mountain Wind
21   Energy project.  Pl. Mot. at 4.  But no final agency decision has been made on the Project and
     Elko's speculation that ultimately it will not be approved is not an imminent injury.  *See*
22   *Caribbean Marine*, 844 F. 2d at 674.

23   [22] Mr. Cleary asserts that Western Exploration controls 331 unpatented claims in Woods
     Gulch/Gravel Creek area and 112 unpatented claims at Doby George.  Cleary Decl at ¶ 4.  Mr.
24   Gustin testifies that Quantum controls 110 unpatented and 9 patented mining claims in the
     Jarbridge area.  Gustin Decl. at ¶ 4.  On October 20, 2015, the Department of the Interior
25   published a Correction Notice which clarifies that the only federal lands proposed for withdrawal
     are the Focal Areas within the listed townships, rather than all of the federal lands within the
26   listed townships.  80 Fed. Reg. at 63,583.  This correction makes clear that the Doby George
     unpatented claims, which Mr. Cleary alleges are not within a Focal Area, *see* Cleary Decl. at ¶
27   12, are therefore not subject to the proposed withdrawal.

28

1   protected.  30 U.S.C. § 26; *Indep. Mining Co., Inc. v. Babbitt*, 105 F.3d 502, 506 (9th Cir. 1997);

2   *see also* 80 Fed. Reg. at 57,637 (the segregation is subject to valid existing rights).  If Plaintiffs

3   have located unpatented mining claims but have not discovered a valuable mineral deposit, they

4   have no "rights" that can be injured by segregation.  *See Cameron v. United States*, 252 U.S.

5   450, 460 (1920); *see also VANE Minerals v. United States*, 116 Fed. Cl. 48, 63 (2014) ("Without

6   a determination as to the validity of the plaintiffs' unpatented mining claims, those claims do not

7   constitute a compensable property interest . . . .").  Nor does a claimant have a "right" to conduct

8   exploration activities to make a discovery after an area is withdrawn.  *See*, *e.g.*, *Freese v. United*

9   *States*, 639 F.2d 754, 758 (Ct. Cl. 1981) ("At best, plaintiff has suffered a denial of the

10  opportunity to obtain greater property than that which he owned upon the effective date of the

11  [withdrawal].  This cannot fairly be deemed the divestment of a property interest, save by the

12  most overt bootstrapping.").  Thus, Plaintiffs have no rights that are affected by the notice of

13  proposed withdrawal.[23]

14         Plaintiffs also cannot demonstrate an imminent irreparable injury based on the

15  speculative fear that the segregation will disrupt ongoing approved exploratory activities, and

16  that they may be precluded from engaging in new exploratory activities.  Gustin Decl. ¶ 16;

17  Cleary Decl. ¶ 6.  Neither the Forest Service nor the BLM are required to conduct an immediate

18  validity examination or to halt ongoing operations under a Plan of Operations approved before

19  the issuance of a segregation notice.  *See* 36 C.F.R. Part 228A (Forest Service Regulations); AR

20  10908  (BLM Handbook providing that operation under a Plan of Operations approved before

21  segregation notice "may continue as accepted or approved and do not require a validity

22  examination unless or until there is a material change in the activity").[24]  Indeed, the Forest

23  _____

24  [23] Plaintiffs make a passing claim that their interests in nine patented mining claims are injured
    by the segregation.  Gustin Decl. at ¶ 18; Pl. Mot. at 25.  Patented mining claims, however, are

25  private property and thus not affected by the segregation and not subject to the Plan
    Amendments.  Plaintiffs have provided no basis for concluding that their private property

26  interests will be injured by the segregation.

27  [24] Mr. Cleary asserts that he was informed by Forest Service personnel that the BLM would

28  "immediately . . . initiate claim contests" challenging Western's unpatented mining claims.

