1
2
3
4
5
6                    UNITED STATES DISTRICT COURT
7                        DISTRICT OF NEVADA
8                              * * *

9  WESTERN EXPLORATION, LLC ET AL.,          Case No. 3:15-cv-00491-MMD-VPC

10                          Plaintiffs,                    ORDER

                     v.
11                                            (Plfs' Motion for Summary Judgment -
   U.S. DEPARTMENT OF THE INTERIOR, *et*      ECF No. 67; Plfs' Motion to Supplement
12 *al.,*                                     Record - ECF No. 68; Defs' Motion for
                                              Summary Judgment - ECF No. 75;
13                          Defendants.       Intervenors' Motion for Summary
                                              Judgment - ECF No. 77; Defs' Motion to
14                                            Strike - ECF No. 102)

15 **I.    SUMMARY**

16         Plaintiffs bring this action against the Department of the Interior ("DOI"), Bureau of

17 Land Management ("BLM"), Department of Agriculture ("DOA"), United States Forest

18 Service ("USFS" or "Forest Service"), and associated government officials, seeking

19 review of two agencies' decisions to amend their resource management plans to provide

20 greater protection to the greater-sage grouse ("GSG") species and their habitat.[1] In

21 particular, Plaintiffs request that the Court enjoin the agencies from implementing these

22 resource management plans in Nevada and that they be remanded to the agencies for

23 further consideration.

24  _____

25        [1]The greater-sage grouse is a sparsely populated bird that lives in sagebrush
   grasslands and once existed in the millions. (ECF No. 75 at 17.) However, as a result of
26 "habitat fragmentation and loss caused by energy development, fire, agricultural
   conversion, and other factors, Sage-Grouse now occupy a little over half of their historic
27 range, and the current population is estimated to be in the hundreds of thousands." (*Id.*
   at 17-18 (citing 75 Fed. Reg. at 13,924-62, 13,986; 80 Fed. Reg. 59,858, 59,684 (Oct. 2,
   2015); WO 26162-63).)
28

Before the Court are five motions: (1) Plaintiffs' Motion for Summary Judgment ("Plaintiffs' Motion") (ECF No. 67); (2) Plaintiffs' Motion to Supplement Administrative Record ("Motion to Supplement") (ECF No. 68); (3) Defendants' Motion for Summary Judgment ("Defendants' Motion") (ECF No. 75); (4) Intervenors' Motion for Summary Judgment ("Intervenors' Motion") (ECF No. 77); and (5) Defendants' Motion to Strike (ECF No. 102). Plaintiffs, Defendants and Intervenors filed responses (ECF Nos. 73, 76, 78, 82, 104) as well as replies (ECF Nos. 83,84, 94, 105), and Plaintiffs filed a sur-reply.[2] (ECF No. 99). The Court held a hearing on the Motions on February 1, 2017. (ECF No. 123.)

The Court agrees with Plaintiffs that Defendants failed to comply with NEPA and remands for preparation of a supplemental environmental impact statement but denies Plaintiffs' request to enjoin implementation of the agencies' resource management plans pending remand.

## II.    BACKGROUND

The State of Nevada, nine Nevada counties,[3] three mining companies,[4] and a privately-owned ranch[5] (collectively "Plaintiffs") initiated this action on September 23, 2015 to challenge BLM and USFS's (collectively "the Agencies") decisions to amend their respective Land Use and Resource Management Plans ("Plan Amendments"[6]). (ECF Nos. 1, 20.)

The impetus for the adoption of the Plan Amendments originated with the United States Fish and Wildlife Service ("FWS"). In March 2010, FWS issued a finding on

---

[2]By stipulation, Plaintiffs were permitted to file a sur-reply in response to Defendants' Motion and in support of Plaintiffs' Motion. (ECF No. 97.)

[3]The counties consist of Elko County, Eureka County, White Pine County, Pershing County, Lincoln County, Lander County, Humboldt Country, Churchill County, and Washoe County.

[4]The three mining companies are Western Exploration LLC, Quantum Minerals LLC, and Paragon Precious Metals, LLC. (collectively "Mining Companies").

[5]The ranch is Ninety-Six Ranch, LLC ("the Ranch").

[6]For ease of reference, the Court will refer to BLM's Plan Amendment as "BLM Plan" and USFS's Plan Amendment as "USFS Plan."

petitions to list three entities of the greater sage-grouse as threatened or endangered under the Endangered Species Act ("ESA"). (75 Fed. Reg. 13910 (Mar. 23, 2010).) FWS found in part that "listing the greater sage-grouse (range wide) is warranted, but precluded by higher priority listing actions." *Id.* at 13910. FWS further examined whether existing regulatory mechanisms available to federal agencies, such as BLM and USFS, adequately protect sage-grouse species and their habitat and found them to be mainly inadequate. *Id.* at 13979-80, 13982. In response, the Agencies began the process of planning for incorporation of sage-grouse protection measures into their land management plans. (ECF No. 75 at 18.) Ultimately, on September 16 and 21, 2015, the Agencies issued Records of Decision ("RODs") [7] approving their respective management plan amendments, which govern 67 million acres of federal lands across ten western states. (NV 91784; FS 14049.)

The Plan Amendments guide future land and resource management decisions on lands administered by BLM and the Forest Service. (NV 91787; FS 140074.) The Amendments aim to benefit the greater-sage grouse by maintaining healthy sagebrush-steppe landscapes while simultaneously ensuring that the lands maintain multiple uses. While the Plan Amendments generally established conservation measures for future decision making, they also contain some conservation measures that were self-implementing, mandatory, or took "immediate" effect upon publication of the Plan Amendments. (NV 90715: FS 140123.) For instance, the Plan Amendments recommend but do not mandate the withdrawal of particular public lands — specifically, Sagebrush Focal Areas ("SFAs") — from mineral entry under the General Mining Law, subject to valid existing rights. (NV 91813; FS 140069.) Consistent with the Plan Amendments, BLM petitioned the Secretary of Interior ("the Secretary") to consider proposing a withdrawal. (WO 65706.) However, the actual withdrawal did not occur until the Secretary decided to accept BLM's recommendation and issued a Notice of Proposed

---

[7]Management plans issued jointly by the two Agencies are commonly referred to as Land Use Plans.

1   Withdrawal and Temporary Segregation[8] ("Notice of Proposed Withdrawal") on

2   September 24, 2015, one day after Plaintiffs initiated this action. (80 Fed. Reg. 57,635

3   (Sept. 24, 2015).) By contrast, the Plan Amendments immediately excluded nonenergy

4   and salable mineral development on PHMA in Nevada. (NV 91814.)

5       In the First Amended Complaint ("FAC"), Plaintiffs allege that the Agencies'

6   decisions to adopt the Plan Amendments are contrary to the National Environmental

7   Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.*, the Federal Land Policy and

8   Management Act ("FLPMA"), 43 U.S.C. §§ 1701 *et seq.*, the National Forest

9   Management Act ("NFMA"), 16 U.S.C. § 1600 *et seq.*, the Small Business Administration

10  Regulatory Flexibility Act ("SBREFA"), 5 U.S.C. § 801 *et seq.*, the Administrative

11  Procedure Act ("APA"), 5 U.S.C. § 551 *et seq.*, the General Mining Law, 3 U.S.C. § 21 *et*

12  *seq.*, and the Due Process Clause of the Fifth Amendment. (ECF No. 20.)

13      Plaintiffs request that the Court enjoin the DOI and BLM from implementing the

14  Nevada portion of the BLM Plan and enjoin the DOA and USFS from implementing the

15  Nevada portion of the USFS Plan. (*Id.* at 3, 87-88.) In effect, Plaintiffs ask this Court to

16  stop Defendants from taking any action that would interfere with Plaintiffs' continued

17  access to all Nevada lands (including federal public lands) that were open for mineral

18  entry or other public use prior to any segregation resulting from the withdrawal of federal

19  public lands that was recommended in the RODs. (*Id.*)

20      Plaintiffs and Defendants have filed cross-motions for summary judgment. (ECF

21  Nos. 67. 75.) Intervenors have also moved for summary judgment, joining certain of

22  Defendants' arguments and asking the Court to deny Plaintiffs' injunction request or

23  vacatur pending remand even if the Court were to agree with Plaintiffs on the merits.

24  (ECF No. 77.)

25  _____

26      [8]The Notice immediately segregated the lands from location and entry under the
    Mining Law until September 24, 2017, after the public decisionmaking and NEPA
27  evaluation process to determine if and what lands are withdrawn. *See* 80 Fed. Reg. at
    57,635. The proposal affects only hardrock mining operations and not leasable minerals.
28  *See id.*

**III.    DEFENDANTS' MOTION TO STRIKE (ECF NO. 102) AND PLAINTIFFS' MOTION TO SUPPLEMENT RECORD (ECF NO.68)**

**A.    Motion to Strike**

As a threshold matter, Defendants seek to strike Exhibits 1, 2 and 6 of Plaintiffs' sur-reply (ECF No. 99), contending that the information presented is not part of the administrative record and is presented for the first time in Plaintiffs' sur-reply. (ECF No. 102.) Plaintiffs counter that the Court may consider extra-record information for purposes of standing and the information presented responds to the issues raised in Defendants' reply. (ECF No. 104.) Plaintiffs also argue that the information in these exhibits is not "new evidence . . . but is merely responsive to, and 'provides the full context' for the 'selected recitation of the facts' found in Defendants' Reply." (*Id.* at 2.) However, it is Plaintiffs' burden to demonstrate standing. *See FW/PBS, Inc. v. Dallas*, 493 U.S. 215, 231 (1990). Plaintiff cannot make a general statement to support standing and then provide more specific information in the sur-reply after Defendants had challenged the lack of injury to support Plaintiffs' standing. This is particularly true where the information was available to Plaintiffs during the briefing period on the pending motions.

The Court agrees with Defendants that the new information presented for the first time in Exhibits 1 and 2 should be stricken. As Defendants point out, except for the information in Exhibit 1 relating to whether Eureka County has access to an off-site location to store gravel (in paragraph 3), Exhibit 1 responds to issues raised in Defendants' Motion, which Plaintiffs should have addressed in their opposition. (ECF No. 105 at 2-3.) Exhibit 2 addresses White Pine County's alleged injury with respect to land disposal, but Defendants challenged this type of injury in their initial Motion. (ECF No. 99-2; ECF No. 75 at 26.) The Court agrees with Defendants that Plaintiffs cannot offer Exhibit 2 for the first time in their sur-reply brief.