1    Service could only require the Mining Companies to suspend or modify their operations under

2    current plans of operation by following the procedures set forth under 36 CFR § 228.4(e), which

3    has not yet happened here. *Baker v. U.S. Dep't of Agric.*, 928 F. Supp. 1513, 1523 (D. Idaho

4    1996).  Until the Forest Service completes this administrative process, including opportunities

5    for administrative appeal, there is no final agency action affecting ongoing operations that is ripe

6    for judicial review, and there is no imminent threat of harm to Plaintiffs.  And, even were the

7    Agencies to immediately require a validity determination, any expense of complying with the

8    examination procedure is not an irreparable injury justifying injunctive relief.  The need to

9    expend money for completion of agency procedures "which are normal incidents of participation

10   in the agency process do not constitute irreparable injury" regardless of how "substantial and

11   nonrecoverable" those expenditures may be.  *California ex rel. Christensen v. FTC,* 549 F.2d

12   1321, 1323 (9th Cir. 1977).

13          Finally, Plaintiffs allege that they are harmed because the notice of proposed withdrawal

14   will have a "chilling effect" on the Mining Companies' ability to raise outside funding.  Pl. Mot.

15   at 25.  But speculation about the independent business decisions of future investors not before

16   the Court does not suffice to demonstrate an actual and imminent injury.  *See*, *e.g.*, *Simon v. E.*

17   *Ky. Welfare Rights Org.,* 426 U.S. 26, 43 (1976) (holding plaintiffs lacked standing where their

18   alleged injury required speculation that the challenged rule would affect behavior of non-parties).

19          In sum, neither the plaintiff Counties nor the plaintiff Mining Companies have

20   demonstrated that the Plan Amendment will cause imminent injury to their interests.

21

22

_____

23   Cleary Decl. ¶11.  But immediate initiation of an administrative mining claim contest is not

24   possible here.  BLM cannot initiate a claim contest until after it or the Forest Service has
     completed a validity determination and found the mining claim is not valid.  *See  McKown v.*

25   *United States*, 908 F. Supp. 2d 1122 (E.D. Cal. 2012) (describing validity examination process
     and subsequent request to initiate contest proceeding).  As noted above, no validity examination

26   has been initiated, and none is required for the existing plans of operation.  Consequently, even if

27   the cited statement was made, there is no imminent threat of the initiation of a contest proceeding
     on any of the mining claims within the segregated area.

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### III.   THE BALANCE OF THE HARMS AND THE PUBLIC INTEREST WEIGH AGAINST AN INJUNCTION

The balance of the harms and the public interest weigh heavily against an injunction. "When the Government is a party, these . . . two factors merge." *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014). "[When] an injunction is asked [for] which will adversely affect a public interest . . . the court may in the public interest withhold relief until a final determination of the rights of the parties, though the postponement may be burdensome to the plaintiff." *Weinberger v. Romero–Barcelo*, 456 U.S. 305, 312-13 (1982). Thus, even if the Court finds that Plaintiffs have established a likelihood of success on the merits and would suffer immediate irreparable harm in the absence of an injunction, the Court should not enter a preliminary injunction because both the government and the public have a compelling interest in seeing the Plan Amendments implemented. *See*, *e.g.*, *Winter*, 555 U.S. at 26 (denying an injunction based on public interest despite injury to plaintiffs).

This planning process was necessitated by the FWS's finding that the listing of the Sage-Grouse was warranted and, specifically, that existing regulatory mechanisms were inadequate to protect the Sage-Grouse from further population declines. *Id.* at 13,982. The Plan Amendments are designed to conserve and enhance Sage-Grouse habitat so that the need to list the species under the ESA can be avoided. AR 5441. Moreover, protecting the Sage Grouse and it ecosystem, but will benefit local economies and rangeland activities such as grazing and recreation. AR 5428. An injunction against implementation of the Plan Amendments would frustrate the Agencies' efforts to protect the Sage-Grouse by delaying the implementation of conservation measures to protect the species. The protection of a species that may become threatened or endangered in the absence of adequate protections in federal land management plans weighs heavily in the public interest. *See Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 422 F.3d 782, 794-95 (9th Cir. 2005) (upholding an injunction to protect endangered salmon); *Marbled Murrelet v. Babbitt*, 83 F. 3d 1068, 1073 (9th Cir. 1996) ("[T]he balance of hardships always tips sharply in favor of endangered or threatened species.").