Plaintiffs do not dispute that Exhibit 6 is not part of the administrative record, nor does it relate to the issue of standing which permits the Court to consider extra-record materials. (ECF No. 104 at 6-7.) Plaintiffs assert that Exhibit 6 is piece of a

demonstrative evidence and shows that BLM made substantial changes to the Coates habitat map and that Plaintiffs discussed an identical map in their reply. (*Id.*) The Court agrees with Defendants that Exhibit 6 is not part of the administrative record and does not fall within any exception for consideration of extra-record materials. Moreover, it is also new information offered for the first time in Plaintiffs' sur-reply.

The Court declines to strike paragraphs 1 through 3 in Exhibit 1 but will grant Defendant's request to strike the remainder of Exhibit 1 and to strike Exhibits 2 and 6.

### B.    Motion to Supplement Record

The Court agrees with Defendants that the documents Plaintiffs seek to be included with the administrative record are not appropriate for supplementation. In any event, because the Court remands the RODs to the Agencies, the Court denies Plaintiffs' motion as moot.

## IV.    MOTIONS FOR SUMMARY JUDGMENT

Defendants insist that Plaintiffs' claims are not justiciable because (1) the withdrawal of lands for mineral entry was a separate process from the Plan Amendments, (2) Plaintiffs lack standing and (3) Plaintiffs' claims are not ripe. (ECF No. 75 at 22-34.) Defendants further argue that Plaintiffs' claims fail on the merits. Plaintiffs disagree. The Court will address the threshold issues first before reaching the merits.

As an initial matter, the standard for summary judgment applies to the threshold issues raised in Defendants' Motion. That is, in evaluating a summary judgment motion, the court views all facts and draws all inferences in the light most favorable to the nonmoving party. *Kaiser Cement Corp. v. Fishbach & Moore, Inc.*, 793 F.2d 1100, 1103 (9th Cir. 1986). The moving party bears the burden of showing that there are no genuine issues of material fact. *Zoslaw v. MCA Distrib. Corp.* 693 F.2d 870, 883 (9th Cir. 1982). Once the moving party satisfies Rule 56's requirements, the burden shifts to the party resisting the motion to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). The nonmoving party "may not rely on denials in the pleadings but must produce specific evidence, through

1    affidavits or admissible discovery material, to show that the dispute exists," *Bhan v. NME*

2    *Hosps., Inc.*, 929 F.2d 1404, 1409 (9th Cir. 1991), and "must do more than simply show

3    that there is some metaphysical doubt as to the material facts," *Orr v. Bank of Am.*, 285

4    F.3d 764, 783 (9th Cir. 2002) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,

5    475 U.S. 574, 586 (1986)).

6    **A.    Justiciability of Claims Stemming from Notice of Proposed**

7    **Withdrawal**

8    The Mining Companies and several of the other Plaintiffs allege injuries that arise

9    from the Notice of Proposed Withdrawal, which resulted in a temporary segregation of

10   PHMA and SFA from mineral entry. While the choice of what lands to withdraw from

11   mineral entry is based on the designation of particular public lands as PHMA or SFA

12   under the Plan Amendments, such designation did not automatically result in withdrawal.

13   As Defendants aptly point out, the RODs only recommended withdrawal of Focal Areas,

14   and BLM was not required to petition the Secretary for withdrawal nor was the Secretary

15   obligated to accept BLM's recommendation. (ECF No. 75 at 32; GBR 10781; NV 90682.)

16   Therefore, despite the classification of certain lands as PHMA or SFA in the Plan

17   Amendments, Plaintiffs cannot seek to enjoin the withdrawal process by challenging the

18   Plan Amendments. Claims that stem from the Notice of Proposed Withdrawal (counts III,

19   VII, VIII and IX) are not properly asserted in this case.

20   The Mining Companies appear to believe that the ultimate basis for their alleged

21   injuries is their inability to comment on the Plan Amendments' recommendation for

22   mineral withdrawal. However, the Mining Companies do, in fact, have the ability to

23   challenge the decision by the Secretary to accept the recommendation of withdrawal,

24   which the Secretary could have chosen not to do. Their remedy is to directly challenge

25   the Secretary's decision to accept BLM's recommendation to withdraw these lands from

26   mineral entry. Because the Mining Companies' claimed injuries relate to the Notice of

27   Withdrawal, they cannot demonstrate Article III standing to challenge the Plan

28   Amendments. *See* discussion *infra* at sect. IV(B)(1).

1

2      **B.      Standing**

3          An analysis of standing involves both Article III limitations as well as non-

4    constitutional statutory limitations. *See Pershing Park Villas Homeowners Ass'n v.*

5    *United Pac. Ins. Co.*, 219 F.3d 895, 899 (9th Cir. 2000). In Defendants' Motion, they

6    argue that Plaintiffs' claims are not currently justiciable in part because Plaintiffs lack

7    standing to challenge the Plan Amendments. (ECF No. 75 at 22-34.) Specifically, they

8    argue that Plaintiffs have failed to show they have satisfied the constitutional

9    requirement that they suffered a concrete and particularized injury or that such injury is

10   imminent. The Court finds that only three Plaintiffs have alleged sufficiently specific facts

11   to demonstrate that they have suffered a concrete and imminent injury sufficient for

12   Article III standing.

13          Given the number of Plaintiffs and the variety of statutes at issue in this case, the

14   Court will address both constitutional and statutory standing with respect to each

15   Plaintiff.

16      **1.      Article III Standing**

17          "Article III of the Constitution limits federal-court jurisdiction to 'Cases' and

18   'Controversies.'" *Massachusetts v. EPA,* 549 U.S. 497, 516 (2007). "To satisfy Article

19   III's standing requirements, a plaintiff must show (1) it has suffered an 'injury in fact' that

20   is (a) concrete and particularized and (b) actual or imminent, not conjectural or

21   hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant;

22   and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by

23   a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC) Inc.*, 528

24   U.S. 167, 180-81 (2000) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61

25   (1992)). The party invoking federal jurisdiction bears the burden of establishing these

26   elements. *FW/PBS,* 493 U.S. at 231.

27          Moreover, the party invoking standing also must show that it has standing for

28   each type of relief sought. *Summers v. Earth Island Inst.,* 555 U.S. 488, 493 (2009).

     However, as Plaintiffs correctly pointed out at the hearing, only one Plaintiff needs to

1    show standing for the Court to address the claims asserted in this case. *See*
2    *Massachusetts,* 549 U.S. at 518 (in addressing a challenge to standing, the Court noted
3    that "[o]nly one of the petitioners needs to have standing to permit [the Court] to consider
4    the petition for review.")

5                               **a.     State of Nevada**

6          While a state does not have standing as *parens patriae* to bring an action against
7    the federal government on behalf of its citizens, a state may bring suit based on a variety
8    of proprietary interests — for example, a state may own land or participate in a business
9    venture. *Alfred L. Snapp & Son, Inc., v. Puerto Rico ex rel. Barez,* 458 U.S. 592, 601,
10   610 n.16 (1982) (citing *Massachusetts v. Mellon*, 262 U.S. 447, 485-86 (1923)). As a
11   result of such proprietorship, a state may have standing to bring suit to remedy harm to
12   those interests. Moreover, a state may challenge land management practices on federal
13   land that could affect adjacent state-owned land. *See Douglas County v. Babbitt*, 48
14   F.3d 1495, 1501 (9th Cir. 1995) (county alleged via affidavit that land management
15   practices on federal lands would "[fail] to properly manage for insect and disease control
16   and fire," threatening the productivity and environment of adjoining county lands).

17         In the FAC, the State generally alleges that, based on Nevada law, it has
18   significant interests in the "protection, propagation, restoration, transplanting,
19   introduction and management of wildlife in [the] State." (ECF No. 20 at 4-5 (citing NRS §
20   501.181(1)(a)).) Specifically, the State challenges the Plan Amendments' disturbance
21   cap protocol, claiming that the protocol actually encourages sage-grouse habitat
22   fragmentation by providing a "perverse incentive to locate new disturbances in areas
23   with little existing disturbance, which in turn increases direct and indirect effects to [the
24   GSG]." (*Id.* at 5 (quoting Governor Brian Sandoval).) In their reply brief, the State also
25   claims that the Plan Amendments increase the risk for fire and that the Amendments
26   curb the state Department of Wildlife's ability to effectively manage wildlife (including the
27   sage-grouse). (*See* ECF No. 82 at 17-18.) The crux of the State's alleged injury is that

28

1    the Plan Amendments interfere with land-use planning on state land, a viable proprietary

2    interest.

3          However, the Court fails to find sufficiently specific facts in Plaintiffs' various briefs

4    and declarations to demonstrate how particular binding standards in the Plan

5    Amendments have caused, or imminently will cause, a concrete and particularized injury

6    to the State. *See Churchill County v Babbitt*, 150 F.3d 1072, 1079 (9th Cir. 1998)

7    (opinion amended and superseded on denial of rehearing) (city and county

8    demonstrated a threatened concrete interest by asserting in affidavits that federal water

9    programs would harm lands possessed or managed by them by causing fire hazards,

10   airborne particles, erosion, unknown changes to underground water supply and reduced

11   quality of local drinking water). The State identifies the specific Plan Amendment

12   provisions that allegedly injure them — adaptive management triggers, allowance of

13   unspecified mitigation measures, classification of land as "SFA," the 3 percent

14   disturbance cap, no mitigation regulation on OHMA, and travel and transportation

15   management (ECF No. 20 at 67) — but fails to provide evidence or specific facts

16   showing exactly how these provisions cause them concrete harm that is imminent.

17   Instead, they generally allege the provisions will "have an enormous impact on [sage-

18   grouse] habitat and interfere substantially with conservation efforts of the State." (*Id.* at

19   66-67.)[9] This is insufficient to withstand a motion for summary judgment.

20         Therefore, the State fails to offer sufficiently specific facts supported by

21   admissible evidence to satisfy the initial Article III threshold of injury in fact.