1    Further, the government and numerous stakeholders who were involved in the

2    development of the Plan Amendments have an interest in having them remain in place.  The

3    four-year process that led to the issuance of the Plan Amendments involved an unprecedented

4    level of coordination and cooperation with states, state wildlife agencies, county governments,

5    FWS, environmental groups, tribes and other stakeholders.  *See* AR 5499; AR 4825-27  In light

6    of the Plan Amendments, FWS found that the listing of the Sage-Grouse under the ESA is no

7    longer warranted, but that finding is dependent upon the "continued implementation of the

8    regulatory mechanisms and conservation efforts" in the land management plans.  80 Fed. Reg. at

9    59,941.  An injunction would undo four years of collaboration and could undermine FWS's

10   finding.  The alleged harms to Plaintiffs do not outweigh the interests of the other stakeholders,

11   including the government, in keeping the Plan Amendments fully in place pending the Court's

12   full consideration of Plaintiffs' claims on the merits.  *Cf. Idaho Farm Bureau Fed'n v. Babbitt*,

13   58 F.3d 1392, 1405-06 (9th Cir. 1995) (declining to vacate a rule listing a species, in part,

14   because of the significant resources that were expended in preparing the rule).

15   Finally, even if injunctive relief were warranted, it should be narrowly tailored to address

16   only the specific injuries and legal violations found by the Court.  *See Friends of the Earth v.*

17   *Laidlaw Envtl. Servs.*, 528 U.S. 167, 193 (2000) (noting that injunctive relief should be "no

18   broader than required by the precise facts"); *Orantes-Hernandez v. Thornburgh*, 919 F.2d 549,

19   558 (9th Cir. 1990) (an injunction must be "narrowly tailored to give only the relief to which

20   plaintiffs are entitled").

21                                   **CONCLUSION**

22   For the foregoing reasons, Plaintiffs' Motion for a Preliminary Injunction should be

23   denied.

24   Respectfully submitted this 23rd day of October, 2015.

25

26                                   DANIEL G. BOGDEN
                                     United States Attorney
27                                   HOLLY A. VANCE
                                     Assistant United States Attorney
28

                                        35

1

2       JOHN C. CRUDEN
        Assistant Attorney General
3
        */s/Luther L. Hajek*
4       LUTHER L. HAJEK, Trial Attorney
        BARCLAY SAMFORD, Trial Attorney
5       U.S. Department of Justice
        Environment and Natural Resources Division
6       Natural Resources Section
        999 18th Street
7       South Terrace, Suite 370
        Denver, CO 80202
8       Tel: 303-844-1376 / 303-844-1475
        Fax: 303-844-1350
9       Email: Luke.Hajek@usdoj.gov
                Clay.Samford@usdoj.gov
10
11
        TANYA NESBITT, Trial Attorney
12      U.S. Department of Justice
        Environment and Natural Resources Division
13      Natural Resources Section
        601 D Street, NW
14      Washington, DC 20004
        Tel: 202-305-0457
15      Fax: 202-305-0274
16
17      Attorneys for Defendants

18

19

20

21

22

23

24

25

26

27

28
                                36

1

**CERTIFICATE OF SERVICE**

2

3

     I hereby certify that I electronically filed the foregoing **DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION** with the Clerk of Court using the CM/ECF system which sent notification of such filing to the following:

4

5

Laura K. Granier
Laura.Granier@dgslaw.com

6

7

C. Wayne Howle
whowle@ag.nv.gov

8

9

Lawrence VanDyke
lvandyke@ag.nv.gov

10

11

Michael Large
mlarge@da.washoecounty.us

12

13

Holly A. Vance
Holly.A.Vance@usdoj.gov

14

15

Tanya C. Nesbitt
tanya.nesbitt2@usdoj.gov

16

17

     Dated this 23rd day of October, 2015.

18

19

                           */s/ Luther L. Hajek*

20

                           Trial Attorney, Natural Resources Section
                           United States Department of Justice

21

                           Environment and Natural Resources Div.

22

23

24

25

26

27

28

37