22                            **b.        Counties**

23         The Ninth Circuit has held that "political subdivisions, such as cities and counties,

24   whose power is derivative and not sovereign, cannot sue as *parens patriae*, although

25   _____

26   [9]The State also provides a declaration from Richard Perry, the head of the
     Nevada Division of Minerals, which gives information about the revenue generated from
     the State's processing of mineral claims. (ECF No. 67-9.) However, challenging a
27   potential loss in revenue from mineral claims aims at the Notice of Withdrawal. The Plan
     Amendments themselves, while recommending mineral withdrawal, do not actually
28   segregate or withdraw the lands from mineral entry.

they might sue to vindicate such of their own proprietary interests as might be congruent with the interests of their inhabitants." *In re Multidistrict Vehicle Air Pollution M.D.L. No. 31*, 481 F.2d 122, 131 (9th Cir. 1973). A municipality, such as a county, has a proprietary interest in its ability to enforce land-use regulations, its powers of revenue collection and taxation, and its proprietary interest in protecting natural resources from harm. *See City of Sausalito v. O'Neill*, 386 F.3d 1186, 1198 (9th Cir. 2004) (citing *Scotts Valley Band of Pomo Indians of Sugar Bowl Rancheria v. United States*, 921 F.2d 924, 928 (9th Cir. 1990) (land-use); *Colorado River Indian Tribes v. Town of Parker*, 776 F.2d 846, 848-49 (9th Cir. 1985) (revenue collection and taxation); *Fireman's Fund Ins. Co. v. City of Lodi*, 302 F.3d 928, 944 (9th Cir. 2002) (natural resources). Moreover, the Ninth Circuit has determined that an increased risk of wildfire is sufficient to support standing. *See Delta Water Agency v. United States*, 306 F.3d 938, 949-50 (9th Cir. 2002) (agreeing with the D.C. Circuit that a substantial risk of wildfire is a threat of injury that entitles plaintiffs to be heard). Additionally, a county may assert an injury to its proprietary interests where "land management practices of federal land could affect adjacent" county-owned land. *Douglas County*, 48 F.3d at 1501.

To survive a motion for summary judgment raising standing, the counties must set forth "specific facts" by affidavit or by other admissible evidence demonstrating that they have suffered an "injury in fact" as a result of the Plan Amendments. *See Anderson*, 477 U.S. at 256; *Friends of the Earth*, 528 U.S. at 180-81. For the reasons discussed below, the Court finds that only three counties — Humboldt, Eureka, and Washoe — have offered sufficiently specific facts supporting the existence of an injury in fact to withstand Defendants' Motion.

### 1.    Elko County

In the FAC, Elko County generally asserts that the travel restrictions in the Plan Amendments affect 40 percent of all of the roads in their county as well as segments of roughly 1,500 miles of county roads. (ECF No. 20 at 44; ECF No. 82-17 at 3.) Specifically, the Plan Amendments prohibit cross-country travel, use of certain roads

1  during specific seasons or times of day, and impose limitations on noise disturbance in

2  designated sage-grouse habitat. (*Id.* at 44.) Elko contends that these restrictions

3  interfere with their land use planning and police powers, such as their obligation to

4  maintain the transportation system and to provide emergency services. (*Id.* at 6.) They

5  also allege that the grazing restrictions in the Plan Amendments will cause them

6  environmental harm because of a resulting "build-up of fuel load on the range and [an]

7  increase [in] wildfire frequency and intensity." (*Id.*) Elko also states that the Plan

8  Amendments' prohibition on wind energy development in the PHMA will cause a loss of

9  tax revenue, pointing to an acknowledgment of such a loss by the Agencies in the FEIS.

10 (*See* ECF No. 82 at 6.) The Court fails to find sufficiently specific facts in the supporting

11 affidavits and evidence to establish that Elko County has Article III standing.

12     In the declaration of Scott Brown (ECF No. 82-17), the County provides an

13 example of an alleged injury to county road maintenance caused by the Plan

14 Amendments. Roughly one-third of a particular segment of county road that gives

15 residents access to private land is under the jurisdiction of BLM. (*Id.* at 2.) In fiscal year

16 2015-2016, the County developed a project to resurface this particular segment of the

17 road, including the portion under BLM's jurisdiction. Because of the BLM road segment's

18 proximity to sage-grouse habitat, BLM required that the Nevada Department of Wildlife

19 ("NDOW") approve the County's application for a Right of Way ("ROW"), which took

20 approximately a month and a half. (*Id.* at 3.) The ROW has yet to be approved, but this

21 can be explained by the County's failure to provide an updated cultural resources

22 survey. (*See id.*; ECF No. 95 at 14.)

23     Elko's assertions about the Plan Amendments' effect on its ability to maintain

24 roads as evidenced in Mr. Brown's declaration are not enough to demonstrate Article III

25 standing. First, the alleged injury occurred after the filing of this action — the application

26 for the ROW occurred in November of 2015 (ECF No. 82-17 at 2) — and cannot be

27 relied upon to show standing. *See Lujan,* 504 U.S. at 569 n. 4 ("The existence of federal

28 jurisdiction ordinarily depends on the facts *as they exist when the complaint is filed.*")

1   (quoting *Newman-Green, Inc. v. Alfonzo-Larrain,* 490 U.S. 826, 830 (1989)). Moreover,

2   the BLM Plan did not change the requirement that the County obtain approval to

3   resurface BLM's portion of the road. Rather, the BLM Plan requires that BLM work with

4   local governments to minimize upgrading existing routes in PHMA and GHMA unless the

5   upgrade is necessary for public safety. (*See* N 90709.) Thus, Elko's claim that its failure

6   to obtain a ROW has caused Elko monthly maintenance requirements of approximately

7   $9,300 is unpersuasive, especially since Elko offers no reasons why it did not at least

8   resurface its portion of the road during fiscal year 2015-2016 to avoid these costs.

9         Elko's assertions of other harm are similarly insufficient to demonstrate standing.

10  Elko relies on a declaration from Demar Dahl to support its claims regarding the Plan

11  Amendments' grazing restrictions, travel restrictions, and prohibition on wind energy

12  projects. (ECF No. 67-2.) First, the grazing restrictions do not take effect immediately

13  according to the Plan Amendments; rather, permits are modified over a period of time

14  and based on site-specific considerations.[10] Mr. Dahl asserts that the livestock grazing

15  restrictions will result in increased fire frequency, but he fails to provide facts to show

16  how these restrictions, as applied in the future, will result in increased wildfires in the

17  county. (*Id.* at 6.) Such alleged potential harm in the future is not "actual or imminent."

18  *See Summers,* 555 U.S. at 496 (finding a desire to return without expression of any firm

19  intention to visit a location subject to the challenged regulation insufficient to satisfy the

20  imminent injury requirement of standing). Mr. Dahl also states that the grazing

21  restrictions affect private ranching and agriculture. (ECF No. 67-2 at 6.) Because Mr.

22  Dahl does not connect his assertion of injury to private parties with the proprietary

23  interests of Elko (other than a general allegation of economic harm) (*id.* at 7), the

24  claimed harm to Elko's citizens is asserted as *parens patriae*, which Elko cannot bring.

25  *See In re Multidistrict Vehicle Air Pollution M.D.L. No. 31*, 481 F.2d at 131.

26  _____

27        [10]BLM even acknowledges in the BLM Plan that the habitat objectives may not be obtainable on every acre of sage-grouse habitat, in which case they will perform a land health evaluation to discern a specific site's ecological ability to meet the habitat

28  objectives identified in the Amendments at Table 2-2. (NV_0090676 – NV_0090677.)

Second, Mr. Dahl fails to identify any post-decisional injuries caused by the Plan Amendments' prohibition on wind energy development; rather, he mentions the County's inability to proceed on the China Wind Energy Project, which occurred before the FEIS or Plan Amendments were issued. (ECF No. 67-2 at 10.)

Finally, Mr. Dahl raises injuries caused by the travel restrictions: (1) ranches, hunters, recreationists, and exploration geologists will be prohibited from road-access to county lands and cross-country travel; (2) the seasonal and daily travel restrictions as well as proposed road closures may impede or even eliminate access to adjacent private land sections and deprive landowners of access to their private property; and (3) road closures interfere with the County's obligation to maintain their roads and provide for public safety. (*Id.* at 9-10.) However, the first two injuries affect private citizens and it is unclear how they affect the proprietary interests of Elko; and such injuries are also too speculative and not actual or imminent. The third injury is too vague (as well as speculative) to show imminent harm for purposes of rebutting Defendants' Motion.

Thus, the Court finds that Elko County fails to offer sufficiently specific facts supported by admissible evidence to satisfy the initial threshold showing of injury in fact for purposes of Article III standing.

### 2.    Eureka County

Eureka County generally alleges that the Plan Amendments will interfere with its land use planning and sovereign police powers, including emergency services, and that the Plan Amendments' livestock grazing restrictions will increase fuel loads, burdening the County and destroying sage-grouse habitat. (*See* ECF No. 20 at 9.) They also allege that the ranching, farming and mining businesses that form the County's economic base will be affected, devastating the County's economic outputs. (*Id.* at 45.) In that vein, Eureka contends that the Plan Amendments' habitat map incorrectly identifies lands as sage-grouse habitat, specifically developed areas where land use restrictions are "nonsensical," and lands it had previously identified for disposal for development and infrastructure. (*See id.* at 46-47.) Eureka also asserts that specific provisions in the Plan

1  Amendments will interfere with its conservation projects because private landowners will

2  be less willing to work with them and that the decrease in tax revenues resulting from the

3  Plan Amendments will impede its conservation efforts as well. (*Id.* at 47-50.)

4        To support its allegations, Eureka County offered three declarations from Julian J.

5  Goicoechea, who is a rancher, veterinarian, firefighter, and County Commissioner for

6  Eureka.[11] (ECF Nos. 67-3, 82-1, 99-1.) Mr. Goicoechea states that the Plan

7  Amendments' seasonal restrictions substantially interfere with their use of a gravel pit for

8  six months of the year, November 1 – May 15, and that the pit is a longstanding source

9  of materials for necessary road repairs. (ECF No. 82-1 at 2.) BLM added seasonal

10  restrictions to Eureka's permit for the gravel pit in March 2016 (when Eureka sought to

11  renew it). (*Id.*) The pit covers 7.5 acres and is located next to a road as well as pinyon

12  and juniper trees. (*Id.*) Failure to access the pit and thus maintain county roads during

13  this six-month period interferes with safe travel for county residents and county

14  emergency services. (*Id.* at 3.) Specifically, the inability to access materials needed for

15  repairs during this time will leave damage to washouts, drainage crossing, culverts and

16  cattleguards, making the roads unsafe as the roads in the area are heavily traveled and

17  the County often needs gravel material during the prohibited months. The travel

18  restrictions also limit the County's ability to access weed-infested roads in the springtime

19  for their noxious and invasive weed treatment program, which treats over 1,000 acres of

20  land. (ECF No. 67-3 at 7.) Mr. Goicoechea further asserts that the Plan Amendments

21  incorrectly designated the town of Eureka, US Highway 50, State Route 278, County

22  landfill, power lines, multiple subdivisions of homes, farms with alfalfa field and irrigations

23  systems, and hay barns, as PHMA. (*Id.*) Because there are explicit land use restrictions

24  for PHMA, the effect of having a town and other landmarks designated as PHMA

25  obviously will affect county land use and planning. Moreover, Mr. Goicoechea also states

26  that improper habitat delineations in the Plan Amendments have compromised county

27

28  [11]The Court strikes the majority of Mr. Goicoechea's third declaration. *See* discussion *supra* at sect. III(A).

1  water plans that are in advanced stages for Diamond Valley, where two-thirds of the

2  County's residents reside. (*Id.* at 6.)

3      The Court finds the evidence offered through Mr. Goicoechea's declarations

4  sufficient to demonstrate that the Plan Amendments have injured the County's

5  proprietary interests in maintaining its roads and utility programs, as well as protecting

6  the local environment. Thus, Eureka County provides sufficiently specific evidence to

7  support the existence of an injury in fact for purposes of Article III standing.

8              *3.    Humboldt County*

9      In the FAC, Humboldt County generally alleges that the Plan Amendments'

10  reduction in the number of livestock allowed to graze by least 25 percent, seasonal road

11  closures during sage-grouse breeding and nesting seasons, and restrictions on pasture

12  rotations will negatively impact ranchers, the second most important industry for the

13  county. (ECF No. 20 at 11.) Germane to Humboldt's land use management, they claim

14  that the Plan Amendments interfere with their good grazing practices, agricultural

15  management, zoning ordinances, wildfire and wildlife management activities, road

16  construction and maintenance, landfill plans, pipelines, local and interstate travel, and

17  their ability to attract industrial development. (*Id.* at 11-12.) Humboldt also claims that the

18  land it had identified for disposal to expand its landfill was erroneously marked as PHMA

19  in the final habitat map and that the Plan Amendments reduce geothermal exploration

20  and development in the county. (ECF No. 82 at 3, 6, 12.) Humboldt provided a

21  declaration in support of its allegations from County Commissioner Jim French (ECF No.

22  67-5). The Court finds that Humboldt has demonstrated standing based on its assertion

23  as to the impact on its planned landfill expansion.[12]

24  _____

25  [12]Humboldt alleges harm related to the withdrawal of SFA from new mining claims
(ECF No. 67-5 at 4), but Plaintiffs cannot challenge the Notice of Withdrawal through the
26  Plan Amendments. (*See* discussion *supra* at sect. IV(A).) Humboldt also asserts harm
relating to the Plan Amendments' restrictions on travel and its potential impact on the
27  County's road maintenance schedule and the County's discharge of its responsibilities,
and grazing and the resulting potential fire hazards. (ECF No. 67-5 at 3-5.) The Court
28  finds that these alleged injuries are too speculative and not actual or imminent. For
*(…fn. cont.)*

In his declaration, Mr. French asserts that Humboldt's "current landfill footprint will require expansion to meet growth predictions within the next 10-15 years." (ECF No. 67-5 at 5.) The landfill is entirely surrounded by federal lands (*id.*), which have been marked as PHMA in the final habitat map (ECF No. 82 at 12; NV 163173-77). Under the Plan Amendments, Humboldt would have to go through the additional burden of showing that the disposal of the land needed for the landfill expansion would provide a net conservation gain to the sage-grouse or that disposal of the land would not have any direct or indirect adverse impact on conservation of the sage-grouse. (*See* NV 90707; FS 140161.) This is sufficient to support the existence of an injury in fact to satisfy Article III standing.

### 4.    Washoe County

Washoe County alleges that the generalities in the Plan Amendments' maps result in arbitrary exclusion of Washoe County lands from use. (ECF No. 20 at 54.) For instance, the County claims that Reno and Sparks have exerted planning jurisdiction over particular public lands for a new school and cemetery that are now off-limits to them because of the lands' designation as PHMA. As support, Washoe offers a declaration from Jeanne Herman, a member of the Washoe County Board of County Commissioners. (ECF No. 67-6 at 3.) Ms. Herman states that the County worked with the Carson City regional BLM office to identify lands that were suitable for disposable for needed public uses. Because of the final map published in the FEIS, many lands the County and regional BLM office had identified as disposable for future county use have been classified as PHMA. For example, the Washoe County School District had evaluated eighty acres of public lands for a future middle school site adjacent to a large

---

*(…fn. cont.)*

example, with respect to road maintenance, Mr. French provides no details about how Humboldt normally conducts maintenance and how the Plan Amendments' seasonal restrictions affect it. As another example, Mr. French generally alleges that the Plan Amendments interfere with grazing practices that manage fuel loads during high periods of fire risk (*id.* at 3-4), but he does not claim that grazing permits have been modified in the County or will be modified so as to cause an increased risk of wildfire.

1
2
residential community. The final map classified this land as PHMA or sage-grouse habitat.[13]

3
4
5
6
7
8
9
10
Under the BLM Plan, a 3 percent human disturbance cap immediately applies to lands classified as PHMA. (NV 90678 – NV 90679.) Thus, the BLM Plan essentially requires Washoe to go through the additional burden of showing that the disposal of the lands that the County seeks would provide a net conservation gain to the sage-grouse or that disposal of the lands would not have any direct or indirect adverse impact on conservation of the sage-grouse. (*See* NV 90707.) Accordingly, Washoe County provides sufficiently specific evidence to support the existence of an injury in fact for purposes of Article III standing.

11
### 5.    Remaining Counties

12
13
14
15
16
17
18
19
20
The remaining counties — Churchill, White Pine, Pershing, Lincoln, Lander — fail to support their alleged injuries with specific evidence beyond the general allegations stated in the FAC. Defendants' Motion challenge that these Plaintiffs' have standing. By failing to offer specific evidence, through affidavits or admissible evidence, Plaintiffs have failed to meet their burden in opposing summary judgment. *See Bhan*, 929 F.2d at 1409. Moreover, as the parties invoking federal jurisdiction, it is Plaintiffs' burden to establish the elements of standing. *Lujan*, 504 U.S. at 561. They have failed to do so in this case. The Court therefore grants summary judgment in favor of Defendants with regards to Churchill, White Pine, Pershing, Lincoln, and Lander Counties.

21
### c.    The Ranch

22
23
24
25
26
Ninety-Six Ranch, a family-owned and operated business, is located on 16,000 acres of private land in Humboldt County. (ECF No. 20 at 16.) The Ranch also has grazing permits for over 250,000 acres of BLM and USFS public lands in the surrounding area. (*Id.*) In the FAC, the Ranch generally alleges three injuries caused by the Plan

27
28
---
[13]When Washoe County asked BLM whether they could perform a site-specific habitat analysis to confirm that the eighty acres were actually suitable sage-grouse habitat, BLM refused. (ECF No. 67-6 at 3.)

1  Amendments. First, the Plan Amendments require a reduction in or cancellation of its

2  grazing permits, which threatens the survival of its operations and devalues its land and

3  resources. (*Id*.) Second, the Ranch contends that the Plan Amendments limit grazing

4  during spring and summer months, which make their grazing permits useless, and

5  threaten the safety of the Ranch by allowing fuels like cheatgrass to grow without check.

6  (*Id.*) Third, the Plan Amendments' limitations on use of trailing permits on or near sage-

7  grouse leks — the Ranch alleges they cannot trail cattle across public lands within four

8  miles of leks — affects access to one-third of the Ranch's private lands, including

9  pastures it has leased as well as vested water-sources on publicly managed lands. (*Id*.)

10  The Ranch relies on the declaration of Fred Stewart, the Ranch's Manager, to support

11  these alleged injuries. (ECF No. 67-7.)

12        Defendants counter that the Plan Amendments themselves do not modify the

13  Ranch's existing permits and do not dictate that grazing levels be reduced in the future.

14  (ECF No. 76 at 27.) Defendants also contend that the Ranch has failed to show that a

15  reduction in grazing is imminent. (ECF No. 95 at 16.)

16        The Court agrees with Defendants. The USFS Plan states that the grazing

17  guidelines do not take immediate effect and will be phased in over a period of 18 to 36

18  months as permits are modified and renewed. (FS 140119.). The BLM Plan provides that

19  "NEPA analysis of renewals and modifications of livestock grazing permits/leases that

20  include lands within SFA and PHMA will include specific management thresholds." (NV

21  90696.) The BLM Plan identifies potential modifications to permits to make them

22  consistent with sage-grouse habitat objectives. (NV 90696 – NV 90697.) Neither Plan

23  requires immediate changes in grazing levels, nor do they require that all grazing and

24  trailing permits be modified so as to categorically reduce grazing.[14] Additionally, the BLM

25

26        _____

27        [14]The Ranch points to Table 2-2 in the BLM Plan to suggest that certain
    seasonable restrictions have immediate effect on existing grazing permit holders. (ECF
    No. 82 at 13.) However, as Defendants responded during the February 1 hearing, the

28  restrictions identified in Table 2-2 are objectives that permit review planners have to
    (*…fn. cont.*)

1  Plan states that lek buffer distances will be applied at the project level after NEPA

2  analysis. (NV 91816.) The BLM Plan also states that a "key element" of their strategy to

3  reduce the threat of rangeland fire is to address the invasion and expansion of

4  cheatgrass, medusahead rye, and other invasive grasses. (NV 91820.)

5      In sum, the Plan Amendments' grazing restrictions and limitations on trailing

6  permits have no immediate effect but are subject to possible future implementation.

7  Accordingly, the Ranch fails to offer sufficiently specific facts supported by admissible

8  evidence to satisfy the initial threshold showing of injury in fact for purposes of Article III

9  standing.

10      **B.    Statutory Standing**

11      "[D]eprivation of a procedural right without some concrete interest that is affected

12  by the deprivation—a procedural right *in vacuo*—is insufficient to create Article III

13  standing." *Summers*, 555 U.S. at 498. Thus, to establish statutory standing, a plaintiff

14  alleging a procedural injury must first show that the agency procedures in question were

15  designed to protect a threatened concrete interest that is the "ultimate basis" of her

16  standing. *Cantrell v. City of Long Beach*, 241 F.3d 674, 679 (9th Cir. 2001) (citing *Lujan*,

17  504 U.S. at 573 n. 8). This requires a showing that (1) the agency violated certain

18  procedural rules, (2) those rules protect the plaintiff's concrete interests, and (3) it is

19  reasonably probable that the challenged action will threaten the plaintiff's concrete

20  interests. *Citizens for Better Forestry v. U.S. Dep't of Agric.*, 341 F.3d 961, 969-70 (9th

21  Cir. 2003). A plaintiff shows injury to a "concrete interest" when the plaintiff "will suffer

22  harm by virtue of [its] geographic proximity to and use of areas that will be affected" by

23  the challenged agency action. *Id.* at 971. Moreover, if a procedural injury is sufficiently

24  demonstrated, the plaintiff's burden to satisfy the last two prongs of the Article III inquiry,

25  causation and redressability, are relaxed. *Lujan*, 504 U.S. at 572 n.7; *see also Salmon*

26

27  *(...fn. cont.)*
   consider, but they do not immediately apply to existing permit holders. (ECF No. 125 at

28  9-10.)

1  *Spawning & Recovery Alliance v. Gutierrez*, 545 F.3d 1220, 1226-1227 (9th Cir. 2008)

2  (citing *Pit River Tribe v. U.S. Forest Serv.*, 469 F.3d 768, 779 (9th Cir. 2006)).

3       Where, as here, plaintiffs are challenging agency action under the APA, "plaintiffs

4  need only show that their interests fall within the 'general policy' of the underlying

5  statute, such that interpretations of the statute's provisions or scope could directly affect

6  them." *Graham v. Fed. Emergency Mgmt. Agency*, 149 F.3d 997, 1004 (9th Cir. 1998)

7  (quoting *Nat'l Credit Union Admin., v. First Nat'l Bank and Trust Co.*, 522 U.S. 479, 487-

8  488 (1998) (further citations omitted)), *abrogated on other grounds by Novak v. U.S.*,

9  795 F.3d 1012 (9th Cir. 2015). In other words, plaintiffs must "show that the injury

10  [plaintiffs have] suffered falls within the zone of interests that the statute was designed to

11  protect." *See Douglas County,* 48 F.3d at 1499. However, the Supreme Court has

12  clarified that in the APA context, the standing test "is not meant to be especially

13  demanding" and "the benefit of any doubt goes to the plaintiff." *Match-E-Be-Nash-She-*

14  *Wish Band of Pottawatomi Indians v. Patchak,* 132 S.Ct. 2199, 2210 (2012) (quoting

15  *Clarke v. Securities Industry Assn.,* 479 U.S. 388, 399 (1987)).

16       The Court will address each statute in turn to determine whether Plaintiffs Eureka,

17  Humboldt, and Washoe can satisfy statutory standing.[15]

18            **1.    FLPMA**

19       Under FLPMA, the BLM is required to develop and periodically revise or amend

20  its  resource  management  plans  ("RMPs"),  which  guide  management  on  BLM-

21  administered federal lands. 43 U.S.C. § 1712(c)(9). Alleged procedural violations of

22  FLPMA are reviewed under the APA. *See Ctr. For Biological Diversity v. U.S. Dep't of*

23  *Interior*, 581 F.3d 1063, 1070 (9th Cir. 2009). FLPMA's purpose is to manage public

24  lands for "multiple use, [ ] with an increased emphasis on the management of the public

25  lands 'in a manner that will protect the quality of scientific, scenic, historical, ecological,

26  ───────────────────

27       [15]The Court will not address statutory standing under the General Mining Law as
     this relates to claims arising from the Notice of Proposed Withdrawal, which Plaintiffs
     cannot challenge through the RODs adopting the Plan Amendments. (*See* discussion

28  *supra* at sect. IV(A).)

environmental, air and atmospheric, water resource, and archeological values.'" *W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 478 (9th Cir. 2010) (citing 43 U.S.C. § 1701(a)(8)). This provision of FLPMA also provides that the "public lands be managed in a manner that . . . will provide food and habitat for fish and wildlife and domestic animals; and that will provide for outdoor recreation and human occupancy and use." 43 U.S.C. § 1701(a)(8). Moreover, Section 202(c)(9) of FLMPA states that,

> In the development and revision of land use plans, the Secretary [of the Department of Interior] shall, to the extent consistent with the laws governing the administration of the public lands, coordinate the land use inventory, planning, and management activities of or for such lands with the land use planning and management programs of . . . local governments within which the lands are located . . . keep apprised of . . . local [ ] land use plans; assure that consideration is given to those . . . local [ ] plans that are germane in the development of land use plans for public lands; assist in resolving, to the extent practical, inconsistencies between Federal and non-Federal Government plans, and provide for meaningful public involvement of State and local government officials . . . in the development of land use programs, land use regulations, and land use decisions for public lands. . .

43 U.S.C. § 1712(c)(9). It is clear to the Court that this provision of the statute protects local governments from over encroachment by the federal government and aims to balance conservation with communities' sustained use of the environment.

Eureka, Humboldt, and Washoe Counties are clearly within the zone of interests encompassed under FLPMA. The explicit language of Section 209(c)(9) provides that the local knowledge and concerns of counties be adequately considered in the land use planning process, ostensibly to ensure that the federal government does not encroach on local needs. All three counties identify concrete injuries that they allege are caused by BLM's failure to meet the requirements of FLPMA. Therefore, the Court finds that these counties demonstrate that they have standing to bring suit for alleged violations of FLPMA.

### 2.    NFMA

NFMA, 16 U.S.C. § 1600 *et seq.*, requires the Secretary of Agriculture and the Forest Service to manage the national forest system consistent with the principles of the Multiple Use and Sustained Yield Act of 1960 ("MUSYA"), 16 U.S.C. § 583 *et seq.* Under

NFMA, the Forest Service is required to develop and periodically revise or amend its land and resource management plans ("LRMPs"), which guide management of forests managed by USFS. Congress enacted NFMA to "serve the national interest" by ensuring that "renewable resource program[s] [for the National Forests] [ ] be based on a comprehensive assessment of present and anticipated uses, demand for, and supply of renewable resources from the Nation's public and private forests and rangelands," and that the agency provide for multiple use and sustained yield opportunities. 16 U.S.C. § 1600(3). The statute requires that USFS "develop, maintain, and, as appropriate, revise land and resource management plans for units of the National Forest System, coordinated with the land and resource management planning processes of State and local governments . . ." 16 U.S.C. § 1604(a). In doing so, the agency must take a "systematic interdisciplinary approach to achieve integrated consideration of physical, biological, economic and scientific factors." 16 U.S.C. § 1604(b).

The Court finds that the language of NFMA is unequivocal about what zone of interests it purports to protect — Congress clearly intended that local governments' land use and economic concerns be given substantive consideration when creating national land use plans, including forest management plans, as local governments and their citizens are directly impacted by the effects of any such plans. However, NFMA grants the Forest Service statutory authority over only those public lands that are national forests. Thus, only those counties containing national forest lands have standing under the statute.

Of the three counties remaining, only Eureka and Humboldt possess National Forest System lands — specifically a portion of the Humboldt-Toiyabe National Park. Eureka asserts that the travel restrictions have caused them concrete and imminent injury. Humboldt asserts that the Plan Amendments' designation of the lands surrounding its landfill disrupts its future growth and development. Therefore, Eureka and Humboldt have satisfied both Article III and statutory standing to bring a challenge under NFMA.

### 3.    NEPA

NEPA is a procedural statute that requires federal agencies to "assess the environmental consequences of their actions before those actions are undertaken." *Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.*, 387 F.3d 989, 993 (9th Cir. 2004). All that NEPA requires is that an agency adequately identify and evaluate any adverse environmental effects of a proposed action. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989). NEPA's express purpose is to protect the environment, *Cantrell*, 241 F.3d at 679, and to ensure that federal agencies prevent or eliminate the environmental consequences of their proposed actions before deciding to proceed. *See Native Ecosystems Council v. Weldon*, 697 F.3d 1043, 1051 (9th Cir. 2012). While the Ninth Circuit has held that a governmental entity in geographical proximity to the site of proposed action, and which must under NEPA be consulted in the EIS process, has standing to challenge the EIS, *Am. Motorcyclist Ass'n v. Watt*, 714 F.2d 962, 965 (9th Cir. 1983), it may do so only if it demonstrates that the environmental health of its land interests is threatened by the agency's action. *See Churchill County*, 150 F.3d at 1081.

"Once a plaintiff has established an injury in fact under NEPA, the causation and redressability requirements are relaxed." *Cantrell*, 241 F.3d at 682. Causation concerns only whether a plaintiff's injury is dependent upon the agency's rule or policy and not the result of independent incentives of a third-party. *Idaho Conservation League v. Mumma*, 956 F.2d 1508, 1518 (9th Cir. 1992).

The Court finds that only Eureka County and Humboldt County have standing under NEPA to challenge the Plan Amendments. Both Counties contend that the change in habitat designation to PHMA that resulted from the FEIS has spillover effects on county-owned land adjacent to federal land and thereby harms the counties' proprietary interests. *See Sierra Forest Legacy v. Sherman,* 646 F.3d 1161, 1178 (9th Cir. 2011) (finding that the State of California had demonstrated a "concrete and particularized interest" protected under NEPA by showing a desire to protect their proprietary interests

1   from direct harm and spillover effects resulting from actions on federal lands.) For

2   example, Humboldt asserts that such designation affects its ability to meet the predicted

3   demands on its landfill, which is surrounded by federal lands that became designated as

4   PHMA in the FEIS. Given the less "demanding" test in the APA context, requiring "that

5   the benefit of the doubt goes to the plaintiff," *see Match-E-Be-Nash-She-Wish Band of*

6   *Pottawatomi Indians,* 132 S.Ct. at 2210, the Court finds that the Counties' assertions are

7   sufficient to demonstrate statutory standing.

8        In addition, Eureka County has shown that the environmental health of its land

9   interests is threatened by the Agencies' adoption of the Plan Amendments. Eureka

10  County contends that the Plan Amendments' travel restrictions interfere with its noxious

11  and invasive plant species removal, which Eureka performs during the springtime.

12  Eureka also contends that improper habitat delineations in the Plan Amendment maps

13  compromise county water plans in Diamond Valley, where two-thirds of county residents

14  reside, and the town of Eureka and other landmarks. Eureka County clearly identifies

15  how the Plan Amendments threaten environmental considerations in its land use

16  planning, sufficiently demonstrating statutory standing.

17       Washoe County's claimed injury — interference with land disposal for purposes of

18  public planning — does not identify or implicate any environmental concerns stemming

19  from its failure to acquire public lands. And unlike Humboldt County, Washoe County

20  cannot claim harm to its proprietary interest from any spillover effect on county-owned

21  lands caused by actions on adjacent federal lands.

22            **4.    SBREFA**

23       The Small Business Regulatory Enforcement and Fairness Act, Pub. L. No. 104-

24  121, amended the Regulatory Flexibility Act ("RFA"), Pub. L. No. 96-354, and extended

25  the requirements under RFA to small entities. In the FAC, Plaintiffs contend that

26  Defendants were required to create and allow public comment on a Regulatory Flexibility

27  Analysis for the Plan Amendments. (ECF No. 20 at 40.) In Plaintiffs' Motion, Plaintiffs

28  make no arguments that the Agencies were required to perform and allow for public

1    comment on an economic analysis under the RFA.[16] Accordingly, the Court finds that

2    Plaintiffs have waived assertion of claims under SBREFA.

3          **C.    Ripeness**

4          Defendants argue that the Plan Amendments act as a planning tool to guide

5    future decision making and that final, reviewable agency action does not occur until site

6    specific decisions are made. (ECF No. 125 at 8.) Because the Court finds that three

7    Plaintiffs have met the requirements for standing under Article III and the relevant

8    statutes, the Court will consider whether the relevant claims for relief are ripe.

9          "While standing is primarily concerned with who is a proper party to litigate a

10   particular matter, ripeness addresses when litigation may occur." *Lee v. Oregon*, 107

11   F.3d 1382, 1387 (9th Cir. 1997). "When, as here, review is sought not pursuant to

12   specific authorization in the substantive statute, but only under the general review

13   provisions of the APA, the 'agency action' in question must be 'final agency action.'"

14   *Lujan*, 497 U.S. at 882 (citing 5 U.S.C. § 704); *see Or. Natural Desert Ass'n v. U.S.

15   Forest Serv.*, 465 F.3d 977, 982 (9th Cir. 2006). Final agency action is a jurisdictional

16   prerequisite to judicial review. *Fairbanks N. Star Borough v. U.S. Army Corps of Eng'rs*,

17   543 F.3d 586, 591 (9th Cir. 2008).

18         The Supreme Court has articulated two conditions that must be satisfied before

19   an agency action may be considered "final." *See Bennett v. Spear*, 520 U.S. 154, 157-58

20   (1997). Even if final, the action is reviewable under the APA only if there are no

21   adequate alternatives to APA review in court. 5 U.S.C. § 704. First, to be considered a

22   "final" agency action, the "challenged agency action must represent the consummation of

23   the agency's decisionmaking process." *Id.* at 178. The agency has to have "rendered its

24   last word on the matter" to determine whether the action is final and thus ripe for judicial

25   review. *Whitman v. Am. Trucking Ass'n*, 531 U.S. 457, 478 (2001). Second, the agency

26   action must be "one by which 'rights or obligations have been determined,' or from which

27   _____

28         [16]Instead, Plaintiffs argue that NEPA requires an economic analysis on the
     changes made between the DEIS and FEIS. (*See* ECF No. 67 at 25-27.)

'legal consequences will flow.'" *Bennett*, 520 U.S. at 158 (quoting *Port of Boston Marine Terminal Ass'n v. Rederiaktiebolaget Transatlantic*, 400 U.S. 62, 71 (1970)). The Ninth Circuit has explained that an action is final when it has a direct and immediate effect on the day-to-day business of the subjected party. *Or. Natural Desert Ass'n*, 465 F.3d at 987 (citing *Ukiah Valley Med. Ctr.*, 911 F.2d at 264) (further citations omitted). The ultimate question is whether the action has the "status of law or comparable legal force[] and whether immediate compliance with its terms is expected." *Ukiah*, 911 F.2d at 264.

Eureka County challenges decisions in the Plan Amendments that the Agencies have deemed "immediate," that require no additional analysis, and that are mandatory constraints on project and activity decision making, such as the seasonal travel limitations and the designation of lands as sage-grouse habitat. (NV_0090715; FS_0140123). With respect to road maintenance, Defendants contend that Eureka County must wait until a hazardous road condition occurs and they are unable to access gravel to repair their roads, to challenge the seasonal travel restrictions. (ECF No. 95 at 14.) However, the Supreme Court has found that a party is put in an unacceptable position when it must wait for the actual harm to occur, only to be left with the choice of violating the law or going through the tedious and expensive administrative process in order to be officially denied and then seek judicial review. *See U.S. Army Corps of Eng'rs v. Hawkes Co. Inc.*, 136 S.Ct. 1807, 1817 (2016). Thus, the decisions Eureka has identified as immediate or mandatory amount to final agency action ripe for judicial review.

Humboldt and Washoe counties' claimed injuries are caused by the BLM Plan's 3 percent human disturbance cap, which immediately applies to lands classified as PHMA. (NV 90678 – NV 90679.) They have identified a final agency action ripe for judicial review as well.

### D.    Merits of Plaintiffs' Claims

The Court next address the four remaining claims asserted under the APA: (1) violation of the APA and FLPMA by ignoring consistency requirements (Count I); (2)

violation of the APA, FLPMA, and NFMA for the failure to manage federal lands for multiple-use and sustained yield (Count II); (3) violation of the APA, NEPA, and FLPMA[17] for substantial changes between the DEIS and the FEIS with no opportunity for public notice or comment (Count IV); and (4) violation of the APA and NEPA for failure to take a hard look at the impact of the proposed plan and analyze viable alternatives (Count V). (ECF No. 20 at 69-84.)

### 1.    Legal Standard

The APA limits the scope of judicial review of agency actions. A court may reverse an agency decision only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). An agency's decision may be reversed as arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). "To make this finding, the court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416 (1971).

In reviewing an agency's decision under this standard, "the reviewing court may not substitute its judgment for that of the agency." *Envtl. Def. Ctr., Inc. v. U.S. Envtl. Prot. Agency*, 344 F.3d 832, 858 n.36 (9th Cir. 2003). Rather, the function of the district court is only to determine whether as a matter of law the evidence in the administrative record permitted the agency to make the decision it did. *Occidental Eng'g Co. v. I.N.S.*, 753 F.2d 766, 769-70 (9th Cir. 1985). Although this review is narrow, "a reviewing court must

---

[17]This claim erroneously incorporates FLPMA; only NEPA requires a supplemental EIS when there are substantial changes between the DEIS and FEIS. *See* 40 C.F.R. § 1502.9(c). Therefore, the Court addresses this claim only as a NEPA violation brought under the APA.

conduct a searching and careful inquiry into the facts." *Nw. Motorcycle Ass'n*, 18 F.3d at 1471. "A satisfactory explanation of agency action is essential for adequate judicial review, because the focus of judicial review is not on the wisdom of the agency's decision, but on whether the process employed by the agency to reach its decision took into consideration all the relevant factors." *Asarco, Inc. v. U.S. Envtl. Prot. Agency*, 616 F.2d 1153, 1159 (1980).

### a.    FLPMA

Plaintiffs allege that BLM failed to comply with FLPMA by (1) ignoring consistency requirements and (2) failing to manage federal lands for multiple-use and sustained yield.[18] The Court addresses the merits of each in turn.

### i.    Consistency Requirements

Plaintiffs[19] allege that BLM violated Section 202(c)(9) because it "made no attempt" to reconcile inconsistencies between the BLM Plan and local land use plans. (ECF No. 67 at 36.) More specifically, they contend that BLM ignored the counties' comments, failed to identify specific inconsistences in the county plans with federal law, and failed to fulfill its responsibility to minimize inconsistencies between the BLM Plan and the counties' land use plans to the maximum extent possible. (*Id.* at 42.) The Court disagrees and finds that BLM fulfilled its obligations under FLPMA's consistency requirements.

Under FLPMA, the Secretary of the Interior, acting through BLM, is required to coordinate with local governments, keep apprised of and consider local plans "germane in the development of land use plans for public lands, [and] assist in resolving, *to the extent practical*, inconsistencies between Federal and non-Federal Government plans. *See* 43 U.S.C. §1712(c)(9) (emphasis added). The agency's plans must be consistent with local plans to the maximum extent the agency finds consistent with federal law and

---

[18]FLPMA does not apply to the Forest Service.

[19]Because the State of Nevada does not have standing to challenge the Plan Amendments, the Court will address this claim only as it applies to the remaining county plaintiffs.

1 | the purposes of the statute. *See id.* By regulation, if a local government notifies BLM in
2 | writing of specific inconsistencies between the draft plan and the local government's
3 | approved or adopted plans, the agency's final plan must show how the inconsistencies
4 | were addressed and, if possible, resolved. 43 C.F.R. § 1610.3-3(a)(3). Any person who
5 | participated in the planning process and who has an interest that is adversely affected
6 | by the plan may protest within thirty days of publication of the Notice of Availability. 43
7 | C.F.R. §1610.6-2(a)(2).

8 | While Plaintiffs note that Eureka County formally participated as a cooperating
9 | agency in the BLM's amendment process, they contend that BLM chose to delay review
10 | of all the Counties' comments to the DEIS regarding inconsistencies until after signing of
11 | the ROD (through the Protest Resolution Report), which they deem unlawful under the
12 | consistency requirements of FLPMA. (ECF No. 67 at 40.) In support of this argument,
13 | they point to an email exchange between Lauren Mermejo and Holly Prohaska, in which
14 | Holly states that she thinks a decision was made to only address comment by comment
15 | as to the State of Nevada and the Nevada Sagebrush Ecosystem Technical Team's
16 | comments. (NV 51396.) Plaintiffs' argument falls short.

17 | FLPMA and its accompanying regulations require only that BLM identify the
18 | inconsistencies brought to its attention by local government officials and state in the
19 | FEIS how BLM addressed them. The statute and regulations are silent on how detailed
20 | or specific BLM needs to be in doing so. Because the Court's review is narrow and
21 | based only on consideration of whether BLM's failure to provide detailed responses to all
22 | identified consistencies with local plans in the FEIS was arbitrary and capricious, the
23 | Court finds that BLM complied with FLPMA's requirements. In the FEIS, BLM
24 | acknowledges that several counties presented similar comments concerning how the
25 | BLM Plan would "restrict resource uses such as minerals and infrastructure development
26 | and would introduce the potential for road or grazing closures," all of which were
27 | inconsistent with the counties' land use plans. (NV 81058.) BLM chose not to resolve
28 |

1   identified inconsistencies between the Plan Amendments and the county plans because

2   doing so "may not be consistent with BLM's National [GSG] Strategy." (*Id.*)

3         Plaintiffs also contend that BLM violated its own protest procedures, *see* 43

4   C.F.R. § 1610.6-2, by predetermining its responses to county protest letters. (ECF No.

5   67 at 43.) They rely on a July 19th draft briefing paper sent to the DC Office of BLM

6   summarizing the administrative process for the four Great Basin Plan Amendments to

7   show that just twenty days after the protests were due, the agency had already

8   concluded it would deny all 133 protests and therefore had no actual intention of

9   resolving the protests. (ECF No. 67 at 43.) However, the Court does not find that this

10  document demonstrates that the BLM Regional offices categorically and without

11  meaningful review denied all 133 protests. (*See* GBR 10916 – GBR 10934.) To begin,

12  the document does not state how many of the 133 protests were sent regarding the

13  Nevada portion of the Plans. Second, the document does not identify how many

14  individuals at BLM were reviewing and resolving the protests; rather, another document

15  in the administrative record shows that fourteen BLM and four Forest Service staffers

16  processed the letters, with a goal of having the protest resolution report drafted within a

17  little over two weeks. (FS 88842.) Finally, the document clearly states that the protests

18  were either denied or resolved. (GBR 10918.) None of this demonstrates that BLM's

19  actual intent was to abstain from resolving any of the protests. Moreover, Plaintiffs'

20  assertion is controverted by the fact that some protests were resolved and that a protest

21  resolution report for the Nevada and Northeastern California FEIS was ultimately issued

22  in September 2015. (NV 88789 – NV 89004.)

23        In addition, Plaintiffs contend that they received form responses to their protest

24  letters, thereby violating FLPMA's consistency requirement. For example, Eureka County

25  provided 125 pages of substantive comments to the DEIS, focusing on the

26  inconsistencies between the proposed land use restrictions and their own policies, and

27  why Eureka's plan would provide better sage-grouse conservation and habitat

28  enhancement while maintaining multiple use. (ECF No. 67 at 42.) Yet. they received the

1  same form letter from BLM that all the other protesters also received. (*Id.*) BLM responds

2  that the Agencies began preparing responses only on those issues that had previously

3  been raised by the counties in their comments on the administrative draft proposed plan,

4  and that early response preparation is typical practice for them. (ECF No. 75 at 39.) This

5  is supported by the Protest Resolution Report. There is nothing in FLPMA's statutory

6  language or accompanying regulations that makes this process patently unlawful.

7                  *ii.*     *Multiple Use Mandate*

8         Plaintiffs allege that BLM ignored FLPMA's requirement to manage public lands

9  for multiple-use and sustained yield. (ECF No. 67 at 27, 44.) The Court disagrees.

10         FLPMA requires that particular considerations be given when developing and

11  revising land use plans. 43 U.S.C. § 1712(c). These include: (1) consideration of

12  principles of multiple use and sustained yield; (2) use of a systematic interdisciplinary

13  approach that integrates considerations of physical, biological, economic, and other

14  sciences; (3) prioritization of designation and protection of areas of critical environmental

15  concern; (4) reliance on inventory of the public lands, their resources, and other values;

16  (5) consideration of present and potential uses of public lands; (6) consideration of the

17  relative scarcity of the values involved and availability of alternative means and sites for

18  realization of those values; (7) balance of long-term benefits to the public against short-

19  term benefits; (8) compliance with pollution control laws; and (9) consideration of local

20  land use plans. 43 U.S.C. § 1712(c)(1) – (9).

21         Plaintiffs contend that BLM Plan's closure of millions of acres of land for multiple

22  use — specifically the proposed withdrawal of 2.8 million acres of land from mineral

23  entry,[20] onerous travel restrictions on 16 million acres, and restrictions on grazing — fails

24

25        [20]Plaintiffs spend a great deal of time in their Motion arguing that BLM's Plan fails
to manage public lands so as to recognize the Nation's need for minerals, *see* 43 §

26  U.S.C. 1701(a)(12), and that BLM should have performed a mineral potential report
before proposing withdrawal of those lands from mineral entry. (ECF No. 67 at 28-35.)

27  While the lands that were withdrawn were done so on the recommendation of the BLM
under the Plan Amendments, Plaintiffs are not challenging the recommendation to

28  withdraw lands; rather, they are challenging the Notice of Proposed Withdrawal and
*(…fn. cont.)*

to meet FLPMA's requirement that BLM balance diverse resource uses based on the relative values of those resources. (ECF No. 67 at 44.) Plaintiffs insist that BLM provided inadequate analysis of the relative value of Nevada resources, based the restrictions to multiple use on faulty science, and did not meaningfully consider viable alternatives that balanced resources and met local economic goals. (*Id.*) Defendants point to a chapter in the FEIS that identifies and discusses socioeconomic effects of the Plan Amendments. (ECF No. 75 at 52.)[21]

A review of the administrative record shows that BLM considered the relative value of Nevada's resources. The FEIS identifies the important industries in the planning area, contains specific information about employment in those industries (Appendix U) (NV 52876 – NV 52890), and identifies economic losses those industries will face as a result of each proposal (Appendix V) (NV 52891 – NV 52908.). (NV 80777 – NV 81026.) Defendants' consideration of the socioeconomic impacts for certain land closures and land use restrictions may not have been as thorough or as focused on Nevada's mining industry as Plaintiffs desired (see ECF No. 75 at 53). However, the Court finds that the evidence in the administrative record permitted BLM to make the decision it did. *See Occidental Eng'g Co.,* 753 F.2d at 769-70. BLM demonstrates that it considered the relevant factors under FLPMA in creating its Plan.

Plaintiffs also argue that the net conservation gain mitigation standard is inconsistent with FLPMA's multiple use mandate, which allows for some degradation of the land. (*Id.* at 46.) Section 1732(b) requires that the Secretary, acting through BLM, take "any action necessary to prevent unnecessary or undue degradation of the lands." 43 U.S.C. § 1732(b). Plaintiffs contend that this standard of "unnecessary or undue

_____

(...fn. cont.)
Temporary Segregation of these lands, which occurred subsequent to the filing of this action. There is no reason that Plaintiffs cannot challenge the segregation, the basis for it (i.e., the classification of certain public lands as SFA), or the Secretary's failure to require a mineral potential report before accepting BLM's recommendation to withdraw the lands.

[21]Appendix V to the FEIS also contains information concerning the economic impacts of the alternative plans on various industry sectors.

1  degradation" maintains multiple use and is not a zero-impacts standard. (*Id.*) They argue

2  that the net conservation gain goes beyond a zero-impacts standard to require that

3  multiple uses of public lands actually improve sage-grouse habitat. (*Id.* at 47.)

4  Defendants contend that the "unnecessary or undue degradation" standard in the

5  statute does not preclude the agency from establishing a more protective standard that

6  seeks improvements in land conditions that "go beyond the status quo." (ECF No. 75 at

7  44-45.) The FEIS states that if actions by third parties result in habitat loss and

8  degradation, even after applying avoidance and minimization measures, then

9  compensatory mitigation projects will be used to provide a net conservation gain to the

10 sage-grouse." (NV 79683.) The Agencies' goals to enhance, conserve, and restore

11 sage-grouse habitat and to increase the abundance and distribution of the species, they

12 argue, is best met by the net conservation gain strategy because it permits disturbances

13 so long as habitat loss is both mitigated and counteracted through restorative projects.

14 (*See* ECF No. 75 at 67-68.) If anything, this strategy demonstrates that the Agencies

15 allow some degradation to public land to occur for multiple use purposes, but that

16 degradation caused to sage-grouse habitat on that land be counteracted. The Court fails

17 to see how BLM's decision to implement this standard is arbitrary and capricious.

18 Moreover, the Court cannot find that BLM did not consider all relevant factors in

19 choosing this strategy, as it appears to possess elements proposed in the DEIS. (*See*

20 NV 44876 –80.)

21 In sum, Plaintiffs fail to establish that BLM's challenged decisions under FLPMA

22 are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

23            **b.    NFMA**

24 Plaintiffs allege that the Forest Service ignored NFMA's multiple-use mandate.

25 Only Humboldt and Eureka Counties contain public lands managed by the Forest

26 Service and may therefore bring this challenge.

27 NFMA requires that in developing, maintaining, and revising plans for units of the

28 National Forest System, the Forest Service provide for multiple use and sustained yield

1  and include coordination of outdoor recreation, range, timber, watershed, wildlife and
2  fish, and wilderness. 16 U.S.C. § 1604(e)(1). Multiple use requires that renewable
3  resources be utilized to best meet the future needs of the American people while
4  considering impacts to the environment. *See* 16 U.S.C. § 1600(3).

5  Plaintiffs contend that the SFA withdrawal zones,[22] travel restrictions on 16 million
6  acres of land, and grazing restrictions violate the multiple-use mandate of NFMA. (ECF
7  No. 67 at 45.) They also challenge that the FEIS violates multiple-use principles because
8  it closes millions of acres of land to important uses, replaces "no unmitigated loss" with a
9  requirement for "net conservation gain," and creates uniform lek buffers that are "no-go
10  zones." (*Id.*) Defendants respond that the various restrictions in the Plan Amendments
11  aim to conserve and enhance sage-grouse habitat, which is within their discretion. (ECF
12  No. 75 at 43.)

13  The Court's review of whether the Forest Service Plan violates NFMA's multiple
14  use mandate is necessarily narrow, and it may consider only whether the Forest Service
15  contemplated all relevant factors in making its determination. First, it is unclear to the
16  Court how travel and grazing restrictions manifest the Forest Service's failure to consider
17  multiple use. To the contrary, the restrictions demonstrate a balance between
18  conservation of greater-sage grouse habitat and sustainable human use of natural
19  resources. Second, the Court fails to see how multiple use mandates that any particular
20  parcel of land be available for any particular use. (*See* ECF No. 95 at 29). While
21  Plaintiffs point out certain land closures in the USFS Plan, such as complete exclusion of
22  new solar and wind energy projects (on SFA, PHMA, and GHMA), the Plan does not
23  exclude all possible human uses on those lands. Finally, Plaintiffs fail to demonstrate
24  how the "net conservation gain" and lek buffer zones preclude multiple use or
25  demonstrate a failure on the part of the Forest Service to consider all relevant factors. In

26

27  [22]Plaintiffs largely focus on how mineral withdrawal violates multiple use. As noted
28  previously, because the Plan Amendments did not mandate mineral withdrawal, Plaintiffs must challenge the segregation directly.

1   fact, the move from "no unmitigated loss" in the DEIS to "net conservation gain" in the

2   FEIS demonstrates that the Forest Service reconsidered whether their initial standard

3   consistently balanced sustainable human use with adequate habitat conservation.

4       The Court thus finds that Plaintiffs fail to show that the challenged decisions of the

5   Forest Service are arbitrary, capricious, an abuse of discretion, or otherwise not in

6   accordance with law.

7                       **c.     NEPA**

8       NEPA provides for public participation in assessing a proposed action's

9   environmental consequences, enabling the public to "play a role in both the

10  decisionmaking process and the implementation of that decision." *Robertson*, 490 U.S.

11  at 349. Although NEPA lacks a substantive mandate, its "action-forcing" procedural

12  requirements help carry out a "national commitment to protecting and promoting

13  environmental quality." *Id.* at 348. As part of these action-forcing requirements, NEPA

14  mandates that agencies considering "major Federal actions significantly affecting the

15  quality of the human environment" must, to the fullest extent possible, prepare an

16  environmental impact statement ("EIS"). 42 U.S.C. § 4332(C); 40 C.F.R. § 1508.11.

17      The EIS "shall provide full and fair discussion of significant environmental impacts

18  and shall inform decisionmakers and the public of the reasonable alternatives which

19  would avoid or minimize adverse impacts or enhance the quality of the human

20  environment." 40 C.F.R. § 1502.1. "[T]he EIS process should serve both to alert the

21  public of what the agency intends to do and to give the public enough information to be

22  able to participate intelligently in the EIS process." *State of California v. Block,* 690 F.2d

23  753, 772 (9th Cir. 1982).

24      After an agency has prepared a draft or final EIS, the agency must issue a

25  supplemental environmental impact statement ("SEIS") if "[t]here are significant new

26  circumstances or information relevant to environmental concerns and bearing on the

27  proposed action or its impacts." 40 C.F.R. § 1502.9(c)(1)(ii). In determining whether the

28  agency should prepare an SEIS, the Ninth Circuit has asked courts to make "pragmatic

1   judgment: (1) whether the alternative finally selected []was within the range of

2   alternatives the public could have reasonably anticipated the [agency] to be considering,

3   and (2) whether the public's comments on the draft EIS alternatives also apply to the

4   chosen alternative and inform the [agency] meaningfully of the public's attitudes toward

5   the chosen alternative." *Block,* 690 F.2d at 772. The touchstone is whether the change

6   "will have a significant impact on the environment in a manner not previously evaluated

7   or considered." *Westlands Water Dist. v. U.S. Dep't of Interior*, 376 F.3d 853, 873 (9th

8   Cir. 2004) (citation omitted); *see also N. Idaho Cmty. Action Network v. U.S. Dep't of*

9   *Transp.*, 545 F.3d 1147, 1157 (9th Cir. 2008).

10      Plaintiffs argue that changes made between the DEIS and the FEIS compel the

11   Agencies to prepare an SEIS because the changes were substantial and Plaintiffs were

12   denied the opportunity to comment on these changes as they are entitled to do under

13   NEPA. (*See* ECF No. 67 at 45.) The substantial changes that Plaintiffs identify cover

14   changes to the lek buffer requirements, the designation of 2.8 million acres of Focal

15   Areas in Nevada, the application of a "net conservation gain" mitigation strategy, and the

16   use of hard-trigger adaptive management strategies. (*Id.* at 15.) The Court agrees with

17   Plaintiffs' that the designation of 2.8 million acres as Focal Areas in Nevada amounts to

18   a substantial change relevant to environmental concerns, requiring the Agencies to

19   prepare an SEIS.

20      The FEIS designated 2.8 million acres as SFA, which caused an additional

21   722,800 acres to be designated as PHMA, turned 436,000 acres of GHMA into PHMA,

22   turned 211,100 acres of OHMA into PHMA, and turned 75,100 acres of non-habitat into

23   PHMA. (NV 5523.) Defendants admit that approximately 21,611 acres were identified in

24   the DEIS as non-habitat and then became SFA in the FEIS. (ECF No. 75 at 59.) The

25   Agencies based their changes and additions of what lands were designated as sage-

26   grouse habitat on data presented to them by FWS. (*Id.*) Defendants contend that the use

27   of new information to adjust the number of acres subject to different management

28   regimes does not require an SEIS. (*See id.* at 63.) The Court disagrees.

1   The decision to designate certain lands as particular kinds of sage-grouse habitat

2   affects subsequent management decisions on those lands. The Agencies used the new

3   information from FWS to include low priority habitat and non-habitat as SFA and failed to

4   explain why it designated already developed areas as priority habitat in the final FEIS.

5   The public should have had an opportunity to review FWS's determinations and

6   comment on the decision to change or add new designations. In fact, the public could

7   not have "reasonably anticipated" the Agencies to be considering developed areas as

8   priority habitat or transforming low priority habitat and non-habitat into SFA. Particular

9   lands, no matter how few, that prior to publication of the FEIS were not subject to any

10  type of management decisions became subject to the most extreme of management

11  decisions in the final Plan Amendments. For example, the change in designation from

12  the DEIS to the FEIS resulted in the apparently erroneous and undisputed designation of

13  the town of Eureka as PHMA. Moreover, Eureka County asserts, and Defendants do not

14  dispute, that Eureka County's landfill, power lines, subdivisions of homes, farms with

15  alfalfa fields and irrigation systems, hay barns, and important portions of the Diamond

16  Valley area, are now classified as PHMA.[23] The DEIS would not have alerted the County

17  or the public that the Agencies would designate these developed areas as PHMA and, in

18  turn, did not allow for intelligent public participation in the EIS process. *See Block,* 690

19  F.2d at 772.

20  While the addition of SFA did not change the management decisions already

21  contemplated in the DEIS, the change affect where those decisions would apply such

22  that the public did not have enough information to be able to meaningfully participate in

23  the EIS process. The Court finds that the change in designation amounts to "significant

24  new circumstances or information relevant to environmental concerns and bearing" on

---

25  [23]The decision to designate these areas as sage-grouse habitat is so implausible

26  that it cannot be ascribed to a difference in opinion. *See Motor Vehicle Mfrs. Ass'n of U.S., Inc.,* 463 U.S. at 43. Moreover, given the travel restrictions on PHMA, these

27  designations of Eureka County land as PHMA has placed restrictions on effectuating environmental programs, including invasive weed reduction and water management. (ECF No. 67-3 at 7.)

28

1  the impact of the Plan Amendments, requiring the Agencies to prepare an SEIS. *See* 40

2  C.F.R. § 1502.9(c)(1)(ii).

3  **IV.    RELIEF REQUESTED**

4          The relief that Plaintiffs request in connection with the claims that the Court finds

5  in their favor on the merits — NEPA claim — is that the Court vacate the RODs and

6  remand them to the Agencies to prepare an SEIS.[24] (ECF No. 67 at 48.) Intervenors

7  argue that neither injunctive relief nor vacatur is appropriate given the scope of the

8  alleged violation and the potential impacts to the sage-grouse. The Court agrees with

9  Intervenors.

10         Courts have "discretion to shape equitable remedy." *W. Oil and Gas Ass'n v.*

11  *EPA,* 633 F.2d 803, 813 (1980). Even where the court has found that the agency failed

12  to comply with the APA, "when equity demands, the regulation can be left in place while

13  the agency follows the necessary procedures." *Idaho Farm Bureau Fed. v. Babbitt,* 58

14  F.3d 1392, 1405 (9th Cir. 1995).

15         As the Ninth Circuit has recognized, the remedy for procedural violation under the

16  APA can be "the most difficult issue of all." *See W. Oil,* 633 F.2d at 813. In *Western Oil,*

17  the EPA had failed to notify the public in advance of its intention to adopt certain states',

18  including California's, proposed attainment designations, which when approved by the

19  EPA would become enforceable regulations under the Clean Air Act. The EPA also did

20  not allow for public comment as required under the APA. Instead, the EPA published the

21  attainment designations and then "declared them 'immediately effective' and solicited

22  comments with a promise to publish revised designations as appropriate." *Id.* at 805. The

23  Ninth Circuit found the EPA violated the APA, but recognized that "[w]hether to leave the

24  challenged designations in effect during the reenactment of the deliberative process is a

25  difficult question." *Id.* at 813. In declining to vacate the challenged designations, the

26

27         [24] Plaintiffs also request that the Agencies prepare a Mineral Potential Report to
be used in the NEPA process, but this part of their request relates to the Notice of
28  Withdrawal.

1   court expressed concerns about disrupting the implementation of the Clean Air Act in

2   California and was "influenced by the possibility of undesirable consequences which [the

3   court] cannot now predict that might result from invalidation of the designations." *Id.*

4          Here, the Court is similarly "influenced by the possibility of undesirable

5   consequences." The parties do not dispute that protecting the greater sage-grouse

6   species and their habitat is an important goal. The State and several of the counties

7   argue that existing state and local land use plans provide for the greater sage-grouse's

8   protection, thus recognizing that a certain level of protection is warranted. Moreover,

9   FWS found in part that "listing the greater sage-grouse (rangewide) is warranted, but

10  precluded by higher priority listing actions," and that existing regulatory mechanisms

11  available to federal agencies were essentially inadequate to provide for the species'

12  protection. (75 Fed. Reg. 13910, 13982 (Mar. 23, 2010).) In balancing such potential

13  harm to the greater sage-grouse species with the Agencies' violation of NEPA—which

14  the Agencies may cure with an SEIS—the Court finds that protection of the greater-sage

15  grouse weights against vacatur of the RODs. Enjoining implementation of the Plan

16  Amendments pending the Agencies' preparation of an SEIS presents "the possibility of

17  undesirable consequences" to the greater sage-grouse species and their habitat.

18  Accordingly, Plaintiffs' injunctive relief request is denied.

19  **V.    CONCLUSION**

20         The Court notes that the parties made several arguments and cited to several

21  cases not discussed above. The Court has reviewed these arguments and cases and

22  determines that they do not warrant discussion as they do not affect the outcome of the

23  parties' Motions.

24         It is therefore ordered that Plaintiffs' and Defendants' competing motions for

25  summary judgment (ECF Nos. 67, 75) are denied in part and granted in part. The Court

26  grants summary judgment in favor of Defendants on all claims except for Count IV with

27  respect to Plaintiffs Eureka County and Humboldt County. With respect to this count, the

28  Court grants summary judgment in favor of Eureka County and Humboldt County on

their claim that the Agencies failed to comply with NEPA. The Court remands the Records of Decision to the Agencies to prepare a supplemental environmental impact statement consistent with this Order.

It is further ordered that Intervenors' Motion for Summary Judgment (ECF No. 77) is denied in part and granted in part. It is granted with respect to Intervenors' request that the Court not vacate the RODs or enjoin implementation of the RODs.

It is further ordered that Plaintiffs' Motion to Supplement Record (ECF No. 68) is denied as moot.

It is further ordered that Defendants' Motion to Strike (ECF No. 102) is granted in part and denied in part. It is denied with respect to paragraphs 1 through 3 in Exhibit 1. It is granted with respect to the remainder of Exhibit 1 and with respect to Exhibits 2 and 6.

The Clerk is directed to enter judgment consistent with this Order and close this case.

DATED THIS 31st day of March 2017.

MIRANDA M. DU
UNITED STATES DISTRICT JUDGE